```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     GREENBELT DIVISION
   _____
 3                                        )
   UNITED STATES OF AMERICA,              )
 4                                        )
        Plaintiff,                        )
 5                                        )Docket Number
                     vs.                  )8:22-cr-00091-1
 6                                        )
   AKBAR MASOOD,                          )
 7                                        )
        Defendant.                        )
 8 _____)

 9            TRANSCRIPT OF TELEPHONE CONFERENCE
              BEFORE THE HONORABLE PAULA XINIS
10           UNITED STATES DISTRICT COURT JUDGE
            THURSDAY, AUGUST 22, 2024, AT 12:00 P.M.
11
   APPEARANCES:
12
   On Behalf of the Plaintiff:
13
        BY:  DARREN GARDNER, ESQUIRE
14           RANGANATH MANTHRIPRAGADA, ESQUIRE
        OFFICE OF THE UNITED STATES ATTORNEY
15      6406 Ivy Lane, Suite 800
        Greenbelt, MD  20770
16      (301)344-4029

17 On Behalf of the Defendant:

18      BY:  EUGENE GOROKHOV, ESQUIRE
        Burnham & Gorokhov, PLLC
19      1634 I Street NW
        Suite 575
20      Washington, D.C.  20006
        (202)386-6920
21
        BY:  DANIEL GOLDMAN, ESQUIRE
22      The Law office of Daniel Goldman, PLLC
        421 King Street, Suite 505
23      Alexandria, VA  22314
        (202)677-5709
24
            ***PROCEEDINGS RECORDED BY AUDIO RECORDING***
25      ***TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION***
```

```
1                     P R O C E E D I N G S

2          THE COURT:  Good afternoon.  This is the judge.

3      Are we recording?

4          DEPUTY CLERK:  We are, Your Honor.

5      The matter now pending before the Court is Criminal Action

6  Number PX22-91-1, the United States of America v. Akbar Masood.

7  The matter comes before this Court for a telephone conference.

8      Counsel, please identify yourselves for the record.

9          MR. GARDNER:  Good afternoon, Your Honor.  AUSA

10 Darren Gardner on behalf of the United States, joined in the

11 room with Ranganath Manthripragada.

12         MR. GOROKHOV:  Good afternoon, Your Honor.  Eugene

13 Gorokhov here on behalf of Mr. Masood.

14         MR. GOLDMAN:  Good afternoon, Your Honor.  Daniel --

15         THE COURT:  Yeah, go ahead.

16         MR. GOLDMAN:  I'm sorry.  Dan -- Dan Goldman also

17 here on behalf of Akbar Masood.

18         THE COURT:  Okay.  Anybody else with us?

19     Okay.  So, counsel, I just wanted to check in with you to

20 find out what's going on tomorrow, because I -- I've received

21 the defense motions, and they seem to be well founded.  And in

22 quick succession, I looked back over the docket, and there are

23 two motions that have never been responded to by the

24 government, and they are substantial motions.

25     There has got to be an explanation for this, because I
```

1  can't imagine that the government expects that this is how this

2  case, if it's going to trial, is going to go.

3       But given that I haven't heard anything, I figured I

4  should get you all on the line to figure out if I'm wasting my

5  time preparing for these motions or what.

6       So let me start with the government.  What's going on?

7            **MR. GARDNER:**  Sure, Your Honor.  This is AUSA Darren

8  Gardner.

9       Your Honor, you may recall that in our last status

10 conference, obviously there was different defense counsel, but

11 we sort of had addressed those two motions.  He represented to

12 the Court that he was planning on dismissing one of them.  I

13 believe that would be the phone motion at the status

14 conference, or -- I'm sorry, the pretrial conference.  And that

15 the other one, he was just going to get on the record, sort of,

16 as an appellate issue.

17      But neither of them -- he did not consider either of them

18 to be (indiscernible) at this time, and so -- because you

19 represented that these could be --

20           **THE COURT:**  Stop.  Stop for a second.  Stop.

21      What I recall was that I could handle them at the

22 pretrial.  I -- and the fact of the matter is, they weren't

23 dismissed.  So at the point at which you get a motion that is

24 styled as summarily grant these pretrial motions because the

25 government has failed to respond, which was a week ago,

1  practically, how about communicating with the Court?

2      So is it -- is it -- they are still on the docket.  They

3  haven't gone anywhere.

4      And Mr. Gorokhov and Mr. Goldman did not suggest that they

5  were going to withdraw those motions.  I read the motions, and

6  at least as to one of them, I've got serious questions about

7  this prosecution.

8      And as to the other, customarily, I can't assess the

9  validity of a warrant, especially one as broad as this one, if

10  I get it right, executed on the day you arrested Mr. Masood, I

11  can't assess it without the government's response.

12      Is it your position that you're just going to come in

13  tomorrow and argue this?

14      **MR. GARDNER:**  Your Honor, I think what we were

15  intending to do was -- was sort of refer back to those earlier

16  discussions.  And, yes, if we needed to address the merits, we

17  could.

18      But, Your Honor, we can certainly respond, you know,

19  immediately to those motions.

20      **THE COURT:**  No, no, no, no, no.  We're on the eve --

21  we're on the eve of this hearing, and you're asking me if now

22  you want to respond?

23      What conversations have you had with the defense on this?

24  Did you let them know that that was your position, and -- and

25  how about an e-mail to the Court saying, by the way, don't you

1    remember this is what prior defense counsel said?

2        And then Mr. Gorokhov and Mr. Goldman can say, well, we're

3    not prior defense counsel, we're going forward.

4        And then you could file something in writing, not the eve

5    of the hearing?

6        I am -- I am -- I've never -- I'm trying to keep my cool,

7    believe it or not.  I have never in all my years of practice,

8    or being on the bench, had a situation in a two-year

9    conspiracy, very complicated fraud case, where I see no fewer

10   than seven gavels, and no response from the government.

11       So you do what you need to do, but do not hit me with a

12   mountain of paper at midnight.  Whatever you do to preserve

13   your position better be surgically and well done, because I am

14   not happy.

15           **MR. GARDNER:**  Understood, Your Honor.

16           **THE COURT:**  In fact, what I'm hearing is that you are

17   persisting in opposing those motions.

18       Let's go to the next thing I have on my mind.  Because I

19   need some guidance before tomorrow, because this is really

20   feeling like it's going to jump the tracks, if I don't get

21   involved now.

22       There is a motion to dismiss based on a 2023 Supreme Court

23   case which really limited the reach of aggravated identity

24   theft.  For the life of me, I can't figure out who Victims 1

25   through 5 are.  I have a number of statements of facts.  You've

1  only had two guilty pleas.  The rest have either been diverted

2  or dismissed, which is a sign that there may be problems in

3  paradise.

4      I want to know now the identities of the five victims that

5  support the identity theft claims.

6      Victims 1 through 5, I need their names so I can

7  understand it before tomorrow.

8      **MR. GARDNER:**  Understood, Your Honor.  I'm pulling

9  them up now.

10     Your Honor, their names are Alsane Soumah, Gail Terrell,

11 Leslie Vass, and is Sollange Gboussou.  Those are Victims 2

12 through 5, Your Honor.

13     **THE COURT:**  And how about one?

14     **MR. GARDNER:**  One is Renee Connor, Your Honor.

15     **THE COURT:**  Okay.  All right.  Those are not names

16 that have been referenced anywhere else, to the best of my

17 memory.  But do be prepared to address why this doesn't fall

18 under -- and the name is escaping me, I think it's like *Dubin*

19 or something, but the Supreme Court case.

20     Okay.  Second question, I have gotten what I consider to

21 be a pretty disturbing motion about the failure to disclose the

22 electronic evidence that was represented throughout this case

23 as being seized by the government and delayed in production

24 because of taint review and other, you know, nonspecific

25 delays.

1        According to the defense, what they were told is, devices

2   pertinent to this case were not reviewed and were returned.

3        I need to understand a little bit more about what I'm

4   going to hear tomorrow, so if I want you to bring more with

5   you, you know that now.

6        What's going on with the electronic devices that were

7   seized in 2019?

8        **MR. GARDNER:**    Sure, Your Honor.

9        So as I understand it, there were three devices that

10  were -- or three -- three search warrants executed, and devices

11  were seized and then basically imaged.  And then there was a

12  notification.  So there's -- they started off being password

13  locked, so a lot of the delay was in sort of trying to break

14  into those passwords.

15       And I think the whole time we were in communication with

16  defense counsel.  And eventually, it was -- there was -- the

17  case reached a point where they were starting to oppose speedy

18  trial extensions based on our inability to get into the phones,

19  basically.

20       And so my predecessor said, you can just give us the

21  passwords, and we will then just sort of -- you will retain

22  your right to challenge whatever is in there, to which they --

23  they basically said, here's the passwords, but they are --

24  there's attorney-client privileged information, we believe, on

25  those phones.  This was Ty Kelly, who was counsel for one of

1  the codefendants, Harriett Jackson, in the case.

2      So we assembled the taint review based on that

3  notification that there could be attorney-client privileged

4  information.

5      My understanding is that taint review was never completed

6  because this case started proceeding quickly with -- with

7  various settlements.  And as you mentioned, you had deferred

8  prosecution agreements.

9      And so because -- because sort of the case started

10 resolving itself, and the information didn't seem relevant, and

11 to this date, has never been reviewed, it's substantial, but

12 we've never actually looked at -- into those devices because

13 they didn't seem relevant.  And the resources simply weren't

14 there to do that taint review based on --

15          **THE COURT:**  You had a trial -- you had a trial in

16 this case on the books.  I had a recorded status February 3rd,

17 2023, where we discussed this very thing, that there were

18 devices seized, they were being reviewed for taint, and then

19 the production would be made right away.  That was told to the

20 defense over and over again.

21     Now you're saying that the content were never reviewed,

22 and the devices were returned, is that the government's

23 position?

24          **MR. GARDNER:**  Your Honor, yes, it is.  And I wonder

25 if there was maybe some confusion.  There was some review of --

1  there was -- there was actual eyes on -- on, you know,

2  documents in certain respects.  So there was a Google search

3  warrant.  Those were being reviewed.

4      But these particular devices, we never even looked into

5  them.

6      There was review going on, but it was to Google search

7  warrants, and I wonder if there's maybe some confusion between

8  those two --

9          **THE COURT:**  No, there's no confusion.  There is a

10 lack of appreciation, I believe, for the defense function.  You

11 don't hit a house or businesses, take electronic devices, hold

12 them, represent to the Court that you are reviewing them for

13 taint, which means you're also reviewing them for evidence, and

14 logically, given the nature of the defense, there would be

15 evidence on them, and then just tell the defense now and the

16 Court now, nope, we never looked at them.

17     You held them.  They have been in your custody.  What's

18 the defense supposed to do?

19         **MR. GARDNER:**  Your Honor, when the defense -- I'm

20 sorry.

21         **THE COURT:**  You -- you represented, the government

22 represented in February of 2023 that you were doing this.  I

23 think we have -- it's fair for the Court and it's fair for the

24 defense to expect that you will follow through and then you

25 will disclose the evidence.  New counsel comes on board, which

1    they are entitled to do.  They need to be ready.  And they

2    discover the lapse.

3        So I --

4            **MR. GARDNER:**  Your Honor --

5            **THE COURT:**  Go ahead.  Go ahead.  I'm just -- I'm

6    just sort of processing all of this.

7            **MR. GARDNER:**  Understood, Your Honor.

8        Now, I think when the devices -- so -- I think -- it came

9    to a point where the devices were returned assuming that, you

10   know, if there was any evidence on those, that the owners of

11   those devices would be -- would be able to use them.  But we

12   have no intention of using anything on the devices and --

13           **THE COURT:**  You keep saying that, but you're missing

14   my point.

15       The scope of the relevant evidence under Rule 16 is not

16   only what you will use, it's what will aid in the defense, in

17   the preparation of the defense.

18       So right now, I want to know, I want a list of the devices

19   that were seized and from what locations.

20           **MR. GARDNER:**  Okay.  Well, there were at least three

21   cell phones, one from each of Harriett Jackson, Michelle

22   Peebles, and Akbar Masood.

23           **THE COURT:**  Okay.

24           **MR. GARDNER:**  And I believe there may have been some

25   personal devices as well, like computers.

1          **THE COURT:**  Okay.  How many, and from where?

2          **MR. GARDNER:**  Your Honor, we can certainly get you

3   that information.  I -- these were from the homes that were

4   searched, so that's where --

5          **THE COURT:**  From --

6          **MR. GARDNER:**  The number (indiscernible) --

7          **THE COURT:**  From the two conspirators -- the two

8   conspirators, the two conspirators, Peebles and Jackson, and

9   Mr. Masood, who is supposed to go to trial in ten days, right?

10         **MR. GARDNER:**  Yes, Your Honor.

11         **THE COURT:**  Okay.  Computers taken from their homes,

12  and today, ten days out from trial, the government cannot tell

13  me how many there are from where?  And the defense makes this

14  motion, and you all just don't respond?

15      I mean, I -- I honestly thought that there must be

16  something in the works in terms of a resolution, because this

17  can't possibly be going on.

18      So, yes, you're going to have to get me that information.

19  But this is a huge problem.

20      I -- the search warrant inventories, the warrants

21  themselves, have those been provided to Mr. Masood's counsel?

22         **MR. GARDNER:**  Yes, Your Honor.

23         **THE COURT:**  Okay.  So for all three homes, for all

24  three locations, how many -- how many sites were searched on

25  that day?

1           **MR. GARDNER:**  One moment, Your Honor, let me ask my

2 co-counsel.

3           **MR. GOROKHOV:**  And, Your Honor, if I may, I do not

4 believe -- I'm sorry, this is Mr. Gorokhov speaking.

5      I do not believe -- we got discovery yesterday, so we've

6 been drinking from a firehose trying to see what more we've got

7 than what we had in the prior counsel's file.

8      But I do not believe we have complete inventories.  There

9 are still serious issues with chains of custody.

10      The -- for example, the Harriett Jackson search materials

11 and an incomplete set of chains of custody are -- the only

12 reason we have that, Your Honor, is because we got it from

13 PACER, as an attachment to her attorney's filing.

14      So we really -- we only have two chain of custody

15 documents, and even after those documents --

16           **THE COURT:**  And those are the ones that you -- and

17 those are the ones that I think you provided to me, or you

18 referenced them, right?

19           **MR. GOROKHOV:**  That's correct, Your Honor.  Yes.

20           **THE COURT:**  All right.  That's all you've got right

21 now.

22           **MR. GOROKHOV:**  That's all we've got as far as chains

23 of custody, yes.

24           **THE COURT:**  All right.  So let's find out how many

25 places were searched so that I know how many search warrants

1  and affidavits there should be with inventories associated with

2  them.

3         **MR. GARDNER:**  Your Honor, I do have those.  So there

4  were four locations searched.  That would be the homes of

5  Harriett Jackson, Michelle Peebles, and Akbar Masood, and then

6  the Infused business itself.  I'm sorry, Case -- Case's

7  business itself.

8         **THE COURT:**  Case business.  Right.

9      So that's part of the problem here, right, is that this

10  isn't just a gun in a car with some drugs in the glove

11  compartment.

12      This is there's a -- there's a parent company, there's a

13  main contract with Walter Reed, there's also another government

14  victim, DHA.  There is -- all depending on what document you

15  read, what -- what entity is at issue, right?

16      So in the future, government, when you're expecting the

17  Court to get up to speed, you can't leave it to the day of the

18  hearing with these kinds of motions.

19      So Jackson, Peebles, Case, Masood.  Okay.

20      So there should be four warrants, four affidavits, and

21  four inventories.  At a minimum, those need to be produced to

22  the defense and to the Court within the hour, because I want to

23  see what's been held back.

24      And while you're at it, I want to know what happened to

25  each of the devices.

1    So the government -- the defense is entitled to the chain

2  of custody for each of the devices.  Who had it, where were

3  they held, when were they released, if they were released?  You

4  got to get to the bottom of this, or the case -- you know what?

5  You can make a prosecutorial decision, but you can't go into

6  this halfway.  This is the government's constitutional

7  obligations.  You --

8          **MR. GARDNER:**  Understood, Your Honor, and those --

9          **THE COURT:**  -- hear what I'm saying?  Okay.

10         **MR. GARDNER:**  Those documents are available, and we

11 will produce them.

12    There has been -- I mean, this -- this certainly will not,

13 you know, smooth over any, you know, failings that you're kind

14 of pointing out.  That -- this case was in a bit of a different

15 posture before where things were being requested and then

16 turned over as they became relevant.  You know, sort of

17 informally, we had, you know, daily calls with defense counsel

18 prior.

19    And then so -- that is absolutely not -- not smoothing

20 over everything that we're discussing right now, but it does

21 sort of explain the posture before, as opposed to now, where --

22 you know, there were questions being answered on a rolling

23 basis, and I think there was a -- sort of a more collaborative

24 approach towards, you know, getting -- getting to trial with

25 the information they needed and the information we needed.

1          **THE COURT:**  But the Constitution doesn't require

2    collaboration.  It requires --

3          **MR. GARDNER:**  Understood, Your Honor.

4          **THE COURT:**  -- the government -- it requires the

5    government to have investigated the case and to know whether

6    there's *Brady, Giglio*, what's in, what's out.

7          And in these electronic cases, sometimes the government

8    just can ask an agent to ask a witness to pull a handful of

9    e-mails that are good for you.  And if you don't do the rest of

10   it, then you find yourself in a real bind because you haven't

11   done the due diligence.

12         I mean, in other cases, it's problematic, because on day

13   one of the -- you know, only in the discovery, the government

14   is disclosing terabytes of information, but at least it's

15   disclosed.  And then we have to work through the --

16   the logistical and practical concerns of turning over to the

17   defense, you know, maybe one percent will be used by the

18   government, 99 percent won't, how to help the defense get

19   ready.

20         But now they are at such a disadvantage because they don't

21   have any of it.

22         **MR. GARDNER:**  Your Honor, again, this is -- this will

23   certainly be after-action reviewed, and then maybe we can make

24   some changes.  But we don't have -- we don't have it either.

25   And I think that was our thought, that the things that are

1    being sort of raised are just -- either they are too

2    voluminous, we didn't have the resources to look into it --

3          **THE COURT:**  Your -- your agents have it, but you

4    don't?  Is that -- is that going to be the defense to all of

5    this, is that the agents or the agency that wishes for you to

6    prosecute this case have it, but you don't?

7          **MR. GARDNER:**  Your Honor, there --

8          **THE COURT:**  (Indiscernible) the devices seized, the

9    devices that were seized, where are they?

10         **MR. GARDNER:**  Your Honor, the physical devices were

11   all returned to their owners.

12         **THE COURT:**  This is amazing.

13         **MR. GOROKHOV:**  Your Honor, if I may?

14         **THE COURT:**  Mr. -- Mr. --

15         **MR. GOROKHOV:**  This is Gorokhov again, Your Honor.

16         **THE COURT:**  Okay.  Oh, Mr. Gorokhov.

17         **MR. GOROKHOV:**  Your Honor -- yes, Your Honor.

18     So these are questions I've been asking.  We -- myself and

19   Mr. Goldman have been asking persistently ever since we got in.

20   So I can summarize the answer we finally got a half an hour ago

21   before this conference.

22     So basically we've been asking, where are the devices,

23   where are the devices?

24     And essentially, the answer was, they were taken.  They

25   weren't reviewed.  They were -- they were taken, they weren't

1   reviewed; they were imaged, but they weren't reviewed; and they

2   were returned.

3       And clearly, from our motion filed on Wednesday -- filed

4   on Monday, you know, it's obvious how badly we need to see

5   these devices.  And that's following on prior claims by defense

6   counsel in front of Judge Grimm, and apparently in February in

7   front of Your Honor, that I wasn't aware of, that they

8   persistently wanted these devices.

9       And now I find out half an hour before this hearing that

10  the devices are in a -- some kind of a facility in

11  Fort Belvoir, and have been there, haven't been looked at at

12  all.

13      So just to kind of cut to the chase -- I'm sorry, go

14  ahead, Your Honor.  I apologize.

15          **THE COURT:**  No, go ahead.  Go ahead.

16          **MR. GOROKHOV:**  I mean, just to cut to the chase on

17  our end, I mean, I think it's -- you know, we can't in good --

18  in good conscience proceed to trial without looking at them.

19  We -- we -- basically -- you know, defense counsel, even before

20  us, stated that these things were important, and they were

21  likely to contain exculpatory evidence.  And even the

22  government's own case agent says, under oath, that they are

23  important evidence that can even exclude people who are not

24  guilty.

25      And that's particularly important in a case, Your Honor,

1  where people have been dismissed out because the government

2  charged innocent people in this case.  So --

3          **THE COURT:**  Well, then let's do this, Mr. Gorokhov.

4  What I want to do, is I want to have an evidentiary hearing on

5  this.  I'm not letting anybody go on this, because I am -- I

6  got to say, I am not too pleased.  This is not the first case

7  in which, you know, electronic devices aren't looked at, aren't

8  considered relevant from the government's perspective, but

9  really no appreciation for the defense function.

10      And to hear that they are off locked in some facility in

11  Fort Belvoir is incredibly disturbing.  So I'm not going to --

12  Mr. Gorokhov, I'm not going to tell you what to file, what not

13  to file, but I do want to understand the nature of, like, what

14  happened here, because it will affect what -- what I do during

15  the trial.

16      And I'm not inclined to move this trial.

17          **MR. GARDNER:**  It -- Your Honor, can I just briefly

18  make a bit of a correction?

19      The physical devices are not in that locker.  What he's

20  referring to -- or what Mr. Gorokhov, I'm sorry, is referring

21  to, is basically as a matter of course, every device seized is

22  imaged, and so those -- those images, basically electronic

23  files.  I just want to make sure that -- we're not holding any

24  physical devices.

25          **THE COURT:**  Yeah, I basically said devices thinking

 1  the -- the carbon copy of the device.  But you gave the devices

 2  back.

 3              **MR. GARDNER:**  Understood.  Yeah, that's correct.

 4              **THE COURT:**  Right.

 5       But -- but what I'm hearing is that the devices are in a

 6  storage room in Fort Belvoir.  And I got to tell you, the

 7  government has represented up until -- I'm going to go back,

 8  and I'm going to listen to all the hearings, but you

 9  represented very late in this -- in these proceedings that they

10  were being searched by a taint team, and that's taking time.

11       So now you're going to have to explain precisely, with

12  witnesses, under oath, what -- what really happened.  And we'll

13  go from there.

14       But there is no way I'm going to accept two federal judges

15  are being told consistently, and all defense counsel are told

16  one thing consistently.  Defense counsel was prescient enough

17  to reserve rights in letters because it didn't sound right to

18  them, but they needed it.  They were putting that on the

19  record.  They couldn't adequately advise their client to

20  prepare without it.

21       And now all of it may or may not be accurate, and I need

22  to understand what happened with that.

23       So tomorrow, you're going to produce -- defense doesn't

24  even have it yet, the search warrants, the affidavits, and the

25  inventories.

1        Any signatories to those documents should be in court

2    tomorrow.

3        So we get it from the horse's mouth.  We don't have

4    thirdhand, because you are -- and Mr. Gardner, I am sorry that

5    you got stuck holding this bag, because you are not the first

6    prosecutor on this, and you didn't make some of these decisions

7    back when they were made.

8        But we have got to get to the bottom of it soon, so I

9    want -- I want the people with firsthand knowledge in the room.

10           **MR. GARDNER:**  Understood, Your Honor.

11           **THE COURT:**  So you figure out -- okay.  So you figure

12    out what happened when it happened.  And what prejudice, if

13    any, flows from it.  Okay?

14           **MR. GARDNER:**  That makes sense, Your Honor.  We'll --

15    we'll be prepared with that.

16           **THE COURT:**  Along those lines, Mr. Gorokhov,

17    Mr. Goldman, do you have any specific witness requests?

18    Because those -- those are the only things that I can think of

19    on this expedited basis to sort of get to the bottom of what

20    happened, are the witnesses with firsthand knowledge that can

21    establish the chain of custody from seizure to today of these

22    documents, of these devices.

23           **MR. GOROKHOV:**  Your Honor, the only other person I

24    can -- I can think of would be -- I guess they would -- they

25    should be included on the chain of custody.  The problem is,

1    what we've seen, that the chains of custody essentially stop at

2    the date of the seizure.

3        But what I would -- what I would suggest, Your Honor, is

4    that we would also need the technician who imaged the devices,

5    because there may be questions --

6        **THE COURT:**  I consider -- that's a good question,

7    because I consider chain of custody all the way through today.

8    And since we don't have the devices, that means the images of

9    the devices, like, who got the -- who got the devices imaged?

10    And how did they end up in the locker that they ended up?  And

11    where did they go in between?

12        So if it's a tech person who can assist in that chain,

13    that's fine.

14        But I was also thinking like -- things like, did it go to

15    a taint team?  When did it go to a taint team?  What was done

16    during that process?  Because otherwise, these representations

17    that were made about a taint team are less than forthright.

18        **MR. GOROKHOV:**  Your Honor, if I may, I think this is

19    an appropriate time to order also disclosure of any internal

20    communications regarding the decision to review or not review

21    the devices, or anything pertinent to the handling of the

22    devices.

23        I cited a case out of the Southern District of New York,

24    *United States v. Sadr* that produced some important -- I think

25    it just -- I'm not saying there's bad faith or anything like

1  that here, but I think that case teaches that, you know, the

2  internal workings and decision-making can be an important

3  factor on, you know, the non-production of evidence.

4          **THE COURT:**  Well, I -- to the extent the government

5  can provide it without squarely invading work product, so if

6  you've got agent to agent, agent to lay witness, I think that's

7  appropriate, agent to technician.

8      I'm not familiar enough with the case, nor do I feel

9  comfortable at this juncture, without seeing more, to say

10  attorney to attorney is going to be produced.

11      But -- but I hear you, and I think that that is -- that is

12  appropriate.  So if there are any internal communications that

13  go with the chain of custody documents and/or the witnesses who

14  will be there tomorrow, produce them, please.

15      A related issue that I don't think we can unpack today,

16  but I got to tell you, very much bothers me, is that it appears

17  as if there are e-mails that the government intends to use that

18  the source of them are not -- is basically asking a witness to

19  pull e-mails and then giving it to the government, and that's

20  where the -- the due diligence has stopped.

21      And that those agencies or repositories of the e-mails are

22  either -- they are unknown, they are not terribly clear to me,

23  I've only seen the e-mails between counsel, and -- nor is it

24  clear to me when it was disclosed to the defense, that that was

25  the process of gathering evidence.  And the reason why I ask

1   that is, is because if that's not disclosed to the defense

2   early, then the defense doesn't know they might have to do

3   their own, you know, third-party subpoena work, or some other

4   out -- outside of the Rule 16 process to get that information.

5       So I suppose this is a long way of saying tomorrow, I want

6   to know precisely what happened with getting those e-mails that

7   the government believes they are going to rely on outside of,

8   you know, what -- what is the defense supposed to do about the

9   source of those e-mails?  Is that -- is that making sense to

10  both sides, what I'm asking for clarity on tomorrow?

11          **MR. GOROKHOV:**  Yes, Your Honor, that's exactly --

12          **MR. GARDNER:**  Yes, Your Honor.

13          **MR. GOROKHOV:**  -- what we're trying to figure out.

14          **THE COURT:**  So I saw something in an e-mail, let me

15  use it as an example, because this was concerning to me.  So

16  there's a search warrant executed on Case.  Case is not the

17  physical site of HMA, is it?

18          **MR. GARDNER:**  No, Your Honor.

19          **THE COURT:**  Okay.  What is the physical site, if

20  there is one, of HMA?

21          **MR. GARDNER:**  Well, I mean, Your Honor, since -- our

22  contention is that HMA was sort of fictitious and people were

23  sort of doubling up their e-mail accounts using Case.  So

24  really it was Case existed wherever the people whose -- who

25  were e-mailing on behalf of Case existed.

1              **THE COURT:**  Okay.  Well, HMA existed wherever

2    Jackson, Peebles and Masood were?

3              **MR. GARDNER:**  Yes, Your Honor.

4              **THE COURT:**  So one -- one problem, then, is a

5    putative repository of all of those communications are with

6    Jackson, Peebles and Masood.  And that's not necessarily

7    incriminating, which is what makes it problematic for the

8    government.  In other words, if the HMA, according to the

9    government, is a shell, then that's consistent with your

10   theory.  It's also consistent with innocence if, in fact, these

11   three were creating this company and it just didn't have a

12   physical site.

13       So when Mr. Gorokhov asked for the server for the -- the

14   source of the HMA communications, if the source are all of

15   these devices that are sitting -- potentially sitting somewhere

16   else, it may not -- it may not be fair for the government to

17   use only a handful of e-mails that were obtained from other

18   sources without providing the rest of it to the defense.

19             **MR. GARDNER:**  Understood, Your Honor.

20             **THE COURT:**  That's why I want to know more about the

21   sources of the evidence that you do intend to use.

22             **MR. GARDNER:**  Understood.

23       Your Honor, I suspect this will not be an issue because we

24   will be able to represent that the entirety of those servers

25   were downloaded and provided.

1          But we will, of course, address that tomorrow.

2              **THE COURT:**  Downloaded and provided to whom?

3              **MR. GARDNER:**  To -- to the defense, as of -- as of

4    Wednesday, but these were, like, not very large servers.  So

5    basically -- there are several buckets of e-mails, and we'll be

6    able to represent that -- that basically the e-mails that could

7    have potentially been, I guess, cherrypicked for -- you know,

8    if that's the characterization we want to use, if there's that

9    potential, those were all part of a larger subset of e-mails

10   which have also been produced.  So there really, I don't think,

11   will be an issue where we can say, well, there was a selective

12   choosing of e-mails that were helpful to the government, and

13   you know, not -- not taking those that were not.

14        So I think we'll be able to make that case tomorrow, Your

15   Honor, but, of course, we'll get to that when we get to it.

16             **MR. GOROKHOV:**  So, Your Honor --

17             **THE COURT:**  Yesterday -- yesterday, which was

18   Wednesday, what -- is --

19             **MR. GARDNER:**  Your Honor --

20             **THE COURT:**  -- that when you produced the servers?

21             **MR. GARDNER:**  There is a bit of a discovery

22   backstory.

23        So these were all produced earlier in the case, much

24   earlier.  But because we have so many defendants in

25   different -- different postures, so -- I mean, there were

1   several companies and different aspects of misconduct the

2   government alleged, of course, were being conducted in the

3   different, you know, companies by different people in different

4   manners.  So it was sort of a wide ranging indictment that was

5   pulled together through this HMA lens, and Case and all that.

6        But what previous counsel did is, there was a lot of

7   e-mails that would be relevant to certain -- certain defendants

8   and not others, which is basically the Case server -- I'm

9   sorry, the Infused server for the three -- you know, Harriett,

10  Michelle and Akbar, you know, the three --

11           **THE COURT:**  Yeah.

12           **MR. GARDNER:**  Three -- yeah, the HMA defendants.

13       And it was put on -- put on USAfx with the -- basically

14  the (indiscernible) of if this is helpful to your defendant,

15  here it is, you can download it.

16       And so all we're doing is right now, on Wednesday, was

17  reproducing that because it does not appear that previous

18  counsel did download it because he didn't think it was useful

19  to his client.  And, of course, new counsel does want it, and

20  so we've been rebasing it and producing it.  But that's sort of

21  the (indiscernible) on that.

22           **THE COURT:**  Let me -- let me -- so let me just stop.

23       What I am going to need, then, is I need every historic

24  discovery letter that was written to Mr. Masood's prior

25  counsel, because you would have memorialized it in a discovery

1    letter.

2              **MR. GARDNER:**  Right.

3              **THE COURT:**  And so that would be the easiest way for

4    me to understand what you produced to Mr. Masood's counsel

5    when.  So if this is a problem of defense counsel

6    communication, well, that's not your problem.  And what you're

7    telling me is that that may be a problem, it may not.  I can't

8    tell.  You got to -- you got to appreciate where I'm coming

9    from right now is --

10             **MR. GARDNER:**  Yes, Your Honor.

11             **THE COURT:**  -- I'm looked at a jaundiced eye with all

12   of this, because I've heard absolutely nothing from the

13   government, and in response to some really, really problematic

14   representations.

15       So the easiest way to do this, put together all the

16   discovery letters that were -- and/or e-mails that were used to

17   disclose discovery to the defense, and give them to

18   Mr. Gorokhov, Mr. Goldman, and me.  Okay?  And that will also

19   be now.  Like, I want to go home tonight with all of this, not

20   tomorrow morning.  Okay?

21             **MR. GARDNER:**  Okay, Your Honor.

22             **MR. GOROKHOV:**  Your Honor, if I may?

23             **THE COURT:**  Yeah, go ahead.

24             **MR. GOROKHOV:**  This is Eugene Gorokhov.

25             **THE COURT:**  Yep.

1          **MR. GOROKHOV:**  The issue that you touched on but we

2    got away from a little bit, so on the server issue, I think

3    that's another area that it's really important for us to get a

4    comprehensive set of chains of custody and anything documenting

5    how the materials were obtained.  Because in our mind, we can't

6    understand from the material we have.

7          So in one instance, one of the buckets that Mr. Gardner

8    referred to were a set of e-mails, and this is -- I believe

9    this is the largest set.  This is the set containing over

10   one -- probably close to 1.5 million documents they obtained

11   from someone called Barbara Rosas.

12         Barbara Rosas was the wife of Marlon Johnson, the

13   individual --

14         **THE COURT:**  Okay.

15         **MR. GOROKHOV:**  -- who instigated this entire

16   prosecution.

17         Now, without getting into specifics, our investigation to

18   date reveals that both Marlon Johnson and Barbara Rosas are up

19   to their eyeballs in *Giglio*.

20         So the fact that -- I don't understand precisely the

21   mechanics by which Ms. Rosas got these e-mails and provided

22   them to the government.  And what we also don't have, Your

23   Honor, as we're accustomed to seeing, is, you know, when the

24   government dumps, you know, parts of a server onto a hard

25   drive, there's a thorough chain of custody on that hard drive.

1  And I haven't seen that either.  Like, what did they do with

2  the hard drive?  Where did they go?  Where did they take it,

3  you know?

4      So it's kind of similar to what we were talking about with

5  respect to the devices.

6          THE COURT:  Okay.  Hold on.  Let me make sure I

7  understand this.

8      You're talking about the repository of the HMA server that

9  the government says has already been disclosed to prior

10 counsel, and you're saying maybe, maybe not, but whatever it

11 is, we need a chain of custody on that because it's

12 problematic.

13     Am I understanding it right?

14         MR. GOROKHOV:  It would be the Infused server, Your

15 Honor.  The Infused --

16         THE COURT:  Infused, sorry.

17         MR. GOROKHOV:  And I don't know if it was -- if she,

18 in fact, did pull it from the server.  I have no idea how she

19 pulled the e-mails, or who pulled the e-mails.  And I would

20 expect even now, on this phone call, I would ask Mr. -- because

21 I've been trying to ask this question, and I've been getting a

22 very general answer.  So I don't know if Mr. Gardner is in a

23 position to say precisely how this was done.

24     I mean, did she go into the e-mail system and just, like,

25 download them herself?  I don't understand the process, the

1  basic process by which they were obtained from her.

2          **THE COURT:**  Okay.  Well, let's -- let's take it step

3  by step.

4      According to the government, we will learn, through prior

5  discovery letters, when the Infused server and in what format

6  it was produced to prior defense counsel.

7      Am I getting that right, Mr. Gardner?

8          **MR. GARDNER:**  Your Honor, yes.

9          **THE COURT:**  Okay.  Secondly, by tomorrow, disclosed

10 to the defense, your witness list, and your exhibits, because

11 we are not going to be in this position, the nine days or ten

12 days before trial, in a vast complicated conspiracy, healthcare

13 fraud, without more guardrails for the Court and for the

14 defense, given everything I've heard today.

15     So I'm going to grant that motion that you produce the

16 trial exhibits.  And I want a witness list produced to them by

17 tomorrow so that we know the scope of the government's case,

18 and that will at least guide whether the prejudice can be

19 overcome.

20     Because so far, there's prejudice.  Like, I'm seeing

21 prejudice.  But I don't know, maybe it will -- convince me

22 tomorrow that the delays in some of these devices being made

23 available, not prejudicial at all.

24     But for purposes of today, just to help me out, assume

25 that there may be some prejudice and you've got to overcome it.

1  One way to do it is to be forthcoming with the defense as to

2  what your case is going to look like.  And (indiscernible) --

3          **MR. GARDNER:**  Your Honor --

4          **THE COURT:**  -- tomorrow so we can understand how all

5  this fits together.

6          **MR. GARDNER:**  Your Honor, we had already arranged

7  with previous counsel to disclose those things very early.  And

8  we're happy to give them to him tonight.  There's no issue

9  there.

10         **THE COURT:**  Okay.  Great.  And then make sure that I

11 get a copy as well so that, you know, I'm -- I'm trying to get

12 up to speed as quickly as possible, and that would be very

13 helpful.  And so if I -- if there are any issues with it,

14 tomorrow we -- we can talk them out.  Okay?

15         **MR. GARDNER:**  Your Honor, just as an administrative

16 note, how -- how would you like those?

17         **THE COURT:**  I think -- I think -- it shouldn't be put

18 on the docket, and -- I don't want you to dump what could be,

19 you know, problematic documents on the document -- on the

20 docket.

21     I think what you should do is file a letter that

22 identifies everything that you have forwarded to defense

23 counsel and to me at my request on this conference call,

24 itemize each one.  And then Ms. Brown will make a link

25 available to you to upload them through a program called

1  Egnyte, which your office has used on many occasions with me

2  before.  And it should be a pretty relatively easy process to

3  do that.

4          MR. GARDNER:  Okay.

5          THE COURT:  Does that -- does that make sense to you?

6          MR. GARDNER:  Yes, Your Honor.

7          THE COURT:  Okay.  So -- so just so we're clear, I --

8  I granted to ECF 242.  The government will produce their trial

9  exhibits and their witness list by tomorrow so we can talk

10  through these issues, in addition to everything else I've

11  ordered.

12      So we can have -- tomorrow, I believe, what we will

13  definitely address is 241, which is the argument that the

14  government has not honored its *Brady* obligations, because it

15  has not thoroughly reviewed what it seized for *Brady*, *Jencks*

16  and *Giglio*, because there are at least -- at least two known

17  cooperators, and likely more.  And I don't know what's been

18  produced and what hasn't.  But we'll have a witness list

19  tomorrow, so there will be a more pointed conversation about

20  whether *Jencks* and *Giglio* have been disclosed, and if not,

21  when.

22      I do intend to address the motion to exclude the expert at

23  ECF 236.

24      Mr. Gardner, I have to tell you, the disclosure is

25  patently insufficient.  It just -- there's nothing about it

1  that complies with Rule 16.  And the way I read it was, you're

2  going to use this witness as a summary witness.  And maybe you

3  were being careful in terms of making sure this witness, you

4  know, doesn't -- like, that you're covered if the witness was

5  going to be challenged as an expert.

6      But am I -- am I reading that wrong?  Are you really

7  intending to use this witness at an expert?

8          MR. GARDNER:  Your Honor, you're exactly right.  I

9  mean, this is actually not an expert witness, and we will not

10 be asking any opinions or -- he is a summary witness of

11 financial documents only.  And this was more of a courtesy to

12 counsel, you know, prior counsel, and sort of a -- in an

13 abundance of caution.

14     But I don't think he's an expert.  And if he gets

15 disqualified as an expert, you know, there will be absolutely

16 no loss to us.

17          MR. GOROKHOV:  If I may --

18          THE COURT:  Okay.  So then -- well, he's not being

19 offered as an expert, right?

20          MR. GARDNER:  No, Your Honor.  Again, this is -- this

21 is --

22          THE COURT:  Okay.

23          MR. GARDNER:  -- straight to defense counsel as sort

24 of a courtesy FYI.  You can -- I mean, the Court can disregard

25 that expert notice.  He is not going to be an expert.

34

1              **THE COURT:**  Okay.  And then that means that the

2    disclosures under -- don't ask me for the rules of evidence,

3    because I don't have them at my fingertips.  I wish I had

4    Judge Grimm's recall on that, so you're stuck with an inferior

5    judge in that regard.

6         But you do have to disclose to the defense the underlying

7    data supporting all of that, and that has to be done, like,

8    now, so that if there's any challenge to summary charts, we get

9    those out of the way before the witness testifies.

10        But it's not -- so I'm going to -- I'm going to deny

11   ECF 236 as moot, based on the government's plain representation

12   this witness will not be called as an expert, will only be used

13   as a summary witness.  But that is without prejudice if there's

14   some other challenge to this witness once you get the

15   underlying data to those summaries, Mr. Gorokhov, when you make

16   that challenge.  Okay?

17             **MR. GOROKHOV:**  Yes, Your Honor.

18             **THE COURT:**  All right.  So then 236 is out.

19        We will -- I'm going to try tomorrow to deal with the

20   aggravated identity theft law as best as I can.  And just to

21   give you all a preview, so you can think about it overnight,

22   the way I'm seeing that Supreme Court case is essentially, this

23   is -- it's contextual.  That's how the Justice put it, and I --

24   I see her point, this is Justice Sotomayor, is I can't really

25   decide if the aggravated identity theft is the crux of the

1  crime, or is it so ancillary that the claims can't go forward?

2      So -- but I want to hear from both you on the nature of

3  the proof, like, what you expect the proof will show to support

4  the aggravated identity theft claim that we can get closer to

5  understanding what the call is going to be at trial.

6      Because if it's -- if it's looking more like the Supreme

7  Court case and less like a case where it's the crux of the

8  crime that, you know, may very well move me to decide it before

9  trial.

10      But if I understand, based on your proffer, that no, this

11  really is a horse race as to whether the aggravated identity

12  theft is the crux of the crime as the Supreme Court requires

13  it, then it's likely going to go to trial and I'll, you know,

14  hear from the defense at the Rule 29 stage.

15      But I do want to hear from you all tomorrow on that.

16  Okay?

17          **MR. GARDNER:**  Yes, Your Honor.

18          **MR. GOROKHOV:**  Yes, Your Honor.

19          **THE COURT:**  Okay.  The thing that I'm really not sure

20  I can deal with tomorrow is going to be the search warrant,

21  because I just don't have any government response.

22      So government, to the extent you want to put something in

23  front of me, it's got to be short, five pages or less, letter

24  pleadings tonight by 9:00.  And -- and otherwise, I'm not sure

25  what I'm going to do, because it does seem to me like you

1    conceded the issues.  But that doesn't seem quite right when

2    we're talking about, you know, a very robust affidavit.

3        I just -- I just need some guidance from you all as to why

4    you think I should deny suppression.  So please put it in

5    writing to me by 10:00 tonight, and I'll look at it in the

6    morning and we'll see if I can deal with it.  Okay?

7            **MR. GARDNER:**  Understood, Your Honor.

8            **THE COURT:**  Okay.  I -- I know I've talked both

9    sides' ears off.  We've been talking for about an hour.  I know

10   I've thrown a lot at you.

11       Is there anything that I've neglected to address that you

12   think would be -- for either side that would be helpful to talk

13   about now before we have our hearing tomorrow?

14           **MR. GOLDMAN:**  Your Honor, this is Dan Goldman on

15   behalf of Mr. Masood.

16       One other item that we had referenced in our discovery

17   motion is the -- there are a bunch of documents, enclosures and

18   exhibits and things that were referenced in the investigative

19   reports, and those were not provided with the reports.

20       I suppose it's possible that they exist somewhere else,

21   but they are not connected.  So the reports themselves, when

22   they are showing a document to a witness or something like

23   that, it's impossible to tell what it is that they are showing

24   to the witness or how it's relevant to the report.

25       So that's something else that would certainly help us to

1  be prepared to address some of these other issues tomorrow, if

2  that's something that the government can provide to us.

3         **THE COURT:**  What's going on with that, government?

4     So we're talking about reports of interviews that

5  reference attachments, and the attachments are not included

6  with the reports, if I hear Mr. Goldman right.  What's

7  happening with those?

8         **MR. GARDNER:**  I mean, Your Honor, they weren't

9  involved -- included initially.  I mean, some were when it was

10  relevant to a witness, but a lot of these reports are the

11  *Jencks* of our case agent, not necessarily, you know, for any

12  other purpose.  So because of that, we didn't, as a matter of

13  course, include the attachments, because they weren't -- they

14  weren't -- you know, they weren't part of his commentary, or

15  his statements, the fact that a document was included.

16     I mean, if it was a one-off document that seems relevant,

17  or even if they have specific questions, or they say, you know,

18  this would really help us if we had these, happy to give them.

19  We're not hiding any documents.  They are actually all --

20         **THE COURT:**  How about -- how about we do it this way?

21  Anyone on your witness list, first cut, anyone on your witness

22  list, when you produce the witness list tonight, produce the

23  underlying ROI with the report, so -- with the documents.  So,

24  for example, you know, I'm just going to throw out a name,

25  Harriett Jackson, she's on your witness list, any ROI with

1    attachments, if they haven't been provided, they need to be

2    provided.  Let's start there.

3        And then defense, if there -- once you get that, if there

4    are any other -- based on the -- the agent's *Jencks*, any other

5    reports that you want, communicate that to the government.  You

6    can communicate it to me tomorrow.

7        Because otherwise, if I'm -- if I'm understanding the

8    government right, this is such a stalling investigation, and

9    they do produce agent witness ROI if there's *Jencks*, it's hard

10   for -- for you to know, defense, necessarily that, and it's

11   hard for the government to know what, if anything, you want.

12       Does that make sense to you, Mr. Goldman, to at least, as

13   a first cut, get all of the witnesses, any ROIs, any

14   attachments in one place for you to review?

15            **MR. GOLDMAN:**  I think that makes sense as a first

16   step.  I think that there are -- I think it's likely that we'll

17   have followups for additional things, but we can communicate

18   those with the government as they come up.

19            **THE COURT:**  Okay.  So then let's do that.  And that,

20   hopefully, will narrow the playing field.

21       I don't need those attachments, Mr. Gardner --

22   Mr. Gardner, but I do need them to be produced to the defense.

23   Okay?

24            **MR. GARDNER:**  Understood.  Thank you, Your Honor.

25            **THE COURT:**  All right.  Anything else?

1          **MR. GARDNER:**  Nothing from the government, Your

2  Honor.

3          **THE COURT:**  All right.  And counsel, I'm going to --

4  we will start tomorrow -- let's -- so the reason why I wanted

5  to move the hearing to 11:00 was because I was going to do -- I

6  was going to do an admission ceremony.  I might try to get

7  coverage on that so we can start earlier, because I do have

8  a 1:00 hard stop.  And maybe we'll get through everything by

9  1:00, maybe we won't.  I want to try to give you as much time

10 as we can.

11     So Ms. Brown will be in touch with the Egnyte link and

12 with a possible earlier time.  And if we're not done, what I

13 might have to do is take a break at 1:00 and then come back

14 after my meeting, which hopefully won't go, you know, past a

15 half hour.  But so just so you all, you know, can plan your

16 day, too, all right?

17          **MR. GOROKHOV:**  Yes, Your Honor.

18          **MR. GOLDMAN:**  Thank you.

19          **MR. GARDNER:**  Thank you, Your Honor.

20          **THE COURT:**  Okay.  Ms. -- Ms. -- Ms. Brown will be in

21 touch then.  Thanks so much.

22          **MR. GOROKHOV:**  Thank you, Your Honor.

23          **MR. GARDNER:**  Thank you, Your Honor.

24          **MR. GOLDMAN:**  Thank you.

25     (The foregoing proceedings concluded at 12:54 p.m.)

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4       I, Paula J. Leeper, do hereby certify that the foregoing

 5  is a correct transcript of the audio-recorded proceedings in

 6  the above-entitled matter audio recorded via FTR Gold on August

 7  24, 2024, to the best of my ability and that said transcript

 8  has been compared with the audio recording.

 9

10                             Dated this 24th day of August, 2024.

11

12                             /s/ Paula J. Leeper
                               _____
13
                               Paula J. Leeper, RPR, CRR
14                             Federal Official Reporter

15

16

17

18

19

20

21

22

23

24

25
```