```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     GREENBELT DIVISION

 3  _____
                                       )
 4  UNITED STATES OF AMERICA,          )
                                       )
 5       Plaintiff,                    )
                                       )Docket Number
 6            vs.                      )8:22-cr-00091-1
                                       )
 7  AKBAR MASOOD,                      )
                                       )
 8       Defendant.                    )
    _____)
 9
               TRANSCRIPT OF PRETRIAL CONFERENCE
10             BEFORE THE HONORABLE PAULA XINIS
               UNITED STATES DISTRICT COURT JUDGE
11           THURSDAY, AUGUST 29, 2024, AT 10:00 A.M.

12
    APPEARANCES:
13
    On Behalf of the Plaintiff:
14
         BY:  DARREN GARDNER, ESQUIRE
15            RANGANATH MANTHRIPRAGADA, ESQUIRE
         OFFICE OF THE UNITED STATES ATTORNEY
16       6406 Ivy Lane, Suite 800,
         Greenbelt, MD  20770
17       (301)344-4029

18
    (Appearances continued)
19

20

21

22

23

24

25     ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
 1   APPEARANCES CONTINUED:

 2   On Behalf of the Defendant:

 3        BY:  EUGENE GOROKHOV, ESQUIRE
                Burnham & Gorokhov, PLLC
 4              1634 I Street NW
                Suite 575
 5              Washington, D.C.  20006
                (202)386-6920

 6

 7        BY:  DANIEL GOLDMAN, ESQUIRE
                The Law office of Daniel Goldman, PLLC
                421 King Street, Suite 505
 8              Alexandria, VA  22314
                (202)677-5709

 9

10        BY:  JOSH GREENBERG, ESQUIRE
                The Josh Greenberg Law Firm
                1717 K. Street NW
11              Suite 900
                Washington, D.C.  20006
12              (202)422-0809

13   ALSO PRESENT:  Akbar Masood, Defendant
                    Maia Bornfman

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2   CALLED BY THE GOVERNMENT:

3   TESTIMONY OF JOSHUA KIMREY

4       Direct Examination by Mr. Gardner          30
        Cross-Examination by Mr. Gorokhov          56
5       Redirect Examination by Mr. Gardner        190
        Recross Examination by Mr. Gorokhov        210
6

7   TESTIMONY OF MARK JOHNSON

8       Direct Examination by Mr. Manthripragada   225
        Cross Examination by Mr. Goldman           246
        Redirect Examination by Mr. Manthripragada 264
9       Recross Examination by Mr. Goldman         266

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2    (Court called to order.)

 3              DEPUTY CLERK:  All rise.  The United States District

 4    Court for the District of Maryland is now in session.  The

 5    Honorable Paula Xinis presiding.

 6              THE COURT:  Good morning, everyone.  You can have a

 7    seat.  Government, call the case.

 8              MR. GARDNER:  Good morning, Your Honor.  Government

 9    calls United States v. Akbar Masood, PX22-91.  AUSA Darren

10    Gardner on behalf of the government.  With me at counsel table

11    is AUSA Ranganath Manthripragada.  And also waiting to testify

12    are agents Joshua Kimrey; Michael Jeffers, an evidence

13    custodian; Mark Johnson, a forensic examiner; and Alford

14    Williams [sic], also a forensic examiner.  We're here for an

15    evidentiary hearing.

16              THE COURT:  Okay.  Thank you.

17              MR. GOROKHOV:  Good morning, Your Honor.  Eugene

18    Gorokhov, Daniel Goldman, and Josh Greenberg here on behalf of

19    Mr. Masood, who is present.

20              THE COURT:  Okay.  Good afternoon.

21       And your paralegal is with you as well?

22              MR. GOROKHOV:  Yes, Your Honor, Maia Bronfman.  May

23    she sit at counsel table as well?

24              THE COURT:  Yes.  She may.  Welcome, Ms. Bronfman.

25       Okay.  Counsel, just to let you know what's going on, with
```

1  the HEPA filters, and yesterday I was masked because we had a

2  COVID positive in our house.  The patient is recovering just

3  fine.  I continued to test negative.  I've asked the folks who

4  are most close to me if it's okay that during this hearing, I

5  not be masked.

6      I want to ask you all the same.  If anyone has a problem

7  with it and wants me to be masked, I'm fine with it.  It's just

8  easier to talk to you all if my full face is showing.  So --

9  but feel free, I really don't mind being told you rather I

10  mask.

11      So with that, let me do one thing, one housekeeping

12  matter, which I'm really loathed to do, but it's important.

13      Yesterday, I issued the order at ECF 264.  There were many

14  categories of documents that the government represented it

15  absolutely could produce completely by today, because I gave --

16  and just -- just for the record, we had an unrecorded status

17  that I called, because time was of the essence, trial was

18  beginning on Tuesday.  I continued to receive messages --

19  e-mails and motions from both sides.

20      The government -- the defense, rather, had filed a most

21  recent motion to compel *Jencks*, attachments to *Jencks*, which is

22  fair if we're going to trial on Tuesday.  But it became clear

23  to me, after requiring briefing from the last two hearings,

24  that I wasn't going to be ready to decide this very important

25  issue by Tuesday.

1     So I wanted to get the attorneys on the line and make sure

2  that they understood there's just not enough hours in the day

3  to fairly call this one and, reading between the lines, it

4  seemed to me that the parties still wanted to have a more

5  robust evidentiary hearing.

6     A gentleman has just walked in.  I don't know if he's a

7  witness.

8     **KELLY HAYES:**  No, Your Honor.  This is U.S. Attorney

9  Gerald Collins, also our deputy criminal chief.

10     **THE COURT:**  Oh, okay.  Hi, Mr. Collins, good to see

11  you.

12     **GERALD COLLINS:**  Good morning, Your Honor.

13     **THE COURT:**  So I got the parties on the phone to let

14  them know that we will be suspending trial, we won't start on

15  Tuesday.  That's not, in my view, a continuance, it is simply

16  we've got to get this part done before we can go to trial.  And

17  we don't know exactly when that's going to be, but it's not

18  going to be -- you know, unless the parties wish for more time,

19  I'm going to try to make it as quick as possible that we get

20  the case tried.

21     Okay.  That said, on the same call, I asked in light of

22  the fact that we still had open questions of fact, I asked the

23  parties if they wished to convert today into an evidentiary

24  hearing or do it next week.  And both sides agreed today was

25  preferable.

7

1          In light of that, I asked the government to confirm for me

2    that they would be able to produce categories of documents by

3    5:00 yesterday in a particular order, and in -- and consistent

4    with my order.

5          And I asked them that because I -- I recognize that while,

6    as the defense pointed out, all of this should be at the

7    government's fingertips, given the history of this case, I

8    wasn't quite sure, and I didn't want to do this in drips.

9          So what I did receive at 4:30, I'm not sure -- again, what

10   was uploaded is hard to discern.  It's not in any -- it's not

11   Bates stamped.  I ordered for it to be Bates stamped.  It's not

12   Bates stamped.  I ordered for it to be in some sort of order,

13   chronological, subject, maybe it is, but I can't see it.

14         So what I'm going to do is go through each of the

15   categories at ECF 264 and just get the government's

16   confirmation that each -- for each category, all relevant

17   documents have been produced.  I think that's the easiest way

18   to do it.

19         And then it appears as if the government is handed up an

20   exhibit list for today's hearing that does have some relation

21   to the -- the naming devices on the PDFs.  So that should be

22   helpful.

23         But I just want to make sure I have everything that the

24   government believes is responsive.

25         So ECF 264, number one was all documents relevant to the

8

1    chain of custody for the devices which the defense assert at

2    ECF 261 have been neither imaged nor retained by the

3    government.

4        Do I have everything in that regard, Mr. Gardner?

5            **MR. GARDNER:**  Yes, Your Honor.

6            **THE COURT:**  Okay.  All documents relevant to chain of

7    custody for all 30 devices, number two.

8        I have those?

9            **MR. GARDNER:**  Yes, Your Honor.

10           **THE COURT:**  Okay.  All correspondence from the

11   government to former and current defense counsel including

12   e-mails memorializing any government production to defense

13   pursuant to Federal Rule of Criminal Procedure 16,

14   *Brady v. Maryland, Jencks* and *Giglio*.

15       Do I have all of that?

16           **MR. GARDNER:**  Your Honor, yes, with the caveat that

17   obviously we're -- we have gotten access to former counsel's

18   e-mails, and that is going to be an ongoing process.  That

19   simply wasn't possible to review years of e-mails.  And so if I

20   find anything responsive to Item 3 that hasn't been produced,

21   I'll do that immediately.

22           **THE COURT:**  Are you talking about Mr. Ake?

23           **MR. GARDNER:**  Yes, I am, Your Honor.

24           **THE COURT:**  Okay.  But I do have some of Mr. Ake's

25   e-mails, so why is it that we're now six days into this saga,

1    and you're telling me that your office can't pull his e-mails

2    and just run a search and give them to me?

3            **MR. GARDNER:**  Your Honor, up until now, we have been,

4    basically, requesting AUSA Ake to search through his own

5    e-mails.  It is a bit of a hoop-jump exercise to actually have

6    me access his e-mails.

7        And yesterday, after the order to, you know, produce

8    anything regarding the taint review, it obvious -- it became

9    obvious that we needed to get access to his e-mails ourselves.

10   And so we put in that request, I have gotten access to those

11   e-mails, and I'm reviewing them.  But that is going to be an

12   ongoing exercise with regard to the taint review.

13       And, of course, if I come across anything responsive to

14   Item 3, I'll produce it immediately.  But I can't represent

15   that I've searched through years of e-mails at this point.

16   That's all I'm saying, Your Honor.

17           **THE COURT:**  Okay.  Well, there's four discovery

18   letters?  Is that right, four or five?  You did produce formal

19   discovery letters, right?

20           **MR. GARDNER:**  Yes, Your Honor.

21           **THE COURT:**  Those, that's the complete set of

22   discovery letters, right?

23           **MR. GARDNER:**  Yes.  I'm sorry.  Yes, Your Honor,

24   those are the complete set of actual discovery letters.

25           **THE COURT:**  But I did ask for e-mails, and you're

1  saying with the caveat that there may be additional e-mails

2  authored by Mr. Ake to defense counsel regarding discovery,

3  *Jencks*, *Giglio*, or *Brady*?

4        **MR. GARDNER:**  Yes.  And I'm just loathed to say there

5  are none, and then come out and say there are some.

6        **THE COURT:**  Got it.  Okay.  All right.

7     And then four was all evidence concerning the government's

8  efforts to comply with *Brady*, and the Due Process Protection

9  Act, and Federal Rule of Criminal Procedure 5(f), and I

10  referred you to ECF 23, which is Judge Sullivan's Due Process

11  Protection Act order that was issued at the beginning of the

12  case.

13     Do I have everything in that regard?

14        **MR. GARDNER:**  Yes, Your Honor.  I think I should make

15  the same caveat, because we may come across an e-mail where

16  AUSA Ake may say, hey, this is your *Brady* and send it.  And, of

17  course, we will produce that immediately.

18        **THE COURT:**  Yeah, you have one of those e-mails

19  regarding Ms. Peebles, right?

20        **MR. GARDNER:**  That's correct, Your Honor, I believe

21  it was regarding Ms. Jackson.

22        **THE COURT:**  Well, it's notable to me because that

23  e-mail that you did produce has Ms. Peebles as an e-mail

24  recipient.

25        **MR. GARDNER:**  Right.  I'm sorry, yes, Your Honor.

1      **THE COURT:**  In the course of today -- yeah, I am

2   going to ask you whether any of the other e-mails, the

3   underlying e-mail that was forwarded to Ms. Jackson -- or no,

4   it wasn't Ms. Jackson, it was Rhonda Paul, right, wasn't it

5   another --

6      **MR. GARDNER:**  Yes, Your Honor.

7      **THE COURT:**  A defendant who was ultimately dismissed

8   or deferred prosecution?

9      **MR. GARDNER:**  Yes, Your Honor.

10      **THE COURT:**  Okay.  The e-mail that was sent as the

11   *Brady*, the call of it was -- from what I could gather, that it

12   was Peebles and Jackson talking about creating a Wes Williams

13   invoice, am I right about that?

14      **MR. GARDNER:**  Yes, Your Honor.

15      **THE COURT:**  There were other e-mails on that e-mail,

16   other CCs.  Are any of them Mr. Masood's?

17      **MR. GARDNER:**  No, Your Honor.  And I -- again, I'm

18   going to continue looking through the files for those kind of

19   documents, but that's why I -- I will represent that yes, we

20   have turned everything over in our position, with the caveat

21   that as I find anything, I will immediately bring it to the

22   Court's attention.

23      **THE COURT:**  Okay.  One of those things might be

24   whether Mr. Masood's counsel was given any sort of "by the way"

25   on those kinds of e-mails as well.  Because the reason why I

1   ask that, is because Mr. Gorokhov raised at the last hearing

2   that in a case like this, where we have three defendants, two

3   of whom have pled and are obviously assisting, there's been a

4   Jencks request for underlying documents showing that at least

5   there's some flavor of they're working together to, quote, pin

6   it on Mr. Masood.

7        Mr. Gorokhov's point was, well, if there's any evidence

8   which shows that Jackson and Peebles are working together

9   outside of Masood's earshot, that that needs to be produced.

10           **MR. GARDNER:**  Right.

11           **THE COURT:**  Maybe -- maybe it's a stretch, from the

12   government's perspective, but I am curious as to whether

13   Mr. Ake ever produced that kind of evidence to Mr. Masood.

14        So when you look, if you can confirm that.

15        By when do you think you will have completed your review

16   of Mr. Ake's e-mail?

17           **MR. GARDNER:**  Your Honor, by the -- by the initial

18   trial date, I think, should be fine.

19           **THE COURT:**  By Tuesday?

20           **MR. GARDNER:**  By Tuesday, yes, Your Honor.  I mean,

21   and that's sort of what the Court had ordered anyway,

22   expeditiously, by close -- or, you know, as expeditiously as

23   possible --

24           **THE COURT:**  Hold on.  I ordered that for the taint

25   team information.  *Brady* is a different --

1            **MR. GARDNER:**  Yeah, your Honor, they are different,

2    but I -- we're going to be in the e-mails anyway with quite a

3    bit of, you know, close inspection.

4            **THE COURT:**  Yep.

5            **MR. GARDNER:**  So they can all be done simultaneously,

6    I think.

7            **THE COURT:**  Okay.  Now, Mr. Raghavan was also on this

8    case for a minute, right?

9            **MR. GARDNER:**  Yes, Your Honor.

10           **THE COURT:**  Are you doing the same with him?

11           **MR. GARDNER:**  Yes, we will.

12           **THE COURT:**  You are?

13           **MR. GARDNER:**  Yes.

14           **THE COURT:**  Okay.  So by Tuesday, anything from

15   Mr. Raghavan and Mr. Ake will also be on this, right?

16           **MR. GARDNER:**  Yes.

17           **THE COURT:**  Now, you're a signatory to one of the

18   early discovery letters to this Court, right?

19           **MR. GARDNER:**  Your Honor, I noticed that.  It's,

20   frankly, in error.  I was never on this case.  That was almost

21   before I joined the office.  It was a typo.  I've never heard

22   of this case before I joined in May, so just an error.

23           **THE COURT:**  All right.  Let's get this nailed down.

24     When did you join the office?

25           **MR. GARDNER:**  It was July 2022, Your Honor.

1          **THE COURT:**  Okay.  So in August 2022, when there's a

2    letter that Mr. Ake signs with your name under it, that's a

3    mistake?

4          **MR. GARDNER:**  It is, Your Honor, yes.

5          **THE COURT:**  Okay.  When did you first touch this

6    case?

7          **MR. GARDNER:**  That would be May 2024, Your Honor,

8    when it was officially transferred as Mr. Ake was leaving the

9    office temporarily.

10          **THE COURT:**  And we have no idea why Mr. Ake put your

11    name under his name?

12          **MR. GARDNER:**  Frankly, Your Honor, we were -- one of

13    my first cases was with Mr. Ake.  He may have used a copy or

14    something.  I --

15          **THE COURT:**  Okay.

16          **MR. GARDNER:**  But that's my best idea.  I have no

17    idea why my name is on there, Your Honor.

18          **THE COURT:**  Yeah, frankly it was very odd to me, so I

19    just kept an eye out.  I didn't see your name on anything else.

20      But to the extent that's not a one-off, and there's

21    e-mails where you have produced any sort of discovery,

22    please --

23          **MR. GARDNER:**  I understand.

24          **THE COURT:**  Discovery, *Jencks*, *Giglio*, et cetera,

25    please disclose those.

1          Okay.  So with that caveat, we've got one through four

2     complete.

3          So the only lacking outstanding evidence conceivably would

4     be e-mails from Mr. Ake or Mr. Raghavan, and those will be

5     produced by Tuesday.

6          Now, there was a second request for in camera inspection

7     regarding the taint team process.  I received documents in

8     connection with that, but I'm not quite sure if I received them

9     in camera or if you also produced them to the defense.

10         **MR. GARDNER:**  I did not produce them to defense, Your

11    Honor.

12         **THE COURT:**  Okay.

13         **MR. GARDNER:**  So those documents would have been

14    segregated and only presented to the Court.

15         **THE COURT:**  All the taint team?

16         **MR. GARDNER:**  The taint team documents, yes, Your

17    Honor.

18         **THE COURT:**  So that includes the memoranda, the

19    e-mail correspondence, the filter terms?

20         **MR. GARDNER:**  Correct, Your Honor.

21         **THE COURT:**  Okay.  Think about how you would like,

22    counsel, for me to handle any questions I have in that regard,

23    because I do have questions.  It's -- it's not as it's been --

24    so as you know, roll the tape back, last week, when we had our

25    first recorded status, I was told, defense was told, and had

been told the taint team process never occurred.  Repeatedly

told by the government never happened.

        Then we get in court the next day, and it did happen.  And

now there were open questions.  Current counsel could not tell

me when it started, when it ended, and anything about the

process.

        So we tried to get to the bottom of it, it was very hard.

That was the genesis of asking for these documents.

        I think we left the last hearing with the general

impression that this was an 18-month taint team process to both

obtain, seize -- after seizure of the devices, image them,

upload them, put them in a database that is accessible to the

taint team and have them reviewed.  This was an 18-month

process.

        Some of the documents that I reviewed suggest it was much

shorter.

        So what do we do with that?  How do I -- maybe you can

both think about how we're to take this going forward.

        I didn't see anything in those documents that's, like,

trade secrets, frankly.  It seems very straightforward.

        There's terms that any of us in this room would have come

up with which to do a proper taint team review.  You've already

disclosed in open court, you know, what the breakdown was of

the items that were presumptively determined to be privileged.

        And then the further review, I want to get to the bottom

1    of it, because I think it's relevant to the nonproduction of

2    these devices, and so think about how you want to deal with

3    that.

4        But I still have concerns about what those documents

5    reflect.  I would like to have an adversarial process about

6    this.  I would like to have both sides weigh in on it.

7        Mr. Gorokhov?

8        **MR. GOROKHOV:**  Yes, Your Honor.  Just as an initial

9    thought, and I'll confer with my colleagues on this, but as an

10   initial thought, if this material bears on admissibility of

11   evidence, due process rights, if it suggests that Mr. Masood

12   has a due process claim to make based on these, or that it can

13   bear on the exclusion of evidence, our position is that those

14   taint team documents are *Brady*.

15       **THE COURT:**  Well, I don't know if they are *Brady*.

16   This is where I think they may most specifically lie, is the

17   government has asked me, in the -- in ECF -- oh, bear with me.

18       In the response, when I asked you all for simultaneous

19   pleadings, I believe it was 259 and 260, you both responded.

20   And the government said, listen, we did confess error, but the

21   error was inadvertent, it's not in bad faith, and, you know,

22   Judge, just give the defense a continuance to look through six

23   terabytes -- and I finally found how many terabytes of

24   documents we're talking about here -- six terabytes of

25   information to get ready for trial.

1    And I do -- provisionally, you all haven't argued the law,

2    but what the law is that the government presented, I think, is

3    right.  I have to be cautious in what sanctions I impose.

4    But I have to make a finding of good faith, bad faith,

5    negligence, gross negligence, recklessness, it all matters in

6    this analysis.  And when I'm told that there's no taint team,

7    and then there is a taint team, and it takes 18 months, and now

8    I'm reading the documents, and from what I can see, the taint

9    team didn't take that long, at least with the documents.

10    And then there was this hurry up and do the phones.  I --

11    that's where I think it matters.

12    And so is there anything -- let me ask the government, is

13    there anything in what you produced to me that you're concerned

14    for whatever government interest there is in producing to the

15    defense so we can just air this out?

16    **MR. GARDNER:**  Your Honor, as far as the e-mails go, I

17    don't think so.

18    **THE COURT:**  Okay.

19    **MR. GARDNER:**  I mean, the taint team memo, I think,

20    is internal attorney work product, and --

21    **THE COURT:**  You mean the memo saying this is how we

22    want it to go?

23    **MR. GARDNER:**  That's correct, Your Honor.

24    **THE COURT:**  Okay.

25    **MR. GARDNER:**  So I don't think that would be

1  producible.  Everything else, I suspect, is fair game.  But I

2  would like to, you know, consult with the office, and actually

3  look -- dive into the substance and maybe pick out anything

4  that we're concerned about before I make a formal

5  representation to the Court about how we want to handle -- and

6  of course, more may come, Your Honor.

7          **THE COURT:**  Right, right.

8          **MR. GARDNER:**  I expect to present more to you, and

9  those might raise issues.  So I would like to kind of consider

10 that before we give a final answer on that one.

11         **THE COURT:**  Okay.  All right.  All right.  Let's put

12 a pin in that.

13     Okay.  So I think that that handles my concerns with

14 regard to the production.

15     Are there any other preliminary matters before we get the

16 evidence taken?

17         **MR. GARDNER:**  No, Your Honor, not from the

18 government's perspective.

19         **THE COURT:**  All right.  And so the order of

20 witnesses, who -- I'm assuming that the way this is going to

21 go, is because there have been genuine issues raised about --

22         **MR. GARDNER:**  Your Honor, I'm sorry.  Could I -- I

23 have a bit of a point of order.

24     So you did discuss Rajeev Raghavan, who is no longer with

25 the office.  I'm told that we had inquired about getting access

```
 1   to his e-mails, and they were working on it, but it will have

 2   to go through EOUSA, because he is actually out of the office,

 3   whereas Adam Ake is just on kind of a temporary assignment.

 4       So that will take actually weeks to fully download

 5   Rajeev's e-mails.

 6           THE COURT:  Okay.  Well, then ask your people whether

 7   a court order commanding it sooner, because I have a trial date

 8   of Tuesday, would help.  I'm happy to order it faster.

 9           MR. GARDNER:  Okay.

10           THE COURT:  And maybe Mr. Ake's e-mail will shed some

11   light on this because Mr. Ake seems to have been the point

12   person on everything.  And from what I've seen, I didn't see

13   Mr. Raghavan's name that much.

14           MR. GARDNER:  I think that's right, Your Honor, and I

15   doubt you will see his name come up, but, of course, we'll look

16   into it.

17           THE COURT:  Yeah, because I'm not really sure the

18   juice is going to be worth the squeeze on that one.  And so I'd

19   rather that we do whatever we can to get the office what it

20   needs so that you have clarity on what Mr. Raghavan's role was

21   through his e-mails, but also not delay things.  Okay?

22       So you let me know if you need an order.

23           MR. GARDNER:  Okay.

24           THE COURT:  Okay.  So where we are today is that

25   because there have been serious issues raised about the 30 --
```

1    and it is 30 devices, right?  The government and defense are in

2    agreement that 30 devices were seized?  Is that right?  I'm

3    looking to defense to make sure.  Because the government's

4    representation.

5            **MR. GOLDMAN:**  Your Honor, it may be 32, with two

6    devices of Mr. Masood's -- it's -- I can't say I calculated it

7    for sure, but it's 30 or 32.

8            **THE COURT:**  Okay.  All right.  So we're north of two

9    dozen, south of three, is the best I can put it.  We're in the

10    30s.

11       There's serious questions about the chain of custody of

12    these devices, number one; and, number two, whether these

13    devices in the chain of custody have been imaged and preserved

14    before they were released to their respective owners.

15       And my understanding from the last hearing, respective

16    owners means the three codefendants, so Mr. Masood,

17    Ms. Peebles, Ms. Jackson.

18       And because the record last week was, frankly, a mess, we

19    never got to any witness testimony.

20       As the proponent of the evidence, it seems most

21    appropriate that the government will put on whatever witnesses

22    and custodians you need to put on to establish the chain of

23    custody for each of the devices, as well as the detour to the

24    taint team, and any other issues that you've raised in your

25    pleadings, including, most recently, your letter at ECF 265,

1    government, which suggests that at least two devices were

2    returned without being imaged or reviewed because you couldn't

3    crack the codes, the passwords.

4        I'm assuming that's all going to come out in the

5    testimony, and by the end of today, government, defense will

6    have a full opportunity to explore these issues.

7        Am I right about that?

8            **MR. GARDNER:**  Your Honor, about the four devices that

9    are -- were supposedly imaged and then --

10            **THE COURT:**  Yeah, yep.

11            **MR. GARDNER:**  -- or not imaged and then returned,

12    absolutely.  I think we're prepared to go through a full

13    custodial record on that.  And we have the witnesses ready.

14        But your Honor had mentioned something about these devices

15    as they relate to going to a taint team and coming back.

16            **THE COURT:**  Yep.

17            **MR. GARDNER:**  And I'm not sure what the Court meant

18    by that.

19            **THE COURT:**  What I meant by that is that the devices

20    were seized.  First step, seizure; second step, imaging, right?

21    Okay.  And what that means, and how it was done, and where the

22    devices went next.

23        And then at that point, you have an image, and you have a

24    device, and they are both in the chain of custody.  The image,

25    if I'm understanding your proffer, goes to the database for

1  taint review, if you were able to download and image it.

2      The device, if I'm getting the government right, goes back

3  to the respective owner, which is only one co-defendant, right?

4          **MR. GARDNER:**  That's correct.

5          **THE COURT:**  Okay.  That's what I mean.  And then

6  those devices -- those images that went to the database, what

7  happened to those, the images themselves?

8      So you download to a thumb drive or to a hard drive the

9  image from a particular device, it gets -- that data gets

10 uploaded to Relativity, but what happens to the device?  See

11 what I'm saying?

12         **MR. GARDNER:**  Yes.  Okay.

13         **THE COURT:**  That's what I mean.

14         **MR. GARDNER:**  So with that understanding, yes, Your

15 Honor, we're prepared to go through those steps.

16         **THE COURT:**  Okay.

17         **MR. GARDNER:**  But I thought you were getting at, you

18 know, sort of following it through the taint team with

19 witnesses today, which I think those would be in the e-mails

20 I'm producing.

21         **THE COURT:**  Oh, right.

22         **MR. GARDNER:**  My understanding was wrong, I think,

23 Your Honor.

24         **THE COURT:**  Right.  Right.

25         **MR. GARDNER:**  So we are prepared to go through the

```
 1   devices, and it will be obvious, once the images are either

 2   obtained or not obtained, that what was obtained went through a

 3   taint review.  I think that's -- will be explained better in

 4   the e-mails and in further, you know, proceedings, maybe, but

 5   we're not prepared to go through that today.

 6             THE COURT:  The taint part?

 7             MR. GARDNER:  The taint part, yes, Your Honor.

 8             THE COURT:  In terms of what happened and when it

 9   happened from the taint review's perspective, but chain of

10   custody I see as a different issue.  Okay.  All right.

11             MR. GREENBERG:  Your Honor, may I just briefly raise

12   a couple of quick housekeeping matters?

13             THE COURT:  Sure.

14             MR. GREENBERG:  Or maybe one of them is more than

15   housekeeping.

16        Although not included in the written order that Your Honor

17   entered into the docket after the unrecorded conference call

18   yesterday, text messages were discussed.

19        And as explained during the call, they were produced in

20   disarray for at least Special Agent Kimrey.  And our

21   understanding was that Your Honor directed the government to

22   produce those text messages, you know, in an organized

23   fashion -- date, time, chronology.  That hasn't happened.

24        The second, just perhaps less significant housekeeping

25   matter, is I just asked that the -- the woman who whispered in
```

1    Mr. Gardner's ear before he mentioned something new about

2    Mr. Raghavan, I would just ask that they be identified for the

3    record, so we know who is involved in communicating for the

4    government.

5              **THE COURT:**  Understood.

6        Ms. Kelly Hayes was in the room -- is in the room.  There

7    are a number of AUSAs, supervisors here.  I welcome you.  Thank

8    you for coming.  It means a lot to the Court.

9        And so the record is clear, Mr. Hagan, Mr. Salem,

10   Ms. Hayes, and, I guess, Mr. Collins had to step out, but I

11   appreciate your being here.

12       And there's nothing improper about either of them, any of

13   them coming up and giving a note to their teammates, just as

14   you all do.  But so the record is clear, they are all here.

15             **MR. GREENBERG:**  Thank you, Your Honor.

16             **THE COURT:**  With regard to the texts, I did say that.

17   I didn't put it formally in the order, because I didn't think I

18   had to.  I thought that it was enough to say that the

19   production should be Bates stamped and organized.  They are

20   not.  I don't really know why -- you know, why this is a

21   problem.  Maybe you can explain.

22             **MR. GARDNER:**  Can I speak to that, Your Honor?

23             **THE COURT:**  Sure.

24             **MR. GARDNER:**  So with regard to both of those issue,

25   my understanding was, the 5:00 deadline was set, because those

1  are the things the government had in its possession sort of

2  ready to go, in the hopper.  And that was accurate.

3      So with regard to the text messages, absolutely, we are

4  going to get them -- you know, sort them by witness.  That was,

5  I mean, not my understanding that the Court included that in

6  its 5:00 deadline, because they were not in that format already

7  and will take a little bit of time.  It could be today, but --

8          **THE COURT:**  Agent Kimrey is going to testify, right?

9          **MR. GARDNER:**  Today, yes, Your Honor.

10         **THE COURT:**  How many pages of texts are we talking

11  about that are in disarray?

12         **MR. GOROKHOV:**  Your Honor, we're checking.

13         **THE COURT:**  Okay.  So let's put the texts to the

14  side.

15      How about everything you produced to me that was ready to

16  go, when the order says in bold at the bottom Bates stamped?

17         **MR. GARDNER:**  Your Honor, that is also being done

18  right now.  I just got an e-mail, as we're coming into court,

19  that it was finished.  But, I mean, that's a process, Your

20  Honor, and I --

21         **THE COURT:**  Okay.  Well, then, like I said, I said it

22  last week, I'm going to say it again, if you can't do it, tell

23  me.  If you don't know, you don't know.  When I say it, and I

24  don't hear anything, I assume it will get done, especially when

25  I verify that it can be.

1    I mean, there's just been one after the other, like

2  deadlines blown.  It's like my orders are suggestions.  And I

3  understand that this is a quick turnaround, but the defense has

4  a good point.  This is all sort of de rigueur in a white-collar

5  case of this kind, right, that you all bring on behalf of the

6  victim hospital.  So -- and the government.  So it's a little

7  frustrating, but -- okay.

8    So texts, how many are we talking about?

9         **MR. GARDNER:**  I'm sorry, 83 pages, Your Honor.

10        **THE COURT:**  83 pages of text messages that are not in

11  any particular order.

12        **MR. GOLDMAN:**  I will say some of them are in order

13  because they are in sequences.  But overall, no, they are not

14  in order.

15        **THE COURT:**  Can you search them?  Are they word

16  searchable?

17        **MR. GOLDMAN:**  No, they are JPGs, it looks like, like

18  screenshots.

19        **THE COURT:**  This is what we're going to do.

20        **MR. GOLDMAN:**  Screenshots converted to PDFs.

21        **THE COURT:**  That are not searchable?

22        **MR. GOLDMAN:**  Does not appear to be searchable.  I

23  may be able to try to run an OCR on it, but I don't think OCR

24  will capture the images.

25        **THE COURT:**  Do you have hard copies?  Or do you need

1   hard copies?  Because we can make you copies.  The reason why I

2   say that is, the way we can handle this, is, one, I asked you

3   both if you want to forward today.  You said yes.  That's fine.

4   So we've got -- it's not perfect, but we got to roll.

5       Two, after the agent testifies, I can certainly give you a

6   break.  You can look through them, figure out whether any of

7   them are relevant and responsive to any of the testimony, you

8   want to use them, but I won't just turn to you and say, okay,

9   you ready to roll?  Does that make sense?

10          **MR. GOLDMAN:**  Appreciate that.  I think hard copies

11  would be helpful.

12          **THE COURT:**  Okay.

13          **MR. GOLDMAN:**  I don't have the hard copies of them

14  here, we just have the electronic copies.  I may be able to --

15  well, with the Court's assistance, that will be most helpful.

16          **THE COURT:**  Sure.  Yeah, that's not hard.

17          **MR. GOLDMAN:**  If not, I may be able to print

18  downstairs.

19          **THE COURT:**  Can you e-mail it to Mr. Ulander, and he

20  will print out -- government, do you need a copy?

21          **MR. GOLDMAN:**  Yes, I can do that.

22          **THE COURT:**  So if you can email it to Mr. Ulander,

23  he'll print them out for both sides, and that way we've got

24  them.  Okay?

25          **MR. GOLDMAN:**  Fair enough.  Thank you.

 1          **THE COURT:**  Anything else before we start with the

 2   witnesses?

 3      Okay.  All right.  Government, who is your first witness?

 4          **MR. GARDNER:**  Your Honor, the government's first

 5   witness will be Agent Joshua Kimrey.

 6      And we have binders for both the Court and defense.  I can

 7   bring it up.

 8          **THE COURT:**  Sure.

 9          **MR. GOLDMAN:**  Your Honor, the connectivity seems to

10   be a little bit -- it's not pulling up Mr. Ulander's e-mail

11   address.  Would I just be able just to get that?

12          **DEPUTY CLERK:**  I just sent you an e-mail from your

13   reply.

14          **MR. GOLDMAN:**  Thank you very much.

15          **THE COURT:**  All right.  And we are invoking the rule

16   on witnesses, and the one lawyer, one witness rule as well.  I

17   don't want a party at the bench.  Okay.

18                        JOSHUA KIMREY,

19   having been first duly sworn, was examined and testified as

20   follows:

21          **THE WITNESS:**  I do.

22          **DEPUTY CLERK:**  Thank you.  You may be seated.

23      Please speak loudly, closely, and clearly into the

24   microphone.

25      State your full name for the record and spell both your

1    first and last name.

2              **THE WITNESS:**  Sure.  My name is Josh Kimrey -- Joshua

3    Kimrey, J-O-S-H-U-A, last name Kimrey, K-I-M-R-E-Y.

4              **DEPUTY CLERK:**  Thank you.

5                         **DIRECT EXAMINATION**

6    BY MR. GARDNER:

7    **Q.**   Good morning, Agent Kimrey.

8    **A.**   Good morning, sir.

9    **Q.**   Can you tell us where you currently work?

10   **A.**   Yes.  I work on Fort Belvoir.  I'm an Army CID supervisory

11   special agent for the fraud field office.

12   **Q.**   And how long have you been in that position?

13   **A.**   Since January of this year.

14   **Q.**   And as a supervisor attorney [sic] for the field -- for

15   the fraud field office, what are your duties and

16   responsibilities?

17   **A.**   Sure.  I currently, you know, I have cases that I had as

18   a -- as a case agent that I have held with my -- kept with me.

19        Additionally, now, I am overseeing all the other agents.

20   I think there's eight agents in the office, and doing case

21   reviews, guidance with them on the cases they are working.

22   **Q.**   What has been your role in the investigation into

23   Mr. Masood?

24   **A.**   So when I came to the field office January or February of

25   2020, I've become the case agent, and I've been the lead agent

1  on this case, along with DCIS, the Defense Criminal

2  Investigative Service, as well as the NCIS, the Naval Criminal

3  Investigative Service as well.

4  **Q.**   Sorry.  Could you give me the date again when you came on

5  the case?

6  **A.**   It was right before the pandemic, so February of 2020 --

7  January/February of 2020, I think, when I came on.

8  **Q.**   As part of your role in this case, did you assist in the

9  execution of any search warrants?

10 **A.**   Yes, sir, I did.

11 **Q.**   Did those search warrants include warrants to search the

12 houses of Akbar Masood, Michelle Peebles, and Harriett Jackson?

13 **A.**   That's correct.

14 **Q.**   Were those searches done on April 6th, 2022?

15 **A.**   Yes, they were.

16 **Q.**   As part of those search warrants, were various devices

17 seized from the residences?

18 **A.**   Yes.

19 **Q.**   Now, in general, could you describe the procedure that you

20 and the Army CID use when you seize a piece of evidence, or, I

21 guess the correct procedure when the Army CID seizes a piece of

22 evidence and puts it into a chain of custody?

23 **A.**   Sure.  So once -- as we're executing the search warrant,

24 we identify a piece of evidence that, you know, falls within

25 the guidelines of our search warrant, it is then identified,

1  it's photographed as is, and it is then documented on -- at the

2  time, it's a form, it's the DA form, a Department of the Army

3  Form 4137.  It has the specific item listed on it, a brief

4  description about that item, as well at the bottom has a chain

5  of custody.  So who would actually collect the item -- who

6  would collect the item, and then additionally, who else would

7  transition to custody of that document, so it's the tracking

8  purpose.

9  **Q.**  And does that -- does that document track the item through

10  the final disposition of the item?

11  **A.**  Yes, it does.

12  **Q.**  And that procedure that you generally outlined, was that

13  procedure followed for each of these devices that were seized

14  at the homes of Michelle Peebles, Akbar Masood, and Harriett

15  Jackson?

16  **A.**  Yes, it was.

17  **Q.**  So I'm going to discuss a few of those items seized and

18  starting with one from Ms. Jackson's residence.

19      I'm showing you what's been marked as Exhibit 1.  Let me

20  know when you can see that.

21  **A.**  I can see it.

22  **Q.**  Agent Kimrey, what is Exhibit 1?

23  **A.**  Exhibit 1, as I just mentioned, this is a Department of

24  Army Form 4137.  It's a custody document for a seized and

25  collected piece of -- it appears to be a cell phone, iPhone.

1    **Q.**    I'm directing your attention to the cell at the top that

2    says location from where obtained.  Can you tell us what's

3    listed there?

4    **A.**    Yes, it's various locations within 2507 Sir Michael Place,

5    Lanham, Maryland, which in this case belonged to Harriett

6    Jackson.

7    **Q.**    And what was the item seized in the case of this DA Form

8    4137?

9    **A.**    Sure.  As it states, Item 1, quantity one, is a cell

10    phone, black in color, an iPhone with an identified serial

11    number.

12    **Q.**    Now, halfway down the page, about, it starts with a

13    header, chain of custody.  Can you explain what the Court is

14    seeing below that chain of custody header?

15          **THE COURT:**  And, I'm sorry.  Before you continue,

16    because we have so many devices, can we identify this device

17    by, I don't know, last three of the serial number, however

18    you're going to do it, Mr. Gardner, so that the record is

19    clear?

20          **MR. GARDNER:**  Your Honor, the Court should have up

21    with it a -- a Summary Chart 8.

22          **THE COURT:**  Summary chart --

23          **MR. GARDNER:**  Please let me know if you don't.

24          **THE COURT:**  Is that -- I know you've produced a

25    summary chart earlier.  Is that in --

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1          MR. GARDNER:  It was the exact same one that was

2     produced in that folder, Your Honor, but I should have given

3     you a physical copy of that.

4          THE COURT:  Oh, I do have it.  Okay.

5       So is this -- this chain of custody chart, is, like,

6     two-point font, but what -- so you've got -- in this chart, and

7     obviously the defense has a copy of it, there are 32 devices

8     numbered.  Yeah.  It would be probably easiest if the agent

9     could refer to which device numbered on this chart.

10          MR. GARDNER:  That was what I was planning, Your

11     Honor.

12          THE COURT:  Perfect.  Okay.  Thanks.

13     BY MR. GARDNER:

14     Q.   Now, Agent Kimrey, did you assist in preparing a summary

15     chart in this case of all the devices and their chains of

16     custody?

17     A.   Yes, I did.

18          MR. GARDNER:  Your Honor, before I go into this, I

19     would move to admit Exhibit 1.

20          THE COURT:  And unless the defense objects, it's in

21     as soon as you reference it.

22          MR. GARDNER:  Okay.  Thank you, Your Honor.

23          THE COURT:  That will make it easier.  As well as the

24     chart, should we mark that as Government's, what, 7?

25          MR. GARDNER:  Yes, Your Honor.

1          **THE COURT:**  All right.  Mr. Ulander, this is

2    Government's 7, because they go to 6, so --

3          **DEPUTY CLERK:**  Understood.

4          **THE COURT:**  Great.  Thank you.

5    Okay.

6    **BY MR. GARDNER:**

7    **Q.**    Agent Kimrey, I'm showing you Government's Exhibit 7.  Is

8    this the chart you helped to create?

9    **A.**    Yes, sir, it is.

10   **Q.**    Okay.  I'm going to zoom in on the second line.

11         Is the device we're referencing in Exhibit 1, does that

12   correspond to Line 2 on this summary chart?

13   **A.**    Yes, it does.

14   **Q.**    And is one way we can identify that and follow it through

15   the process, the second column, the DN number?

16   **A.**    Correct, the Document Number 0122.

17   **Q.**    Thank you.

18         Turning back to Exhibit 1 and starting at the beginning of

19   the chain of custody section, could you walk us through the

20   chain of custody?  And I'll stop you if I have any clarifying

21   questions.

22   **A.**    Sure.

23         And just to clarify, at the bottom, we're seeing, you

24   know, 2 -- you know a 222, an MCU 122.  We're referring to the

25   MCU, it's the Major Cyber Unit's Document Number 0122, which

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  correlates with the chart.

2  **Q.**   And for the record, he's referring to the bottom right

3  corner, there's MCU number of 01, dash, 22, correct?

4  **A.**   Correct.

5       And I can continue on with your chain of custody.

6  **Q.**   Please.

7  **A.**   So as you follow, you know, Item 1, the date it was

8  collected, on 6 April, '22, it was initially collected by

9  Mr. Zack Bornick, he's an agent with Army CID, he collected as

10  evidence.

11      That same day, on 6 April, he would bring it back to the

12  evidence room on Fort Belvoir.  At the time, I was the evidence

13  custodian, and he would sign it over to me where it would be

14  in-pros'd as evidence.

15      And then the following day, the next line down, 7 June,

16  that's when a lab request was put in --

17           **THE COURT:**  That's not the following day, April to

18  June.

19           **MR. GARDNER:**  Oh, right.

20           **THE WITNESS:**  I'm sorry.

21           **THE COURT:**  Just making sure the record is --

22           **THE WITNESS:**  Yeah, that's an error, my mistake

23  there.

24      So it would be 7 June, '22, is when the lab request was

25  put in, and it was approved.  And I would drive it down to

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1    Quantico, and it would be signed for by SA Robert Snyder, which

2    was the alternate evidence custodian at the cyber field office

3    in Quantico, Virginia.

4    **BY MR. GARDNER:**

5    **Q.**   I'm sorry.  You mentioned that Robert Snyder is -- what is

6    his position?

7    **A.**   So he is the alternate evidence custodian.

8    **Q.**   Okay.  I'm sorry, please continue.

9         Starting on Line 4, it looks like Robert Snyder then signs

10   it over to a Mark Johnson; is that correct?

11   **A.**   Yes.  Then on that same day it appears 7 June, '22,

12   Agent Snyder then would sign it over to Mr. Mark Johnson, the

13   examinator -- digital forensic examinator, is his official

14   title -- for an examination.

15   **Q.**   I'm sorry, examination, that's on the far right column,

16   correct?

17   **A.**   Correct, the purpose of the chain of custody column.

18   **Q.**   And what's your understanding of what it means by

19   examination?

20   **A.**   He would perform some sort of digital forensic examination

21   and analysis.

22   **Q.**   Okay.  And going to the last line on this page, can you

23   continue on the chain of custody?

24   **A.**   Yes.  I believe that's 5 August, it's a little blurry in

25   this picture here.  So 5 August, '22, it appears Mark Johnson

1    would sign the evidence over to Mr. Michael Jeffers.  In this

2    situation, he was -- Mr. Jeffers was the primary evidence

3    custodian for the cyber field office in Quantico.

4    **Q.**    Thank you.

5         Turning to the second page -- turning to the second

6    page -- actually, the third page.  There's a blank page in the

7    file.

8         The third page of Exhibit 1, and starting at the top,

9    could you continue walking us through the chain of custody?

10   **A.**    Absolutely.

11        So the first line there is 8 August, '22, that's when

12   Mr. Michael Jeffers would then sign the evidence over to me,

13   where I signed for it.  And it would be -- the purpose is

14   forwarding to controlling office.  And then it looks like the

15   next line down, the 10 August, '22, that's where I signed the

16   evidence over to the owner for a final disposition where

17   Harriett Jackson signed for it.

18   **Q.**    And at the point when you signed it over to the owner, why

19   would you sign it over to the owner at that point?

20   **A.**    So I did receive notification from the previous

21   prosecutor, AUSA Adam Ake.  He sent an e-mail to get all

22   physical evidence back to their respected owners.

23   **Q.**    And now I want to turn your attention to Exhibit 3 in this

24   case.

25        I'm showing you Page 1 of Exhibit 3.

1      Do you recognize Exhibit 3?

2 **A.**   I do.  It is a -- also an evidence -- EPCD, is what we

3 refer to, it's a custody document.  It appears at the very

4 bottom right, I see an MCU 10-22.

5 **Q.**   Okay.  And can you look at the location from where

6 obtained and tell us where these items were obtained from?

7 **A.**   Yes.  Various locations within 6412 Auburn -- I think it

8 was Auburn Road, Riverdale, Maryland, 20737, and that belonged

9 to Michelle Peebles.

10 **Q.**   Now, under the description of items, it has several

11 listed.  Can you tell us why there are eight items listed here

12 and only one item on the previous Exhibit 1?

13 **A.**   Yeah.  It's just -- you know, it's totally up to the

14 collecting agent whether they want to break devices into a one

15 for one.  So one item being listed on an EPCD.

16      In this situation, Mr. Opanasets, the collecting agent,

17 you see at the bottom, made the decision just to put them all

18 on one EPCD, which is also a common practice for our agency.

19 **Q.**   Okay.  Now, I am going to -- specifically, I want to talk

20 about Items 1, 2, and 6 on this list.  And now I'm going to

21 turn back to Exhibit 7.

22      Now, can you tell me if Items 1, 2, and 6 are the same

23 items reflected in Lines 20, 21, and 24 on Exhibit 7?

24 **A.**   Yes.

25 **Q.**   Okay.  Now, starting with your description of Item -- Item

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  1 -- I'm sorry, I shouldn't say your description.

2      Starting with the description of Item 1, what is Item 1?

3  **A.**   Item 1, quantity one, it's a laptop, Chrome.  You know, it

4  had cracks on it, missing delete key, no visible serial number.

5  So in summary, just a Chrome laptop.

6  **Q.**   And on the far left column of the chain of custody

7  section, it lists item numbers.  Are we going to be using that

8  to basically walk us through that particular item's chain of

9  custody?

10  **A.**   Yes.

11  **Q.**   And is that because we have, you know, multiple items on

12  one -- on one, like, receipt or chain of custody document?

13  **A.**   That's correct.

14  **Q.**   So focusing specifically on Item 1, can you, again, walk

15  the Court through the chain of custody for that item?

16  **A.**   Sure.

17      Item 1, so down halfway through the chain of custody, you

18  see Number 1 through 8, which includes Number 1, went from the

19  crime seen to Agent Opanasets collected as evidence.

20      The next line down, also on Item 1, on 6 April '22, you

21  see SA Opanasets signing the evidence over to myself for

22  release to evidence custodian.

23      And then two lines below that, you see a 1 through 4,

24  which includes Item 1.  On 7 June, '22, I signed the evidence

25  over to the alternate evidence custodian at the cyber field

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

 1  office.

 2          **THE COURT:**  Wait.  Stop.

 3      Sir, can you -- can you explain what DFE is?  I just

 4  needed to know that, please.

 5          **THE WITNESS:**  Yes, ma'am.  DFE, a digital forensic

 6  examiner.

 7          **THE COURT:**  Great.  Thank you.  Go ahead.  Sorry to

 8  interrupt you.

 9          **THE WITNESS:**  Yes, ma'am.

10      So -- yeah, on that 1 through 4, that line down there,

11  that would be 7 June, '22, myself would sign it over to SA

12  Robert Snyder, the alternate evidence custodian at the cyber

13  field office.

14  **BY MR. GARDNER:**

15  **Q.**  Are there any more entries dealing with Item 1 on this

16  page.

17  **A.**  Not on this page.

18  **Q.**  I'm showing you the second page of Exhibit 3.

19  **A.**  Uh-huh.

20      So as I'm looking for Item 1, it would be the very last

21  item on this particular page, a 1 through 8, which includes

22  Item 1, on 8 August '22.  Mr. Jeffers then would then sign the

23  evidence over to me to forward it to controlling office.

24  **Q.**  Okay.  Now, it went from -- it looks like on Page 1,

25  Snyder, and it's Jeffers signing it out, correct?

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  **A.**    Correct.

2  **Q.**    Okay.  Can you explain why -- can you explain this Snyder

3  to Jeffers transfer, and why we don't see Snyder signing it out

4  to you?

5  **A.**    Sure.

6       So there -- in all of our evidence rooms within our

7  agency, there's always a designated primary and alternate

8  evidence custodian.  There is, I believe, an MFR, a memorandum

9  for record, that identifies agent -- primary agent will be the

10  primary custodian, secondary will be the secondary, and, you

11  know, they can interchange evidence.

12       And so there wouldn't be a specific signing over the every

13  single item in the evidence room every single day that the

14  alternate would take over.

15       So it is common practice for them to interchange without

16  signing it over to each individual person.

17  **Q.**    So for purposes of chains of custody, Snyder and Jeffers

18  are interchangeable; is that what I'm hearing?

19  **A.**    That's correct.

20  **Q.**    And we didn't see Mark Johnson on this chain of custody,

21  correct?

22  **A.**    Not for this particular item.

23  **Q.**    I just want to be clear about that.

24       Okay.  And I'm sorry, so what is the final disposition of

25  this item, after it's signed back to you?  I'm sorry, I believe

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  that's --

2  **A.**   Yeah, the other page.

3  **Q.**   Next page.

4  **A.**   There we go.

5  **Q.**   This is Page 3 of Exhibit 3.

6  **A.**   Uh-huh.

7      So Items 1 through 8, which includes Item 1 that we are

8  talking about on 8 August '22, I signed the evidence over to

9  Mr. Sal O'Donnell, released to owner.  This is after I received

10  an e-mail confirmation from Michelle Peebles authorizing me to

11  provide all of her evidence to Mr. O'Donnell.

12  **Q.**   Now, staying on Exhibit 3, back to the first page, and I'm

13  now going to discuss Item 2.

14  **A.**   Okay.

15  **Q.**   And what is Item 2?

16  **A.**   Item 2 is an Apple iPad with a serial number ending in

17  Mike, X-ray, Juliet.

18  **Q.**   And, again, this item is Number 21 on that chart number,

19  the Exhibit 7, the chart that we created, correct?

20  **A.**   Do you mind if I just look at it real quick to make sure?

21  Remind myself.

22  **Q.**   Sure.

23  **A.**   And which number?

24  **Q.**   21.

25  **A.**   21, yes.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  **Q.**    Okay.  And, again, could you walk us through the chain of

2  custody of the second device on this exhibit?

3  **A.**    Sure.

4       Talking about Item Number 2, as I go down in the chain of

5  custody and see a 1 through 8, that's where Mr. Opanasets

6  collected it from the scene, evaluated as evidence.

7       The next line down, 1 through 8, which includes Item 2, on

8  6 April 22, Opanasets then signed it over to me for a release

9  to evidence custodian.

10      And the next line down, 1 through 4, which includes

11  item -- I'm sorry, two lines down from that, would be, as you

12  see, a 1 through 4, which includes Item 2, on 7 June '22, I

13  signed it over to SA Robert Snyder for a release to evidence

14  custodian.  That would be at the lab down at Quantico, cyber

15  field office lab.

16      The next line down, a 2 and 6, now they are identified,

17  because there's two items there, that's why you see a 2 and 6.

18  Item 2, that same day, 7 June '22, Mr. Snyder -- Mr. Snyder

19  signed the evidence over to Mr. Mark Johnson.

20  **Q.**    And the purpose for that was, per that column?

21  **A.**    Sure, a forensic examination.

22  **Q.**    I'm going to turn the page.

23      And it looks like the next -- well, I'll just let you

24  continue working your way down with Item 2.

25  **A.**    Sure.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1    **Q.**    I next see it on the second to last line.

2    **A.**    Correct, as do I.

3         So the second to last line on Number 2, Item 2, would be 8

4    August '22, Mark Johnson then signs the evidence over to the

5    primary evidence custodian, Mr. Jeffers.

6    **Q.**    And, again, we do see that switch from Snyder to Jeffers

7    with this item as well, correct?

8    **A.**    Yes, sir.

9    **Q.**    Okay.  And I'm sorry.  You can continue.

10    **A.**    So then the very last line there, you see Items 1 through

11    8, which includes Item 2.  On 8 August '22, Mr. Jeffers then

12    signs it over to me.

13    **Q.**    And the final disposition of this item?

14    **A.**    Uh-huh.

15         And top one there was 1 through 8, which includes Item 2,

16    8 August '22, I signed it over to Mr. O'Donnell for the same

17    purposes as previously discussed, e-mail confirmation from

18    Michelle Peebles.

19    **Q.**    And just to be clear, this is Page 3 of Exhibit 3,

20    correct?

21    **A.**    Correct.

22    **Q.**    All right.  Going back to Page 1 of Exhibit 3, and

23    starting with Item Number 6, what is Item Number 6?

24    **A.**    Item Number 6 is an Apple iPad, serial number ending in --

25    it appears to be an FHW, Foxtrot Hotel Whiskey.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  **Q.**    And turning to Exhibit 7, is Item 6 on Exhibit 3 the --

2  basically summarize the chain -- is the chain of custody for

3  that item summarized on Line 24 of Exhibit 7?

4  **A.**    Yes.

5  **Q.**    Okay.  And same as before, could you please walk us

6  through the chain of custody for Exhibit 6?

7  **A.**    Sure.

8       Exhibit 6 --

9  **Q.**    Not Exhibit 6, Item 6.

10 **A.**    Right, Roger.

11      Item 6, okay.  Going down to the chain of custody, you see

12 a 1 through 8, which includes Item 6, on 6 April,'22,

13 Mr. Opanasets collects it as evidence.

14      The next line down, 1 through 8, which includes Item 6, on

15 6 April '22, Opanasets then signs it over to SA Kimrey for

16 release to evidence custodian.

17      And then two more lines down, I see a 6, Item 6, on 7

18 June,'22.  Agent Kimrey then signs it over to Agent Snyder, the

19 alternate, at the cyber field office, evidence custodian for

20 release to evidence custodian.

21      And the next item down of the -- the last line on this

22 page, I see an Item 6 on 7 June, '22.  Agent Snyder then

23 provides it to Mark Johnson for a forensic examination.

24 **Q.**    Turning to Page 2 of Exhibit 3.

25 **A.**    Yeah.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1     On the second line down, I see a 6.  On 15 June, '22,

2  Mr. Johnson signs it back over to Mr. Snyder to go back into

3  the evidence room.  And then I do not see a 6 until the very

4  last line.

5     1 through 8, which includes Item 6, 8 August, '22, the

6  primary evidence custodian, Mr. Jeffers, signs it back over to

7  me.

8  **Q.**  Turning to Page 3 of Exhibit 3.

9     On the first line, do you see final disposition of this

10  item?

11  **A.**  I do.  I see Items 1 through 8, which includes Item 6.  On

12  8 August, '22, I signed it over to Mr. O'Donnell for the same

13  purpose as previously discussed, received an e-mail

14  confirmation from the owner, Michelle Peebles, to release it to

15  Mr. O'Donnell.

16  **Q.**  Thank you, Agent Kimrey.  I have nothing else.

17       **MR. GOROKHOV:**  Your Honor, we're -- we're prepared to

18  proceed.  I think if -- if anything, if we need the texts,

19  we'll let the Court now.  But I think for now, we're good to

20  proceed.

21     I can hand up to the Court defense exhibits.

22       **THE COURT:**  Can you all approach for just a second?

23     (A bench conference was held as follows:)

24       **DEPUTY CLERK:**  We have them if you want them.

25       **MR. GOROKHOV:**  Yes, Your Honor.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1    **THE COURT:**  Is the defense agreeing that the chain of

2    custody on all the other -- all the other devices but the ones

3    that Mr. Gardner examined the witness on the chain of custody

4    is tight and correct?

5    **MR. GOROKHOV:**  No, Your Honor.  We're going to be

6    asking some questions about it.

7    **THE COURT:**  That's -- it's your burden.  That' why --

8    like, you went through four, but I don't know what happened to

9    the rest of them.  Isn't it -- am I going to hear about them?

10   Or are you resting on -- if you're resting on the documents,

11   that's fine, too.  But I need to know that they are in.

12   **MR. GARDNER:**  Your Honor, basically, as far as the

13   government is concerned, there -- there has been no calling

14   into question of any of these document.

15       I understand it's our burden to affirmatively show the

16   chain of custody, but I think until we here what the contention

17   is, does the Court want us to go through 32 documents in this

18   matter?

19   **THE COURT:**  Well, you know, we're here because it's a

20   mess.

21   **MR. GARDNER:**  Right.

22   **THE COURT:**  You do what you think is best for your

23   case.  But I just -- I got six exhibits in, you haven't moved

24   them in.  I assume you want them in.  When I'm going to look at

25   chain of custody issues -- if you're good with what I have in

1    terms of documents, I'm fine with it.

2         **MR. GARDNER:**  Your Honor, I think in the posture of

3    this case, where I think the thrust of the prejudice that's

4    being alleged is from these four documents, I haven't really

5    heard that there's --

6         **THE COURT:**  Wait, wait, wait.

7         We've gotten to a place where four are now missing.  Let's

8    be clear as to what the prejudice is.

9         There's six terabytes of information, data, that, as of

10   last week, you said you never looked at, you gave it all back.

11   And the story has changed since.

12        I've gotten these documents all upside down and sideways.

13   I have no idea -- first it goes from 27 to 30, now it's 32

14   today.  It's an enormous amount of data on -- and it's not just

15   some tertiary witness.  These are the three main participants,

16   right?

17        So, you know, and you're putting in evidence about when

18   these items were returned, and to whom, and -- listen, if you

19   want to rest and say it's their burden, I think you're wrong.

20   But that's okay.  You know, it's really up to you.  I just

21   think that at this point -- that's why I asked the question of

22   the defense, are you conceding that the other items are

23   everything that you've given -- been given so far is a sound

24   chain of custody?

25        **MR. GOROKHOV:**  No, Your Honor.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1          THE COURT:  Let me ask you, what's the problem with

2     them?

3          MR. GOROKHOV:  Well, there are questions I'm going to

4     ask.  Like, for example, today, we find out the most recent

5     spreadsheet, there's a computer that's been taken from Walter

6     Reed that was returned to Walter Reed.  There's a computer used

7     by one of the main participants in this case.

8          THE COURT:  Which number is that?

9          MR. GOROKHOV:  It's the first one, Your Honor.  It

10    appears in green.  The first line in green.  First time we find

11    out it's returned to Walter Reed is in this version we

12    received --

13         THE COURT:  So it's not in the chain of custody, but

14    it's in this document?

15         MR. GOROKHOV:  Yes.  And we received the previous --

16    I haven't seen a chain of custody on that.  And in the previous

17    version of the spreadsheet, Your Honor, it was grayed out,

18    didn't have any disposition.

19       And there's a lot of irregularities I would like to

20    address with Agent Kimrey.

21         THE COURT:  Okay.  I mean, that's fine.

22         MR. GOROKHOV:  And, Your Honor, just to kind of maybe

23    avoid an objection, I want to be forward with everybody here

24    that my cross-examination is going to be quite broader, because

25    we've raised a number of issues here.

1        Can you hear me well?

2            **THE COURT:**  I can.

3            **MR. GOROKHOV:**  Okay.  My cross-examination is going

4    to be broader, because we've raised a slew of issues, other

5    issues about how this case was handled.  And we have an issue

6    of the standard for the violation, what level does the

7    violation rise to.

8        In order to address that, Your Honor, I need to get a

9    little bit into the context of the investigation.  So I just

10   want to tell Your Honor, I promise that it's really relevant to

11   the Court's consideration, what I'm about to go through.

12           **THE COURT:**  In terms of the -- sort of the level of

13   intent that we talked about earlier?

14           **MR. GOROKHOV:**  That's correct, Your Honor.

15           **THE COURT:**  And/or the nature of the prejudice?

16           **MR. GOROKHOV:**  That's correct, Your Honor.

17       And we anticipated calling Agent Kimrey as our witness

18   anyway.  So either way --

19           **THE COURT:**  I see.

20           **MR. GOROKHOV:**  -- we would -- we would address it.

21           **THE COURT:**  Well, I can't really call it until I hear

22   it.

23       Yeah, this is -- I mean, this is a very unusual case.  I

24   don't do this in many cases, but I've had now three hearings

25   where the evidence keeps changing, the proffers keep changing.

1    Chain of custody is one issue, as well as the prejudice

2  from the confessed violations.

3    I understand that the government is now saying, eh, we've

4  only used *Brady* a little too loosely.  Maybe, maybe not.  We'll

5  see.

6    But Rule 16, that's clear.

7    So understanding a little bit more about how all this

8  evidence was handled, and the interactions, I think, regarding

9  it is fair.  But I guess I'll take it on a question-by-question

10  basis.

11    **MR. GARDNER:**  I mean, is it possible -- technically,

12  I guess, we haven't rested with Agent Kimrey.  Is it possible

13  to get a proffer for -- just the scope of your examination?

14    **MR. GOROKHOV:**  Well, the proffer would cover all of

15  the issues we've raised, including the government's review or

16  failure to review *Brady.*

17    **THE COURT:**  So in other words, as the evidence

18  custodian, what were you told or not told to do with these

19  items?

20    **MR. GOROKHOV:**  Well, not just that, but as the case

21  agent.  He's not just the custodian, Your Honor.  He's the case

22  agent.  He finds evidence and communicates and interacts with

23  the prosecution team.  And that is fundamentally at issue, Your

24  Honor, in their intense standard that this Court ultimately has

25  to rule on.

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1    So I promise, Your Honor, that I believe I'm on solid

2  ground that everything I ask today is going to be relevant to

3  that.

4    **THE COURT:**  If you lay the foundation, and we'll see

5  how it goes, because the government's position is, there is no

6  *Brady* violation, we're not at trial yet.

7    No, I see lots of heads going up and down this way, but

8  you also can't -- you can't fix it, either, because at least

9  with respect to the -- the devices that are gone, they are

10  gone.  You're going to tell me that, I guess, with Agent

11  Johnson that they are password protected.  But you still have

12  six terabytes of data you never went through, at least I don't

13  have any evidence you did.

14    So, listen, I can't call it until I hear it.

15    **MR. GOROKHOV:**  Yeah.

16    **THE COURT:**  And, government, you do what you need to

17  do, but we'll -- I'm going to allow some -- listen, it would go

18  in the normal course as you would have to call the witness

19  yourself, he would be adverse.

20    **MR. GOROKHOV:**  Right.

21    **THE COURT:**  It's just me.  Let's just get it done.

22  Let's get whatever questions to Agent Kimrey posed, and you get

23  to examine him as well, and he's done.

24    **MR. GOROKHOV:**  Thank you, Your Honor.

25    **THE COURT:**  Okay.  Thanks.  Over.  Do you have

*DIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1   something else you need?

2          **MR. MANTHRIPRAGADA:**  Can we have one more moment?

3          **THE COURT:**  Please come back.  We're not done.  Okay.

4   Yes?

5          **MR. GARDNER:**  I'm sorry, Your Honor.

6       I wasn't clear if -- if the scope of the cross-examination

7   is going to -- I mean, we -- we still have the agent on the

8   stand, and I want to make sure if there's anything else we can

9   clarify now, as an affirmative matter.

10         **THE COURT:**  No, let's find out what it is.  Why are

11  you so concerned about the case agent testifying?

12         **MR. GOROKHOV:**  That's your burden.

13         **MR. GARDNER:**  I'm not, Your Honor.  If there does

14  need to be other chain of custody, I'm happy to go through

15  this, but I don't know what --

16         **THE COURT:**  It's up to you.  I mean, the problem is

17  I've told you in open court, it's 32 devices, right?  You

18  didn't give the chain of custody to the defense until last

19  week, despite this case going on since April of 2022.

20      Chain of custody -- the first discovery letter says,

21  here's your phone, essentially, here's a download from a phone.

22  I don't even know what phone you're talking about.

23      The second discovery letter, which was eight months after

24  the case was indicted, right, is very robust.  Maybe -- but

25  it's eight months.  I mean, had the defense, like, put you to

1    it, you would have had a speedy trial violation.  That's two.

2         And in none of it do I see chain of custody.

3         Am I wrong?

4              **MR. GARDNER:**  No, Your Honor.

5              **THE COURT:**  Okay.

6              **MR. GARDNER:**  I think the defense wanted the phones

7    back enough to toll a speedy trial.

8         But you're absolutely right, I mean, it was eight months.

9              **THE COURT:**  They wanted the phones back.

10             **MR. GARDNER:**  They thought there was going to be

11   information that would be helpful to them, so they weren't

12   willing to go forward.

13             **THE COURT:**  Correct.  But I'm saying that you waited

14   eight months before giving any discovery.  Not just -- you gave

15   nothing from the phones.  But the discovery itself.

16        So -- so we got that.

17        And third, in terms of a Rule 16 violation, you didn't

18   give these chains of custody until last week.  So it seems to

19   me like you would want the defense to have a full opportunity

20   to do whatever they need to do because it may negate the

21   prejudice.  That's number one.

22        Number two, if you think you're done with chain of

23   custody, and you think the documents are enough, I'm okay with

24   it.  I just wanted to make sure I knew where we were going.

25             **MR. GARDNER:**  Okay.  That makes sense, Your Honor.

1          **THE COURT:**  Okay.

2          **MR. GOROKHOV:**  Thank you, Your Honor.

3      (The bench conference concluded and proceedings resumed as

4  follows:)

5                      **CROSS-EXAMINATION**

6  **BY MR. GOROKHOV:**

7  **Q.**  Good morning.

8  **A.**  Good morning, sir.

9  **Q.**  So you are the lead case agent in this case; is that

10  correct?

11  **A.**  That's correct, sir.

12  **Q.**  And you've been on this case -- excuse me for my voice,

13  I'm a little under the weather today.

14      You've been on this case since February of 2020, you

15  testified?

16  **A.**  Yes, sir.

17  **Q.**  That's more than four and a half years, right?

18  **A.**  Okay.

19  **Q.**  I'm asking you.

20  **A.**  Yes, sir, it is.

21  **Q.**  Okay.  And you're a supervisory agent now with CID, right?

22  **A.**  That's correct.

23  **Q.**  All right.  I want to just get an idea, before we get into

24  the substance, general idea if you can talk about what are the

25  special duties of a lead case agent as opposed to just a

1   regular case agent.  Okay?

2   **A.**   Okay.

3   **Q.**   So can you -- for example, as the lead case agent, you're

4   the primary point of contact with the U.S. Attorneys' Office;

5   is that correct?

6   **A.**   For the most part.

7   **Q.**   Okay.  And as a lead case agent, you coordinate with other

8   investigators in the case, correct?

9   **A.**   That's correct.

10  **Q.**   And as a lead case agent, you make decisions about what

11  steps need to be taken in the investigation, correct?

12  **A.**   As a team, we make a collective, you know, individual --

13  investigative plan, yes.

14  **Q.**   Okay.  But your voice counts a little bit more than your

15  average agent, right, because you're the lead case agent?

16  **A.**   I wouldn't say that.  I would say that we have a respect

17  amongst all three agencies to work as one, you know, to work

18  the case.

19  **Q.**   Okay.  And in this -- in this case, for example, you

20  interviewed witnesses, right?

21  **A.**   Yes, sir.

22  **Q.**   And you made decisions about who -- which witnesses would

23  be important to interview, correct?

24  **A.**   We did, yes.

25  **Q.**   Okay.  And you made decisions about what documents needed

1  to be subpoenaed?

2  **A.**   As a team, we decided what -- who we were going to

3  subpoena, yes.

4  **Q.**   Okay.  And when you say as a team, you mean Adam Ake as

5  well, right, he was part of that team?

6  **A.**   He was part of that, yes, sir.

7  **Q.**   Okay.  And as you gain more information as a case agent,

8  it's fair to say that you filter some information to the

9  prosecutors, right?  It's not -- prosecutors are not going to

10 review a million e-mails, correct?

11 **A.**   Correct.

12 **Q.**   So it's kind of your job to go through and identify what's

13 important, and then you highlight for the prosecutors, and then

14 you guys talk about it, right?

15 **A.**   Yes.

16 **Q.**   Is that fair?  Okay.

17       And, also, you, as the case agent, have some say in who

18 needs to be charged in a case; is that correct?

19 **A.**   We make recommendations to the prosecutor's office.

20 **Q.**   And you -- in fact, you made recommendations in this case

21 about who should be charged, correct?

22 **A.**   So when I came on, there was -- there was already

23 individuals that were charged, it was an ongoing case.

24 **Q.**   Okay.  And the individuals charged, Mr. Masood,

25 Ms. Peebles, Ms. Jackson, and a number of individuals who were

 1  dismissed from the case were charged in 2022?

 2  **A.**   Were charged in 2022?

 3  **Q.**   That's correct.

 4  **A.**   Okay.  I don't remember the exact date when they were

 5  charged.

 6  **Q.**   Let's -- let's take a quick look here.  I'm sorry.

 7          **MR. GOROKHOV:**  And, Your Honor, I think instead of

 8  doing this, we don't have a jury, I'll say for the record that

 9  the original indictment was issued in 2022 by the grand jury.

10          **THE COURT:**  Was there anyone else, to your knowledge,

11  charged in 2020 related to this case, Agent?

12          **THE WITNESS:**  I guess -- I guess I should make a

13  clarification.

14      Formally not charged, but within our investigation, we

15  would consider them titled in our investigation.  But as a

16  grand jury -- I'm sorry, as an indictment, I think the first

17  one was what this gentleman just mentioned in 2022.

18          **THE COURT:**  Okay.  So there were no other charges in

19  any other court against any of the defendants ultimately

20  charged in this case?

21          **THE WITNESS:**  Not that I know of.

22          **THE COURT:**  Okay.  When you say "titled," do you mean

23  target?

24          **THE WITNESS:**  Targeted within our -- yes, ma'am.

25          **THE COURT:**  Okay.  Thanks.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1              MR. GOROKHOV:  Thank you for the clarification.

2    BY MR. GOROKHOV:

3    Q.  So 2022, that's, like, two years after your involvement in

4    the case began, correct?

5    A.  Yes, sir.

6              MR. GOROKHOV:  And for the record, Your Honor, the

7    first -- just so it's -- 3/17/22 is the date of the indictment,

8    the original indictment.

9              THE COURT:  Handing down the original indictment, not

10   the date of the arrest.  3/17/22.  Got it.  Okay.

11             MR. GOROKHOV:  Correct.  The arrest happened sometime

12   later.

13   BY MR. GOROKHOV:

14   Q.  So you were two years into the case, and then that's when

15   everybody got charged, right?

16   A.  Yes.

17   Q.  And you were the lead case agent?

18   A.  I was, yes, yes.

19   Q.  And you had a role to play in deciding who would be

20   charged?

21   A.  I assisted the United States Attorneys' Office who would

22   be charged and indicted, yes.

23   Q.  Okay.  You assisted?  That means they listened to what you

24   would said, right?

25   A.  They take what I say into consideration, yes.

1  **Q.**   Or do they ignore you?

2  **A.**   I wouldn't say they ignore me, no.

3  **Q.**   Okay.  So you, as the lead case agent, you get some --

4  your word has some weight in the case, right?

5  **A.**   They take what we say into consideration, yes, sir.

6  **Q.**   Okay.  Great.

7       Now, I want to ask you about some of the investigative

8  steps you took in this case.  Do you understand?

9  **A.**   I do, yes.

10 **Q.**   Okay.  In this case, you conducted a number of

11 investigative techniques; is that right?

12 **A.**   Yes.

13 **Q.**   You conducted surveillance?

14 **A.**   Uh-huh, yes.

15 **Q.**   Right?

16      And those were your decisions about what -- what was

17 important to surveil?

18 **A.**   Yes.

19 **Q.**   Who was important to look at, right?

20 **A.**   Yes.

21 **Q.**   You even conducted flyovers, right?

22 **A.**   I did, that's correct.

23 **Q.**   Was that in a helicopter or plane?

24 **A.**   That was a -- I believe it was a single-engine plane owned

25 by the Navy.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**   Okay.  And you felt that was necessary for the case,

2  right?

3  **A.**   As -- as a team, we felt to utilize our resources to

4  conduct some surveillance, yes.

5  **Q.**   Great.

6      And that's because you wanted to be careful, and you

7  wanted to gather as much evidence as you possibly could, right?

8  **A.**   At that time, I think we were anticipating a search

9  warrant, so we wanted to get a layout of the land for our

10  operations.

11  **Q.**   So you went as far as to fly a plane?

12  **A.**   I mean, I didn't fly the plane, but I was in the plane --

13  **Q.**   You flew in a plane?

14  **A.**   Yes, sir; yes.

15          **MR. GOROKHOV:**  I'm going to go through this quickly.

16  I don't want to --

17          **THE COURT:**  Okay.  Thank you.

18  **BY MR. GOROKHOV:**

19  **Q.**   You conducted subpoenas, right?  You carried out

20  subpoenas?

21  **A.**   Yes, sir.

22  **Q.**   How many subpoenas?

23  **A.**   I do not know off the top of my head, but it was a pretty

24  good handful.

25  **Q.**   Large number, right?

1  **A.**   I would say yes.

2  **Q.**   You -- for example, to banks, correct?

3  **A.**   I'm sorry, I didn't hear --

4  **Q.**   For example, you issued subpoenas to banks?

5  **A.**   Yes, sir, we did.

6  **Q.**   And you reviewed those documents carefully when you

7  received them, correct?

8  **A.**   We, as an investigative team, all reviewed those

9  documents, yes.

10  **Q.**   Okay.  And you prepared reports about investigative steps

11  that you took, right?

12  **A.**   Are we talking about the bank records or just in general?

13  **Q.**   Just in general, you prepared reports to be thorough, to

14  document what you did?

15  **A.**   Yes, sir.

16  **Q.**   Because it was important to get it right?

17  **A.**   Correct.

18  **Q.**   Okay.  Now, you would agree, as an agent, as a lead case

19  agent, a supervisory agent, it's important -- it's as important

20  for you to find out who is guilty as it is to find out who is

21  innocent, right?

22  **A.**   Correct.

23  **Q.**   You don't want to charge innocent people, do you?

24  **A.**   I wouldn't want to.

25  **Q.**   Okay.  Now, I want to ask you some questions about e-mails

1   that you seized in this case.  You understand?

2   **A.**   Okay.

3   **Q.**   You carried out a -- actually, let me strike that.

4        In March of 2020, you obtained e-mails from certain

5   accounts from Infused, correct?

6   **A.**   Certain accounts from Infused.  And what was the dates

7   again?

8   **Q.**   It was in the month of March 2020.

9   **A.**   That sounds accurate.

10  **Q.**   Okay.  And you obtained those e-mails from Barbara Rosas,

11  right?

12  **A.**   It was from Infused; Barbara was there, yes, yes.

13  **Q.**   Barbara was your point of contact?

14  **A.**   That's correct, yeah.

15  **Q.**   And, in fact, when you went to Infused, there was some

16  type of a forensic person with you; is that right?

17  **A.**   There was, yes.

18  **Q.**   And then there was Barbara at her computer?

19  **A.**   We were all around her computer.  And if I remember

20  correctly, I think Marlon Johnson was there, too.

21  **Q.**   Oh, Marlon Johnson was present as well?

22  **A.**   He was there, I'm pretty certain he was.

23  **Q.**   Okay.  And you decided that it was important for you to

24  obtain the data from three e-mail accounts from Infused, right?

25  **A.**   Yes.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1   **Q.**   From -- one for Akbar Masood, correct?

2   **A.**   Correct.

3   **Q.**   One for Kristine Morgan, whose name is now Gillespie?

4   **A.**   Correct.

5   **Q.**   And one for Michelle Peebles?

6   **A.**   Correct.

7   **Q.**   You made the decision that you did not need to obtain

8   Marlon Johnson's e-mail?

9   **A.**   Well, just to be clear, that was maybe a month after I

10  came on the investigation, so I took direction from the

11  previous agents that have been on, what, two -- two years from

12  that -- maybe a year from that point.  You know, because I was

13  being spun up on the case, so I took what they considered and

14  kind of continued with the case.

15       So at that time, I took what they had to say into

16  perspective and moved on.

17  **Q.**   Okay.  But the answer is yes, you -- you -- the answer is,

18  you only got these three e-mails, and you, at least as an

19  investigative team, made a decision not to get Marlon Johnson's

20  e-mail?

21  **A.**   At the time, that's the three e-mail accounts we

22  collected.

23  **Q.**   Well, you say at the time, but was there ever a time when

24  you collected Marlon Johnson's e-mail?

25       **MR. GARDNER:**  Your Honor, I think at this point, I

 1  have to object and say we're getting a little bit afield from

 2  the chain of custody.

 3            **THE COURT:**  Overruled.  Overruled.

 4       Yeah, right.  And that's why at the bench, I said that the

 5  defense would be able to get in its evidence on prejudice and

 6  on delay and on all the other issues we talked about last week.

 7  We'll do it once with this witness so that the witness doesn't

 8  have to come back.

 9       So overruled.  Go ahead.

10  **BY MR. GOROKHOV:**

11  **Q.**  And you, as an investigative team -- I don't know if I

12  ever got an answer, so let me repeat the last question.

13       You as, an investigative team, never made the decision to

14  get Marlon Johnson's e-mail account; is that correct?

15  **A.**  So I don't think that we collected a targeted data pull

16  from Marlon Johnson.  But he was -- I would assume that --

17  actually, I'm pretty certain that a lot of his e-mails would

18  have been included in that pull we took.

19  **Q.**  Right.  But you didn't specifically request the data from

20  Marlon Johnson's specific account; is that right?

21  **A.**  We did not.

22  **Q.**  And the person, by the way, who gave you those e-mails was

23  Barbara Rosas, right?

24  **A.**  Yes, that's correct.

25  **Q.**  And she's Marlon Johnson's wife?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1   **A.**   Okay.

2   **Q.**   I don't know.  I mean, I'm asking you.  You're the lead

3   case agent.

4   **A.**   I mean, I haven't seen a marriage certificate, but they

5   say they are married, so I take that to face value.

6   **Q.**   So this was not an issue you spent any time on, the

7   relationship between Barbara Rosas and Marlon Johnson?

8   **A.**   I did not inquire about their marital status.

9   **Q.**   Okay.  Thank you.

10      And you didn't get Barbara Rosas' e-mail address either?

11  **A.**   No, we did not.

12  **Q.**   Okay.  All right.  That's fair.

13      I'm going to throw some numbers at you.  I'm not trying

14  too trick you.  This is information I can represent came from

15  the government.  Akbar Masood's e-mails, 543,000 e-mails came

16  out of his account, right, at Infused?

17  **A.**   I don't know.

18  **Q.**   Does that sound right?

19  **A.**   I would have to see.  I can't give a definitive answer.

20  **Q.**   Sure.

21      I can hand you up my notes that are -- well, I -- no?

22  Okay.

23          **THE COURT:**  That doesn't sound right to me.  If you

24  have something else that you want to refresh the agent's

25  recollection.

1          MR. GOROKHOV:  Well, remember you can refresh with

2    anything.  I could bring an elephant.

3          THE COURT:  Well, I don't know if that's going to be

4    persuasive.  It is what it is.

5          MR. GOROKHOV:  I'll see if my colleague, Dan, can

6    pull up Mr. Gardner's e-mail setting forth numbers --

7          THE COURT:  Okay.  Let's do that.

8          MR. GOROKHOV:  -- let me continue to not waste time.

9          THE COURT:  Okay.

10   BY MR. GOROKHOV:

11   Q.   Kristine Morgan, 680,000 e-mails, does that ring a bell?

12   A.   I don't know specifically the amount.

13   Q.   Okay.  All right.  But it's fair to say you got a lot of

14   e-mails from these three accounts at Infused.

15   A.   I would agree with that.  There was a lot of data.

16   Q.   And that's because you reviewed those e-mails, right?

17   A.   We as a collective team did, yes.

18   Q.   But you were one of the people who were, in fact,

19   reviewing those e-mails?

20   A.   I was.

21   Q.   And you reviewed them carefully?

22   A.   Absolutely.

23   Q.   Because they were evidence in the case.

24   A.   Yes.

25   Q.   Adam Ake, an AUSA in this court, who was trying cases,

1   couldn't review a huge volume of e-mails, could he?

2   **A.**   I don't know.  That's a question for Mr. Ake.

3   **Q.**   Well, you're the lead case agent, so you know presumably

4   you're exchanging information with Mr. Ake constantly, right?

5   **A.**   I am.

6   **Q.**   And it's true, is it not, that one of your duties here was

7   to highlight for Mr. Ake what's important in these Infused

8   e-mails?

9   **A.**   It was.  But I think your question was, did he review all

10  the e-mails?

11  **Q.**   Right.

12  **A.**   I don't know.  That's a question --

13  **Q.**   Okay.  That's fair.

14       But it was your duty to highlight what was important?

15  **A.**   Yeah, as a collective team, we did.

16  **Q.**   Okay.  That's fair.  Thank you.

17       Now, you also obtained e-mails from HMA; is that correct?

18  **A.**   That's correct.

19  **Q.**   And you didn't execute a search warrant on HMA's e-mail

20  accounts, did you?

21  **A.**   We did not.

22  **Q.**   You went to an individual by the name of Sal O'Donnell who

23  worked at HMA, right?

24  **A.**   Yes.

25  **Q.**   And he gave you the e-mails?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **A.**    He did.

2  **Q.**    Was he an informant?

3  **A.**    I wouldn't consider him an informant.

4  **Q.**    What did you consider him?

5  **A.**    An individual who was -- let me think.  Like, an

6  administrator for that -- that database, the -- at HMA

7  Solutions database, he was.

8  **Q.**    Okay.  Did you extend an immunity offer to Mr. O'Donnell?

9  **A.**    I did not.

10  **Q.**    Did you give Mr. O'Donnell anything for his assistance?

11  **A.**    A handshake and a thank you.

12  **Q.**    Okay.  So let's talk about how you got these from Sal

13  O'Donnell.

14    You made a decision not to execute a search warrant,

15  right?

16  **A.**    We did not.

17  **Q.**    Who made a decision?

18    When you say "we did not," what does that mean?

19  **A.**    It was -- like I said, as a collective team, discussing

20  with previous AUSA --

21  **Q.**    Right.

22  **A.**    -- of what my investigative steps were to do.

23  **Q.**    Yeah.

24    So you, after discussing your investigative steps, decided

25  it would just be better to get the e-mails from somebody in the

1  company rather than to get a warrant to actually go in and look

2  at the e-mails yourselves?

3  **A.**    Well, at the time, when I asked Mr. Ake if that was

4  acceptable, he did say it was acceptable.  And so we went with

5  his guidance.

6  **Q.**    Okay.  And again, the HMA e-mails, you reviewed them

7  carefully and thoroughly, right?

8  **A.**    I did.

9  **Q.**    In fact, you wrote a report highlighting the important

10 e-mails?

11 **A.**    I did.

12 **Q.**    And that was important to the investigation because you

13 wanted to be thorough, and you wanted to gather the evidence

14 about who was doing what within HMA, correct?

15 **A.**    I did.

16 **Q.**    And you agree that those e-mails contained very important

17 clues about what was going on?

18 **A.**    Yes.

19 **Q.**    Okay.  Now, let's switch gears.  I want to ask you about

20 *Brady*.

21        What is *Brady*?

22 **A.**    I'm not sure.

23        **MR. GARDNER:**  Objection, Your Honor.

24        **MR. GOROKHOV:**  I was --

25        **THE COURT:**  Basis?

1          **MR. GARDNER:**  He's asking for a legal definition.

2          **THE COURT:**  Well, I don't know.  Let's find out.

3      Have you ever been trained on what *Brady* evidence is?

4          **THE WITNESS:**  I don't recall if we have.  But I'm

5  sure it's been brought up, but I don't recall at this time.

6          **THE COURT:**  Okay.  Were you ever asked by anyone on

7  the prosecution team to assist in locating what's called *Brady*

8  evidence in this case?

9          **THE WITNESS:**  I don't think so.

10          **THE COURT:**  Anyone use that word with you?

11          **THE WITNESS:**  No, ma'am.

12          **THE COURT:**  How about anyone asking you about looking

13  for evidence to show someone is not guilty?

14          **THE WITNESS:**  I mean, I would say in that sense, it

15  got brought up, sure.

16          **THE COURT:**  Okay.  So if we're using it in part for

17  that, that got brought up, maybe that's where Mr. Gorokhov can

18  pick up.  Don't use the word *Brady*, but explore it in other

19  ways.

20          **MR. GOROKHOV:**  Sure.

21          **THE WITNESS:**  Exculpatory evidence.

22          **THE COURT:**  Yes, exculpatory, right.

23  BY MR. GOROKHOV:

24  **Q.**   So that's your definition, exculpatory evidence?

25  **A.**   Yes.

1  **Q.**    Okay.  What about *Giglio*, do you know what that is?

2  **A.**    I don't know a legal definition of *Giglio*.

3  **Q.**    Okay.  You were never trained on the legal definition of

4  *Giglio*?

5  **A.**    I mean, I'm sure it got brought up during the academy, but

6  I don't recall at this time.

7  **Q.**    Okay.  And if you don't recall the definition of *Giglio*,

8  then certainly you don't remember anyone giving you

9  instructions on how to look for that type of evidence?

10        **MR. GARDNER:**  Objection, Your Honor.

11        **THE COURT:**  Sustained.  Rephrase.

12        **MR. GOROKHOV:**  Okay.

13  **BY MR. GOROKHOV:**

14  **Q.**    Do you remember anyone giving you instructions to look for

15  *Giglio* evidence?

16        **MR. GARDNER:**  Objection, Your Honor.

17        **THE COURT:**  Overruled.

18     Did anyone ever give you instructions on looking for

19  *Giglio* evidence?

20        **THE WITNESS:**  Can I get a legal definition of *Giglio*,

21  please?

22        **MR. GOROKHOV:**  No.  No, we're testing the witness's

23  knowledge.

24        **THE COURT:**  I mean, if you -- well, did you ever --

25  did anyone ever ask you to find evidence or information about

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  witnesses, potential witnesses, that would hurt their

2  credibility?

3            **THE WITNESS:**  E-mails to look --

4       **THE COURT:**  Any evidence.  Yeah, anyone say to you,

5  just, you know, make sure if you find anything that undermines

6  a witness's credibility or reliability or believability?

7            **THE WITNESS:**  I mean, I don't remember a specific

8  guidance that we received on that, or discussions.

9       But as far as being thorough, we're looking at every

10 e-mail and thinking, you know, is it objectable or not, does it

11 help or hurt a witness, help or hurt a subject.  We're looking

12 at all the e-mails.

13           **THE COURT:**  And when you say "help," what do you

14 mean, or "hurt," what do you mean?

15           **THE WITNESS:**  Maybe I used the wrong word there.

16      But, I mean, we're just -- I'm a fact finder.  Like, I

17 don't give my opinions.  So if I find an e-mail where somebody

18 admitted to something, I bring that up.  If I find an e-mail,

19 you know, denying something, then that would be viewed, but I

20 wouldn't necessarily -- I don't know if I would bring that up.

21 I mean, again, that's an example.

22           **THE COURT:**  Okay.

23           **THE WITNESS:**  But, I mean, we would look at all

24 e-mails thoroughly.

25           **THE COURT:**  But going back to the original question,

 1   no one from the prosecution team gave you any guidance in that

 2   regard?  Or did they?

 3           **THE WITNESS:**  I don't remember specific conversations

 4   about that.

 5           **THE COURT:**  Either exculpatory, or help, or hurt, or

 6   affecting a witness's believability or anything like that?  I

 7   mean anything.  Just I'm going broad now, because I understand

 8   legal definitions are not necessarily fair to you.

 9           **THE WITNESS:**  Right.  Okay.

10       I mean, I do not recall any conversations.  I feel that it

11   is a common practice for our agency to --

12           **THE COURT:**  Okay.

13           **THE WITNESS:**  -- you know, look at all the

14   perspectives that we come across e-mail-wise.

15           **THE COURT:**  Okay.  That's part of like your training

16   and experience?

17           **THE WITNESS:**  Yes, yes.

18           **THE COURT:**  Got it.

19           **MR. GOROKHOV:**  I'm sorry.  Your Honor, Court's

20   indulgence.

21           **THE COURT:**  Go ahead.

22           **MR. GOROKHOV:**  All right.  Your Honor, thank you.

23       And I'm sorry -- I know you didn't want a party up here,

24   and it's -- we're not going to keep doing that.  So --

25           **THE COURT:**  Okay.  Go ahead.

1          **MR. GOROKHOV:**  Thank you, Your Honor.

2    **BY MR. GOROKHOV:**

3    **Q.**    Search warrants, I want to talk to you about search

4    warrants.

5    **A.**    Yes, sir.

6    **Q.**    How many search warrants were executed in this case?

7    **A.**    There were four.

8          Well, there was -- are you talking just the residents?

9    Because there was additional ones.

10   **Q.**    Well, if you don't mind, just give me a list of the

11   warrants, and we'll start there.

12   **A.**    Yeah.  We executed search warrants at Harriett Jackson's

13   house, Michelle Peebles' house, Masood's house, Case Health

14   Care Solutions, and Google.

15   **Q.**    Okay.  Thank you.

16         I want to just talk to you about Masood, Peebles, and

17   Jackson search warrants, okay?

18   **A.**    Okay.

19   **Q.**    These search warrants, they authorize you to search what

20   is inside the person's residence, correct?

21   **A.**    We follow the confines of the search warrant, including

22   Attachment 1, yes.

23   **Q.**    Of course.  And it's an exhaust -- it's a very detailed

24   list of documents and items that you can seize, correct?

25   **A.**    Correct.

1    **Q.**    And those -- among those items are electronic devices,

2    correct?

3    **A.**    Correct.

4    **Q.**    You specifically applied for a warrant that would allow

5    you to seize electronic devices from each of these three

6    individuals; is that right?

7    **A.**    Yes.

8    **Q.**    And by electronic devices, we mean -- and I'll refer to

9    them like that going forward, but just for the record, phones,

10    tablets, computers?

11    **A.**    Yes.

12    **Q.**    External hard drives?

13    **A.**    I don't remember if that was specified in Attachment 1.

14    **Q.**    That's fine.

15        Now, as a lead case agent, you had input into whose homes

16    and devices could be searched and seized; is that correct?

17    **A.**    Can you rephrase that question?

18    **Q.**    As the lead case agent, you were part of the

19    decision-making process about -- well, let's just start on

20    this.  Let me strike that question.

21        As the lead case agent, you were part of the

22    decision-making process on what warrants needed to be obtained

23    in this case?

24    **A.**    Yes.

25    **Q.**    And -- and you discussed that with the prosecution?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1    **A.**    Yes.

2    **Q.**    And as to these three warrants, Masood, Peebles, and

3    Jackson, the decision was made that their homes and devices

4    could be taken as you just testified, correct?

5    **A.**    Yes.

6    **Q.**    And the reason for that is because they were viewed as the

7    three most important defendants in the case?

8    **A.**    At the time, they were -- well, I think on that day, there

9    were additional people that were -- that were, you know,

10   requested to come to the courthouse to surrender.

11   **Q.**    Yeah.

12   **A.**    But as far as executing the search warrant, yes, we

13   identified those -- that our investigation showed that those

14   were the three main individuals.

15        Does that answer your question?

16   **Q.**    Okay.  And that's the reason why they had search warrants

17   and the other individuals did not?

18   **A.**    Correct.

19   **Q.**    Now, ultimately, I think there's some dispute about the

20   number of devices that were ultimately seized.

21        But -- by the way, how many devices were seized?  I'm not

22   counting the Walter Reed laptop, which we'll get to.

23        How many devices in total were seized from these three

24   individuals?

25   **A.**    30.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**   30.

2      And the devices were provided to you by the seizing

3  agents, as you testified, correct?

4  **A.**   Correct.

5  **Q.**   On the day that they were seized?

6  **A.**   Correct.

7  **Q.**   Okay.  Now, you testified --

8          **THE COURT:**  Before you go on, can we get a breakdown

9  as to each location, how many from each location, from this

10 witness?

11         **MR. GOROKHOV:**  Absolutely, Your Honor.

12         **THE COURT:**  Okay.

13 **BY MR. GOROKHOV:**

14 **Q.**   Can you please answer the Court's question?

15     Can you give a breakdown, how many devices came from --

16 start with Mr. Masood, and then Ms. Peebles, and then

17 Ms. Jackson.

18 **A.**   I think it would help if I had actual documents in front

19 of me to confirm.

20 **Q.**   Yes.  I can give you the --

21         **MR. GOROKHOV:**  And, again, since there's no jury,

22 Your Honor, I presume it's okay for me to say it on the record.

23         **THE COURT:**  Sure, yeah.

24         **MR. GOROKHOV:**  The chain of custody chart that you

25 discussed, I'll put it up on the screen.

1          **THE COURT:**  That's Exhibit 7, yeah.

2          **MR. GOROKHOV:**  Government Exhibit 7.

3  **BY MR. GOROKHOV:**

4  **Q.**   Are you able to take a look and see if that's refreshes

5  your recollection?

6  **A.**   Yeah.  So if we could maybe zoom into the subject column,

7  I believe that would help.

8       Okay.  So it looks like -- one, two, three, four, five,

9  six, seven, eight -- nine from Jackson's house.

10 **Q.**   All right.

11 **A.**   Okay.  One, two, three, four -- ten for Masood's house.

12      Would you like me to keep going?

13 **Q.**   No.

14 **A.**   I mean, there's additional ones from Masood's house at the

15 bottom, but I can't see them.

16 **Q.**   I'm sorry.  Let me scroll up for you.

17 **A.**   So three more for Masood.  So what's that, 13 for

18 Masood's?

19 **Q.**   That sounds right to me.

20 **A.**   And would you like me to go to Peebles?

21 **Q.**   Yes.

22 **A.**   Okay.

23 **Q.**   I'm sorry.  The way this is -- because of how small the

24 font is, if I zoom in, you can't see the whole chart.

25      Is this workable for you?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **A.**   That is workable.

2  **Q.**   Okay.

3  **A.**   Let's see.  It would be eight for Peebles.

4  **Q.**   Okay.

5  **A.**   So what is that, eight, nine and 13?

6  **Q.**   You're asking the wrong person.

7        Eight, nine, and 13.  That's 30, correct?

8  **A.**   That's what I get, yes, sir.

9  **Q.**   Okay.  All right.  Now, I want to ask you about what

10  happened -- I want to go through with you the, kind of,

11  trajectory or the path that these devices took.

12        **MR. GOROKHOV:**  And, Your Honor, I believe I never

13  handed up our exhibits to the Court, so --

14        **THE COURT:**  Okay.  Yep.

15        **MR. GOROKHOV:**  So, Ms. Bronfman, if you could hand up

16  Defense Exhibits D1, D2, and D3 to Judge Xinis, and I'll

17  provide them to the government as well.

18        **THE WITNESS:**  Is it possible to get a little water,

19  by chance?

20        **THE COURT:**  Oh, sure.  Absolutely.

21        **THE WITNESS:**  Thank you.

22        **MR. GOROKHOV:**  All right.  So let's -- let's talk

23  about -- I'm going to put up -- Your Honor, for the record, I'm

24  going to put up D1, but I'm going to start with the second page

25  of D1.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1        **THE COURT:**  Okay.

2        **MR. GOROKHOV:**  And, Your Honor, I would move it into

3 evidence.

4        **THE COURT:**  All right.  Well, it's in unless it's

5 objected to, so let's give the defense -- government --

6        **MR. GARDNER:**  No objection, Your Honor.

7        **THE COURT:**  Okay.  And it's a multi-page document,

8 right?

9        **MR. GOROKHOV:**  Yes, Your Honor.  And I'll represent

10 to the Court that this collection of documents is what was

11 presented in response to the Court's order yesterday as to the

12 four devices.

13        **THE COURT:**  Got it.  Okay.

14    So it's that face sheet, that summary?

15        **MR. GOROKHOV:**  Yes, Your Honor.

16        **THE COURT:**  As well as the underlying chain of

17 custody documents?

18        **MR. GOROKHOV:**  Yes, Your Honor.  Although I will

19 admit, we reshuffled the order a little bit, but --

20        **THE COURT:**  To get them to be in line with the

21 summary?

22        **MR. GOROKHOV:**  To be a little easier -- well, just

23 for my own --

24        **THE COURT:**  Go ahead.  Yep.  Not a problem.  I know

25 what they are.

1          **MR. GOROKHOV:**  Okay.  Thank you, Judge.

2   **BY MR. GOROKHOV:**

3   **Q.**  All right.  I'll let you have a drink, and we'll proceed.

4   **A.**  Okay.  Thank you.

5   **Q.**  Thank you.

6        All right.  So just looking at this, you testified that

7   you were the, quote, unquote, primary custodian because you

8   were the case agent?

9   **A.**  No.

10        The duties within my office at the time identified that we

11   had to -- agents had a -- basically a double hat.  So I was an

12   agent and the evidence custodian.

13   **Q.**  Okay.  And is that documented in the memorandum within

14   your office?

15   **A.**  There is a memorandum right outside the door of the

16   evidence room.

17   **Q.**  Okay.  That identifies you as the custodian?

18   **A.**  The primary, yes, sir.

19   **Q.**  For the relevant period of time?

20   **A.**  Yes, sir.

21   **Q.**  So here when you received Devices 1 through 8 on April --

22   in April, and then a subset of those devices were submitted to

23   another custodian by the name of Robert Snyder, those were

24   actually in the evidence room; is that your testimony?

25   **A.**  So, yes.  By the time -- as it went from -- it was -- on

1    6 April, it came into the evidence room; and then 7 June, it

2    came out of my evidence room and went to the Quantico cyber

3    field office evidence room.

4    **Q.**    Okay.  Now, that happened on June 7th for Items 1 through

5    4, 6 and 8; is that correct?

6    **A.**    1 through 4, 6, and 8, yes, sir.

7    **Q.**    But Items 5 and 7 went to an SA Pugliese, Troy, or Troy

8    Pugliese, I assume, who is a forensic examiner?

9    **A.**    That's correct.

10    **Q.**    And 5 and 7 were two iPhones, right?

11    **A.**    They were.

12    **Q.**    Who made the decision to pull out these two specific

13    iPhones and give them to Troy Pugliese?

14    **A.**    Yeah.  So Pugliese is his name, and he is a digital

15    forensic examiner.  He was at the office with me on that day,

16    the 7 April.  And because he's an examiner, he's an expert in

17    forensics, he made the decision the best decision available

18    would be to take those two devices and take them down to the

19    lab for processing.

20    **Q.**    Why those two devices?

21    **A.**    There was something about the items, and I can't recall

22    specifically, but, I mean, he would be the best person to ask

23    that to.

24        And that's why they were taken straight down to the lab

25    for analysis.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1   Q.   And you're saying he came to you, the defense forensic

2   examiner -- by the way, did he participate in the -- all of the

3   workup up until the point of the search warrants in the case?

4   A.   What do you mean by the workup?

5   Q.   Like, did he participate in meetings with the team,

6   talking about what search warrants need to be executed,

7   reviewing the evidence, talking about e-mails?

8        Did he have -- was he a guy who was looking at the

9   evidence in this case, or was he just a guy who helps with

10  forensic devices?

11  A.   No.  He is -- he is a digital forensic examiner assigned

12  to a different office.

13  Q.   Right.  Okay.

14  A.   He was -- particular at this location with me, he was,

15  lack of a better term, an over-the-shoulder expert giving

16  guidance on, you know, which items to collect.

17  Q.   Okay.  So your testimony is that this guy, this forensic

18  examiner, who wasn't working on the case, said those two

19  iPhones look like two things I should image, and you agreed?

20  A.   Well, he has much more experience examining physical

21  devices, electronic devices.  It could have been the devices

22  were turned on, and in order to process them, he wanted to take

23  them down to the lab to have them analyzed.

24       And, again, this is just an example, but that's one thing

25  that could have happened.

1  **Q.**    And did you communicate with anyone on the investigative

2  team or the prosecution team about that these two particular

3  devices were singled out for imaging at this time?

4  **A.**    I mean, my investigative team and I, and the previous

5  AUSA, had multiple, multiple discussions.  So I think it would

6  be likely that, yes, I did communicate that with my team.

7  **Q.**    Would those discussions be on e-mail chains?

8  **A.**    I don't recall.

9  **Q.**    Would those discussions be on text chains?

10  **A.**    They would be on probably a phone call.

11  **Q.**    A phone call.

12       So no documentation of this decision to single out two

13  devices?

14  **A.**    Well, again, the digital forensic examiner, Mr. Troy

15  Pugliese, he was there.

16  **Q.**    Right.

17  **A.**    Examined this device and made the decision -- the best

18  decision that he thought would be, take it straight to the lab.

19  **Q.**    Okay.

20            **MR. GOROKHOV:**  And, Your Honor, for the record, I

21  don't think the government listed Mr. Pugliese as a witness who

22  is available.

23            **THE COURT:**  Right.  Okay.

24  **BY MR. GOROKHOV:**

25  **Q.**    Now, I want to go down a little bit of a ways down this

1  chart and see that as to Items 1, 4, 6, and 8, you held onto

2  those until June 7th, and then you handed them over to Robert

3  Snyder, correct?

4  **A.**   Correct.

5  **Q.**   And then on June 7th, Items 2 and 6, which appear to be an

6  iPad and an iPad -- two iPads, again, those two items were

7  pulled and sent to Mark Johnson; is that correct?

8  **A.**   That's -- that's what I read here.

9  **Q.**   And Mark Johnson --

10 **A.**   I would like to clarify that that was at the lab.  So I

11 couldn't - I couldn't attest to why they made the decision to

12 grab those two items.

13           **THE COURT:**  Can I ask just a real quick followup on 5

14 and 7?

15      Where does this chain of custody reflect them coming back?

16           **THE WITNESS:**  It would be at the very last item on

17 this page, I do believe.  Yeah.

18           **THE COURT:**  So -- wait a minute.

19           **THE WITNESS:**  On the second page, the very last.

20           **THE COURT:**  On the second page, there -- what entry

21 shows Mr. Pugliese returning them?

22           **THE WITNESS:**  So, I guess, it would help if I, kind

23 of, explain.

24      So our agency was transitioning from old-school paper form

25 that we're seeing here on this exhibit, you know, hand jamming

1  stuff to an electronic system.  Our headquarters, including the

2  lab, was already on that electronic system, so they did not

3  accept this old-school 4137, as we call it.

4       "They," meaning Pugliese, whenever he entered into the

5  lab, he had to put those two particular items into the new

6  system, which would -- which would like initiate a second chain

7  of custody for those devices.

8            **THE COURT:**  Yep.

9            **THE WITNESS:**  And, you know, the -- I'm not sure if

10  it's in here, but there's a chain of custody for those where

11  Pugliese is shown giving that particular -- these two items

12  to -- back to the evidence custodian.  And then --

13            **THE COURT:**  Okay.  You mean the evidence custodian

14  that would be reflected in the document that you're reviewing

15  now with Mr. Gorokhov?

16            **THE WITNESS:**  So no.  That would be a separate chain

17  of custody.

18            **THE COURT:**  Okay.

19            **THE WITNESS:**  So I like to think of it as, like, I

20  give -- you know, I give a pen to you.

21            **THE COURT:**  Yep.

22            **THE WITNESS:**  And my chain of custody is me giving

23  you the pen.  What you do with that pen, you would document it

24  on your own sheet.

25            **THE COURT:**  Right.

1           **THE WITNESS:**  But then when it comes back to me, you

2    know, on his form he would say he gave it to me -- he gave it

3    to -- as you see, the very last item, is Jeffers on his form,

4    it will show that he gave it to Jeffers.

5        And then if you transition to this form, as all the items

6    as coming back to me, you see Items 1 through 8, including

7    Items 5 and 7 that were initially given to Mr. Pugliese.

8           **THE COURT:**  Right.  I understand that.

9        But on this form, you'd agree with me there isn't an entry

10   for received by Pugliese to evidence custodian, right?  So I

11   understand that Pugliese might document it on his end, but

12   there's nothing on this form, just so I'm clear.

13          **THE WITNESS:**  Yes, ma'am.

14       On the other form, it would show Pugliese giving it to the

15   evidence custodian, either Michael Jeffers, or Mr. Snyder, the

16   evidence custodians.

17          **THE COURT:**  All right.  Go ahead.

18          **MR. GOROKHOV:**  Thank you, Your Honor.

19   BY MR. GOROKHOV:

20   **Q.**  But we can agree, can we not -- excuse me, let me go back

21   to the first page.

22       We can agree that as to the vast bulk of items, with the

23   exception of Items 5 and 7, those did not go to the lab until

24   June 22nd -- I'm sorry, 7th of June, 2022?

25   **A.**  Yeah, it looks like about two months later, and I can't

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  remember the exact reason.  I mean, there was a lot of

2  documentation from the warrants we executed.  I mean, there's

3  other things going in the office.  Different taskers.

4  **Q.**   But two months, that's -- I just want to -- I'm not asking

5  you for the reasons right now.

6  **A.**   Okay.

7  **Q.**   I'm just asking you, it took two months for them to get

8  into the lab?

9  **A.**   It says two months here, yes, sir.

10 **Q.**   Okay.  Thank you.

11     I want to ask to you -- I want to move to the next step

12 here and ask you about when you submitted the items to the lab,

13 and what happened then.  Okay?

14 **A.**   Okay.

15         **MR. GOROKHOV:**  Your Honor, I'm putting up Defense

16 Exhibit 2 that I move into evidence at this time.

17     I guess without objection, I'll proceed.

18         **THE COURT:**  Yeah.  If it's -- if you offer it, and

19 there's no objection, it's automatically in.  You don't have to

20 move.

21         **MR. GOROKHOV:**  Understood.  Thank you, Your Honor.

22         **THE COURT:**  Okay.

23 **BY MR. GOROKHOV:**

24 **Q.**   So when you submit devices to -- for forensic examination,

25 there's a special form you fill out, right?

1  **A.**    Yes, sir, it is -- there is.

2  **Q.**    And that's this forensic laboratory examination request?

3  **A.**    Correct.

4  **Q.**    Fair to say you filled out a fair amount of these in your

5  career?

6  **A.**    Yes, I did.

7  **Q.**    Okay.  And you submitted in this particular request -- if

8  we look at the bottom, where it says evidence submitted, and I

9  want you to have an opportunity to look at the full list here,

10 so let me know when you've looked at this page, and I'll move

11 on to the next one.

12 **A.**    Okay.

13 **Q.**    All right.  Moving on to the following page, and just take

14 a look at that and make sure you have an opportunity to see

15 what's there.

16 **A.**    Yes, I reviewed it.

17 **Q.**    Okay.  So this is you submitting the seized devices.  It

18 looks like the majority, at least, of the seized devices for

19 examination and requesting that the forensic examiners look at

20 them?

21 **A.**    Correct.

22 **Q.**    And image them for review, correct?

23 **A.**    Correct.

24 **Q.**    And it specifically lists here, just before we move on, it

25 says -- it makes reference to this item, and it looks like --

1    is that two items that are currently with Troy Pugliese?

2    **A.**    No.  It's saying the -- the EPCD, which is the property

3    custody document number, HMMD5, the items on that were

4    currently in possession of Mr. Pugliese at that lab.  So I was

5    including what he took initially from Michelle's house in this

6    lab request.

7    **Q.**    Okay.  So when -- so when you submitted this form to the

8    DFEs, you provided this brief description that gave a summary

9    of the -- what you believe the investigation showed at that

10    time; is that correct?

11    **A.**    Yes.

12    **Q.**    And you also provided a section, I'm turning to Page 2,

13    for the record, Your Honor -- provided a section that talks

14    about how the images should be produced, correct?

15    **A.**    Correct.

16    **Q.**    And it refers to the AUSA's cyber team, right?

17    **A.**    Yeah.  I mean, I did not know a specific -- their specific

18    department, but yes, I -- I see what you're saying, referring

19    to.

20    **Q.**    Right.  I'm just asking, who did these instructions come

21    from?

22        You're communicating instructions, it looks like, for how

23    the U.S. Attorneys' Office wants this evidence --

24    **A.**    Yeah, so -- yeah, there are conversations with the

25    investigative team, to include Mr. Ake, about what format would

1  be acceptable to go into Relativity.  And that's what they told

2  me in EO1 file.

3  **Q.**   So when you discussed this matter with Mr. Ake, he had

4  input into how this evidence should be produced for review,

5  correct?

6  **A.**   I would say that -- yeah, I did discuss -- we would be

7  sending a lab request to include information on here, yes.

8  **Q.**   And on the first page, if you look at the top, exam

9  priority, it's marked -- it's marked routine, right?

10  **A.**   Uh-huh.

11  **Q.**   Not expedite?

12  **A.**   Correct.

13  **Q.**   Okay.  Now -- and that's because you didn't receive a

14  request to expedite; is that correct?

15  **A.**   Well, the lab gives guidance out that they -- we need to

16  be very specific on a lab request.  So, for instance -- well,

17  they are very specific on what cases they -- that they want

18  expedited.

19  **Q.**   Wait, you're saying the lab decides when evidence gets

20  produced?

21  **A.**   No.  They give guidance on don't -- you know, they don't

22  want everybody putting expedited on there, which would defeat

23  the whole purpose.

24  **Q.**   Okay.  All right.  So you made a decision not to put

25  expedite, that's what you're saying?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **A.**   I did.

2  **Q.**   Now, I want to talk to you about the date this was

3  submitted.  This request for forensic examination was submitted

4  on May 12th of 2022.  That's when you signed it, correct?

5  **A.**   Let me see here.  Yes, I see in Block 15 Charlie, my

6  digital signature is 12 May, '22.

7  **Q.**   Okay.  I want to now switch gears here and talk to you

8  about the next step, which Judge Xinis brought up earlier,

9  which is that when these devices were imaged, okay, the

10  instructions you provided was that they should all be put on

11  one drive, correct?

12  **A.**   I'm just going to reference -- one second.

13  **Q.**   Yeah, please.

14       Do you have Exhibit 2?

15  **A.**   Yes, sir, I do.  Right here.

16  **Q.**   Okay.

17  **A.**   So I see once the raw data is extracted and placed on a

18  hard drive.

19  **Q.**   Right.

20       Okay.  So it says, if all files could be placed on a

21  single drive in one format, I could collect all of them and

22  provide it to the AUSA, right?

23  **A.**   Yes, sir.  I see that now, yes.

24  **Q.**   And do you remember collecting one drive and providing it

25  to the AUSA?

1  **A.**    I do.

2  **Q.**    Where is the chain of custody for that drive?

3  **A.**    So, this is just a copy.  The -- our agency would consider

4  that a working copy.

5  **Q.**    Okay.

6  **A.**    So that way we could provide it to whoever the attorney

7  sees fit.

8  **Q.**    Right.

9  **A.**    In this case, it was the AUSA's -- AUSA's cyber team to

10  input on Relativity.

11  **Q.**    Okay.  But let me ask you the question again.

12      Where is the chain of custody for that drive?

13  **A.**    Well, it's a copy of the actual evidence, so there is no

14  chain of custody.  This is considered a working copy.  We

15  wouldn't have a chain of custody for a working copy because

16  it's not the -- it's not the evidence.  The evidence is on the

17  actual image devices, which there is a chain of custody for

18  those.

19  **Q.**    Oh, we'll get to those.  But let's -- let's stick with

20  this for a while.

21  **A.**    Okay.  Okay.

22  **Q.**    This drive is the data that supposedly the U.S. Attorneys'

23  Office is going to be looking at, the prosecutors in this case

24  are going to be looking at this version of the data, they are

25  not going to be looking at the phones or the SD cards, or

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1   whatever else, they are looking at this, right?

2   **A.**   They are looking at the files on this, yes.

3   **Q.**   Yeah.  So you guys did not keep a chain of custody as to

4   this device on which the government reviewed the evidence in

5   this case?

6   **A.**   We did not keep a chain of custody on the working copy.

7   **Q.**   Where is this copy now?

8   **A.**   It is currently in Relativity.

9   **Q.**   No, no.  Where is this drive now?

10  **A.**   Oh, I -- I don't know.  I gave it to Mr. Ake, who I

11  believe I gave it to -- he gave it to the cyber team in

12  Baltimore, his supporting individuals.  But I can't say for

13  certain.  All I can tell you is that I gave it to Mr. Ake.

14  **Q.**   When did you give it to Mr. Ake?

15  **A.**   I -- when I reviewed my files, it was in there, but I

16  don't remember the exact date.

17  **Q.**   Okay.  And you didn't write a report saying, "On this

18  date, I delivered a device to Adam Ake containing all of the

19  digital devices seized"?  You didn't write a report about that?

20  **A.**   I did not write a report about that.

21          **THE COURT:**  But hold on.  It's 12:00.  I would like

22  to take a break.

23      Did you say, sir, that it would be in your notes when you

24  gave over the drive to the AUSA?  I thought you just said "when

25  I reviewed my notes"; is that right?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

 1          **THE WITNESS:**  I did, yes, ma'am.

 2      We call it ALERTS, it's the Army Law Enforcement Tracking

 3   System, it's where we document, you know, what we do on a daily

 4   basis.

 5          **THE COURT:**  With counsel's permission, why don't you

 6   take a look at your notes while we're on break so that you

 7   could give us that date.

 8          **THE WITNESS:**  Okay.

 9          **THE COURT:**  Okay?

10          **MR. GOROKHOV:**  Your Honor, thank you.

11      And if I can just say for the record, say if we can

12   continue with the rule on witnesses, obviously no discussions

13   between Agent Kimrey --

14          **THE COURT:**  Yes, obviously.  I'll give you the

15   advisement, you're still on the stand, you're still under oath,

16   don't talk to anybody about your testimony.

17      But with my permission, I would like you to review your

18   notes so that we can get a date by which the hard drive was

19   produced to AUSA Ake.  Okay?

20          **THE WITNESS:**  Yes, ma'am.

21          **THE COURT:**  Great.  Let's take 15.

22          **DEPUTY CLERK:**  All rise.  This Honorable Court now

23   stands in recess.

24      (Recess taken.)

25          **DEPUTY CLERK:**  All rise.  The United States District

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

 1  Court for the District of Maryland resumes in session.  The

 2  Honorable Judge Xinis presiding.

 3          **THE COURT:**  All right.  Everyone, you all can have a

 4  seat.  The agent is still under oath in the witness chair.

 5      Did you have enough time, sir, to review your notes?

 6          **THE WITNESS:**  Yes, Your Honor, I did.

 7          **THE COURT:**  Okay.  Great.

 8      Mr. Gorokhov?

 9          **MR. GOROKHOV:**  Your Honor, before we proceed, I

10  request we -- I think the Court --

11          **THE COURT:**  Do you want to come to --

12          **MR. GOROKHOV:**  Yes, Your Honor, yes.  Thank you,

13  thank you.

14          **THE COURT:**  Go ahead.

15      (A bench conference was held on the record as follows:)

16          **MR. GOROKHOV:**   Your Honor, is it okay if I --

17          **THE COURT:**  Wait for the government to get here.

18          **MR. GOROKHOV:**  Thank you.

19          **THE COURT:**  Yeah.  Go ahead.

20          **MR. GOROKHOV:**  Is it okay if I let Mr. Greenberg

21  field this one?  I just want to save my voice a little.

22          **THE COURT:**  I'm sorry.  Say that again.

23          **MR. GOROKHOV:**  Is it all right if I let Mr. Greenberg

24  address this issue real quick?

25          **THE COURT:**  Sure, yeah, just because I know you're

1   sort of battling something.

2        **MR. GREENBERG:**  So, Your Honor, we would respectfully

3   ask that these notes be produced in full, immediately.

4        **THE COURT:**  Well, they are not with him, right?  They

5   are not on the stand with him?  Are they on the stand with him?

6        **MR. GARDNER:**  I believe he just reviewed his

7   electronic device, Your Honor.

8        **MR. GREENBERG:**  I mean, these notes appear to be

9   squarely within the scope of the Court's order directing the

10  government to produce all documents related to the chain of

11  custody and the devices.

12       **THE COURT:**  Well, to the extent -- I don't know if

13  I'll order all notes, right?  But if there are notes that

14  reflect the chain of custody with respect to that drive that we

15  now learned was taken, created from the images and turned over

16  to the government, you know, or certainly you can expect --

17  inspect the notes to confirm that it's consistent with the

18  testimony.  I don't know if we actually need the note, though.

19       **MR. GREENBERG:**  Well, Your Honor, if these notes have

20  not been produced to us -- Your Honor has ordered the

21  government multiple times, orally, in writing, orders in the

22  docket, I mean it's at least two orders that I can think of,

23  probably more, to produce everything related --

24       **THE COURT:**  All the chain of custody.

25       **MR. GREENBERG:**  -- to the chain of custody.

1          THE COURT:  Right.

2          MR. GREENBERG:  And I believe it went further into

3    all documents related to the chain of custody.

4          THE COURT:  No, I said -- I said every piece of paper

5    that shows me where these devices went from beginning to end.

6    I think there's probably a good faith dispute about what

7    happens when you create a drive.

8        In any event, I'm not going to order that all the notes

9    get turned over to you, but why don't you explore with this

10   witness what he had, what he looked at, where it is.

11       And you know, I think it's fair -- my recollection is,

12   under the rules, if a witness uses a document to refresh

13   recollection, which is what this witness is doing, then the

14   parties have an opportunity to review it.

15         MR. GOROKHOV:  Yes, ma'am.  Yes, ma'am.

16         THE COURT:  So I think that's fair.

17         MR. GOROKHOV:  Yes, ma'am.

18         THE COURT:  But not all notes, just whatever he

19   reviewed to refresh on this issue.

20         MR. GREENBERG:  Well, Your Honor, I just want to make

21   our record that, you know, our position is to the extent that

22   these notes are within the realm of documents related to the

23   chain of custody or existence or destruction or loss of these

24   devices, they should have been produced pursuant to the Court's

25   multiple orders before today.

1    If there are parts that are not relevant, that could have

2  been redacted.

3    But, you know, this appears to be another violation of the

4  Court's orders.

5        **THE COURT:**  Well, let's see.  You can ask about it.

6  maybe there's more, maybe there isn't.  If there is, then

7  counsel talk about it, and if there has to be a late

8  production, I'll take it into account.

9        **MR. GREENBERG:**  Okay.

10        **THE COURT:**  If there isn't, then there's no -- it's

11  moot, there's no issue there.

12        **MR. GREENBERG:**  Okay.  I just want to make sure we're

13  making a record.

14        **THE COURT:**  Yep.  I got it.  Okay.  Thank you.

15    (The bench conference concluded and proceedings resumed as

16  follows:)

17  **BY MR. GOROKHOV:**

18  **Q.**    Over the break, did you have an opportunity to review a

19  document that refreshes your recollection as to when you

20  delivered this hard drive to Mr. Ake?

21  **A.**    Yes, sir.  In it -- just to clarify, it wasn't a document.

22  So what I reviewed was -- it's our system internal to the Army

23  called ALERTS, that's the Army Law Enforcement Tracking System.

24    So in there, we would put entries of what we did in the

25  case file.  So, for instance, you know, I did look back at my

 1  entries within this case file, and I noted that on 10 August,

 2  '22, is when I delivered this hard drive to AUSA Ake, and that

 3  would have been the same day that we conducted a proffer of

 4  another defendant in this case.

 5  **Q.**  Okay.  And when you -- you write these notes, you intend

 6  these notes to be accurate, right?

 7  **A.**  Yes.

 8  **Q.**  I mean, this is -- this is serious stuff, right?  It's

 9  evidence, and, you know, you want to track what you're doing at

10  any given time, being able to go back, just as you did now, and

11  be able to retrieve information about what you did on a

12  particular date?

13  **A.**  We try to be as accurate as we can in our entries.

14  **Q.**  Okay.  Did the government ever ask you to produce these --

15  a copy of these entries?

16  **A.**  No.

17        **MR. GOROKHOV:**  Your Honor, may we approach again?

18        **THE COURT:**  Sure.

19  (A bench conference was held on the record as follows:)

20        **THE COURT:**  Okay.  What's -- what's up?

21        **MR. GOROKHOV:**  I just want to note for the record, it

22  seems to be a clear violation of *Jencks*.  I mean, it's his

23  entries.  He intends them to be accurate.  He adopts them.

24  They are his statements about the investigation, they were

25  never produced, never even asked for by the government.

 1              THE COURT:  I don't know if the government knows

 2    about them, in fairness.

 3              MR. GARDNER:  Your Honor, whatever -- let me just

 4    mention, I mean that's an internal -- internal data entry

 5    system.

 6              THE COURT:  That's not my question.  Did you know --

 7              MR. GARDNER:  I don't know about them, Your Honor,

 8    no.

 9              MR. GOROKHOV:  But, Your Honor, this is the problem,

10    in order to know about something, you have to have a process to

11    find about it.  He can't be, you know, a babe in the woods

12    like, just, you know, completely helpless to turn over --

13              THE COURT:  All right.  Let's do this.  Ask whatever

14    questions you wish --

15              MR. GOROKHOV:  Okay.

16              THE COURT:  -- regarding ALERTS, and what's in it,

17    how it works, because it was a little bit -- you know, I'm not

18    going to make the call now that there's a *Jencks* violation, and

19    then we'll see where we go.  You can examine this witness on

20    it, we'll figure it out.  Okay?

21              MR. GOROKHOV:  Thank you, Your Honor.

22         (The bench conference concluded and proceedings resumed as

23    follows:)

24    BY MR. GOROKHOV:

25    **Q.**   All right.  And this ALERTS system, is this something that

1  you can access on your -- how do you -- how do you access this

2  system?

3  **A.**    Yeah.   It's -- it's -- we call it CAC enabled, that's our

4  common access card.   You have to have a government ID to access

5  with a pin.

6  **Q.**    Okay.   And in it -- again, what is the purpose of the

7  system?

8  **A.**    So the purpose is just to document what we've done on the

9  case, and those are more generalities.   So if I have a phone

10  call with somebody, I would just phone call with this person.

11  **Q.**    Okay.   Okay.   So that document would also reflect things

12  like when you were reviewing particular evidence as well,

13  right?

14  **A.**    It could.

15  **Q.**    So it documents pretty much everything you were doing in

16  this investigation, right?

17  **A.**    I wouldn't say everything, but a majority of it.

18  **Q.**    It documents the important steps you were taking?

19  **A.**    It would.

20  **Q.**    And, again, you make sure that you make those entries

21  accurate?

22  **A.**    We try to be as accurate as we can in the entries.

23  **Q.**    Okay.

24           **MR. GOROKHOV:**   Your Honor, I think that's all the

25  record I need to make on that.

1          **THE COURT:**  Okay.  I'll give the government an

2  opportunity --

3          **MR. GOROKHOV:**  Okay.  Thank you.

4          **THE COURT:**  -- on redirect, and we'll figure out

5  where we are.

6          **MR. GOROKHOV:**  I will move on.

7  **BY MR. GOROKHOV:**

8  **Q.**   So your notes, after looking at the system, say that you

9  produced this hard drive to Mr. Ake on August -- excuse me, on

10  August 10th of 2022; is that correct?

11  **A.**   Correct.

12  **Q.**   And you said you had an interview that day with another

13  subject; is that correct?

14  **A.**   Correct.

15  **Q.**   And who is that?

16  **A.**   It would be Wesley Williams.

17  **Q.**   Okay.  Now, I want to ask you about the next step.  We're

18  going to step away from the hard drive that we talked about.

19  And I want to ask you about the imaging of the devices that you

20  submitted to be copied.  Okay?

21  **A.**   Okay.

22  **Q.**   And let's take a look at D3, Defense Exhibit 3.

23          **MR. GOROKHOV:**  And, Your Honor, for the record,

24  again, these are records produced by the government, and they

25  are -- I'm going to question the witness and get to the bottom

1  of what they are.

2      **THE COURT:**  Okay.  All right.

3  **BY MR. GOROKHOV:**

4  **Q.**  Are you familiar -- if you want, you can just kind of leaf

5  through the packet.

6  **A.**  Okay.

7  **Q.**  Just -- I'm not trying to play any tricks.  I want you to

8  see what's in there.

9  **A.**  I hope not.  Okay.

10     Okay.  I've leafed through them.

11 **Q.**  Okay.  And so what these are, are records on the -- they

12 are records from the folks who actually do the imaging, right,

13 the forensic work?  And they are the chains of custody that

14 they create on their end; is that correct?

15 **A.**  So this would have been an image from a device, and at

16 that point, once they collect the data, they would put it on a

17 hard drive, it would become evidence at that point.

18 **Q.**  Right.

19     Because what's, in fact, referred to here is you have a

20 Western Digital drive, for example, as the first item,

21 QMJL5-HDD, and that has reference to a forensic image of a

22 device, correct, Item 1?

23 **A.**  That is what this document indicates.

24 **Q.**  Okay.  So just going through -- I'm not going to get, you

25 know, redundant on these documents, but if you just look at the

1   dates when -- and, by the way, Alfred Williamson in this case

2   was a forensic examiner; is that correct?

3   **A.**   Yes.

4   **Q.**   Okay.  So on July 21st, 2022, Alfred Williamson passes on

5   item -- this item, which is a hard drive, to -- well, it looks

6   like he noted that he had it.  And then on July 21st, Alfred

7   Williamson releases it to Michael Jeffers, who you've testified

8   is the custodian, correct?

9   **A.**   So just to clarify, I think you're referring to the first

10  item, Quebec Mike Juliet Lima 5, right?

11  **Q.**   No.  Let's just look -- if you look down at the chain of

12  custody, we can start with the hard drive, 2D3BD-HDD?

13  **A.**   Okay.

14  **Q.**   That's also a hard drive containing a forensic image of a

15  device, right, Item 8?

16  **A.**   Yes, yes; I see it now, yes.

17  **Q.**   All right.  So on July 21st, Williamson gives this device

18  to Michael Jeffers who is a custodian, correct?

19  **A.**   That's what this indicates.

20  **Q.**   And that device already contains the image of the device?

21          That device already contains the data from the originally

22  seized device?

23  **A.**   Well, I think that would be a question for him.  I didn't

24  actually do the analysis.

25  **Q.**   Okay.  You didn't do the analysis.  Oh, I see.  Okay.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1        Well, I mean you rely on these chains of custody, right?

2   **A.**   Right.

3   **Q.**   I mean, these are documents that you use daily to know

4   what evidence you have and what's coming in?

5   **A.**   Correct.  Correct.

6        To answer your question, the documents indicate an image.

7   But what's actually on the documents, that would be a question

8   for the examiner in this case, Williamson.

9   **Q.**   Right.

10       But you've gone through the prosecution -- gone through

11  with the prosecutors in detail the images that were obtained

12  and were not obtained in this case, right?

13  **A.**   We've went over the devices that were collected.

14  **Q.**   Yeah.  And, in fact, it was just days ago when you were

15  getting these chains of custody from the lab; is that right?

16  **A.**   Chains of custody from the evidence custodian who handles

17  the originals, yes.

18  **Q.**   Yeah.  Right.

19       So there -- at least their records indicate that these

20  hard drives contain images of devices that were seized.

21  **A.**   Okay.  Right.  Yes, sir.

22  **Q.**   Right?

23  **A.**   Yes.

24  **Q.**   And so just in the case of this specific device, and I

25  don't want to be -- I just want to use this as an example and

1  move on because we all have better stuff to do.

2      But here, you have July 21st, 2022, he gives it to

3  Jeffers, right?

4  **A.**   Uh-huh, yes.

5  **Q.**   At that point, according to this document, the image is

6  already on the device, correct?  And then you get it on

7  August 8th?

8  **A.**   Correct.

9  **Q.**   Okay.  And then your testimony was that eventually, all of

10  this was also dumped onto a hard drive that you gave to Adam

11  Ake on August 10th of 2022; is that correct?

12  **A.**   Okay.  Yes.

13  **Q.**   And it's fair to say that all of these chains, I just want

14  you, again, to have an opportunity -- but roughly, they reflect

15  that the devices were imaged sometime in June or July of 2022,

16  and then you received them, the vast bulk of them by

17  August 8th.

18  **A.**   I believe it was August 8th when I picked up the majority

19  of the documents.

20  **Q.**   Okay.  So just by August 8th of 2022, the devices are

21  imaged and the majority of them are in your custody.

22      And, again, you can look through here and see which ones

23  aren't, you know, to be accurate.  But --

24  **A.**   Okay.  I've looked through a majority of them, and they

25  appear to reflect August 8th is when I became in control of

1  them.

2  **Q.**   Okay.   Great.

3      I also want to ask you -- and it's fair to say that the

4  ones that you became in control of, they were imaged either in

5  June or July of 2022?

6  **A.**   I cannot say when exactly they were imaged.  I can tell

7  you when I -- when I obtained them and when I gave the devices

8  to the digital forensic examiner.

9  **Q.**   Let me be a little more precise.

10     You can tell based on these chain of custody that -- not

11 the date they were imaged, but the date that they were -- the

12 date that they were on the hard drive?  Right?

13     Because, like, we looked at on this page, for example, we

14 know that on July 21st of 2022, Williamson is done with this

15 device, right?  He's done with this hard drive?

16 **A.**   That's how I interpret that, yes.

17 **Q.**   And he's not turning over a blank hard drive, right?  His

18 own notes reflect that there was an image placed on the hard

19 drive?

20 **A.**   Correct, I would agree.

21 **Q.**   Okay.  All right.

22         **MR. GOROKHOV:**  Court's indulgence, Your Honor.  I

23 think I appear to be missing a document.  Okay.

24     All right.  I'm going to go back to D1 now, Your Honor,

25 briefly.

1          **THE COURT:**  Okay.

2   **BY MR. GOROKHOV:**

3   **Q.**   And I'm going to go to Page -- if you scroll -- if you --

4   do you still have D1 up?

5   **A.**   D1, yes, I do.

6   **Q.**   Okay.  If you go back to a document that looks like this.

7   **A.**   Okay.

8   **Q.**   Now, you're familiar with this type of document, right?

9   **A.**   I've seen it before.  I am not familiar.

10       This is a worksheet utilized by the DFEs, the digital

11  forensic examiners.

12  **Q.**   Okay.  So you're not sure how that document gets

13  populated?

14  **A.**   I am not.

15  **Q.**   So we would have to ask a DFE what these entries mean,

16  correct?

17  **A.**   Yes, sir; yes.

18  **Q.**   Okay.  That's fair.

19       All right.  So going back to the timeline here.

20       We've established, I think you've testified, when the --

21  when the hard drive got to Adam Ake.

22  **A.**   Uh-huh.

23  **Q.**   There were also -- I want to go back and ask you a couple

24  of general questions, again, as your -- in your experience as

25  an investigator.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1    You would agree, would you not, that when you obtained

2    evidence, it's important to preserve it, right?

3    **A.**    I would agree.

4    **Q.**    And you have to definitely try not to destroy evidence; is

5    that correct?

6    **A.**    We -- we -- there would be -- I mean, we would -- I can't

7    think of a reason where we would destroy evidence, unless it

8    was authorized within the investigation.

9    **Q.**    Okay.  Now, in this case, there were several devices that

10   were not actually imaged; is that correct?

11   **A.**    Several items that weren't imaged?

12   **Q.**    Several items that weren't imaged.

13   **A.**    According to the DFE, there were issues with a few of the

14   devices.  Why or why not they could not be imaged, that would

15   be specific questions for the examiner.

16   **Q.**    So the examiners -- is your testimony here today that the

17   examiners did not communicate with you about the purpose --

18   excuse me, about the problems they encountered in imaging these

19   devices?

20   **A.**    No, that's not what I'm saying.

21   **Q.**    Okay.  Did the examiners in this case communicate with you

22   about the issues they were having in imaging the devices?

23        **MR. GARDNER:**  Your Honor, objection here.  We're

24   going to hear from them in two minutes, and --

25        **THE COURT:**  Well, the question is, did they

1    communicate with you?

2        Did the examiners communicate with you in their process of

3    imaging the devices?

4            **THE WITNESS:**  I would say yes.  I mean, whether it be

5    a phone call, it was majority on -- on phone call, when they

6    would -- either Mr. Johnson would call me and discuss the

7    status on the case.  Now, what specifically he was saying, I

8    don't recall specifically.

9    **BY MR. GOROKHOV:**

10   **Q.**   And you just testified that there's a CAC card access

11   system where you go in and you keep tabs on phone calls that

12   you have, right?

13   **A.**   We do our best to document, yes.

14   **Q.**   The important phone calls, right?

15       I didn't get an answer.

16   **A.**   Uh-huh.

17       Could you ask the question one more time, please?

18   **Q.**   Yes.

19       You testified that this system where you go in and make

20   entries about steps in your investigation, you -- you would

21   note important phone calls, that was a specific example you

22   gave; is that right?

23   **A.**   We would try to be as accurate as possible.  And every

24   entry -- everything we do in the case, we try to be as

25   accurately as possible and document what we do.

1    **Q.**    Okay.  And in this case, do you understand that the

2    government has represented that the DFEs communicated that they

3    couldn't break into the device and it would take years?

4    **A.**    I don't recall that specifically.

5    **Q.**    Okay.  So that's not a conversation you had with one of

6    the DFEs?

7    **A.**    I could have had that conversation, but I'm saying

8    specifically about that, years to take, I don't recall.  I'm

9    not saying it couldn't have happened, I'm just -- at this

10   moment cannot recall specifics about what the DFE did or did

11   not say.

12   **Q.**    Well, would reviewing the notes in your system refresh

13   your recollection?

14   **A.**    For that specific conversation?

15   **Q.**    Yeah.

16   **A.**    So, again, our system in ALERTS, it's only going to catch

17   generalities.  So I don't think if I did a word search of

18   "years," I don't see that populating.

19   **Q.**    So when you -- you were able to catch the generality -- I

20   don't know what you mean by generalities, so let's explore this

21   a bit.

22        So your system allowed you to determine when you delivered

23   this hard drive to Mr. Ake, correct?

24   **A.**    It did.

25   **Q.**    But your system would not allow you to determine when a

1  DFE calls you and says there's an item of evidence that we

2  can't access, and it would take a long time to access it, and

3  then they get the directive that they should quit and return

4  the device to the owner, that -- that would not go in your

5  system?

6  **A.**    So like I said before, generalities.  So if I call you to

7  have a conversation, my entry would just be simply had a

8  call -- I'm sorry, I forgot your name, I'm sorry.  But I would

9  call you, that's all it would say.  It wouldn't say that we

10  talked about meeting at Starbucks or anything like that.

11  **Q.**    So how did you know that you called Adam Ake and delivered

12  the hard drive to him on August 10th of 2022?

13          **THE COURT:**  August 8th.  I think it's August 8th.

14  But go ahead.

15          **MR. GOROKHOV:**  August 8th is when he received it,

16  Your Honor.

17          **THE COURT:**  Oh, I'm sorry.  Okay.  Go ahead.

18      How did you know --

19          **THE WITNESS:**  I think you asked me if I made that

20  call.  I don't think I ever made that call.

21      I'm saying that on 10 August, I was at the U.S. Attorneys'

22  Office doing another interview, is when I gave that hard drive

23  to Mr. Ake.

24  **BY MR. GOROKHOV:**

25  **Q.**    Oh, I see.

1    So there was no entry.  You never made an entry about when

2   you delivered that hard drive to Mr. Ake?

3   **A.**    That's not true, sir.

4   **Q.**    Well --

5   **A.**    Like I said, we just went back and I reviewed the entries.

6   And what I got on that entry, is I'm seeing on 10 August, '22

7   is when we were doing a proffer with Mr. Williams.  Also on

8   that same entry, I documented that I gave the hard drive to

9   Mr. Ake.

10  **Q.**    So you documented giving the hard drive to Mr. Ake in your

11  entry; is that your testimony?

12  **A.**    Yes, sir.

13  **Q.**    Okay.  But you did not document any kind of conversation

14  with the forensic examiner about the decision not to attempt to

15  get the data off of a device that they couldn't breach, because

16  the forensic examiner told you, quote, unquote, it would take

17  years?

18  **A.**    So we received direction to return the devices to their

19  owners.

20       Now, the timeline on that, if you're asking why the

21  decision was made, I don't know.  That would be a question for

22  Mr. Ake.

23  **Q.**    So you weren't consulted about the decision not to do the

24  brute force extraction of the device?

25  **A.**    I think you're talking about a specific analysis.  I -- I

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1    can't tell you analysis that the DFEs would do.  I think that
2    would be a question for them.
3             **THE COURT:**  I would move on.
4             **MR. GOROKHOV:**  Okay.  Your Honor.  Thank you.  Thank
5    you for your indulgence.
6        So I just want to go back to this chart.  I forget the --
7    please ignore the scribblings.
8        I forget the exhibit number.  I think the government put
9    it into evidence, Your Honor?
10            **THE COURT:**  Oh, 7.  Of the chart, you mean?
11            **MR. GOROKHOV:**  Yes, Your Honor.
12   **BY MR. GOROKHOV:**
13   **Q.**  Government 7, minus the notes.
14       So the top -- the line at the top, in green -- you
15   prepared this chart, by the way, right?
16   **A.**  I assisted, yes.  Yes.
17   **Q.**  You prepared it yesterday?
18   **A.**  It would have been yesterday or the day before, yeah.
19   **Q.**  Right.
20       So you were working on this chart as of yesterday, right?
21   **A.**  I believe so, yes.
22   **Q.**  But there was a previous version of this that was an Excel
23   file, right?
24   **A.**  Yes.
25   **Q.**  And you worked on that as well, right?

 1   **A.**   I've worked on this for a majority of my week.

 2         **MR. GARDNER:**  Objection, Your Honor.  I -- can we

 3   just --

 4         **THE COURT:**  The previous Excel file, did you work on

 5   that, sir?

 6         **THE WITNESS:**  Yes.

 7         **THE COURT:**  Okay.

 8         **MR. GARDNER:**  I just want to be very specific about

 9   which Excel file, because there's -- there have been multiple

10   versions of this as we kind of worked through it, and I just

11   want to be very specific about if we're trying to --

12         **THE COURT:**  Is there more than one Excel file that

13   more than one agent worked on?

14         **MR. GARDNER:**  Well, this has multiple versions, and

15   I'm wondering if the witness is referring to, like, version one

16   and version two as we sort of went through how to do the

17   margins, which columns to include, that sort of thing.

18         **THE COURT:**  Right.

19      The question, though, is, did you also work on an Excel

20   file regarding the devices, and the answer was yes.

21         **MR. GARDNER:**  And, Your Honor, this PDF was just

22   extracted from an Excel file.  Obviously, it was created in

23   Excel.  So that's -- I'm just trying to make the record very

24   clear.

25         **THE COURT:**  The PDF is an extraction from --

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1           MR. GARDNER:  It is, Your Honor.  It's just a screen

2   capture of the Excel.

3           THE COURT:  So the agent worked on both, right?  And

4   when you're saying it took the majority of a week, you're -- do

5   you mean the collective process?

6           THE WITNESS:  No.  I'm just saying organizing it with

7   columns and rows and --

8           THE COURT:  Right.

9      I guess my point is, that week-long process included work

10  on this Excel file that was then exported to the chart; is that

11  right?

12          THE WITNESS:  That's accurate, Your Honor.  Maybe

13  when I say a week, I don't physically mean a week.  It took

14  some time.

15          THE COURT:  Okay.  Very good.  Mr. Gorokhov?

16          MR. GOROKHOV:  Thank you, Your Honor.

17  BY MR. GOROKHOV:

18  Q.   So here, we have this version that came yesterday, and the

19  top line, there's a computer, it refers to a computer --

20       The Court's indulgence.  I'm sorry.

21       All right.  You see the computer at the top?

22  A.   I see the -- you talking about the green row?

23  Q.   Yes.

24  A.   Yes, sir, I see that.

25  Q.   All right.  And that refers to a computer that was seized

1  from Walter Reed; is that right?

2  **A.**   That is not true.

3       It was seized from Jackson's house.

4  **Q.**   Okay.  Property of Walter Reed, though, right?

5  **A.**   It was collected during the execution of the search

6  warrant.

7  **Q.**   Uh-huh.

8  **A.**   But when we got to look at it, it had a CAC card, a card

9  belonging to somebody else.

10      In order to follow our search warrant, we determined that

11  that wasn't within our search warrant, since we believed it

12  belonged to somebody else.  And that's when we returned it to

13  Harriett Jackson without doing any sort of analysis.

14  **Q.**   Wait.

15      You seized this from the home of Harriett Jackson?

16  **A.**   Well, Mr. Bornick did, yes.

17  **Q.**   Mr. Bornick did.

18      And this was a property-of-Walter-Reed computer --

19  **A.**   Well --

20  **Q.**   -- correct?

21  **A.**   -- to be clear, the contract -- the contract, Infused

22  Solutions, they were contractors of the United States

23  government.  They did get equipment from the government to

24  perform their duties.

25  **Q.**   Okay.  Let's break this down.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1    Ms. Jackson, in her home, had a computer that was property

2 of the United States government, correct?

3 **A.**  Yes.

4 **Q.**  You found this computer, correct?

5 **A.**  Mr. Bornick did, yes.

6 **Q.**  Mr. Bornick did.

7    In the computer was a CAC card, an access card belonging

8 to somebody else, not Ms. Jackson, correct?

9 **A.**  Well, at the time, there was a CAC card.  I don't know if

10 the collecting agent looked at that CAC card, but when it was

11 processed into evidence, that's the first time I saw it.  As I

12 pulled it out, I then noticed it wasn't Ms. Jackson.

13 **Q.**  So you didn't get a followup warrant for this, right?

14 **A.**  We didn't.

15 **Q.**  You did not.  You returned this computer without ever

16 looking at it?

17 **A.**  Well, this -- this -- the CAC card belonged to somebody

18 not associated with this investigation.

19 **Q.**  That's not my question.

20    It was in Harriett Jackson's house, wasn't it?

21 **A.**  It was.

22 **Q.**  So you made the decision to return this computer instead

23 of searching it, correct?

24 **A.**  Well, we didn't believe this phone belonged to Harriett

25 Jackson.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**   I'm not asking you who it belonged to.  I'm just asking

2  you the basic fact, that you seized this from Harriett

3  Jackson's house, you found a CAC card belonging to somebody

4  else in the computer, and then you gave it back to Harriett

5  Jackson?

6  **A.**   Well, the collecting agent, Mr. Bornick --

7  **Q.**   Yeah.

8  **A.**   -- collected it as he was instructed to do within the

9  guidelines of the search warrant.  Once it came to me, I

10  noticed it was not belonging to Harriett Jackson.

11  **Q.**   And your solution was then to return it to Harriett

12  Jackson?

13  **A.**   Yes.

14          **THE COURT:**  Okay.  Hold on.  Stop.

15      I want to make sure I know what the evidence number is

16  from Harriett Jackson's home for this item.  So go back --

17  someone go back and tell me which chain of custody document I'm

18  looking at, and which number that shows this Agent Bornick is

19  the one that seized this document.

20          **MR. GARDNER:**  Your Honor -- I'm sorry.

21          **THE COURT:**  Yeah, go ahead.

22          **MR. GARDNER:**  The government handed up Government's

23  Exhibit 8.

24          **THE COURT:**  Government's Exhibit 8.

25          **MR. GARDNER:**  Maybe we haven't handed it up yet and I

 1  can, Your Honor.  That is the document that we're referring to

 2  right now, Your Honor.

 3           **THE COURT:**  Okay.  Hold on.

 4           **MR. GARDNER:**  I'm sorry.

 5           **THE COURT:**  Let me do it this way.

 6       What's the document that was the original chain of custody

 7  that came from the search and seizure of -- the search warrant

 8  that was executed on April 6th?  Which document is that?

 9           **MR. GARDNER:**  And I misspoke, Your Honor, I meant

10  Government's Exhibit 9.

11       So this is -- you're referring to the chain of custody

12  hand receipt, basically, as we've been going through it today,

13  right?

14           **THE COURT:**  Correct.  Okay.  Yep.

15           **MR. GARDNER:**  That is that document, Your Honor.  And

16  that's -- and if you want the electronic copy, the file name is

17  DN1-22 Jackson.

18           **THE COURT:**  So I got it in front of me.  This is the

19  chain -- I've seen this before.  The defense has actually

20  attached it before, so I just wanted -- this is the -- just let

21  me look at it for a sec.

22       Okay.  So now we're oriented.  Let's make sure -- does

23  Agent -- does Agent Kimrey -- I want to make sure, I want the

24  record to be clear, does Agent Kimrey have a copy of G9?

25       And you have a copy of G9, right, Mr. Gorokhov?

1    **MR. GOROKHOV:**  I'm sure -- it doesn't seem to be in

2  the exhibits they have given us so far, Your Honor.

3        **MR. GARDNER:**  Your Honor, this was going to be part

4  of our reexamination.  I can distribute it right now.

5        **THE COURT:**  Yeah, just give it to Mr. Gorokhov now.

6  Actually, Mr. Gorokhov, I think you've attached this --

7        **MR. GOROKHOV:**  I probably have, Your Honor.

8        **THE COURT:**  -- before, so you've seen it.

9        **MR. GOROKHOV:**  I'm sure I have.

10       **THE COURT:**  I just want Agent Kimrey to look at it.

11       **MR. GARDNER:**  May I provide it to the witness, Your

12  Honor?

13       **THE COURT:**  Of course.

14    Okay.  Go ahead, Agent, take a look at G9, and let's just

15  confirm this is the chain of custody documents associated with

16  the laptop to which you're testifying.

17       **THE WITNESS:**  Yes, ma'am.

18       **THE COURT:**  Okay.  All right.  That's all I needed.

19  Go ahead.

20       **MR. GOROKHOV:**  All right.  Thank you, Your Honor.

21    I'm going to move this into evidence as a separate

22  exhibit, D6.

23       **THE COURT:**  D6.

24       **MR. GOROKHOV:**  If that's all right, Your Honor.

25       **THE COURT:**  I see.  It's the same -- is it the same

1    document that I was just given?

2              MR. GOROKHOV:  It is the same document, Your Honor.

3    The government just handed it to me.

4              THE COURT:  Okay.  That's fine.  D6.

5    BY MR. GOROKHOV:

6    Q.  So just so we are all on the same page, I want to make

7    sure the record is clear, you seized the laptop from Harriett

8    Jackson's house and then found out it belonged to the

9    government, found there was a CAC card belonging to somebody

10   other than Harriett Jackson in the laptop, did not get a

11   warrant for the laptop, and made the decision to return it to

12   Harriett Jackson, that's what this shows?

13   A.  We returned this computer to Ms. Jackson, because it did

14   not -- we did not feel that it fit within our current search

15   warrant.

16   Q.  Right.  But you didn't obtain a followup warrant, did you?

17   A.  We did not.

18   Q.  Who made the decision not to do that?

19   A.  It was a collective team, which would have included, you

20   know, Mr. Ake and the investigative team.

21   Q.  So Mr. Ake was involved in this decision, that's your

22   testimony?

23   A.  He would have been, yes.

24   Q.  He signed off on it, right, because he's in charge?

25   A.  Signed off on it?  What do you mean?

1  **Q.**   He's in charge, right?

2  **A.**   I would not say he's in charge.

3  **Q.**   Who is in charge?

4  **A.**   The investigative team runs the case, we advise the

5  prosecutor on the case.

6         **THE COURT:**  Let me just -- I just need to make sure I

7  understand what this is.  Okay?

8      Sorry to -- sorry to step all over everything.

9         **MR. GOROKHOV:**  Of course.  No, please.

10        **THE COURT:**  Agent Kimrey, D6, G9, the chain of

11  custody shows a laptop that was seized on April 6th, right?

12        **THE WITNESS:**  Yes, ma'am.

13        **THE COURT:**  That laptop is the property of Walter

14  Reed; is that correct?

15        **THE WITNESS:**  Well, it had markings of Walter Reed on

16  it.  I would assume that it belonged to Walter Reed.

17        **THE COURT:**  Okay.  So there's -- in the summary chart

18  that you worked on, right, Government's 7 that we've been

19  looking at, you told me it took a long time to create, right?

20        **THE WITNESS:**  Uh-huh.

21        **THE COURT:**  You got it in front of you?

22        **THE WITNESS:**  Right.

23        **THE COURT:**  Who wrote in the right-side column

24  "property of Walter Reed" describing this laptop?

25        **THE WITNESS:**  That would have been me.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1      **THE COURT:**  Okay.  You just said you assume it.

2      I would imagine that at the point at which you're making

3  this chart, for today, for my purposes, as the fact finder, you

4  would have made sure of this.

5      Is it an assumption, or is there evidence that this laptop

6  was property of Walter Reed?  What -- how do you know it's

7  property of Walter Reed?

8      **THE WITNESS:**  By the markings on there.  I recall

9  specific markings of Walter Reed that are consistent with what

10  IT would put on this device.

11      **THE COURT:**  Can you describe that for me?

12      **THE WITNESS:**  It would be the Walter -- the Walter

13  Reed emblem, it's like a sticker that they would put on it.

14      **THE COURT:**  Okay.  Any other investigation that you

15  did to confirm that this laptop was Walter Reed's, the property

16  of Walter Reed?

17      **THE WITNESS:**  Not that I recall.

18      **THE COURT:**  Okay.  The CAC card inside of it, what is

19  a CAC card, to your knowledge?

20      **THE WITNESS:**  It's a government-issued ID,

21  identification card, that has a chip enabled in it, and that

22  chip allows a user to open the computer and access it.

23      **THE COURT:**  Does it store any data to your knowledge?

24  I know I'll ask the forensic person this as well, but I just

25  want to know what you know.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1          THE WITNESS:  To my knowledge, on the CAC card, no,

2    it does not story any.  Maybe certificates to enter a building,

3    for instance, or a computer.

4          THE COURT:  And your testimony today is that the CAC

5    card belonged to someone other than Ms. Jackson?

6          THE WITNESS:  Yes.

7          THE COURT:  How did you know that?

8          THE WITNESS:  Because when I received the evidence, I

9    pulled out the CAC card.

10          THE COURT:  Okay.

11          THE WITNESS:  And I noted it was not Harriett

12    Jackson.

13          THE COURT:  Who was it?

14          THE WITNESS:  I don't recall the specific name.  I

15    would assume that it would be in my notes, but --

16          THE COURT:  Don't assume.

17      Can you look in your notes and get that name for us at

18    some point?

19          THE WITNESS:  I could attempt to look, yes, ma'am.

20          THE COURT:  Okay.  But you know it wasn't

21    Ms. Jackson?

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.  And -- just I want to make sure I

24    understand it, based on that, you returned the item ultimately

25    to Ms. Jackson?

1              THE WITNESS:  Yes.

2              THE COURT:  Okay.  And the -- the item, meaning the

3   laptop, was never imaged, am I right about that?

4              THE WITNESS:  It was not sent to the lab.

5              THE COURT:  Okay.  And to your understanding, that

6   means it was never imaged?

7              THE WITNESS:  Yes, ma'am.

8              THE COURT:  Okay.  All right.  I think I got it.

9   Thank you.

10             MR. GOROKHOV:  Thank you, Your Honor.

11        And I think that takes care of most -- most of my

12   questions on that.

13        I will put up, Your Honor, as another exhibit, Exhibit --

14   what I'll call Exhibit D5, which is one of the -- I'll

15   represent to the Court one of the spreadsheets that we received

16   from the government focusing on these devices.  It's a previous

17   version.

18             THE COURT:  I think -- do I have this as well?  Was

19   it part of an ECF?

20             MR. GOROKHOV:  No, Your Honor.  I'm sorry, I don't

21   believe we've ever -- okay.  Part of our filing, correct.

22        Yeah.  So our filing, Your Honor, on Tuesday --

23             THE COURT:  On Tuesday?

24             MR. GOROKHOV:  -- is an exhibit -- either this one,

25   or a similar version of it is an exhibit to our filing.

1          THE COURT:  Okay.  All right.  So you're marking this

2    as D --

3          MR. GOROKHOV:  D5, Your Honor, I intended to put it

4    on before.

5          THE COURT:  Government, do you have a copy of this

6    version?

7          MR. GOROKHOV:  Your Honor --

8          MR. GARDNER:  We do, Your Honor.

9          MR. GOROKHOV:  And Mr. Goldman can hand up a copy to

10   the Court.

11         THE COURT:  Great.  Thank you.  Is this also in

12   two-point font, because you all are testing my --

13         MR. GOROKHOV:  It seems a little better.

14         MR. GOLDMAN:  It's a little bigger.

15         THE COURT:  Great.  Thanks.  D5?  Okay.

16         MR. GOROKHOV:  So, Your Honor, so do you see the line

17   at the top there, and it says laptop computer, location MPFFO,

18   and --

19         MR. GARDNER:  I'm sorry, Your Honor.  I do object to

20   this being entered into evidence through this witness.  I don't

21   believe he's authenticated that he participated in any way.

22         THE COURT:  Okay.  Let's lay the foundation if you

23   can.

24      Have you seen this document before, sir?

25         THE WITNESS:  Yes, I have seen this document.

 1          **THE COURT:**  All right.  Go ahead.  Take it from

 2   there, Mr. Gorokhov.

 3   **BY MR. GOROKHOV:**

 4   **Q.**  And, in fact, you just testified you worked on Excel

 5   spreadsheets before, right?

 6   **A.**  Right.

 7   **Q.**  Right?

 8   **A.**  In -- in general, or --

 9   **Q.**  No.  Excel spreadsheets reflecting the devices in this

10   case, including the destroyed devices?

11   **A.**  This appears to be an Excel document.  I do not -- I did

12   not recall ever working on this particular document.

13   **Q.**  Okay.  So you --

14          **THE COURT:**  But you have seen it, just so I'm clear?

15   You've seen this before?

16          **THE WITNESS:**  Yes.  I'm sorry.

17       I'm confused by his question.  But, yes, I have seen this

18   before, yes, ma'am.

19   **BY MR. GOROKHOV:**

20   **Q.**  Okay.  All right.  So looking at this document, if we

21   compare it to the other one, you'll notice here that the top

22   row is blacked out, right?

23   **A.**  It appears to be blacked out, yes.

24   **Q.**  And in the comments section, "in request but not provided

25   per case agent," right?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **A.**    That is what it says.

2  **Q.**    You see that?

3  **A.**    That is what it says, yes.

4  **Q.**    Okay.  But now in the version we received yesterday,

5  that's -- we now learn -- we now learn that this was a laptop

6  that was seized from Harriett Jackson that belonged to Walter

7  Reed that was returned to Harriett Jackson without any imaging?

8  **A.**    No, I think that's not accurate.

9  **Q.**    Is that a different item?

10 **A.**    Can we bring up that form again, so I can verify?

11      I think we may be talking about different items.

12 **Q.**    Okay.

13 **A.**    And, actually, I know what --

14 **Q.**    Yeah.  So why don't you show me on this item which -- if

15 you can mark it on the screen, I think that would be great.

16 **A.**    So just to be clear, we're talking about the very top

17 item, correct?

18 **Q.**    Yes.

19 **A.**    The one we were just talking about?

20 **Q.**    Right.

21 **A.**    And if you could scroll over to the comments again.  Okay.

22      So just to clarify, in my request to the lab, I didn't

23 initially put this on there.  This was done prior to us sending

24 it to the lab.

25      But at that point, at -- later down the road, we

 1  determined that it was not within our purview, or not within

 2  our confines of our search warrant, so we did not send it to

 3  the lab.

 4      So my DFE forensic examination request that we just went

 5  over, the D2, it did include this particular item, but it was

 6  never sent to the lab.  So I put it on there initially but then

 7  later learned we were going to return it.

 8      So that's -- that's why it's on here, and that's why we're

 9  seeing "in request but was not provided," because I didn't

10  actually give it to the lab as indicated in the charts.

11  **BY MR. GOROKHOV:**

12  **Q.**   Okay.  Let's talk about my question now.

13  **A.**   Okay.

14  **Q.**   Which is that as of yesterday -- sorry.

15      As of the day before yesterday, right --

16  **A.**   Uh-huh.

17  **Q.**   -- you created spreadsheets that laid out these devices,

18  correct?

19  **A.**   Yes.

20  **Q.**   You testified about that.

21      And the spreadsheet provided yesterday was the first one

22  that identified that this was actually a laptop that was

23  property of Walter Reed and was returned; isn't that correct?

24  **A.**   I don't know what's been provided.

25  **Q.**   Well, you worked on the spreadsheets yesterday, didn't

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1    you?

2    **A.**    Right, right.

3    **Q.**    Because the metadata and the document shows that you did,

4    doesn't it --

5              **THE COURT:**  Hold on.

6        Mr. Gorokhov, can we just -- can I ask one question for

7    clarification?

8        Agent Kimrey, I thought in response to a question I asked,

9    you said that this document, D5, you had seen, but you had not

10   created?  Am I right about that?

11             **THE WITNESS:**  The document on the screen, Your Honor,

12   I have seen, I have not been in any form edit to this

13   particular document or create it.

14       This was created by Digital Forensic Examiner Johnson.

15             **THE COURT:**  Okay.  But a moment ago, you said you put

16   this on, meaning the words in the comments section.  So I was

17   just a little confused as to what you meant by that.  If you

18   didn't create it and only saw it, what do you mean by you put

19   this on, looking at this document?

20             **THE WITNESS:**  So maybe -- maybe we're talking about

21   this chain of custody, this document here that I've been

22   provided.

23       So I've --

24             **THE COURT:**  You mean Government 7, what we've been

25   talking about today, or something else?

 1          **THE WITNESS:**  This doesn't have a G7 on it.

 2          **THE COURT:**  Then it's probably not -- where -- the

 3  thing you're holding in your hand, where did you get it from,

 4  sir?

 5          **THE WITNESS:**  I think it was in D3, the bottom of D3,

 6  I do believe.  I -- they have given me a lot of papers here,

 7  so -- I think it's the very last item in D3, if I'm not

 8  mistaken.

 9          **THE COURT:**  Okay.  The last item of my D3 is not that

10  chart that you're holding.

11          **THE WITNESS:**  Okay.

12          **THE COURT:**  Why don't you hand it up to me so I can

13  figure out what's going on?

14          **MR. GARDNER:**  Your Honor, it is attached -- it is the

15  last page on my D3.  It's also Government 7.

16          **THE COURT:**  Not on mine.  Not on mine.  It's the last

17  one on whose?  Government's what?

18          **MR. GARDNER:**  Defense Exhibit 3, so --

19          **THE COURT:**  Yeah, it wasn't on mine.

20      So -- counsel, can you approach?

21      (A bench conference was held on the record as follows:)

22          **THE COURT:**   Okay.  So this witness has said he's

23  looking at the last page of D3, which when I look at what's

24  been handed up as the last page of D3, it looks identical to

25  Government 7; is that accurate?

1          **MR. GOROKHOV:**  That should be accurate, yes, Your

2     Honor, yes.

3          **THE COURT:**  Okay.  So now I think I understand he's

4     looking essentially at the chart that we've all been

5     discussing, the most recent version.

6          **MR. GOROKHOV:**  Yes.

7          **THE COURT:**  Thank you.

8          **MR. GOROKHOV:**  That's correct.

9          **THE COURT:**  Now, I'll find out what he means by "what

10     I put on this."  Does anybody have any information on that?

11     Like why is he telling me --

12          **MR. GARDNER:**  Your Honor, I think he's actually

13     mistaken in -- or he thinks you're describing the hand receipts

14     with the signatures on it.  I think he's -- he thinks you're

15     referring to that document.

16          **THE COURT:**  Okay.  Earlier, his testimony was in

17     response to having Defense 5 in front of him, he -- I asked him

18     very specifically, "Did you create this document?"

19          "No, but I have seen this document."

20          And then in -- in the conversation with Mr. Gorokhov, he

21     said, "I put this information here," and he's trying to explain

22     it.

23          But that's inconsistent with whether he created it.  So I

24     just want to get to the bottom of what he's talking about

25     because this is about chain of custody of these items, okay?

 1  So I'm going to -- and I'm sorry to keep interrupting, but I

 2  just got to get the basics for the record.

 3          **MR. GOROKHOV:**  I'm very grateful, Your Honor, for --

 4          **THE COURT:**  So just let me just figure this out with

 5  him so we know what the foundation of his testimony is as to

 6  D5, and then we will -- I'll hand it back to you all.

 7          **MR. GREENBERG:**  Your Honor, I think I might be able

 8  to assist.

 9          **THE COURT:**  Oh, that would be great.

10          **MR. GREENBERG:**  D5 is an exhibit to our letter.  This

11  is another exhibit to our letter, the info metadata for D5.

12  And if you look at the bottom, this is discussed in our filing,

13  I think this would be -- sort of illuminate some things.

14          **THE COURT:**  Well, you know what?  You all feel free

15  to go there with him.  Because I don't want to interfere.  I

16  just want to know what he means by "I just saw this, but I put

17  it," and then you can go where ever.

18          **MR. GREENBERG:**  Your Honor, he testified --

19          **THE COURT:**  Or do you want to just go there?  I mean,

20  it doesn't matter to me, I just want to understand it.

21          **MR. GREENBERG:**  I mean, I -- he testified he did not

22  create this document.  That is materially misleading, because

23  he last modified it, it appears.

24          **THE COURT:**  Okay.  Well, let -- let me just ask my

25  followup question now that I understand what he's holding, and

1    then I'm going to turn it over to defense.  Okay?

2              **MR. GOROKHOV:**  Thank you.

3       (The bench conference concluded and proceedings resumed as

4    follows:)

5              **THE COURT:**  Okay.  Agent Kimrey, thank you for your

6    patience.  I just wanted to make sure I have the right

7    documents in front of me.

8       So a moment ago you held up a chart that is vertical on an

9    8-by-11 page, and at the top of it, it says chain of custody

10   chart, right?

11             **THE WITNESS:**  Yes, ma'am.

12             **THE COURT:**  And that's the one that you testified

13   earlier you worked on, you created?

14             **THE WITNESS:**  Yes, Your Honor.

15             **THE COURT:**  And you've been working on it for quite

16   some time, am I right about that?

17             **THE WITNESS:**  Yes, Your Honor.

18             **THE COURT:**  And for the record, that's Government 7.

19      D5, do you have that in front of you?

20             **THE WITNESS:**  I do not.

21             **THE COURT:**  Can we get you a copy of it?  I don't --

22      Oh, now, it's in front of you.  Do you need a hard copy?

23   Would you like a hard copy of this?

24             **MR. GOLDMAN:**  Yeah, I'll make one.

25             **THE COURT:**  That way you've got it in front of you.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1          THE WITNESS:  That would be helpful, yes, Your Honor.

2          THE COURT:  Yeah, you don't have to rely on anybody

3  moving an ELMO around.

4          MR. GOLDMAN:  May I approach?

5          THE COURT:  Sure.  And you have a nifty device there

6  that just pops those out, a printer?

7     Okay.  Good.  You have, now, in front of you, Agent

8  Kimrey, D5.

9          THE WITNESS:  Yes, Your Honor.

10         THE COURT:  And this is the document earlier you told

11  me you did not create, you had seen it before, am I right about

12  that?

13         THE WITNESS:  That is correct.

14         THE COURT:  Okay.  Nor did you modify it, you had

15  just seen if before; is that right?

16         THE WITNESS:  That is correct.

17         THE COURT:  Okay.  But a moment ago when you were

18  testifying about this document, you said "I put this here

19  because."  What you did mean by that?  And I'm referring to

20  the -- to the top row about the laptop, the colloquy was about

21  comments, and I think you were explaining why you put what you

22  put there.

23     My question is really basic.  If you had never created or

24  modified this document, how could you put anything there?  Like

25  what did you mean by "put"?

1          **THE WITNESS:**  So I think we're talking about the

2    chart that you're looking at; is that your question?

3          **THE COURT:**  I'm talking about D5.

4          **THE WITNESS:**  Okay.

5          **THE COURT:**  D5 is in front of you.  And D5 were the

6    questions you were asked, right?

7          **THE WITNESS:**  Yes, Your Honor.

8          **THE COURT:**  A moment ago you told me you did not

9    create this chart, right?

10         **THE WITNESS:**  Right.

11         **THE COURT:**  And did you not modify this chart, right?

12         **THE WITNESS:**  Right, Your Honor.

13         **THE COURT:**  But earlier, when you were testifying,

14   you said you put something on this chart.  Did you mean -- let

15   me ask you another way.

16      Did you mean Government 7 when you said that, and not D5?

17         **THE WITNESS:**  That's correct.  I meant Government 7.

18   Sorry, Your Honor.

19         **THE COURT:**  Got it.

20      So when you say "I put this information" regarding this

21   laptop, earlier, you were talking about Government 7?

22         **THE WITNESS:**  That's correct, Your Honor.

23         **THE COURT:**  Thank you.  Great.  My question is asked.

24      Mr. Gorokhov?

25

1  **BY MR. GOROKHOV:**

2  **Q.**   So you deny creating or modifying D5; is that correct?

3  **A.**   I did not modify or create this.

4  **Q.**   Okay.  All right.  Let's move on.

5      I don't want to belabor the point, but as to the other

6  devices in this case that could not be imaged, do you recall

7  having conversations about -- with the DFEs about the devices

8  that could not be accessed?

9  **A.**   We did have conversations about all of the devices.

10 **Q.**   And are those conversations documented?

11 **A.**   I -- I mean, again, they are going to be general

12 documentation, like simply discussed case with DFE.

13 **Q.**   Okay.

14 **A.**   I don't necessarily think any of the information would be

15 in there.

16 **Q.**   Did you have any communications with Adam Ake about the

17 devices that could not be imaged?

18 **A.**   Communications meaning other than a phone call?

19 **Q.**   E-mails, text messages, Snapchat?

20 **A.**   No.  No Snapchat, nope.

21 **Q.**   No Tinder either, right?

22     Let's move on.

23     I'm going to ask you now about the filter team, right?  At

24 some point, these devices were imaged.  We talked about the

25 separate images, and then we talked about hard drive containing

1    all of the images.

2       Do you follow?

3    **A.**   Yes.

4    **Q.**   Okay.  That hard drive containing all of the images

5    eventually was uploaded to a hard database called Relativity;

6    is that correct?

7    **A.**   Yes.

8    **Q.**   And when was it uploaded to Relativity?

9    **A.**   Oh, I don't know.  I did not -- I was not involved in that

10   particular action.  I simply provided the hard drive to

11   Mr. Ake.  He gave it to whoever he gives it to.  And then

12   behind the scenes, there's a lot that goes on that I could not

13   attest to.

14   **Q.**   Okay.  I got you.

15      And when you say behind the scenes, you mean like people

16   who put it up on the database, and then all the technical

17   things that need to happen to make it reviewable, right?

18   **A.**   Precisely.

19   **Q.**   And you didn't make any decisions about which types of

20   files need to be pulled off of the devices to be viewed in

21   Relativity, right?

22   **A.**   So initially, it was just a direct image of the complete

23   device.

24   **Q.**   Right.

25   **A.**   Yes.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**    But on Relativity, you don't -- Relativity is different

2  than a program like Axiom, right?

3  **A.**    It's a different system.

4  **Q.**    Right.  So you're not really familiar with Relativity, are

5  you?

6  **A.**    I -- I know how to use Relativity.  I've never received

7  like a class.  I'm not aware of a class to use it.  I mean,

8  it's pretty user friendly.

9  **Q.**    Okay.  I understand.

10       Now, in this case, you, as the case agent, you know, you

11  kept up with the progress of how these devices were being

12  imaged and placed on Relativity, and what happened with them

13  afterwards, right?  You at least kept up with what was going

14  on, correct?

15  **A.**    Well, I think -- actually, I need to -- we need to

16  clarify.

17       So particularly with this hard drive, right, we were told

18  that it was too large to put on the database.

19  **Q.**    Okay.

20  **A.**    So we were then asked to downsize drastically, so --

21  meaning -- I see your reaction, sir, so that's why I stopped

22  for a second.

23  **Q.**    Yeah. Yeah.

24  **A.**    But it had operating systems, things that had way too much

25  information.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**  Right.

2  **A.**  Which, from what I was told, that was just too much

3  information to be put on Relativity.

4  **Q.**  Yeah.

5  **A.**  So I'm sorry, I did state earlier that stuff -- data from

6  that hard drive was put on Relativity.  It was not put on

7  Relativity.

8  **Q.**  Okay.  Who communicated to you that the hard drive

9  needed -- that this data needed to be downsized?

10 **A.**  I think it would have been Mr. Derek Johnson, works for

11 DOJ, or Mr. Ake, a conversation.

12 **Q.**  Okay.  And he -- how would he have communicated this

13 information to you?

14 **A.**  I -- I am not sure.  May have been a phone call, may have

15 been an e-mail.  I don't know.

16 **Q.**  So you're not even sure if it was ever documented?

17 **A.**  Well, I just -- your question was I don't -- how do I

18 specifically recall that conversation.

19 **Q.**  Yep.

20 **A.**  I don't.

21 **Q.**  Was it documented?

22 **A.**  I don't know at this time.

23 **Q.**  Okay.  And when you say downsized, how did you downsize

24 from the large hard drive to a hard drive with a smaller amount

25 of data?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1   **A.**    So I didn't do it.  The forensic examiner actually did

2   that.

3   **Q.**    So at some point, this hard drive that was too large to

4   load on Relativity went back to the forensic examiner?

5   **A.**    No.

6   **Q.**    How -- I thought you just said you delivered a hard drive

7   to Mr. Ake.

8   **A.**    I did.

9   **Q.**    Containing all of the images of all of the devices.

10  **A.**    I did.

11  **Q.**    Okay.  So -- and now you've been told that it needs to be

12  downsized?

13  **A.**    Correct.

14  **Q.**    So walk me through what happened next.

15  **A.**    So then I reached out to Mr. Mark Johnson, explained that

16  I believe system files needed to be removed.

17  **Q.**    Uh-huh.

18  **A.**    He then did what he did.  I think it's appropriate to let

19  him attest to that.  And then he put the data on an SD card.

20  **Q.**    Okay.  So there was actually an SD card, a new medium, and

21  then was that SD card then given to the U.S. Attorneys' Office?

22  **A.**    Yes.

23  **Q.**    And did you do that?

24  **A.**    I did.

25  **Q.**    When did you deliver that SD card to the U.S. Attorneys'

1  Office?

2  **A.**    So on my break, I actually looked that up on ALERTS as

3  well.  So I have on 13 October, '22, is when I delivered that

4  SD card.

5  **Q.**    So that's two months later than the original hard drive,

6  right, roughly?

7  **A.**    October -- roughly.

8  **Q.**    Okay.  Now, once the data was finally loaded onto

9  Relativity, who was it that -- there was a filter team that

10  reviewed the data, right, first?

11  **A.**    So I think that would be a question for Mr. Ake.  He told

12  me a filter team needed to review it first.

13      Now, on the filter review, I don't recall any specific

14  details from that.  That was out of my hands.

15  **Q.**    So is it your testimony that you weren't in touch with the

16  filter review team?

17  **A.**    With the filter review team?

18  **Q.**    Yeah.

19  **A.**    In touch with them?

20  **Q.**    Yeah.

21  **A.**    I mean -- so wait.

22      As far as the filter review, I mean, it wouldn't be

23  something -- something our office would be in charge of.

24  **Q.**    Well, didn't --

25  **A.**    That would be the U.S. Attorneys' Office.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**   Didn't you exchange e-mails with the filter review team in
2  2023?

3  **A.**   I could have.  If you're asking me, I don't know, I would
4  have to see that e-mail.

5  **Q.**   So it's possible you had communications with the filter
6  review team in 2023?

7  **A.**   If there's an e-mail, I would like to see it.

8  **Q.**   Do you have a general timeline of when the filter review
9  team started the filtering process in this case?

10 **A.**   A general timeline would have been after I would give the
11 hard drive and SD cards to Mr. Ake.  I mean, that's when it
12 started.

13     As far as when it ended, I -- I do not know.

14 **Q.**   Okay.  Sometime after the day that it was uploaded to
15 Relativity, right?

16 **A.**   Again, I don't know the specific date.

17 **Q.**   Okay.

18 **A.**   Again, that -- the U.S. Attorneys' office was in charge of
19 that filter review.

20 **Q.**   Okay.  And -- but you know that when the data was
21 accessible to Mr. Ake, you knew about that, right?

22 **A.**   I -- I may have been told it's on Relativity, but we were
23 told not to review it until a filter review was done.

24 **Q.**   Okay.  But once the filter review was done, were you told
25 to review it?

1   **A.**   I don't -- I don't remember how it was discussed on the

2   filter review is complete.  But I do recall reviewing it on

3   Relativity.

4   **Q.**   Okay.

5   **A.**   After I was told filter review is complete.

6   **Q.**   You reviewed it on Relativity.  Okay.

7        And did you prepare any reports?

8   **A.**   I did not.

9   **Q.**   How much time did you spend reviewing it?

10  **A.**   I don't have an exact time.

11       **MR. GOROKHOV:**  Your Honor, it's now 1:22.  I don't

12  know if it's an okay time to --

13       **THE COURT:**  Yeah, it's getting about that time.  I

14  think we all need a break.

15       Why don't we take 20 for lunch?

16       How much more do you have, Mr. Gorokhov?

17       **MR. GOROKHOV:**  I probably have half an hour.

18       **THE COURT:**  No more than that?  Okay.  All right.

19       Let's take 20.  Mr. Gorokhov will wrap up, and then I'm

20  assuming there will be redirect, and we'll go from there.

21       Okay.

22       **DEPUTY CLERK:**  All rise.

23       **THE COURT:**  Twenty minutes.

24       Agent, you're still on the stand, you're still under oath.

25  Don't talk to anybody.  Go have some quick lunch and we'll see

1  you back here in 20 minutes.

2          **THE WITNESS:**  Yes, Your Honor.

3          **THE COURT:**  Thank you, all.

4          **DEPUTY CLERK:**  This Honorable Court now stands in

5  recess.

6      (Recess taken.)

7          **DEPUTY CLERK:**  All rise.  The United States District

8  Court for the District of Maryland resumes in session.

9          **THE COURT:**  All right.  Everyone can have a seat.

10     Agent Kimrey, you're still under oath.

11     Whenever you're ready, Mr. Gorokhov.

12         **MR. GOROKHOV:**  Thank you, Your Honor.

13     I would like to, before we move on to a different subject,

14  I would like to come back and just clean up a couple of items

15  from the prior testimony.

16     So, first, Your Honor, I'm going to represent to this

17  Court that in our filing, which is 261-1 on the -- filing 261

18  on the docket, Exhibit 1, is also the same document as D5.

19         **THE COURT:**  Okay.  All right.

20         **MR. GOROKHOV:**  Exhibit A to the document.  Okay?

21         **THE COURT:**  Okay.

22         **MR. GOROKHOV:**  Just for the record.

23  BY MR. GOROKHOV:

24  **Q.**   And, Agent Kimrey, I know there's a lot going on, and I'm

25  frustrated -- I was frustrated, I raised my voice.  I'm going

1  to try this again because it's important we get this clear.

2  Okay?

3       So you testified that you did not create this document; is

4  that correct?

5  **A.**  Correct.  Well, I -- I mean, this appears to be an Excel

6  turned into a PDF.  But I did not -- I did not create this

7  document.

8  **Q.**  Okay.  Are you saying you didn't create the PDF or you

9  didn't create the Excel?

10 **A.**  So I just want to make sure I'm perfectly clear, because I

11 think it's confusing.

12      This item you're looking at, are you considering this the

13 PDF?

14 **Q.**  Right.

15      This is a -- this is a -- just to be clear, this is an

16 Excel -- this is a printout of an Excel spreadsheet that was

17 sent to us by the government.

18 **A.**  Uh-huh.

19 **Q.**  And what I'm trying to find out from you is not whether

20 you printed this document, but whether you worked on it and

21 filled in the fields in this document.

22 **A.**  Okay.  I did not fill in any fields on this particular

23 document, no.

24 **Q.**  Okay.  What about -- have you seen this document?

25 **A.**  I have seen this document, yes.

1  **Q.**    When did you see it?

2  **A.**    So I -- let's see.  I would have downloaded it from

3  ALERTS, because this was a document that the forensic examiner,

4  Mark Johnson, uploaded into our ALERTS system, and that's when

5  I downloaded it.

6          **MR. GOROKHOV:**  Your Honor -- thank you.

7      I'm sorry, Your Honor?

8          **THE COURT:**  No, go ahead.  I was just talking to

9  myself.  Go ahead, what?  What do you need?

10          **MR. GOROKHOV:**  Okay.  I just want to -- excuse me,

11  Your Honor.  Court's indulgence.

12          **THE COURT:**  Sure, sure.  Yeah.

13          **MR. GOROKHOV:**  Your Honor, my colleague is going to

14  assist me here with the actual Excel file, because this is

15  important.

16          **THE COURT:**  Do you need -- do you need me to print it

17  out for you all?

18          **MR. GREENBERG:**  It's a matter, Your Honor, of showing

19  the native version of the file.

20          **THE COURT:**  Because we can also have you plug in your

21  laptop, and you can do it over the big screen, so that you

22  don't have to --

23          **MR. GREENBERG:**  I have to be careful --

24          **THE COURT:**  Mr. Ulander can help you with that.  That

25  would be a lot easier on everybody, to just publish it to the

 1  screens.

 2          **MR. GREENBERG:**  That would be great.

 3      Your Honor, my colleague is somewhat under the weather,

 4  and just for this brief part, if I could just sort -- I know

 5  you didn't want more than one attorney.

 6          **THE COURT:**  I really don't.  It's not fair to the

 7  government.  I'm not going to let them do it.

 8          **MR. GREENBERG:**  Fine, I'll just -- assist.

 9          **MR. GOROKHOV:**  That's fine, Your Honor.

10          **THE COURT:**  Yeah, you can be the able tech assistant.

11          **MR. GOROKHOV:**  Let me go on this side, then.

12      All right.  Thank you, Your Honor.

13  **BY MR. GOROKHOV:**

14  **Q.**  Now, we have an actual Excel file on the screen.

15      Do you see that?

16  **A.**  I do.

17          **MR. GOROKHOV:**  And I move for the record, Your Honor,

18  can we make that D5A?

19          **THE COURT:**  And will you print out a version of

20  what's on the screen right now so we can have a hard -- you

21  know what?  I think we can get a screen capture, can't we

22  Mr. Ulander?

23          **DEPUTY CLERK:**  I can assist with that.

24          **MR. GOROKHOV:**  That would be great.

25          **THE COURT:**  Okay.  So we can capture it and print it

1   so we have it in the hard copy.

2           **MR. GOROKHOV:**  Okay.

3   **BY MR. GOROKHOV:**

4   **Q.**   And I just want to make sure that you, when you're

5   testifying, that you did not create this document?

6   **A.**   I did not create this document.

7   **Q.**   And you did not see this document in Excel format, is that

8   your testimony?

9   **A.**   No, that is not true.  I did see this in Excel format.

10  **Q.**   Okay.  When was the last time you saw it?

11  **A.**   The last time I saw it was probably last night, when I was

12  reviewing this case.

13  **Q.**   Okay.

14          **MR. GOROKHOV:**  Your Honor, enough -- for the record,

15  Your Honor, this is a native file.

16          **THE COURT:**  Yep.

17          **MR. GOROKHOV:**  Okay.  And my colleague is now going

18  to -- right.

19      Your Honor, this is the same -- Your Honor, this is the

20  same document that was filed as 261-1, Exhibit A to our

21  letter --

22          **THE COURT:**  Okay.

23          **MR. GOROKHOV:**  -- for the record.

24          **THE COURT:**  Okay.

25          **MR. GOROKHOV:**  And the info metadata is Exhibit G to

1  that letter, Your Honor.

2          **THE COURT:**  Okay.

3          **MR. GOROKHOV:**  For the record, Your Honor, my

4  colleague has now opened up the info of the document.

5  **BY MR. GOROKHOV:**

6  **Q.**  Agent Kimrey, do you see that?

7  **A.**  I do.

8  **Q.**  What does it say next to last modified by?

9  **A.**  It has my name.

10 **Q.**  Okay.  And what does it say next to last modified as to

11 the date?

12 **A.**  Last modified 8/24, which was five days ago.

13 **Q.**  Okay.  And what does it say as to when it was created?

14 **A.**  7/21/22.

15 **Q.**  Okay.  Thank you, Agent Kimrey, on that.

16     I want to return to another subject now just to clean up.

17     You have -- you would agree, would you not, that if a

18 device is seized from an alleged co-conspirator, right, it's

19 important that the government have access to that device, you

20 understand?

21 **A.**  Could you ask that question again, please?

22 **Q.**  Yes.

23     If a device is seized from an alleged co-conspirator,

24 right, as evidenced by the government, it is important for the

25 government to access that device.  Would you agree with that?

1  **A.**    Assuming that the item seized did belong to an individual

2  that was -- that the search warrant was executed on, yes.

3  **Q.**    Okay.  Do you agree that if a device seized from an

4  alleged co-conspirator -- excuse me, strike that.

5        Do you agree that if the government seizes a device but

6  then is not able to access it, that is an important issue; do

7  you agree with that?

8              **MR. GARDNER:**  Objection, Your Honor.

9              **THE COURT:**  Basis?

10             **MR. GARDNER:**  I -- what does he mean by issue?  I

11 just want him to clarify --

12             **THE COURT:**  Can you rephrase?

13             **MR. GARDNER:**  -- the question.

14             **MR. GOROKHOV:**  Yes.

15 **BY MR. GOROKHOV:**

16 **Q.**    In terms of -- excuse me.

17       From your perspective as an investigator, if you seize a

18 device as part of a search warrant from an alleged

19 co-conspirator, but you cannot access that device, is that an

20 important fact in your case?

21 **A.**    I think in this situation, the -- we were determining the

22 device did not belong to our individual, Harriett Jackson.

23 **Q.**    I'm not referring to any specific device.

24       I'm saying if you have a search warrant to seize devices,

25 you obtain the devices, but there's a device that you are

 1  unable to access, do you agree that that is an important fact

 2  in the investigation?

 3  **A.**   I -- I -- are you -- do you have a specific example of a

 4  device that wasn't accessed?

 5  **Q.**   Yes.

 6       In this case, aren't there four devices that the

 7  government wasn't able to access?

 8  **A.**   Okay.

 9  **Q.**   So would you agree that those are important facts, that

10  the government seizes the devices but then doesn't access them?

11  **A.**   Well, I think it's important to get all facts of the

12  investigation.

13  **Q.**   Right.

14       And it's important to document the fact, if you're not

15  able to access a device, correct?

16  **A.**   Well, I mean, if you're asking about digital forensic

17  steps and procedures --

18  **Q.**   Right.

19  **A.**   -- that's a step for them.

20       I am not a digital forensic examiner.  Now, if you're

21  asking about their procedures, that would be a question for

22  them.

23  **Q.**   So is your testimony, as the case agent, that if there's

24  devices seized, based on search warrants that you prepared,

25  that the government is not able to access, that's not something

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  important to be documented; is that your testimony?

2  **A.**   I think it's important -- important to document every

3  device that's analyzed.

4  **Q.**   I'm not asking about devices that are analyzed, and I'll

5  try it one more time.

6       I'm talking about devices that they attempt to analyze but

7  are unable to get into.  Is that important to document?

8  **A.**   I mean, it's important to document all devices that an

9  analyst would look into.

10 **Q.**   So that's something that you should have documented in the

11 system; is that correct?

12 **A.**   Well, no.  That's -- again, I think that would be crossing

13 my -- what I would be doing.  That is a role of the digital

14 forensic examiner and what steps they do, what documentation

15 they do.  That's a question for them.

16 **Q.**   So that's not a question for you?

17 **A.**   That would be a question for the examiner.

18 **Q.**   Okay.  And if there's a decision that you were involved in

19 as part of the investigation team not to use brute force to get

20 into a device, is that something that you should have

21 documented, if you were involved in that decision?

22 **A.**   So again, that's an analysis question.  I would have no

23 documentation on what that agent examiner would have done.

24 **Q.**   So you're -- but in this case, there were decisions not to

25 use brute force to open devices.  You understand the government

1  has made that representation to the Court?

2  **A.**    Well, I understand your term of brute force.  Again, that

3  would be a question on whether what brute force is, what

4  policies and procedures were followed, that would be a question

5  for the examiner.

6  **Q.**    Okay.  My last question on this point is, if there were a

7  decision to cancel imaging of the device that you were a part

8  of, that would be documented, that's important -- an important

9  issue that needs to be documented, correct?

10  **A.**    That would be an important issue.

11  **Q.**    And it should be documented?

12  **A.**    Well, what do you mean by issue, important issue?

13  **Q.**    It's an important fact of the investigation that needs to

14  be documented.

15  **A.**    Okay.  Okay.

16  **Q.**    Is that correct?

17          **MR. GARDNER:**  Your Honor, I think we're using a lot

18  of terms very loosely, like documented --

19          **THE COURT:**  Do you want to approach for a second?

20      (A bench conference was held on the record as follows:)

21          **THE COURT:**  Here's how it's striking me, that he's

22  playing games.  He swore out in an affidavit under oath that

23  seizure and review of electronic devices is fundamental to a

24  fraud investigation.  It rules people in or out.

25      Now this guy can't answer a simple question about whether

 1  encryption or steps to be taken to get into the very devices

 2  that he swore to a Court are critical to the investigation.

 3  Okay?  He's playing games.  That's how I'm seeing it.

 4      Maybe it's not, you know, textbook question, but

 5  commonsense, you know, like, he's a smart guy.  You know where

 6  this is going.

 7      So that's how I'm seeing it, as a credibility issue.

 8  And -- and so I'm not sure, like, what question do you want,

 9  Mr. Gorokhov, to pose to him, to get to this answer?  Did you

10  document it or not, unless you want me to ask about it.

11          **MR. GARDNER:**  An initial question would be how would

12  he document it?

13          **THE COURT:**  Or did he.

14          **MR. GARDNER:**  Or did he?

15          **THE COURT:**  Right.

16          **MR. GARDNER:**  But if he -- did he document it, if he

17  did, how would he have documented it?  And then turn to if he

18  didn't, would somebody have done it?

19          **THE COURT:**  Why.

20          **MR. GARDNER:**  Right.  Why, and would somebody else

21  have done it?

22          **THE COURT:**  Well, why?  If it's important to you, why

23  didn't you do it?

24      I assumed -- I assumed that the question went there

25  because there's no evidence he documented it.

 1          **MR. GOROKHOV:**  Right.

 2          **THE COURT:**  Okay.  But if you want the foundational

 3    questions, that's fine, ask the foundational questions.  And

 4    when we get "I don't know," that database he's referring to is

 5    getting turned over.  That's where I am right now.

 6          **MR. GARDNER:**  Your Honor, if you could make it clear

 7    that setting aside anything that Mark Johnson --

 8          **THE COURT:**  Yeah.

 9          **MR. GARDNER:**  So let's set aside any documentation --

10          **THE COURT:**  Okay.

11          **MR. GARDNER:**  -- the forensic examiner would have

12    done.  I wonder if he's just sort of saying that's their job.

13        And so if we can make sure we're setting aside any

14    documentation they would have done and say -- speaking, you, as

15    a case agent specifically, let's talk about any documentation

16    that you --

17          **THE COURT:**  I understand that.

18        But the question that Mr. Gorokhov is putting to him,

19    which I don't think is an unfair question is, isn't this

20    important to you?  If it is, yes; if it isn't, no.

21        But, you know, the affidavit that I've seen that this

22    agent swore out, it's not -- it's fair game.  It's squarely

23    what he said in the affidavit to get a Court to sign these

24    warrants is important.

25        So let's try to ask the question more directly, more

1  simply, just --

2          **MR. GREENBERG:**  Can I just have one point, Your

3  Honor?

4          **THE COURT:**  Yeah.

5          **MR. GREENBERG:**  If I heard the agent correctly this

6  morning, he testified unambiguously that any important step in

7  the investigation is documented in the system.  So --

8          **THE COURT:**  I agree with you.

9          **MR. GREENBERG:**  So I think the foundation may already

10  be there.

11          **THE COURT:**  I don't know.  We'll see.  We'll see.

12  Because I think Mr. Gorokhov is insinuating in his questions

13  that it wasn't.  This agent did not document it.  So why don't

14  we just start there and take it from there, because otherwise

15  we're just going to go round and round fighting about the word

16  "issue."

17          **MR. GOROKHOV:**  That's fair, Your Honor.  Thank you.

18          **THE COURT:**  All right.  Thank you.

19          **MR. GREENBERG:**  Thank you, Your Honor.

20      (The bench conference concluded and proceedings resumed as

21  follows:)

22  **BY MR. GOROKHOV:**

23  **Q.**   All right.  So going back again, we're talking now about

24  the devices that were seized but could not be imaged.

25      Do you recall that?

1    **A.**    Okay.

2    **Q.**    You talked about the system where you document steps in

3    your investigation.

4         Do you recall that?

5    **A.**    I do.

6    **Q.**    What's that system called again?

7    **A.**    ALERTS.

8    **Q.**    ALERTS.

9         You didn't document in ALERTS anything about a device that

10   could not be -- a device that could not be accessed; is that

11   correct?

12   **A.**    So I -- I don't know if that's correct or not.  I will

13   tell you, like I've told you before, my entries are more

14   generic, so it would be a discussion with DFE.

15        Now, what you -- what would be an appropriate question is

16   to ask that to DFE Johnson.

17   **Q.**    Okay.

18             **THE COURT:**  Okay.  Let me ask you a question, sir.

19             **THE WITNESS:**  Yes, ma'am.

20             **THE COURT:**  You're the case agent, right?

21             **THE WITNESS:**  That's correct.

22             **THE COURT:**  You swore out affidavit supporting these

23   search warrants on four different locations, right?

24             **THE WITNESS:**  Yes, ma'am.

25             **THE COURT:**  You specifically asked for the electronic

1    devices, correct?

2           **THE WITNESS:**  Correct.

3           **THE COURT:**  Four of those devices, according to the

4    government, could never be accessed because of password and

5    other issues, right?

6           **THE WITNESS:**  Correct.

7           **THE COURT:**  Is that important to you as a case agent?

8           **THE WITNESS:**  It's important not to access a phone, I

9    would say yes.

10          **THE COURT:**  Right.  Right.  The fact that you

11   couldn't get to it -- when you swore out an affidavit saying

12   that this is important evidence, the fact that you couldn't get

13   to it is an important piece of evidence in your case, right?

14          **THE WITNESS:**  I would say that's important, yes.

15          **THE COURT:**  Okay.  Did you document for the four

16   devices that could not be accessed because of password or other

17   issues, did you, personally, document that anywhere?

18          **THE WITNESS:**  So I did not.

19          **THE COURT:**  Is there a reason why you didn't?

20          **THE WITNESS:**  Because that would have been a function

21   by the DFE.

22       Like, I wouldn't know if an item would be accessible or

23   not.  I did not try.  I just handed over the evidence to -- to

24   the examiner.

25          **THE COURT:**  Yes.

1          **THE WITNESS:**  At which point they did their analysis.

2    I couldn't tell you which one without seeing their notes.

3          **THE COURT:**  Fair enough.

4      Was the fact that these four devices could not be accessed

5    by the examiner, was that documented for you?  Did you learn

6    that from the examiner?

7          **THE WITNESS:**  Yes.

8          **THE COURT:**  How did you learn it?

9          **THE WITNESS:**  By -- by this report.

10         **THE COURT:**  Any other way that you learned it?

11         **THE WITNESS:**  It -- it was most likely a phone call.

12   I mean, I know I was in constant communication with the

13   forensic team on this, specifically, Mark Jackson, I would

14   have -- I believe we had a phone call conversation about it.

15         **THE COURT:**  And your system, where you document these

16   kinds of contacts, that would be reflected -- those phone calls

17   would be reflected in that system or no?

18         **THE WITNESS:**  Sometimes they are.  I mean, I can't

19   say that specific conversation, because the entries that we put

20   in there, they are more general terms.

21         **THE COURT:**  Right.  Like, had a conversation with the

22   examiner on a particular date, right?

23         **THE WITNESS:**  There likely could, Your Honor, but

24   sometimes there would not be an entry on that.

25         **THE COURT:**  Well, then what's the purpose of the

1  system?  Why -- why have it if you don't do it with some

2  regularity?

3          **THE WITNESS:**  Well, you know, I mean, there is a lot

4  going on.  So if I'm in the car and I receive a call, then, you

5  know, I would have that call, I would -- there could be an

6  instance where that is not documented.  We try to make it as

7  accurately as possible, but sometimes there's stuff that is not

8  documented.

9          **THE COURT:**  Okay.

10          **THE WITNESS:**  Such as a small fact.

11          **THE COURT:**  The reason why I'm asking is many of your

12  answers today have been -- it's been a phone call, maybe it was

13  documented, maybe it wasn't.  So I want to understand better

14  what your system of documenting your investigative steps are.

15  You see what I'm saying?  I just want to understand --

16          **THE WITNESS:**  I mean, I -- I do.  I understand what

17  you're saying, Your Honor.

18          **THE COURT:**  Okay.  All right.  So with regard to

19  these phones that could not be accessed, the -- what I'm

20  hearing you say is the only source of information, apart from

21  an occasional phone call, would be these custody reports that

22  you received from Agent Johnson.

23      Am I right about that?

24          **THE WITNESS:**  So if you're talking about the -- you

25  know, the items that weren't accessible, there wouldn't be any

1    custody documents on them because there was no image on those

2    devices.

3              THE COURT:  Any document reflecting --

4              THE WITNESS:  Oh, document.  Yes, Your Honor.

5              THE COURT:  Anything that reflected you took an

6    electronic device from a target, you kept it and attempted --

7    and when I say you, I mean the team -- attempted to retrieve

8    the data on it but couldn't because of a password issue.  Okay?

9              THE WITNESS:  Uh-huh, okay.

10             THE COURT:  The only place I hear you saying you

11   would have documentation of that fact is in a report created by

12   Agent Johnson.

13       Am I right about that?

14             THE WITNESS:  Correct.  There may be an entry on his,

15   because he would open up his own action in ALERTS and document

16   steps.  He would also document on a worksheet, if a worksheet

17   was particularly within his, you know, steps.

18             THE COURT:  So ALERTS might be a place that he would

19   document the substance of that result?

20             THE WITNESS:  Yes, Your Honor.  And it's dependent on

21   the agent.

22       So if he sees an opportunity -- or if he sees the need to

23   document what he does in ALERTS, it could be in ALERTS.  But as

24   far as my documentation, it is more general instances.

25             THE COURT:  Is ALERTS the kind of database where you

1   can see each other's information?

2          **THE WITNESS:**  I can -- I can read only his, you know,

3   his case, yes, Your Honor.

4          **THE COURT:**  Is that one of its purposes?

5          **THE WITNESS:**  Yes.  And so, for instance, sharing of

6   documents, so I was able to download all of his documents to

7   include this Excel.

8          **THE COURT:**  Okay.

9          **THE WITNESS:**  Additional PDFs such as the worksheets,

10  and that's how I provided it to the government.

11         **THE COURT:**  Okay.  So now that we know for any agents

12  or any individuals, if I'm getting it right, who are part of

13  the ALERTS system, you can access their information and

14  download it.  Am I getting that right?

15         **THE WITNESS:**  You're correct, Your Honor.

16         **THE COURT:**  Okay.  And, again, I just want to make

17  sure I'm clear, the -- the place where this information about

18  four phones or four devices not being accessed came from Agent

19  Johnson's report that you could access using ALERTS?

20         **THE WITNESS:**  That's correct, Your Honor.

21         **THE COURT:**  Great.  Okay.  I think I get it.

22      Go ahead, Mr. Gorokhov.

23         **MR. GOROKHOV:**  Thank you, Your Honor.

24  **BY MR. GOROKHOV:**

25  **Q.**  I want to switch gears now and ask you about -- about the

1  review of the devices that were uploaded to Relativity.  You

2  understand?

3  **A.**    Okay.

4  **Q.**    Okay.  So you testified earlier, if I understand

5  correctly, that there came a time when the -- a subset of the

6  data from the devices was uploaded to Relativity; is that

7  correct?

8  **A.**    That's correct.

9  **Q.**    And who is responsible for primarily reviewing that?

10 **A.**    It would have been the investigative team.

11 **Q.**    The team?

12 **A.**    Correct.

13 **Q.**    And that would include Adam Ake?

14 **A.**    I don't know if he has access to Relativity or not.

15 **Q.**    Okay.  You don't know.

16      Now, you testified earlier that it's important to document

17 your review of evidence; is that correct?

18 **A.**    Correct.

19 **Q.**    And it's important -- for example, you did that with

20 respect to the HMA e-mails, right?

21 **A.**    Correct.

22 **Q.**    But you didn't write any report of review of the devices

23 in this case, did you?

24 **A.**    I didn't.  I believe a majority of the review was done by

25 co-agent Sonia Smith from NCIS.

1   **Q.**   Okay.  Did she write a report?

2   **A.**   I -- I don't believe she did.

3   **Q.**   Are there any communications, e-mails, text messages about

4   the review of the Relativity database?

5   **A.**   Not that I know of.

6   **Q.**   Are there any instructions about what to look for on the

7   database?

8   **A.**   I don't recall.

9   **Q.**   Okay.  Now, I just want to step back and talk to you a

10  little bit about the investigation and -- and how it came to be

11  with this Relativity database.  Okay?

12      At the time when the documents were uploaded onto the

13  Relativity database, that was pretty late in the investigation;

14  is that correct?

15  **A.**   What do you mean by late?  I mean, we --

16  **Q.**   I mean November of 2023.

17  **A.**   That's when they were uploaded.

18  **Q.**   That's correct, right?

19  **A.**   I don't know the exact date when they were uploaded.

20  **Q.**   Okay.  You have -- by this point, you have a number of

21  individuals that have been charged, right?

22  **A.**   Uh-huh.

23  **Q.**   Some of those individuals, the investigative team, which

24  includes you, you figured out are actually not guilty of the

25  charges, right?

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **A.**    Could you rephrase that question?

2  **Q.**    Well, there were a number of individuals in this case who

3  were dismissed from the prosecution; is that right?

4  **A.**    Okay.  I think that was later on.

5  **Q.**    Yeah, later on.

6       And that's because you learned that they were not guilty;

7  is that right?

8  **A.**    Well, it's not my job to provide a guilty or not guilty.

9  **Q.**    So you didn't participate in the decision?

10      You weren't part of the process where you figured out, oh

11  my God, we charged these people with a federal crime, and now

12  we have to dismiss them?  You weren't in on those

13  conversations?

14  **A.**    I mean, I conducted -- my role is simply a fact finder,

15  right?

16  **Q.**    Right.

17  **A.**    So I write reports as I see them, interview people, I

18  collect documents as I review them.

19  **Q.**    Right.

20  **A.**    I then hand that over to the United States Attorneys'

21  Office to make that decision.

22  **Q.**    Right.

23      And you're the lead fact finder in this case, right?

24  **A.**    On paper I was.  But I will tell you that my agents

25  were -- co-agents were just as actively involved as I was.

1   **Q.**   And you were communicating with your co-agents?

2   **A.**   I was.

3   **Q.**   You weren't keeping secrets from each other?

4   **A.**   No.

5   **Q.**   You were working as a team?

6   **A.**   Correct.

7   **Q.**   And you figured out through your fact finding process that

8   people that were charged with federal crimes were not guilty in

9   this case; is that right?

10   **A.**   Like I told you, I provided all my details to the United

11   States Attorney, and they made their decision from there.

12           **THE COURT:**   Mr. Gorokhov, I think you can move on.

13           **MR. GOROKHOV:**   Okay.

14   **BY MR. GOROKHOV:**

15   **Q.**   I want to ask you then, there came a point where Harriett

16   Jackson came in and pled guilty; is that right?

17   **A.**   Now, there's a time where -- through her defense attorney,

18   she came in for a proffer sitting.

19   **Q.**   Right.

20           In fact, she came for a proffer more than once, right?

21   **A.**   That could be right.  Maybe twice.

22   **Q.**   And here you have an individual -- and you were present

23   for those proffer sessions, right?

24   **A.**   I was, yes.

25   **Q.**   So here you have an individual who came in to talk about

 1  her crimes, right?

 2  **A.**    To talk about --

 3  **Q.**    In the proffer session, she was talking about her crimes,

 4  right?

 5  **A.**    -- like, the case in general?

 6          **THE COURT:**  Wait a minute.  One at a time.  One at a

 7  time.

 8          **COURT REPORTER:**  I'm sorry.  I didn't get the answer.

 9  "To talk about" --

10          **THE WITNESS:**  To talk about the investigation, we had

11  questions for the entirety of the case.

12  **BY MR. GOROKHOV:**

13  **Q.**    Right.  Right.

14      And -- and she was talking to you about multiple crimes

15  that she had committed, right?

16  **A.**    Multiple crimes, what do you mean?

17  **Q.**    Well, she stole peoples' identities, right, without their

18  knowing?

19  **A.**    We asked her questions about that.

20  **Q.**    And you found out that she did?

21  **A.**    Without looking at the report, I'm not so sure what you're

22  asking.

23          **MR. GOROKHOV:**  Your Honor, at this point --

24          **THE COURT:**  Can you all -- can you all come up for a

25  second?

1          MR. GOROKHOV:    I'm prepared to move on, Your Honor.

2          THE COURT:    Okay.

3          MR. GOROKHOV:    Is that all right?

4          THE COURT:    Yeah, if you want to move on, that's

5     fine.

6          MR. GOROKHOV:    Your Honor, since there's no jury

7     here, I'll just say that the statements -- the stipulations of

8     facts are in evidence.

9          THE COURT:    Right.

10         MR. GOROKHOV:    They are part of the evidence in this

11    case.

12         THE COURT:    I have them.    Yes.    And if there's

13    anything else documentary -wise you want me to look at, you can

14    hand them up.

15         MR. GOROKHOV:    Thank you.    Thank you, Your Honor.

16    BY MR. GOROKHOV:

17    Q.    Is it fair to say, though, that -- I just -- I'm not going

18    to get into specifics, because it doesn't -- it seems like you

19    don't remember a whole lot.

20         But it's fair to say that these individuals, both Harriett

21    Jackson and Ms. Peebles, there were times when they lied during

22    the course of this investigation, to you; isn't that right?

23    A.    They lied to me?    Could you be more specific?

24    Q.    Well, you wrote reports about their interviews, right?

25    A.    We wrote reports on proffers, yes.

1  **Q.**  Yes.

2      And there were moments where you confronted these

3  individuals about telling you what you knew to be lies, right?

4  **A.**  I didn't hear that last part.

5  **Q.**  You -- there were -- it's documented in your reports --

6  **A.**  Right.

7  **Q.**  -- where you and the team confronted these people about

8  lying in their proffers, right?

9  **A.**  We -- we asked them questions about the investigation.

10  **Q.**  Well, that's not my question, Agent Kimrey.

11      Do you want me to repeat my question?

12  **A.**  Sure.

13  **Q.**  There were times reflected in your reports where you

14  confronted these individuals about lying to you?

15  **A.**  Lying to me specifically?  I mean, we continued to ask

16  them questions --

17          **THE COURT:**  Can you bring up the reports, please?

18          **MR. GOROKHOV:**  Your Honor, they are in a little bit

19  of disarray.

20          **THE COURT:**  That's all right.  Come on up, Counsel.

21      (A bench conference was held on the record as follows:)

22          **THE COURT:**  All right.  Can you point out to me in

23  the report where -- your basis for asking him?

24          **MR. GOROKHOV:**  Yes, yes, I have a history of cases

25  for that.

1        So at least in one report that I remember from memory --

2   I'm trying to be general, because we'd be here until Christmas,

3   but at least in one report with Harriett Jackson, for example

4   her -- he documents that her attorney actually had to stop her,

5   interrupt her and tell --

6            **THE COURT:**  To tell the truth.

7            **MR. GOROKHOV:**  The prosecutor that she's lying.

8            **THE COURT:**  Okay.  So hold on.  And Agent Kimrey was

9   in the room.  And the point of this is because he did not get

10  this *Giglio* to you yet?

11           **MR. GOROKHOV:**  No, Your Honor.  The point --

12           **THE COURT:**  What's the point of it?

13           **MR. GOROKHOV:**  The point of it is he extolled the

14  importance, as Your Honor knows, of the devices, right?

15           **THE COURT:**  Right.

16           **MR. GOROKHOV:**  He has these people lying to his face,

17  and as you now know, Your Honor, in his own words, trying to

18  pin it on Masood, right?  Or pinning it on Masood.

19           **THE COURT:**  Right, yeah.

20           **MR. GOROKHOV:**  I'm trying to find out if this man

21  speaks with these people and then goes and looks at these

22  devices that he considers to be so important to find out --

23           **THE COURT:**  All right.  Well, you know what?  I think

24  there's a really simple way to ask the question that's not

25  argumentative, because you are going to argue all day long with

 1   this witness.

 2              **MR. GOROKHOV:**  Yeah.  Yeah.

 3              **THE COURT:**  I'm just saying, it is what it is.  Get

 4   the dates of the proffer, and ask if after these proffers, he

 5   ever went back and looked at the devices, or had someone else

 6   do it.  And then you can argue from that.  Okay?

 7        (The bench conference concluded and proceedings resumed as

 8   follows:)

 9   **BY MR. GOROKHOV:**

10   **Q.**   So do you recall -- so let me -- let me go back a few

11   steps.

12        So there were multiple proffers with Ms. Peebles; is that

13   right?

14   **A.**   Correct.

15   **Q.**   And one of those proffers took place in June of 2023,

16   right?

17   **A.**   I would assume so, but you keep referencing reports.  I

18   don't have the exact dates of these reports.

19   **Q.**   I'm not talking to you about a report.  Now I'm just

20   asking about rough dates of when this -- of when these proffers

21   took place.

22   **A.**   Yes, sir.  But I'm not sure of the exact dates you're

23   asking me, so you're --

24   **Q.**   Okay.  But it's fair to say there were multiple proffers

25   with Ms. Peebles?

1  **A.**    That's correct.

2  **Q.**    And multiple proffers with Ms. Jackson?

3  **A.**    Correct.

4  **Q.**    Now, your testimony is, you did not go back into

5  Relativity and then conduct a thorough search and prepare a

6  report of how their stories lined up with what was seized from

7  their data; is that correct?

8  **A.**    We did not.

9  **Q.**    In good faith, you didn't think it was important to look

10  at those devices, did you?

11  **A.**    In good faith, I -- I mean, just the current posture of

12  the case, we just decided it wasn't through -- our

13  investigative team.

14           **MR. GOROKHOV:**  Okay.  Your Honor -- one moment,

15  please.

16  **BY MR. GOROKHOV:**

17  **Q.**    So your testimony is that it wasn't -- say that again,

18  please, for the record.

19  **A.**    I don't remember what I said.

20  **Q.**    Why you didn't go back and look at those devices.

21  **A.**    We -- as an investigative team, to include AUSA Ake, it

22  was determined that we would not go back and do that.

23  **Q.**    Including AUSA Ake; is that correct?

24  **A.**    He was there in the conversation, yes.

25  **Q.**    And that's after Ms. Jackson and Ms. Peebles started

1  implicating Mr. Masood, right?

2  **A.**    Yes.

3  **Q.**    After they started pinning this crime on him, right?   In

4  your words?

5  **A.**    In my words of painting the crime?

6  **Q.**    Pinning.

7  **A.**    Pinging the crime.

8  **Q.**    Not pinging, pinning.

9          **MR. GOROKHOV:**   Strike that question, Your Honor.

10          **THE COURT:**   Okay.

11          **MR. GOROKHOV:**   It's not important.

12      All right, I'm just going to have -- we're almost done

13  here.

14      If we don't -- can I -- can we pass up the affidavits,

15  please?

16          **MS. BORNFMAN:**   They're not numbered.

17          **MR. GOROKHOV:**   So -- okay.

18  **BY MR. GOROKHOV:**

19  **Q.**    Your testimony is that after these individuals came in and

20  started implicating Mr. Masood in the offense, it was

21  determined by the investigative team that it's not important to

22  review those devices, correct?

23  **A.**    Yes.

24  **Q.**    Okay.   I want you to turn -- you have in front of you your

25  affidavit.

*CROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1   **A.**   Okay.

2          **MR. GOROKHOV:**  Your Honor, it's already in the

3   record.  It's in -- it's on the docket.  I don't think it's

4   necessary now to be an exhibit.

5       Maybe out of an abundance of caution, let's --

6          **THE COURT:**  Yeah, let's just mark it because there's

7   more than one affidavit.

8          **MR. GOROKHOV:**  Yeah.

9          **THE COURT:**  This is -- what you've handed up is one

10  affidavit; is that right?

11         **MR. GOROKHOV:**  Yes.

12         **THE COURT:**  And it's to search Mr. Masood's home and

13  Case, am I right about that?

14         **MR. GOROKHOV:**  Yes, Your Honor.  Can we mark it D8?

15         **THE COURT:**  D8?

16         **MR. GOROKHOV:**  Yes, Your Honor.

17         **THE COURT:**  All right.

18         **MR. GOROKHOV:**  Thank you.

19  **BY MR. GOROKHOV:**

20  **Q.**   All right.  I want you to go to Page 23.

21  **A.**   Uh-huh.

22  **Q.**   And, by the way, this affidavit is your sworn affidavit,

23  right?

24  **A.**   Yes.

25  **Q.**   It's submitted under oath?

1   **A.**   Yes.

2   **Q.**   You prepared this document in order to obtain devices that

3   Mr. Masood has a Fourth Amendment privacy right in, right?

4   **A.**   Yes.

5   **Q.**   And the reason this affidavit is necessary is because you

6   have to explain how so important these devices are that you

7   guys can go beyond his privacy right; is that correct?

8   **A.**   We have to be thorough in our -- in our affidavit, yes.

9   **Q.**   Okay.  I want you to read -- go to Page 23 and please read

10  Paragraph 35.

11  **A.**   Based on my -- the whole paragraph, sir?

12  **Q.**   Yes, sir.

13  **A.**   Okay.  "Based on my training and experience, in a case

14  where multiple individuals are conspiring together to commit

15  fraud, evidence of this case will be located on their

16  electronics.  For example, documents containing information

17  about the fraudulent enterprise planning and organization are

18  likely to be found on the co-conspirators' devices, along with

19  text messages and other social media between them, as well as

20  voice mails, phone call logs, notes, drafts of e-mails, and

21  documentation of profits."

22      "Moreover, in a case such like this, based on my training

23  and experience, I know that the place of business and residents

24  of the co-conspirators is likely to contain additional

25  evidence, transactions, gains, routing numbers and bank account

1   numbers, as well as written notes about the enterprise

2   contained in the notebook paper or electronically, et cetera."

3   **Q.**   Okay.  I want you now to go now to Page 26 and please read

4   just the first part of Paragraph 39, up until it goes into Part

5   A.

6   **A.**   Okay.  39, sir?

7   **Q.**   Yes, sir.

8   **A.**   "Forensic evidence, as further described in Attachment B,

9   this application seeks permission to locate not only computer

10  files that might serve as direct evidence of the crimes

11  described on the warrant, but also forensic electronic evidence

12  that establishes how computer -- computers were used, the

13  purpose of their use, who was -- who used them, and when."

14      "There is probable cause to believe that the forensic

15  electronic evidence will be on any storage media -- medium in

16  Target Premises 1 and Target Premises 2."

17          **MR. GOROKHOV:**  Now, we're almost done, Your Honor.

18  Two more and we're done.

19  **BY MR. GOROKHOV:**

20  **Q.**   Page 27, little b, I just want you to read the first

21  sentence of that paragraph.

22  **A.**   "As explained herein, the information stored within a

23  computer and other electronic storage media may provide crucial

24  evidence of the who, what, when, why, when, where and how of

25  the criminal conduct under investigation, thus enabling the

1  United States to establish and prove each element, or

2  alternatively, to exclude the innocent from further suspicion."

3  **Q.**   To exclude the innocent from further suspicion.  Those are

4  your words, right?

5  **A.**   Yes.

6  **Q.**   Under oath?

7  **A.**   Yes.

8  **Q.**   And you didn't look at it?

9  **A.**   I'm sorry?

10  **Q.**   You didn't look at this material?

11  **A.**   Which material are we talking about, sir?

12  **Q.**   You didn't look at these devices after Ms. Peebles and

13  Ms. Jackson started implicating Mr. Masood; is that right?

14  **A.**   Well, during the situation, there was an issue with the

15  proffer -- or excuse me.

16     Could you ask the question again?

17        **MR. GOROKHOV:**  I'm going to strike the question.

18     And I -- that's all, Your Honor.  That's all I have.

19        **THE COURT:**  Can I ask just one sort of cleanup

20  question on that?

21     For the 32 devices that we've been talking about, did you

22  personally ever review the data contained on any of them?

23        **THE WITNESS:**  So, yeah, just to clarify, there were

24  30 devices, Your Honor, and that would have been, yes, as -- as

25  the digital forensic examiner pulled information off of the,

1  you know, 23 devices, put it on an SD card, it was then put in

2  Relativity, at that point, yes, I did review it.

3          **THE COURT:**  You reviewed what?

4          **THE WITNESS:**  The Relativity, the data that was put

5  in Relativity, which included the devices.

6          **THE COURT:**  When did that happen?

7          **THE WITNESS:**  It would have been -- I mean, it would

8  have been after discussions with the -- with the attorney,

9  after the filter review was completed.  So I believe last --

10  last year, 2023.

11          **THE COURT:**  What was your purpose in reviewing the

12  data?

13          **THE WITNESS:**  So just kind of reviewing all the data,

14  looking for -- looking for evidence of the crime.

15          **THE COURT:**  Did you document that anywhere?

16          **THE WITNESS:**  I -- I -- I believe I did.  It wouldn't

17  have been in a report.  It would have been in ALERTS.

18      But I will say that, you know, my co-agents, they handled

19  the majority of the review in Relativity.

20          **THE COURT:**  Oh, so now you have co-agents who did it,

21  not you?  Not just you looking at Relativity, you had other

22  people doing it, too?

23          **THE WITNESS:**  Well, as a team, yes, Your Honor.

24          **THE COURT:**  All right.  Give me the names of those

25  people.

 1            THE WITNESS:  Sure.  So my co-agent was agent Sonia

 2 Smith.

 3            THE COURT:  Okay.  Who else?

 4            THE WITNESS:  And so at the time --

 5            THE COURT:  No, I want all the names of the people

 6 first.  I want to go in order.  I want us to be very, very

 7 precise about this.  Okay?

 8            THE WITNESS:  Okay.

 9            THE COURT:  Agent Smith.  Who else?

10            THE WITNESS:  So DCIS had two agents, Defense

11 Criminal Investigative Service, SA Ryan Goins, and SA Kevin

12 Warne.

13            THE COURT:  Kevin Warne.

14            THE WITNESS:  W-A-R-N-E.

15            THE COURT:  Okay.

16            THE WITNESS:  It would have been us four individuals.

17 That's all that I recall had access.

18            THE COURT:  And how do you know that these other

19 three individuals reviewed Relativity at all.

20            THE WITNESS:  Through discussions on, you know, a

21 conference call.

22            THE COURT:  You didn't -- just calls.  Did you

23 document this anywhere?

24            THE WITNESS:  I mean, within our ALERTS system, there

25 would be -- would be entries in there that says discuss --

1          THE COURT:  There would be entries?

2     Okay.  Okay.

3          THE WITNESS:  If -- if -- I mean, it's -- the reason

4    why I'm having trouble, is because it would just be general

5    terms.  So I wouldn't specifically say, you know, did this

6    review.  It would be discussions with the team.  It wouldn't --

7    it wouldn't say what they did, it wouldn't say what I did, it

8    wouldn't say what anybody did.  It would just say discussed --

9    discussed case with team.

10         THE COURT:  Okay.  Your testimony is that at some

11   point, you reviewed Relativity, the evidence in Relativity,

12   right?

13         THE WITNESS:  So I jumped in Relativity a few times,

14   yes.

15         THE COURT:  Did you review it or didn't you?  Now

16   it's "I jumped in."  I want to know what you did, sir.

17         THE WITNESS:  I mean, initially, it would be -- I

18   mean, I can't recall specifically.  It would be keyword

19   searches.  It would -- try to find some e-mails.  I mean --

20         THE COURT:  Okay.

21         THE WITNESS:  But -- but -- I mean, I don't remember

22   the outcome of -- of -- of what we did.  I mean, I didn't see

23   anything that would be of --

24         THE COURT:  So, let me get this -- let me -- let me

25   make sure I understand it.

1      You don't remember exactly when you did it, or why you did

2  it, or how you did it, you remember jumping in, and you don't

3  have any documentation for any of this.  Am I getting that

4  right?

5          **THE WITNESS:**  Well, like I said, I believe that a

6  couple of times that I've done it, I may have documented it in

7  CAS.  In our --

8          **THE COURT:**  In what?

9          **THE WITNESS:**  -- in our -- in our ALERTS.

10          **THE COURT:**  In ALERTS?

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  Okay.  So you would have documented

13  the -- what you did, it would be in ALERTS.

14          **THE WITNESS:**  It may have been.  And I'm just -- I'm

15  sorry, I'm just talking in general terms.  It would have -- if

16  I were to document it, it may be in ALERTS saying that, "Hey, I

17  reviewed Relativity."

18          **THE COURT:**  Today, when you came in to testify --

19          **THE WITNESS:**  Yes, ma'am.

20          **THE COURT:**  -- you were informed part of the purpose

21  was for me to know what review, if any, had been done for the

22  data that was ultimately put in Relativity, you knew that,

23  right?

24          **THE WITNESS:**  Maybe generally, but I don't know that

25  specific it was asked of me.

 1            **THE COURT:**  Okay.  How about anything like the Court

 2   wants to know whether the devices that were seized were ever

 3   reviewed?  Did that come up?

 4            **THE WITNESS:**  Again, I -- I would -- I don't want to

 5   assume.

 6            **THE COURT:**  Well, if you didn't -- if it didn't come

 7   up, you can testify to that, but I just want to know.  Because

 8   the reason why I ask, is because to not have any details for me

 9   after six hours of being together, practically, and I ask a

10   very simple question, which is, did you review Relativity, and

11   if so, how?  And I can't get many details from you.  So I'm

12   trying to just understand that.

13            **THE WITNESS:**  Okay.

14            **THE COURT:**  Okay.  So I can't get details from you

15   now.

16       Where -- is -- is ALERTS the place that you would look to

17   refresh your recollection as to what you did?

18            **THE WITNESS:**  Yes, ma'am.

19            **THE COURT:**  Okay.  Is there anywhere else you would

20   look to refresh your recollection?

21            **THE WITNESS:**  That would be the sole place.

22            **THE COURT:**  That would be it?

23            **THE WITNESS:**  Yes, ma'am.

24            **THE COURT:**  Okay.  You referenced three other agents.

25   Would you also look in their ALERTS to see what they did with

1  respect to reviewing Relativity?

2          THE WITNESS:  Yeah, I'm -- they have similar systems,

3  I'm sure, but yes, they could probably check to see if they

4  documented such review.

5          THE COURT:  Were you ever asked to do that before

6  today?

7          THE WITNESS:  To look into ALERTS to see -- no,

8  ma'am, I was not.

9          THE COURT:  Or -- or look and see if there's any

10  documentation of reviewing this evidence before today, the

11  Relativity evidence?

12          THE WITNESS:  I mean, I was asked specifically did I

13  review Relativity by the United States Attorneys' Office, but I

14  told them yes, I did review it, but I -- I was never asked what

15  specific dates, or how long, or what my keyword search terms

16  were.

17          THE COURT:  Okay.  When were you asked that question,

18  and by whom?

19          THE WITNESS:  Well, it would have been by Mr. Darren,

20  maybe -- maybe last week, the week before, maybe when all this

21  started.

22          THE COURT:  Okay.  But before that, no one had made

23  that inquiry of you?

24          THE WITNESS:  Not that I recall.

25          THE COURT:  Did anyone ask you from the U.S.

1   Attorneys' Office to do the review, to actually look in

2   Relativity for, as you put it, evidence?

3          **THE WITNESS:**  Sure.

4      So Mr. Ake had us -- told us we can go ahead and start

5   looking in Relativity.  But as far as documenting a report, no,

6   it was never directed that we needed to document a report.

7          **THE COURT:**  And, again, where we would find any proof

8   or corroboration of this would be ALERTS; is that right?

9          **THE WITNESS:**  Yes, ma'am.

10         **THE COURT:**  Okay.  Okay.

11     Any other followup, Counsel, before I let the

12  government --

13         **MR. GOROKHOV:**  One last question.

14         **THE COURT:**  -- redirect?

15  **BY MR. GOROKHOV:**

16  **Q.**   When you -- in response to Judge Xinis' question, one of

17  the questions, you said that you were -- it was 30 devices in

18  Relativity.  But, in fact, are you including in those 30

19  devices, the laptop that was returned to Harriett Jackson?

20  **A.**   No, no, no.

21  **Q.**   Oh, okay.  Those are separate?

22  **A.**   So I think the judge was looking at the PDF that has 32

23  items.

24  **Q.**   Okay.

25  **A.**   But in reality, 29 of them went to the lab, and 23

 1  contained the images.

 2          **MR. GOROKHOV:**  Understood.

 3          **THE COURT:**  Okay.  All right.

 4      So you're saying 29 went to the lab.

 5          **THE WITNESS:**  Yes, Your Honor.

 6          **THE COURT:**  23 were imaged.

 7          **THE WITNESS:**  Yes, ma'am.

 8          **THE COURT:**  And those 23 constitute the data that was

 9  uploaded ultimately to Relativity?

10          **THE WITNESS:**  Yes, ma'am.

11          **THE COURT:**  Okay.  At some point, someone is going to

12  have to identify which ones are which, but I think I understand

13  it now.

14      Okay.  Very good.

15      All right.  Government?

16                      REDIRECT EXAMINATION

17  **BY MR. GARDNER:**

18  **Q.**  Agent Kimrey, maybe we can start with the Court's last

19  question.

20      So I'm -- I'm showing you, again, Government's Exhibit 7.

21  **A.**  Uh-huh.

22  **Q.**  And, of course, zooming in.

23      Okay.  You had mentioned that 23 devices were actually

24  imaged, correct?

25  **A.**  Yes.

*REDIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  **Q.**   Okay.  Now, if we count up basically the -- the gray, the

2  light gray cells, or -- or rows, that would equal 23, right?

3  **A.**   Light gray?

4  **Q.**   Yeah.  The -- so in the legend, the ones that say copied,

5  if we count those up, it will be 23?

6  **A.**   Do you mind if I count them?

7  **Q.**   Sure.

8  **A.**   Can you zoom in just a smidge?

9  **Q.**   I'm sorry.  I guess we would also have to include -- well,

10 let me just back up.

11      So on this entire sheet, there are 32 rows, correct?

12 **A.**   Correct.

13 **Q.**   Okay.  And two were copies, and those are -- are those the

14 ones that are delineated in red?

15 **A.**   That's correct.

16 **Q.**   Now, of those 30, if we subtract out the column -- or Row

17 Number 1, which that was the -- again, Row Number 1, was that

18 the device that we were saying belonged to Walter Reed?

19 **A.**   Yes.

20 **Q.**   And then you can see Rows 2, 10, 12, 20, 21, and 24, those

21 are devices that had either been wiped or that could not be

22 accessed because of passwords; is that also correct?

23 **A.**   Correct.

24 **Q.**   Okay.  And so if we subtract from 32, the two copies and

25 then these seven, does that equal 23?

*REDIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  **A.**   You mean 30.  I think you said 32, but -- 30.

2  **Q.**   I'm sorry, yes.

3      So after subtracting out the duplicates from 30 devices,

4  we subtract these seven that we just identified in both green

5  and orange on this exhibit, we get to 23, correct?

6  **A.**   Correct.

7  **Q.**   Okay.  There was some discussion earlier about when

8  certain data was taken from Infused, and you had mentioned that

9  Barbara Rosas was there, and I just want to be clear, who all

10  was in the room when that data was taken from Infused?

11  **A.**   So in the room, it -- Barbara Rosas was there, I was

12  there, and then our forensic examiner was Wes Mahon, he was

13  there.

14  **Q.**   And was Mr. Marlon Johnson also there?

15  **A.**   So he -- I don't remember him in the room.  He was in the

16  office.  It was a relatively large space.  But I don't recall

17  him being physically in the room with us.

18  **Q.**   There was also a bit of talk about *Jencks*, *Brady*, *Giglio*.

19      Now, do you recall how you -- I mean, I'll start -- I'll

20  start with the *Jencks*.

21      So do you remember a conversation where it was discussed

22  that you would provide written statements, texts, notes, that

23  sort of thing?

24  **A.**   Yes.

25  **Q.**   And do you remember exactly what -- what we, and by "we,"

1  I mean, I, advised you?

2  **A.**   Yeah, that would have been all reports that I did, and

3  then all e-mails associated with this case, which is what I

4  did.

5  **Q.**   And would that have included all written communications as

6  well?

7  **A.**   Yes.

8  **Q.**   Do you remember -- and then do you remember collecting all

9  that data and providing it to me?

10  **A.**   Yes.  I believe it was through USAfx.

11  **Q.**   Now, do you remember how you spelled *Jencks*, when you sent

12  it to me?

13  **A.**   I don't.

14  **Q.**   Okay.  I'll represent you spelled it J-I-N-X.  Is that

15  because you -- you don't --

16        **MR. GOROKHOV:**  Your Honor, leading.  I'm going to

17  object to leading here.

18        **THE COURT:**  Yeah.  And -- and you can move on.

19  **BY MR. GARDNER:**

20  **Q.**   Do you have an independent knowledge of the case law

21  behind *Jencks*, *Giglio*, and *Brady*?

22       If I say those names, do those names independently mean

23  something to you?

24  **A.**   They do.

25  **Q.**   Okay.

 1  **A.**    Slightly.

 2  **Q.**    And is your understanding of those through your

 3  training -- well --

 4          **MR. GOROKHOV:**  Object to leading, Your Honor.

 5  **BY MR. GARDNER:**

 6  **Q.**    Do you understand, generally, that it's your

 7  responsibility as you review -- you had mentioned exculpatory.

 8  You had mentioned the word "exculpatory" in your testimony,

 9  right?

10  **A.**    Yes.

11  **Q.**    Okay.  Regardless of which case that falls under, do you

12  understand -- what is your understanding of your obligation

13  about turning over to the U.S. Attorneys' Office exculpatory

14  information you find?

15  **A.**    So any -- any -- anything within the investigation

16  worth -- worth of evidence -- evidentiary value, whether it be

17  "Hey, I did it," or "Hey, I didn't do it," as an example.

18  **Q.**    So what you're saying is, if you -- in your review, if you

19  came across --

20          **MR. GOROKHOV:**  Object to leading, Your Honor.

21          **THE COURT:**  Yeah.

22      Can you not lead, please?

23  **BY MR. GARDNER:**

24  **Q.**    So let's just take an example.  You're reviewing

25  documentation, you're reviewing evidence.

1           **MR. GOROKHOV:**  Object to leading, Your Honor.

2           **THE COURT:**  No, no, no.  He's just laying the

3    foundation.  Go ahead.

4    **BY MR. GARDNER:**

5    **Q.**   So you're reviewing documents in an e-mail.

6    **A.**   Okay.

7    **Q.**   And you see something that would tend to suggest somebody

8    didn't commit a crime, what would you do with that evidence?

9    **A.**   That would be flagged.

10   **Q.**   Okay.  And who would that be flagged for?

11   **A.**   The investigative team.

12   **Q.**   Okay.  Anybody else?

13   **A.**   That would be for the entire investigative team to include

14   the AUSA as per discussions.

15   **Q.**   And now I'll take the converse.

16        So now you're reviewing something, and you find

17   information that tends to suggest that somebody was -- was

18   innocent or tends to suggest that they -- that they have a

19   defense that was not -- that you didn't realize before, what

20   would you do with that information?

21   **A.**   It would also be flagged and we would provide it to the

22   team to include AUSA Ake.

23   **Q.**   And now, turning to information that suggests somebody --

24   so you're, again, reviewing documents, and you find information

25   that suggests that somebody was less than truthful in any of

*REDIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1  those statements, what would happen to that information?

2  **A.**    That would also be flagged and provided to the team.

3  **Q.**    Okay.  And now you are reviewing something and the

4  converse is true, now you find information that tends to

5  support something -- something that a witness had told you in

6  an interview or something else, what would you do with that

7  information?

8  **A.**    That would also be flagged and provided to the team.

9  **Q.**    And you -- do you understand -- those -- would those be

10 flagged based on -- I'm sorry.

11     What would that be based on?  Your knowledge that you

12 should flag those, what's that based on?

13 **A.**    My training and experience.

14 **Q.**    And now, specifically to this case, if you had come across

15 evidence in any of your reviews that suggested the particular

16 defendant in this case, Mr. Masood, didn't commit -- didn't

17 commit the crime, the crimes that he's being accused of, what

18 would happen to that information?

19 **A.**    That would also be flagged and provided to the team.

20 **Q.**    And would the converse be true, information intended --

21 **A.**    Yes.

22 **Q.**    -- to implicate Mr. Masood?

23 **A.**    Yes.

24 **Q.**    I'm going to return quickly to my previous question before

25 it kind of fades from memory.

REDIRECT OF JOSHUA KIMREY BY MR. GARDNER

1      What is Ms. Rosas', Barbara Rosas' position within the

2 company?

3 **A.**   She's operations manager at Infused.

4 **Q.**   Okay.  And does she have access to the Infused server, to

5 your knowledge?

6 **A.**   Yes, she did.

7 **Q.**   And Mr. Johnson's position within the company?

8 **A.**   The president, majority owner.

9 **Q.**   Okay.  And does -- I'm sorry.

10      Does he also have access to the server, to your knowledge?

11 **A.**   I have not specifically asked him.

12 **Q.**   Okay.  I'm going to show you, again, Government's

13 Exhibit 3.  You were specifically asked questions about Devices

14 5 and 7.  And I think, you can correct me if I'm

15 misremembering, but these were taken to the lab at a different

16 time, correct?  And they were -- you see that on the third line

17 down, under chain of custody, it says released to DFE?

18 **A.**   That's correct.

19 **Q.**   And that was -- that was at a different time than the

20 other devices, correct?

21 **A.**   Correct.

22 **Q.**   Now, I don't think you got to explain exactly why you

23 think that may have happened differently.  I don't know exactly

24 know what the point that was -- I'll just let you -- let you

25 go.

*REDIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1      So the Lines 5 -- Items 5 and 7, you had mentioned

2 something about them being turned on and that being a potential

3 explanation.  Could you expand a bit more on that?

4 **A.**    Yeah.  I gave an example of what a forensic examiner would

5 look for in -- in order to, you know, take the evidence

6 directly to the lab.

7      Now, what reason he specifically took those two items from

8 the lab, that would be a question for Mr. Pugliese.

9 **Q.**    And so what -- what relevance did the fact that it may

10 have been turned on have, in your mind?  Why -- why did you --

11 why did you mention that today?

12 **A.**    Well, through my training, experience, I've learned that

13 at some points, if -- if a device is turned on, it captures

14 data.  And if it is shut off at any point, that data could be

15 lost forever.

16           **THE COURT:**  Sir, was Device 5 and 7 turned on when

17 they were seized?  Were they turned on?  Were they on, 5 and 7?

18           **THE WITNESS:**  Right.  I do not know --

19           **THE COURT:**  Don't know?

20           **THE WITNESS:**  -- Your Honor.

21 BY MR. GARDNER:

22 **Q.**    Agent Kimrey, can I direct your attention to the

23 descriptions of Items 5 and 7, and could you please review

24 those and then tell us if you can tell from those if they were

25 turned on?

1  **A.**    Okay.  I've reviewed 5 and 7, and no, it does not indicate

2  whether the item was turned on or not.

3           **THE COURT:**  And I think that question has been asked

4  and answered.  Mr. Gardner, move on.

5  **BY MR. GARDNER:**

6  **Q.**   Can I direct your attention --

7  **A.**   So --

8           **THE COURT:**  The witness clearly misread and didn't

9  see the word "on" on the document --

10          **MR. GARDNER:**  Understood, Your Honor.

11          **THE COURT:**  -- that he's been extensively examined

12  about.  So I get it.

13          **THE WITNESS:**  Thank you, Your Honor.

14          **THE COURT:**  No problem.

15 **BY MR. GARDNER:**

16 **Q.**   I'm turning to Government's Exhibit -- Government's

17 Exhibit 8.

18      And what do you recognize Government's Exhibit 8 to be?

19 **A.**   This would have been the custody document that was

20 completed by Agent Clezie -- I'm sorry, Clezie, after he signed

21 the evidence out.  So he would have to put it into the new

22 system as required -- new system, I mean the evidence

23 management portal, and he would have put it into the system in

24 order for it to be examined.

25 **Q.**   And just -- just so I'm -- I'm -- I'm clear, there are

*REDIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1   two, it looks like, the ones with dispo written on them.  You

2   see that?

3   **A.**    Yes.  Yes, I see them.

4   **Q.**    And you see those are two, it looks like, iPhones?

5   **A.**    Yes.

6   **Q.**    Are those the same iPhones that we're referring to in

7   Items 5 and 7 on Exhibit -- Exhibit 3?

8   **A.**    Yes.

9   **Q.**    Okay.  And how do you know that?

10  **A.**    Well, if you look at the description, there is a -- the

11  description is very similar, and if you focus in on the time,

12  date, and initials collected, then they would match.

13  **Q.**    So -- so basically what we're saying, is -- when you turn

14  something over, there is still a chain of custody, and this

15  document is that chain of custody; is that what you're saying?

16  **A.**    That's correct.

17  **Q.**    And I'm sorry, this would be the chain of custody with the

18  forensic image, or would this be the physical device?

19  **A.**    This would be the physical device, and it appears, you

20  know, if you look at the Item 1, the LWCC9, that appears to be

21  the physical image of the second cell phone.

22  **Q.**    We didn't walk through the chain of custody in exhaustive

23  detail on this document.  This is Government's Exhibit 9.

24        And I'm -- I -- I want to represent, we've already sort of

25  established that this is the one regarding the device that

1   was -- belonged to Walter Reed, in your words?

2   **A.**    Yes.

3   **Q.**    And can you just walk us through the chain of custody, and

4   then from the beginning to the end, just those three -- those

5   three lines?

6   **A.**    Yes.

7         So Item Number 1 there, it was on 6 April, '22, it was

8   collected from the search warrant by -- from the scene by

9   Mr. Bornick, re-evaluated as evidence.  That same day, the next

10  line down, 6 April, '22, Mr. Bornick signed the evidence over

11  to me, the evidence custodian.  Then the next line down on

12  10 August, 22 is when I signed this particular item over to

13  Ms. Harriett Jackson, it was a release to owner.

14  **Q.**    And just to be clear, when you -- when you pulled out the

15  CAC card from that device, was it a name you recognized at all?

16  **A.**    It was not.

17  **Q.**    You don't remember who it was, but you remember it was not

18  a name that was -- that was in your --

19              **MR. GOROKHOV:**  Object to leading.

20              **THE COURT:**  Yeah.  Sustained.

21        Next question.

22  **BY MR. GARDNER:**

23  **Q.**    When you create an image, is it fair to say the image is

24  just a copy?

25  **A.**    Yes.

 1  Q.   Okay.  Now, when you -- when you upload a document -- like

 2  if -- if you upload a download -- so say you have a dataset,

 3  and you upload it to USAfx, for example, would you describe

 4  that as an image?

 5        **MR. GOROKHOV:**  Your Honor, I'm going to object.  This

 6  is not lay testimony.

 7        **THE COURT:**  Yeah.  Sustained.  Sustained.

 8  **BY MR. GARDNER:**

 9  Q.   Do you consider copies -- do copies require their own

10  chains of custody?

11        **THE COURT:**  Okay.  Counsel, can you come up?

12        **MR. GOROKHOV:**  Object to foundation.

13        **THE COURT:**  Come up please.

14    (A bench conference was held on the record as follows:)

15        **THE COURT:**   In fairness, I want to understand where

16  you're going, because, you know, this witness has repeatedly --

17  didn't answer questions, because if it's anything forensic, he

18  has nothing to do with it.  Now you're trying to step what, so

19  I --

20        **MR. GARDNER:**  So I think there was some discussion

21  about whether -- whether or not a -- sort of impeaching him on

22  the fact that maybe there -- the images weren't tracked

23  independently.  So I'm just trying to establish that if an

24  image is essentially just a copy, any time someone makes a

25  copy, they don't start a new hand receipt.  It is --

1          **THE COURT:**  Yeah, except that this witness has

2    expressly disavowed almost any knowledge of anything forensic,

3    digitally forensically related.  He's told Mr. Gorokhov over

4    and over again that that's not his kettle of fish.

5          **MR. GARDNER:**  I think he has said and will continue

6    to say that making a copy does not start its own hand receipt.

7    And I think that is kind of where I'm getting at.

8          **THE COURT:**  You got to establish the foundation.

9    Because you just want him to say that an image is a copy, and a

10   copy doesn't have to have its own chain of custody, it's really

11   not very probative.

12      So I don't know how you want to get into it, but right

13   now, the questions are just untethered to anything, and he's

14   easily said "it's not my bailiwick."  So maybe it's in response

15   to a question that Mr. Gorokhov --

16          **MR. GARDNER:**  I'll move on, then.

17          **MR. GOROKHOV:**  Your Honor, if I just may make the

18   record on this.

19      My recollection of the testimony is that he testified

20   there was a hard drive onto which the images were placed which

21   had no chain of custody.  And then Derek Johnson modified that

22   hard drive and made a new hard drive.

23          **THE COURT:**  A card, card, right.  A San card.

24          **MR. GOROKHOV:**  An SD card, yes.

25          **THE COURT:**  Which also doesn't have a chain of

1    custody.  Yeah.  So that's, in part, why I think I'm confused.

2              **MR. GARDNER:**  I'll ask a question about that.  I

3    think that makes more sense.

4              **THE COURT:**  Okay.  All right.  Thank you.

5         (The bench conference concluded and proceedings resumed as

6    follows:)

7    **BY MR. GARDNER:**

8    **Q.**   Agent Kimrey, I think you testified that after all the

9    devices were imaged, those images were placed on some sort of

10   hard drive; is that correct?

11   **A.**   Yes.

12   **Q.**   Okay.  And then there was some processing done to that

13   hard drive and you had mentioned an SD card, correct?

14   **A.**   Two separate items, yes.

15   **Q.**   What do you mean by two separate items?

16   **A.**   So the -- a hard drive is what I understand is what DFE

17   Mark Johnson copied all the devices to.  That's what I

18   initially gave to Mr. Ake.  And at that point, you know, as

19   discussed earlier, we needed to downsize.  So then a smaller,

20   not actual hard drive, right, a little SD card was produced by

21   Mr. Jackson -- Johnson, and then that's what I also gave to

22   Mr. Ake.

23   **Q.**   And do you have any idea of the size of that SD card?

24   **A.**   I don't.

25   **Q.**   And the purpose of creating that, you discussed it, I

 1  think, about taking out system files.  Can you discuss the --
 2  any -- any guidance you're aware of about what files should
 3  remain on that SD card?
 4          MR. GOROKHOV:  Your Honor, object to foundation.
 5          THE COURT:  Yeah.  I -- sustained.
 6  BY MR. GARDNER:
 7  Q.  So were you part of any conversations where it was --
 8  where they had determined how they were going to take the hard
 9  drive and turn it into the SD card that would then be used for
10  Relativity?
11  A.  Yeah.  I asked Mr. Jackson to take out the system files,
12  and he knew exactly what I meant, and that's -- that would be a
13  question for him, but that's what he did.
14  Q.  So what was left on that SD card would have been what?
15          MR. GOROKHOV:  Objection, leading.
16          THE COURT:  Do you know what was left on the SD card.
17          THE WITNESS:  Yes.  Yes, Your Honor.
18      I mean, he did give me an e-mail of what he did to it and
19  what he -- what he stripped out and what he provided.
20          THE COURT:  Oh, so there's an e-mail that documents
21  what Agent Johnson did?
22          THE WITNESS:  Yes, Your Honor.
23          THE COURT:  Okay.
24      Have you produced that e-mail?
25          MR. GARDNER:  We can produce it, Your Honor.

1          **THE COURT:**  You haven't produced it?

2          **MR. GARDNER:**  Do we have it?  It probably already has

3    been produced, Your Honor.

4          **THE COURT:**  Maybe it has, maybe it hasn't.

5      Does the defense have it?

6          **MR. GARDNER:**  I have to -- I'll have to ask Agent

7    Kimrey what e-mail he's referring to, and then I can produce

8    it, if it hasn't.

9          **THE COURT:**  Have you -- Agent Kimrey, have you --

10   this e-mail that you refer to, where Agent Johnson documented

11   what he did from the drive to the card, did you ever produce

12   that to any of the government -- any of the prosecutors?

13         **THE WITNESS:**  Yes, I would have uploaded it to fx.

14         **THE COURT:**  To fx.

15         **THE WITNESS:**  USAfx.  Yes, Your Honor.

16         **THE COURT:**  Okay.  And can you just tell me, because

17   I'm not a hundred percent sure I know what USAfx is.

18         **THE WITNESS:**  Okay.  It's a file sharing.  So if I

19   was -- instead of e-mailing or hand out documents to the AUSA's

20   office, it would just be uploaded to a file sharing portal --

21         **THE COURT:**  Okay.

22         **THE WITNESS:**  -- that I would have access to and the

23   prosecution would have access to.

24         **THE COURT:**  And you're saying that this information

25   regarding what Agent Johnson did would have been made available

*REDIRECT OF JOSHUA KIMREY BY MR. GARDNER*

1   to the government through USAfx?

2            **THE WITNESS:**  Yes.

3            **THE COURT:**  Okay.  And do you know when?  I mean,

4   would it have been at or around the time that the work was

5   done?

6            **THE WITNESS:**  No.  It would have been within the last

7   couple of weeks.

8            **THE COURT:**  Oh, I see.  I see.  So it wasn't -- it

9   wasn't -- it wasn't communicated to the government in real

10  time, it was in response to this inquiry about what happened to

11  the data on the devices?

12           **THE WITNESS:**  Correct.

13           **THE COURT:**  Okay.  So then it was produced to the

14  current counsel for the government?  I mean, it was made

15  available to them through fx; is that what you're saying?

16           **THE WITNESS:**  That's correct.

17           **THE COURT:**  All right.  Well, that answers that.

18    I don't know if it was given to the defense.  Let's see.

19         **MR. GOROKHOV:**  We do have an e-mail from Derek

20  Johnson dated May 23rd, 2023, Your Honor, regarding an SD card.

21  I can confer with the government and make sure --

22           **THE COURT:**  Make sure that's it.

23         **MR. GOROKHOV:**  -- that's the one.

24           **THE COURT:**  Okay.

25         **MR. GOROKHOV:**  Because we would want that in

1  evidence, Your Honor.  Thank you.

2              **THE COURT:**  All right.  Then let's -- let's do that

3  so you all know that we're all talking about the same thing.

4  But I think we have figured it out, I think.

5      Okay.  Go ahead.

6  **BY MR. GARDNER:**

7  **Q.**  And I believe this was Defense -- Defense 7?

8              **MR. GOROKHOV:**  Yes.

9              **THE COURT:**  Is it 7 or 5?

10             **MR. GOROKHOV:**  I think it's 5, Your Honor.

11             **THE COURT:**  It's 5, yeah.

12             **MR. GARDNER:**  This document is Defense 5.

13  **BY MR. GARDNER:**

14  **Q.**  Now, you basically said you've seen it but didn't draft

15  it, correct?

16  **A.**  I -- I have seen this.  I did not draft it.

17  **Q.**  And so how did it come in your possession?

18  **A.**  I downloaded it from ALERTS.

19  **Q.**  Okay.  So you --

20  **A.**  Which is our reporting system.

21  **Q.**  And did you then -- I mean, so I -- I -- what did you then

22  do with the document?

23  **A.**  So I downloaded it from ALERTS onto my computer, and then

24  I provided it to you through USAfx, the file sharing system.

25  **Q.**  Okay.  So you -- would you have saved it?

**REDIRECT OF JOSHUA KIMREY BY MR. GARDNER**

1  **A.**    Yeah, I would have saved it.  I mean, you have to.  You

2  have to save it to my desktop, or my server, wherever I want to

3  direct the destination to.

4  **Q.**    And would that have been in response to a request that I

5  gave you to look for these kind of documents?

6  **A.**    Yes, yes.

7  **Q.**    Okay.  And in a general time frame, what -- when would

8  that time frame have been?

9  **A.**    Within the last couple of weeks.

10  **Q.**    Okay.  And lastly, a few questions about the Relativity

11  database.

12       You said you had reviewed it.  I just want to -- let me

13  just ask a general question.

14       What steps did you take in Relativity when you had access

15  to it?

16  **A.**    I would open it up and just -- I would just do keyword --

17  keyword searches, but I don't recall what searches.

18  **Q.**    Okay.

19  **A.**    And again, I would like to point out that I had little --

20  I was in there a little bit, as I was reviewing, but the

21  majority of the review was completed by my team.

22            **MR. GARDNER:**  Your Honor, I think that's all we have.

23            **THE COURT:**  Okay.

24       Any recross, based on the redirect?

25            **MR. GOROKHOV:**  Your Honor, very -- just a few

1    questions.

2             **THE COURT:**  Okay.

3             **MR. GOROKHOV:**  And if I may, just the Court's

4    indulgence for just one second.

5         Thank you, Your Honor.

6                        **RECROSS-EXAMINATION**

7    **BY MR. GOROKHOV:**

8    **Q.**   Do you recall looking at the chain of custody document,

9    and then the spreadsheet that we showed you that is D5 that

10   I'll put on the screen here?  And there was --

11   **A.**   Yes.  Yes, I remember D5.

12   **Q.**   You remember that?

13        And then there was the other document that's a part of

14   D4 -- excuse me, D3.  I don't have it right here.  But it's got

15   a green row at the top.

16        You remember that?

17   **A.**   Yes, I do remember.

18   **Q.**   It's Government 7.

19   **A.**   I think I gave it --

20   **Q.**   Do you know why the row changed from this color to green

21   on the chart?

22   **A.**   Could you be more specific about your question?

23   **Q.**   Yeah.

24        Do you know why this version of the chart had this blacked

25   out, and then the green version -- the new version of the

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  chart, it was denoted in green?

2  **A.**    So I took information from this chart and created my own,

3  and that's -- I put green on that chart.

4  **Q.**    You decided that it should be green?

5  **A.**    I just selected a random color.

6  **Q.**    Right.

7       And that was a different color, because that was the only

8  device that was handed back after the search, right?

9  **A.**    Yes.

10  **Q.**    Okay.  Now, I want to ask you -- I want to ask you --

11            **MR. GOROKHOV:**  Can I borrow Government's 8?  I'm

12  sorry.

13  **BY MR. GOROKHOV:**

14  **Q.**    Who made the notation up here that says disposed?

15  **A.**    I did.

16  **Q.**    Why did you make that notation?

17  **A.**    Because if you look at the last document on this page,

18  that's when Mr. Masood -- I provided it to Mr. Masood --

19  actually, no, I'm sorry.  When it was dispo'd to -- can we see

20  the name please, the very last page?

21       Because it's referring to a disp -- it was a final

22  disposition, so if this is -- I believe we're talking about

23  Michelle Peebles' items, it was returned to Sal.  And so me to

24  make myself a note, I would just put DISP, for disposed, just

25  to remind myself.

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **Q.**   All right.  Now, you mentioned an e-mail from Derek

2  Johnson regarding an SD drive that was uploaded to USAfx; is

3  that correct -- I'm sorry, that was uploaded to Relativity; is

4  that correct?

5  **A.**   I don't remember a specific e-mail, but I remember

6  communication from that.

7  **Q.**   Okay.  But as far as your role as the lead case agent, an

8  SD card that would have been uploaded to Relativity, that would

9  have been the compressed version -- not the compressed, but the

10 reduced version?

11 **A.**   Yes, sir.

12 **Q.**   And as far as you know, there was only one hard drive -- I

13 mean, one SD card; is that correct?

14 **A.**   Yes, yes.

15 **Q.**   I'm going to ask you to take a look at this e-mail here

16 and see if this is what you're referring to.  I'm sorry, I just

17 have it on my --

18        **THE COURT:**  You can't plug in to put it on the

19 screen, so everyone can see it?

20        **MR. GOROKHOV:**  No, because I have a Mac, Your Honor.

21        **THE COURT:**  Well, show it first to the government,

22 then.

23        **MR. GOROKHOV:**  Yes.

24    Your Honor, I'll put this up on the screen.

25        **THE COURT:**  Let's try that.  I don't know if it's

 1  going to work.

 2          **MR. GOROKHOV:**  It's not terrible.

 3      Can you see that?

 4          **THE COURT:**  I can't, because nothing is -- nothing is

 5  publishing to me up here, just so you know.  None of my screens

 6  are working.  That's okay.  We'll figure it out.  Let's see if

 7  Mr. Ulander can do a screen capture for me.

 8          **MR. GOROKHOV:**  It's publishing, it looks like, to the

 9  court one.

10          **THE COURT:**  I've had it up until now.  Let's see.

11  Maybe we can get this going.

12      All right.  Can you -- can you just screen capture it and

13  print it?

14          **DEPUTY CLERK:**  The system can't do that.  We would

15  have to --

16          **THE COURT:**  How about this, continue -- continue with

17  your examination, and we'll just get it from you afterwards.

18          **MR. GOROKHOV:**  Okay.  Thank you.

19      I just wanted to ask him, Your Honor, if this -- if he

20  recognizes this e-mail as Derek Johnson's reference to an SD

21  card that is now available for review in Relativity.

22          **THE COURT:**  Okay.  Go ahead, sir.

23          **THE WITNESS:**  Yeah, I believe I recall this, yes.  He

24  was referring to the Google dataset that I sent him and this SD

25  card.

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  **BY MR. GOROKHOV:**

2  **Q.**   And that's the SD card you believe is the smaller version

3  of the larger drive; is that correct?

4  **A.**   I believe so.

5  **Q.**   And that's dated May 23rd, 2023; is that correct?

6  **A.**   Correct.

7       **MR. GOROKHOV:**  And we'll submit that, Your Honor, as

8  D9 when we provide it to the Court.

9       **THE COURT:**  Okay.

10       **MR. GOROKHOV:**  Your Honor, I think that's all I have.

11  Let me check with my colleague here.

12       **THE COURT:**  Sure.  And that's D9.  Okay.

13       **MR. GOROKHOV:**  So, Your Honor, just a housekeeping

14  point.  We're done for now.  We would like to keep the ability

15  to recall this witness, if these -- if these proceedings

16  continue.  And we would like to, for the rule on witnesses, to

17  continue to apply as long as Your Honor is conducting an

18  inquiry into this matter.

19       The other issue I think we can raise outside the presence

20  of the witness.

21       **THE COURT:**  Okay.  That's fine.  So right now, I

22  think as I hear it, and let's -- let's do this, just because we

23  got to get to the other witnesses, but I don't -- I want the

24  record to be clean.

25       Agent Kimrey, we're going to release you for now.  I'm

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1  sure you're hoping that this is the first and last time you

2  have to testify in this proceeding.  It may not be.  So I will

3  continue to invoke the rule on witnesses until further notice,

4  which just means don't talk to anybody about your testimony.

5          **THE WITNESS:**  Yes, Your Honor.

6          **THE COURT:**  And you are free to -- and government,

7  you don't have anything else, do you?

8          **MR. GARDNER:**  No, Your Honor.

9          **THE COURT:**  So you're free to step down for now, and

10  we'll see if it's forever.  Okay.  Thanks.

11      You have a housekeeping matter before the next witness?

12      And if you would step out, Agent, that would be great.

13  Thank you.

14          **MR. GOROKHOV:**  Thank you, Your Honor.  I'll let my

15  colleague, Mr. Greenberg, address the Court on that issue.

16          **THE COURT:**  Yes.

17          **MR. GREENBERG:**  Your Honor, I think this is probably

18  a foregone conclusion at this point, but we would respectfully

19  request that Your Honor order the government to produce this

20  database with all the system ALERTS in full in a usable format,

21  the same way that's accessible to Special Agent Kimrey, as

22  expeditiously as possible.

23          **THE COURT:**  I'm in -- I'm inclined to say yes, at

24  least with respect to this case, and the agents who touched

25  this case.

1      I mean, this witness at the end of the day, if I get it

2   right, is saying that he reviewed Relativity, but then he

3   popped in on Relativity, and he wasn't the main one reviewing

4   the Relativity database.  But if it's going to be memorialized

5   anywhere, it would be on ALERTS.

6      So the motion is granted.

7      The question in my mind is going to be scope.  Because

8   I -- I have very limited insight as to -- his ALERTS,

9   Johnson's, and the three other agents that he mentioned as most

10  critically being part of a review process would be pretty

11  important to this analysis.  I mean, this is the first I've

12  heard that anybody reviewed these devices.

13         **MR. GREENBERG:**  Yes, Your Honor.  And I believe this

14  directly contradicts previous representations to the Court by

15  the government.

16      In addition to the database, with respect, we would

17  respectfully ask the Court order the government to produce the

18  native version of this chart with the new green first row that

19  was -- we just first got yesterday afternoon.

20         **THE COURT:**  Of Government 7, you mean?

21         **MR. GREENBERG:**  Yes, Your Honor.

22      And we would like to get -- ask the Court respectfully to

23  order the government to produce the native version of that file

24  and all previous versions of that file regardless of who worked

25  on them or touched them.

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1           **THE COURT:**  Okay.  Let's do this on that, why don't

2   you all meet and confer, right?  That should be something that

3   I don't -- I mean, this is obviously a pretty big issue, this

4   witness testified repeatedly that there was a document which at

5   least the defense has generated some evidence, in its native

6   form, was modified by this witness, but yet the witness told me

7   over and over again he really -- he didn't create it, he didn't

8   modify it.  So I don't know what's going on.  It seems fair to

9   get to the metadata on some of this.

10          **MR. GARDNER:**  Can we hold off on that until

11  Mr. Johnson testifies?  And that may clear things up.

12          **THE COURT:**  Sure.  It -- it may.

13          **MR. GARDNER:**  I anticipate -- I anticipate Johnson

14  saying, "I wrote it, yes, this is my document," and then maybe

15  that clears the issue up.

16          **THE COURT:**  I don't know if it will clear up how

17  Agent Kimrey is on it as a modifier in -- in the last week, I

18  don't know.  But I'll give you an opportunity to have your --

19  your next witness testify.

20          And, frankly, it just seems to me like you all should be

21  able to work that out on one pretty important chart as to

22  whether the metadata, as to how it was created, either can --

23  you know, you either come to some agreement, and if you can't

24  come to some agreement, you bring to me what the issue is.  But

25  you haven't even had a chance to talk about it, so --

1       The ALERTS system, though, it's all over this witness's

2  testimony.  It is the very reason, you know, why he did or

3  didn't do something.  And -- and when asked about what this

4  system is and how it works, I don't really have a lot of

5  clarity on it.

6       And given that it is such an important issue, it is

7  whether the government's agents ever looked at the substance of

8  at least 23 devices that were kept and uploaded and imaged.  It

9  would seem to be in the government's interest to want to get to

10 the bottom of this as well.

11      So I am going to grant that motion because I just think

12 it's an easy one.

13      And that -- that the ALERTS -- evidence of the

14 communications -- really, any interaction with the ALERTS

15 system relevant to this investigation involving Agent Kimrey,

16 the other three agents he identified, Agent Johnson, turn it

17 over.  I don't know how quickly you can gather that

18 information.

19      So why don't you consult -- I know I told Agent Kimrey no

20 talk about this testimony, but I'll allow that consultation so

21 he can figure out how quickly to get this information to the

22 defense in a format that is readable, searchable, usable.

23 Okay?

24      All right.  Go ahead.

25          MR. GARDNER:  Your Honor, I just want clarity on the

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

 1    names.  Obviously Agent Kimrey would be included.

 2              **THE COURT:**  Yeah.

 3              **MR. GARDNER:**  And then the other agents.

 4              **THE COURT:**  The agents that he testified to today are

 5    names I never -- well, I heard Agent Smith, I've heard of her.

 6    And then a Ryan Goins.

 7              **MR. GARDNER:**  Ryan Goins and Kevin Warne.

 8              **THE COURT:**  Kevin Warne.  Those are the three.  Hey,

 9    if you know of others, include them, because at this point --

10              **MR. GARDNER:**  Understood, Your Honor.

11              **THE COURT:**  -- we're trying to get to the bottom of

12    who, if anybody, reviewed the evidence in the Relativity

13    database, which now seems to be the only remaining repository

14    for the data gathered from the devices, right?  I think that's

15    fair.  All the devices were returned, the original devices.

16    Don't yet know where the hard drive went, maybe that will come

17    to be.  But for now, it was given to Mr. Ake, and I don't know,

18    maybe Mr. Johnson will explain it.

19        And then the card, according to this agent, was used to

20    upload -- was uploaded into Relativity.  So that's the only

21    remaining repository that I can see for the -- for the data on

22    the devices.  Am I right about that?

23              **MR. GARDNER:**  Your Honor, as part of your order

24    yesterday --

25              **THE COURT:**  Yeah.

1           **MR. GARDNER:**  -- we basically uploaded documents --

2    there is an image of that SD card that exists, and it's on

3    USAfx and we're trying to provide it to defense in hard copy,

4    so I took the Court to say that maybe, like, there was only one

5    copy, and it's now in Relativity and it can't be accessed.  I

6    just want to represent to the Court, and I've uploaded

7    documents to this effect, that defense has the same SD card

8    that was uploaded to Relativity and they had, kind of, asked

9    for access to Relativity, we can still give that.

10          **THE COURT:**  Okay.  That -- that's fine.

11          **MR. GARDNER:**  But we've given him a copy, also, Your

12    Honor.

13          **THE COURT:**  That's fine.  And maybe I -- I was a

14    little too exclusive in my comment.

15      My point was, there is a repository of the information on

16    the SD card, the data on the SD card, that's Relativity.  This

17    witness, at the end of his testimony said, I reviewed it,

18    jumped into it, don't really know how much or how.  He

19    referenced other people who, to his knowledge, did the same

20    thing.

21      As a matter of fact, he shifted it to them and said, oh,

22    most of the investigation, it happened with them, and they're

23    not going to testify, at least for now.

24      But that's the call of the -- of the order, right?  Is

25    it's a really important issue.  This witness relied heavily on

 1  ALERTS would be the place to document when and if this

 2  happened.  So that's why I'm ordering the information in the

 3  database ALERTS for the agents we've discussed, including

 4  agent -- or the Forensic Examiner Johnson.  Okay?

 5      All right.  Mr. --

 6          **MR. GOLDMAN:**  That was just my point, was that

 7  Johnson had been left out.  And I want to clarify that that's

 8  Mark Johnson, rather than Derek Johnson who I think is on the

 9  -- on that e-mail.

10          **THE COURT:**  I was going to ask that question, too.

11  Which Johnson is the examiner?

12          **MR. GOLDMAN:**  I would respectfully ask -- Mark

13  Johnson is the examiner, but I would respectfully ask that if

14  either Derek Johnson or Mark Johnson has anything in the ALERTS

15  system, that we should get it from both of them.

16          **THE COURT:**  All right.  Well, Mark Johnson -- okay.

17  I know now you're saying he's the examiner.  And I've seen

18  Derek Johnsons' name.

19          **MR. GOLDMAN:**  He's the one that sent the e-mail on

20  5/23/23 that we introduced related to this -- these issues.  I

21  can't recall if he's an U.S. Attorney or if he's an examiner.

22          **MR. GARDNER:**  He's a specialist within the U.S.

23  Attorneys' Office, Your Honor.

24          **THE COURT:**  He's a special assistant?

25          **MR. GARDNER:**  Yes.  Not a special assistant.  An

1  electronics specialist.  He is an IT specialist in the office.

2        **THE COURT:**  And what's his role in this --

3        **MR. GARDNER:**  I -- my -- I mean --

4        **THE COURT:**  -- process.

5        **MR. GARDNER:**  -- he is able to create Relativity

6  databases.

7        **THE COURT:**  I see.  Okay.  So he's not in the ALERTS

8  system?

9        **MR. GARDNER:**  He will not be, Your Honor.

10       **THE COURT:**  He's the one -- got it.

11       **MR. GARDNER:**  I do want to point out it very well may

12  be, because all of these individuals, Ryan Goins, Kevin Warne

13  are not within the U.S. Army CID, or not all of them.  There is

14  agents from other agencies as part of this case.

15       **THE COURT:**  Right.

16       **MR. GARDNER:**  I just want to front the -- front the

17  possibility that they are not in ALERTS, because ALERT -- they

18  don't have that system or they use some other system.

19       **THE COURT:**  Okay.

20       **MR. GARDNER:**  I will, of course, find out about that.

21  But if you don't get five ALERTS downloads, I want the Court to

22  know why.

23       **THE COURT:**  Yeah.  Well, then your -- then your

24  witness has an issue with what the testimony was, I believe.  I

25  mean, that's -- that's -- maybe I misheard it.  I mean, it's

*RECROSS OF JOSHUA KIMREY BY MR. GOROKHOV*

1    possible.  I can go back.  But I thought that's what this

2    witness testified to, not only did they do it, but -- but the

3    corroboration of it would be in ALERTS.

4         **MR. GOLDMAN:**  That was my understanding of the

5    testimony, Your Honor.

6         **THE COURT:**  And if it turns out something different,

7    well then you deal with it as a matter of credibility.  Okay?

8       All right.  Anything else before we call our next witness,

9    or you all call?

10        **MR. GREENBERG:**  Your Honor, this may be covered by

11   the Court's earlier directive to review all of former AUSA

12   Ake's e-mails, I'm not sure.  But just for clarity, because I

13   understood the last witness -- Special Agent Kimrey, he

14   testified that Mr. Ake was involved in the decision, did not

15   search Relativity to see if proffers by Peebles and Jackson

16   lined up with documents, and he had testified earlier something

17   to the effect that he was communicating constantly with

18   Mr. Ake.

19      So we would -- we would respectfully request the Court

20   order the government to produce, directly to us, all e-mails

21   between Mr. Ake and anyone else in the U.S. Attorneys' Office

22   with the agents on this case.

23        **THE COURT:**  I mean, I think at this point, I'm not

24   going to order the government to turn over -- I don't think.

25   Let me think about it.  I know that those e-mails regarding

1  this whole process with Mr. Ake will be provided to me because

2  it overlaps with the taint process, it has to be.  It's all one

3  in the same.

4      So I'm assuming that I will get a full -- government has

5  to make sure they do their job in terms of, you know, pulling

6  it all down and getting it to me.  But let me take a look at it

7  first in camera and we'll go from there.

8      That should include though, after a lot of testimony

9  today, about the constant communication with Mr. Ake regarding

10 what I see to be from this witness to be sort of bookending the

11 taint process, tainting review process.  But then also once, I

12 guess -- well, separate and apart from that, any review of the

13 devices in regards to this case.

14     There was testimony of communication between Mr. Ake and

15 this witness, Agent Kimrey, about that.  I do want to see

16 those.  And I'm not going to -- after we get -- after I get

17 them, I'll decide if they are -- you know, will be produced,

18 just to be cautious.

19         **MR. GREENBERG:**  Thank you, Your Honor.

20         **THE COURT:**  Okay.  And then those can be produced --

21 all of it can be produced by next Tuesday, right?

22         **MR. GARDNER:**  Yes, Your Honor.

23         **THE COURT:**  Okay.  Okay.

24     And it is -- I suppose it's possible that those other

25 agents were not on ALERTS because they were from different

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

 1  agencies, and I appreciate that.  And so let's just find out

 2  what ALERTS has and then you can keep us up to date,

 3  Mr. Gardner.

 4      All right.  Are we ready for your next witness?

 5          **MR. MANTHRIPRAGADA:**  We are, Your Honor, with the

 6  Court's permission, I'll be presenting Mark Johnson.

 7          **THE COURT:**  Sure.  Okay.

 8          **MR. MANTHRIPRAGADA:**  The government calls Mark

 9  Johnson to the stand.

10          **DEPUTY CLERK:**  Please raise your right hand.

11                          MARK JOHNSON

12  having been first duly sworn, was examined and testified as

13  follows:

14          **THE WITNESS:**  I do.

15          **DEPUTY CLERK:**  Thank you.  You may be seated.

16      Please speak loudly, closely, and clearly into the

17  microphone.  State your full name for the record and spell both

18  your first and last name.

19          **THE WITNESS:**  Mark Johnson, M-A-R-K, J-O-H-N-S-O-N.

20          **DEPUTY CLERK:**  Thank you.

21                      **DIRECT EXAMINATION**

22  **BY MR. MANTHRIPRAGADA:**

23  **Q.**  Mr. Johnson, I'm going to be asking you the questions.

24      Sir, could you tell the Court where your -- what your

25  occupation is?

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1  **A.**   I am a digital forensic examiner.

2  **Q.**   And who do you work for?

3         **THE COURT:**  Mr. Johnson, can you do me a favor?  Can

4  you move that microphone real close to you so we can hear you?

5  It's very hard to pick up voices.

6         **THE WITNESS:**  I apologize, Judge.

7         **THE COURT:**  That's great.

8         **THE WITNESS:**  I'm very soft spoken.

9         **THE COURT:**  That's okay.  The mic will do its job.

10  Thank you.

11  **BY MR. MANTHRIPRAGADA:**

12  **Q.**   And, sir, who do you work for?

13  **A.**   I am an employee of Agile Defense, a federal contractor

14  who holds a contract with Army CID.

15  **Q.**   Army CID.

16     And how long have you worked with that particular branch

17  of the government?

18  **A.**   Approximately 18 years.

19  **Q.**   And can you describe your duties and responsibilities

20  there, please?

21  **A.**   We conduct various digital examinations, acquisitions,

22  basically anything related to computer forensics in criminal

23  investigations.

24  **Q.**   And do you have a background in forensic analysis?

25  **A.**   I do.

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1  **Q.**    And can you describe that for the Court, please?

2  **A.**    My entire career has been with IT, going back nearly 30

3  years now.  Information security, general IT, but first -- and

4  then information security, and for the last 18 years doing

5  slowly digital forensics.

6      I am accredited as a CISSP, that's the Certified

7  Information Systems Professional.  I hold a EnCase

8  certification, ENCE as well as various --

9          **COURT REPORTER:**  I'm sorry.

10          **THE WITNESS:**  I'm --

11          **COURT REPORTER:**  You hold a?

12      You're going very fast. I'm sorry.  Can you back up?

13          **THE WITNESS:**  I hold a CISSP, and I have an ENC

14  certification from EnCase.  And since then, continuing

15  education going on a regular basis.

16  **BY MR. MANTHRIPRAGADA:**

17  **Q.**    Sir, I want to direct your attention to April of 2020 and

18  ask you if you became involved in -- I'm sorry, April of 2022,

19  and you became involved in an investigation involving Army CID?

20  **A.**    Yes.

21  **Q.**    And as a part of that investigation, did you accompany

22  agents to a particular site where a search warrant was being

23  executed?

24  **A.**    With respect to this case, yes, I did.

25  **Q.**    Okay.  At that site, did you witness various items being

1   seized and taken into possession, taken into custody?

2   **A.**   Yes.

3   **Q.**   Now, in that same case, directing your attention to later

4   that year, did there come a time when you began to examine some

5   of those devices that were seized?

6   **A.**   Yeah.  We did acquisitions of a number of different

7   devices that were obtained from multiple sites of that search

8   warrant.

9   **Q.**   Okay.  So let me show you what's been marked as

10  Government's Exhibit 1.  It's in evidence.

11       Do you recognize that item?

12  **A.**   I do.

13  **Q.**   And what is that, please?

14  **A.**   This is an evidence custody document for tracking chain of

15  custody for an iPhone that was conducted for this particular

16  case.

17  **Q.**   Now, before I begin talking to you about this particular

18  document, could you describe for me and for the Court what the

19  chain of custody process and procedures are at the agency where

20  you work?

21  **A.**   Well, at initial seizure, which would be done by a sworn

22  member of law enforcement -- as a contractor, I don't seize

23  evidence -- they would take the initial information that you

24  see here on the document.  And then from that point on, every

25  time it changes hands, we will be signing it in, signing it

 1  out.  So we have -- maintain the custody record of everyone who

 2  has touched the evidence since.

 3  **Q.**   Now, within your office, do you maintain a separate chain

 4  of custody?  Meaning, a separate way of keeping track of the

 5  items that come into your possession and -- and your

 6  examination?

 7  **A.**   We use the same system.  It has since changed to an

 8  electronic version, but there -- it's the same process.

 9  **Q.**   Okay.  Now, directing your attention to the middle part of

10  that -- this particular document, Government's Exhibit 1, it

11  describes a cell phone, a black cell phone.

12       Do you see that?

13  **A.**   I do.

14  **Q.**   Now, did there come a time when you came into possession

15  of that particular cell phone?

16  **A.**   I do believe so, yes.

17  **Q.**   Now, let me show you the bottom part of this particular

18  document titled chain of custody.  That's the section I want

19  you to focus on.

20       Do you see your name, your signature on that document?

21  **A.**   I do.

22  **Q.**   And approximately where in that document, what date did

23  you come into possession of the -- of the item?

24  **A.**   I signed it out from our evidence custodian on the 7th of

25  June.

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1   **Q.**   Okay.

2   **A.**   And returned it on 5 August.

3   **Q.**   Okay.  Now, sir, this particular item, did you examine

4   this item?

5   **A.**   We obtained -- attempted to obtain a digital extraction.

6   **Q.**   Okay.  Let me show you what's been marked Government's 2.

7   Do you recognize that item?

8   **A.**   I do.

9   **Q.**   What is it?

10  **A.**   This is a worksheet that we use to contain our various

11  notes as -- going through our acquisition process for -- with

12  respect to mobile devices and computers.

13  **Q.**   Is this the worksheet for the particular items I just

14  showed you?

15  **A.**   It does look correct.  I would have to -- if you could

16  scroll that slightly down -- up, actually.

17  **Q.**   Up to the top.

18  **A.**   So I -- yes.

19       Yeah, that is from Item 1 of -- so that should be -- that

20  is the correct one.

21  **Q.**   Okay.  Now, sir, I want you to focus on the middle section

22  that's titled Section 3.

23       There's a box -- there's a second box from the -- from the

24  left titled extraction obtained.  There's a yes-or-no answer.

25  What did you check?

1  **A.**    No.

2  **Q.**    There is -- on the third column, second one up, biometric

3  lock.  There's a yes-or-no box for you to -- to tick, depending

4  on what you find.  What did you find in this case?

5  **A.**    They were using a biometric in this case, Touch ID for

6  fingerprint.

7  **Q.**    Meaning it was biometrically locked?

8  **A.**    Biometric, yes.

9  **Q.**    Okay.  Turn the page over to the second page, same Exhibit

10  2.

11      Now, I direct your attention to the bottom of the page.

12  Do you see that?

13  **A.**    I do.

14  **Q.**    And what notation did you make upon examining this

15  particular device?

16  **A.**    This particular device, at that time, was not supported by

17  our -- our tool, primary tool, which was Cellebrite.  So we

18  were not able to use that.  And we attempted to brute force the

19  passcode using another tool, GrayKey.  However, that's very

20  slow.  In some cases glacially slow.  And ultimately, it was

21  aborted as unrealistic.

22  **Q.**    So in final analysis, was anything extracted from this

23  particular device?

24  **A.**    No.

25  **Q.**    I'm showing you what's been marked 2A.  Do you recognize

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1    that image?

2    **A.**    I do.

3    **Q.**    And what is that image?

4    **A.**    This is a -- a photocopy of the original phone as we

5    collected it, and the other document is just the original

6    voucher tag, basically, so we can tie them together.

7    **Q.**    And that's the device we've just been talking about; is

8    that right?

9    **A.**    Correct.

10        **MR. MANTHRIPRAGADA:**  Your Honor, I haven't formally

11   moved any of the exhibits in, but I'm assuming that --

12        **THE COURT:**  That's okay.  Yep.

13        **MR. MANTHRIPRAGADA:**  -- by their -- thank you.

14        **THE COURT:**  Yes.

15   **BY MR. MANTHRIPRAGADA:**

16   **Q.**    Now, sir, I'm going to show you another document, please

17   take a moment, just look it over, and tell me if you need me

18   for -- for it to be scrolled up, scroll down?

19   **A.**    If you can scroll it down.

20        **DEPUTY CLERK:**  Can you state the exhibit record --

21   exhibit number for the record?

22        **MR. MANTHRIPRAGADA:**  This is Exhibit Number 3.

23        **DEPUTY CLERK:**  Thank you.

24        **THE WITNESS:**  Okay.

25

1  **BY MR. MANTHRIPRAGADA:**

2  **Q.**   Do you recognize this item?

3  **A.**   I do.

4  **Q.**   What is it?

5  **A.**   This is another evidence custody document for another

6  group of devices that were collected, related to this case.

7  **Q.**   Now, sir, the middle part of this document lists a number

8  of devices that were examined.

9  **A.**   Uh-huh.

10  **Q.**   Is that correct?

11  **A.**   A number of devices were collected, yes.

12  **Q.**   Okay.  So what I'm going to do is, I'm going to refer to

13  this particular sheet for various items and -- and ask you to

14  testify as to whether you were able to examine those items or

15  not.

16          **MR. MANTHRIPRAGADA:**  And, Your Honor, for the Court,

17  I know there were four particular items that were at issue, and

18  the Court was trying to inquire as to whether or not we were

19  able to get into those items, whether anything was extracted

20  from those items.  And the -- the testimony that the witness is

21  providing, and that I'm offering right now, is specifically

22  pertaining to those devices.

23          **THE COURT:**  Okay.  All right.  Very good.  Thank you.

24          **MR. MANTHRIPRAGADA:**  You're welcome, Your Honor.

25

1    **BY MR. MANTHRIPRAGADA:**

2    **Q.**    All right.  Now, sir, pointing to Item Number 1, could

3    you -- could you read what that describes, please?

4    **A.**    It refers to a Chromebook-type -- it's marked as laptop,

5    but it's technically a Chromebook.  It's semantics.  They're

6    the same.

7    **Q.**    Now, do you recall that particular item being presented to

8    you by Agent Kimrey and the rest of his staff?

9    **A.**    It was included with the rest, yes.

10   **Q.**    And do you recall what your assessment and your reaction

11   was when you were presented with this particular item?

12   **A.**    We don't have any capability at our facility to examine a

13   Chromebook in a true typical forensic capability.  I'm not

14   actually aware of any true way to do that.

15       However, the information that would be relevant to that is

16   going to be synchronized with the associated Google account,

17   and I advised the case agent that they should -- if they had

18   not already done so, should obtain process from Google to

19   obtain the contents of their Google account.

20   **Q.**    And as a result of your very initial assessment, did you

21   accept custody of the Chromebook?

22   **A.**    I do not recall ever unsealing this device, no.

23   **Q.**    And since there was no extraction, was there a report

24   produced to say that no extraction was done?

25   **A.**    No.

1  **Q.**    Now, in situations like that, how do you let the agent --

2  the case agent know that you were not able to -- or this is not

3  something you'd even consider examining?

4  **A.**    That would have been a contemporaneous conversation by

5  e-mail, phone call, or in this case, I believe it was

6  annotated.

7  **Q.**    Now, do you use the ALERTS system as well?

8  **A.**    We do.

9  **Q.**    And would this -- would something like this be notated in

10  the ALERTS system?

11  **A.**    It may have been.  I don't recall annotating it

12  specifically.

13  **Q.**    But the bottom line is, you generated no report with

14  regard to the --

15  **A.**    No, sir.

16  **Q.**    -- Chrome notebook; is that right?

17  **A.**    No, sir.

18  **Q.**    Let me stay with this particular sheet, Government's

19  Exhibit Number 3, and look at the second item, please.  Can you

20  see what it refers to?

21  **A.**    This is referring to an Apple iPad, a tablet-type

22  computer.

23  **Q.**    Now, did you accept custody of that particular item?

24  **A.**    We did.

25  **Q.**    And did you get a chance to examine that particular item?

1   **A.**   We, again, attempted to obtain an extraction.

2   **Q.**   All right.  Now, this particular sheet showed the fact

3   that you accepted that -- that item.

4   **A.**   You need to scroll up, please.  It may have been -- yeah,

5   at the bottom there, June 7th.

6   **Q.**   And that -- does your signature appear there?

7   **A.**   That is -- it does.

8   **Q.**   Okay.  Now, sir, let me show you what's been marked

9   Government's 4.  Do you recognize Government's 4?

10  **A.**   I do.

11  **Q.**   And what is Government's 4?

12  **A.**   This is another one of our worksheets that we prepared

13  in -- in -- with respect to this particular iPad.

14  **Q.**   Similar to the other questions that I have with regard to

15  your worksheet, let me direct your attention to Section 3.

16       Does it describe the item?

17  **A.**   It does.

18  **Q.**   And what is it?

19  **A.**   It is indicating it's an Apple iPad 6.  In this case,

20  we've annotated a serial number that was visible.  It was the

21  IMEI for an onboard cellular modem.

22       Other things here, it also was locked with Touch ID,

23  fingerprint, that is, so we were unable to -- again, unable to

24  access this device.

25  **Q.**   Okay.  And just so that we can point to the areas that --

1  where that's memorialized, let me ask you to direct your

2  attention to the bottom section of Section 3.  And there's a

3  box titled lock status.

4  **A.**    Uh-huh.

5  **Q.**    And you had an option of ticking locked or unlocked, what

6  did you tick?

7  **A.**    It is locked.  Keeping in mind this was actually annotated

8  that we received it as turned off, so by definition, it would

9  have been locked.

10 **Q.**    I understand.

11      I'm directing your attention to where I'm pointing again,

12 extraction obtained.  You had the option of ticking the box yes

13 or no, and what did you tick?

14 **A.**    No.

15 **Q.**    I'm going to turn the page over.  There's nothing else

16 that's noted here.  And could you testify -- could you let the

17 Court know what it is, if you were able to extract anything

18 from this device?

19 **A.**    We were not.  And, again, there was nothing more I could

20 do with this device, not supported, we were not able to do

21 anything with it, so no extraction was made.

22 **Q.**    I'm showing you what's been marked 4A.  Do you recognize

23 that item?

24 **A.**    I do.

25 **Q.**    What is that?

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1  **A.**    This is a photocopy, poor quality, as it may be, of the

2  iPad with it's associated evidence tag.

3  **Q.**    And that's the item we've just finished talking about; is

4  that right?

5  **A.**    That is correct.

6  **Q.**    Now, sir, let me go back to Government's 3 and direct your

7  attention to Item 6.  Do you recognize Item 6?

8  **A.**    Again, another iPad as collected during this

9  investigation.

10  **Q.**    Okay.  And did you accept custody of that particular item

11  for examination?

12  **A.**    We did.

13  **Q.**    I'm showing you what's been marked as Government's 5.  Do

14  you recognize Government's 5?

15  **A.**    Yes.  Again, another worksheet corresponding to this

16  particular iPad.

17  **Q.**    Okay.  And again, directing your attention toward the

18  section titled cell phone, in the bottom left, this particular

19  item, for the lock status, you had two boxes to tick, locked or

20  unlocked.  What box did you tick?

21  **A.**    It was checked as unlocked.

22  **Q.**    Okay.  And the next section that follows after that is

23  questioning what -- the section titled extraction obtained, you

24  had the option of checking yes or no.  And what box did you

25  tick?

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1   **A.**   No.

2   **Q.**   Directing your attention to the next column, second from

3   the bottom, where my finger is pointed --

4   **A.**   Uh-huh.

5   **Q.**   -- titled biometric lock.

6   **A.**   That is checked as yes, also with Touch ID.

7   **Q.**   And so what does that mean?

8   **A.**   In this particular case, it was -- if you'll scroll

9   further down, you'll indicate -- or I believe it's on the rear,

10  this was -- yeah.  This device was basically in setup mode,

11  like you would take it -- if you had received it new or if you

12  had factory wiped it.

13         So in other words, there was no information on it.  It had

14  a Touch ID capability, but the device was essentially a

15  complete factory reset, and nothing on it.

16         So, again, no extraction to be made because there's

17  nothing to collect.

18  **Q.**   Let me show you what's been marked 5A.  Do you recognize

19  5A?

20  **A.**   I do.

21  **Q.**   And what is that?

22  **A.**   Another poor photocopy of a -- the iPad corresponding to

23  this item.

24  **Q.**   The item that we just finished looking at --

25  **A.**   Correct.

1  **Q.**    -- Government's Exhibit Number 5; is that right?

2  **A.**    Yeah.   Your -- 5A is marked.

3           **MR. MANTHRIPRAGADA:**   Your Honor, for the Court's

4  edification, the devices we just finished talking about on the

5  Government's Exhibit Number 7 would be Items 2, Line 2, Line

6  20, Line 21, and Line 24.   That would be the cross-reference.

7           **THE COURT:**   Thank you.

8  BY MR. MANTHRIPRAGADA:

9  **Q.**    Lastly, sir, I wanted to show you what's been marked -- I

10 know it's been --

11          **MR. MANTHRIPRAGADA:**   Your Honor, this is something

12 that was talked about and it's been marked now as Government's

13 10.   I'll show it on the screen.

14          **THE COURT:**   Okay.   Is this also Defense 5?   Is it the

15 same?

16          **MR. MANTHRIPRAGADA:**   I believe so, Your Honor.

17          **MR. GOROKHOV:**   Yes, Your Honor.

18          **MR. MANTHRIPRAGADA:**   That's why I wanted to point it

19 out.

20          **THE COURT:**   Okay.   Thanks.

21 BY MR. MANTHRIPRAGADA:

22 **Q.**    Sir, do you recognize this particular item?

23 **A.**    I do.

24 **Q.**    And what is that?

25 **A.**    This is a spreadsheet that I created to, kind of, try to

**DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA**

1  keep track of all these various items, since we had a large --

2  relatively large number of them, and a large number of document

3  numbers, to make sure we didn't get anything mixed up, and also

4  to track the status of them.  The items we've discussed are

5  listed here and are all marked accordingly.

6  **Q.**  Okay.  And the question I was going to ask is what were

7  you trying to capture with this particular spreadsheet?

8  **A.**  Basically, an overall summary of where we -- where we

9  stood during the exam.  For example, where the -- who had the

10  evidence, the evidence numbers, the descriptions, what the

11  ultimate result was, what -- meaning, did we collect an

12  extraction, did we not, so forth.

13  **Q.**  Okay.  And does it also capture the devices that you were

14  not able to either get into for various reasons, or that were

15  wiped clean as you testified to?

16  **A.**  They are included, yes.

17  **Q.**  All right.  Sir, I'm going to try to zoom in on the top

18  portion of this particular document and ask you about a comment

19  that appears to be listed here.  Well, maybe I was a little bit

20  too -- the very first comment that's listed in here is in

21  request but not provided per case agent.

22  **A.**  Could you scroll to the -- to my left, please?

23  **Q.**  I will.  I apologize, for the witness, its moving.

24  **A.**  I don't recall specifically, but I vaguely remember there

25  was one laptop that we did not have.  It was noted on there

1   initial request for examination, but for whatever reason, we

2   didn't receive it from them.  I don't recall anything specific

3   beyond that.

4   **Q.**   So did you include it in the interest of being complete?

5   **A.**   Yes.  I mean, I made an annotation so they would match up,

6   that our in and out would match, but there was nothing further

7   done with this.

8            **MR. MANTHRIPRAGADA:**  Okay.

9        Your Honor, I don't have any other questions.  Thank you.

10           **THE COURT:**  Hold on, you might.

11           **MR. MANTHRIPRAGADA:**  Could I have a moment, Your

12   Honor?

13           **THE COURT:**  Okay.  All right.  No problem.

14   **BY MR. MANTHRIPRAGADA:**

15   **Q.**   It's a relevant question that had come up, so let me ask

16   you, sir.

17       Now, you've indicated you created this particular document

18   in its entirety.  Did you send it to anyone?

19   **A.**   Yes.  It's been to a number of people, including the case

20   agent, some of the people at my office for various reasons.

21   **Q.**   Now, I'm not an expert with regard to metadata, but you

22   obviously are, so I would like to ask you the following couple

23   of questions with regard to this -- this item.

24           **MR. GOLDMAN:**  I'm going to object.  I don't think

25   this expert has been qualified.

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1          **THE COURT:**  Yeah.

2          **MR. GOLDMAN:**  I don't think this witness has been

3  qualified as an expert.

4          **THE COURT:**  He's not an expert.  If you want to lay

5  the foundation as to whether he --

6          **MR. GOLDMAN:**  And we don't have a CV or anything like

7  that.

8          **THE COURT:**  Right.

9          **MR. GOLDMAN:**  He's made some representations, but.

10          **THE COURT:**  This witness is not an expert, right.

11          **MR. MANTHRIPRAGADA:**  I can ask him the questions

12  generally, Your Honor.  But I can lay the foundation for

13  expertise, but if counsel wants a CV, I'm not in a position to

14  provide that right now.

15          **THE COURT:**  Yeah.  How about you just lay the

16  foundation and we'll take it from there?  Okay.

17  **BY MR. MANTHRIPRAGADA:**

18  **Q.**   You briefly testified early on about your background.  I'd

19  like to dig into some of the specifics.

20      Could you tell the Court where you're educated?

21  **A.**   I --

22          **THE COURT:**  Let me stop you.  I don't mean that.

23      Approach.

24      (A bench conference was held on the record as follows:)

25          **THE COURT:**  It's getting late.  I probably wasn't

1  clear.  I don't think you have to qualify him as an expert.  If

2  you want to ask him about his familiarity with metadata and

3  familiarity with the document, just lay the foundation in that

4  respect and let's get the firsthand information from him, if he

5  has any.

6       Does that make sense?

7            **MR. MANTHRIPRAGADA:**  Yes, ma'am.

8            **THE COURT:**  Okay.

9       (The bench conference concluded and proceedings resumed as

10  follows:)

11  **BY MR. MANTHRIPRAGADA:**

12  **Q.**  Sir, let me rephrase the question that I had.

13       Now, you've indicated you created this particular

14  document, and you sent it to Agent Kimrey.

15       Now, the question is about metadata.  If I -- if I -- if

16  you sent the document to me, and this is a hypothetical that I

17  pose to you.  If you sent the document to me, and I saved it,

18  when you look at the metadata, would that indicate -- what

19  would that indicate?

20  **A.**  Are you referring to the metadata about the spreadsheet

21  itself?

22  **Q.**  Correct.

23  **A.**  Depending on the date you're referring to, I mean, you

24  would see the date that -- it would depend on how it was sent.

25  It would -- if it was e-mailed to him, you would be -- you'd

*DIRECT OF MARK JOHNSON BY MR. MANTHRIPRAGADA*

1  have e-mail metadata, you'd also have the time that he saved it

2  to his computer, and the like.  It will depend on the

3  situation.  But yes, I mean, dates would be relevant in that

4  respect.

5  **Q.**  So -- and let me ask it this way.  If I -- if you sent it

6  to me by e-mail, let's say, I saved it, and we looked at the

7  metadata, would it show the date, a modified date --

8           **MR. GOLDMAN:**  Objection.

9           **MR. MANTHRIPRAGADA:**  -- on the document?

10          **THE COURT:**  Sustained.

11  **BY MR. MANTHRIPRAGADA:**

12  **Q.**  What would you expect to see on the metadata if you sent

13  me a document and I then saved the document?

14  **A.**  I would -- if you're referring to dates on your computer,

15  I would be seeing a creation date on your computer showing the

16  date that it was originally saved.

17      The last modification date would be coming from the device

18  of -- the -- the -- depending on how it was sent, it would be

19  coming from the spreadsheet itself.  But the important thing

20  would be the creation date on the computer indicating the date

21  it was saved.

22  **Q.**  So even though you're the author and the creator of the

23  document, when I save it --

24  **A.**  It would be a new copy as far, as the computer is

25  concerned, so it would be the creation date on your machine.

 1              **MR. MANTHRIPRAGADA:**  I understand.

 2       Thank you, Your Honor, I have no further questions.

 3              **THE COURT:**  All right.

 4       Why don't we take ten.  We've been going for a while.  I

 5  want to give my great staff a break.  Okay?  So let's come back

 6  at 4:00.

 7       Sir, you're still under oath.  Just remind you, no -- talk

 8  to anybody about your testimony, but you get a break, too.  See

 9  you at 4:00.  Thank you.

10              **DEPUTY CLERK:**  All rise.  This Honorable Court now

11  stands in recess.

12       (Recess taken.)

13              **DEPUTY CLERK:**  All rise.  This Honorable Court now

14  resumes in session.

15              **THE COURT:**  All right, everyone.  If you have a seat.

16       Witness is in the chair, under oath.

17       Mr. Goldman, you can begin whenever you wish.

18              **MR. GOLDMAN:**  Thanks very much.

19                        **CROSS-EXAMINATION**

20  BY MR. GOLDMAN:

21  **Q.**   Good afternoon, Mr. Johnson.

22  **A.**   Good afternoon.

23  **Q.**   I just want to be clear, you are a government contractor;

24  is that right?

25  **A.**   That is correct.

*CROSS OF MARK JOHNSON BY MR. GOLDMAN*

1  **Q.**  And you work with Army CID?

2  **A.**  Correct.

3  **Q.**  All right.  You're not a case agent in this case?

4  **A.**  No, sir.

5  **Q.**  Okay.  I -- I understood from your direct that you

6  testified that in April 2022, you went to the site where the

7  devices were collected; is that accurate?

8  **A.**  One of the locations.  There were multiple locations.

9  **Q.**  Which site did you go to, do you recall?

10  **A.**  I believe that was Ms. Jackson's.

11  **Q.**  Ms. Jackson's home.

12      Sir Michael Place, does that strike a cord?

13  **A.**  It sounds correct, yes, sir.

14  **Q.**  Did you prepare a report of your accompanying the agents

15  to the search warrant execution?

16  **A.**  I do not believe so, no, sir.

17  **Q.**  Okay.  Now, your -- your job is a forensic examiner; is

18  that right?

19  **A.**  Correct.

20  **Q.**  And your -- an important part of your job is to document

21  the work that you do to confirm that the evidence is what it

22  purports to be?

23  **A.**  Correct.

24  **Q.**  To protect the chain of custody of items?

25  **A.**  Yes.

*CROSS OF MARK JOHNSON BY MR. GOLDMAN*

1  **Q.**    To carefully log when you receive something, when you turn

2  it over to someone else?

3  **A.**    Yes.

4  **Q.**    What you do with those items?

5  **A.**    Yes.

6  **Q.**    Okay.  And to that end, the government presented a couple

7  of documents to you.  And I'm not going to go through all of

8  those, but I do want to just point to a couple of them and get

9  a couple of clarifications, if that's all right.  Okay?

10       So this document is what's previously been admitted as

11  Government's Exhibit 2.

12       Do you recognize that as Government's Exhibit 2?

13  **A.**    I do.

14  **Q.**    At the top left-hand corner, under Section 1, there's a

15  date there.

16  **A.**    Uh-huh.

17  **Q.**    Can you tell me what that date indicates?

18  **A.**    Normally, this would be the date that I start filling out

19  this form.

20  **Q.**    You start filling out this form the date that you begin

21  analyzing the device?

22  **A.**    Collect it, yes.

23  **Q.**    Is it fair to say that you wouldn't have done any

24  examination of this device before that date?

25  **A.**    Normally, yes.

1  **Q.**   Do you recall in this case whether there was any

2  examination of this device done by you before June 13th, 2022?

3  **A.**   I do not recall anything, no.

4  **Q.**   Okay.  And I just wanted to go through -- the government

5  went through a few of these boxes that are checked or not

6  checked.  I just want to ask you a couple of questions about

7  those.

8      There's -- do you see in Section 3, about two-thirds over

9  to the right, there's a box that says placed in airplane mode?

10  **A.**   Uh-huh.

11  **Q.**   And what's checked on this device?

12  **A.**   No.

13  **Q.**   And can you please just explain briefly what airplane mode

14  means and why you would place a device in airplane mode or not?

15  **A.**   Airplane mode more commonly -- is basically a way to

16  quickly turn off the device radios, such as wifi, cellular.

17  That term has changed a little bit since that -- we did this

18  before, but basically it's a way to quickly shut off the radios

19  so they can't have outside communications.

20  **Q.**   Can you give me examples of why that might be important in

21  a forensic analysis of a digital device?

22  **A.**   Specifically, to prevent them from being remotely wiped.

23  **Q.**   Okay.  Now, on this device, which box is checked under

24  airplane mode?

25  **A.**   No.

1  **Q.**    Okay.  Now, you didn't ultimately obtain an extraction

2  from this device?

3  **A.**    Correct.

4  **Q.**    But nevertheless, that's the purpose of airplane mode, and

5  you check that on each of the devices that you have analyzed;

6  is that right?

7  **A.**    Correct.

8  **Q.**    Thank you.

9       Likewise, with bluetooth and wifi disabled?

10  **A.**    Same principle, basically those two work hand in hand.

11  **Q.**    To prevent someone from outside to remoting into the

12  device and making changes to it while you're trying to conduct

13  a forensic analysis; is that fair?

14  **A.**    Yes, specifically remote wiping.  IPhones are designed to

15  not allow remote access per se, but they can be remotely

16  triggered to wipe them.

17  **Q.**    It's fair to say that with many digital devices today,

18  iPhones and others, that much of the data that you can access

19  through the phone is, in fact, stored in the cloud, not

20  necessarily on the device; is that fair?

21  **A.**    That is common, yes.

22  **Q.**    So you might be able to make alterations to that data that

23  would affect the device that you're looking at here if someone

24  were able to make changes remotely?

25  **A.**    That is possible, yes.

1  **Q.**    Okay.  Now, I'm going to just place for your review,

2  again, this is -- this is Government Exhibit 4.

3        And just briefly, that date up in the upper left-hand

4  corner, what's the date there?

5  **A.**    June 9th.

6  **Q.**    Of 2022?

7  **A.**    Correct.

8  **Q.**    And is it fair to say that you did no examination or

9  analysis of this device before that date?

10  **A.**    Not to my knowledge, no.

11  **Q.**    Okay.  Similarly, the boxes that are checked here reflect

12  not in airplane mode, not -- and that the bluetooth and wifi

13  was not disabled?

14  **A.**    Correct.

15  **Q.**    Thank you.

16        I'm sorry, I missed one thing on the last exhibit.

17        Back to Government Exhibit 2, on the second page here, I

18  just want to get clarification on what you wrote in additional

19  comments in Section 9.

20        You wrote that it was not -- not supported by Cellebrite;

21  is that correct?

22  **A.**    Correct.

23  **Q.**    And that no -- that a brute force attempt via GrayKey was

24  canceled by case agent request?

25  **A.**    Correct.

*CROSS OF MARK JOHNSON BY MR. GOLDMAN*

1  **Q.**   Was that your decision to cancel the brute force, or when

2  you say case agent, who are you referring to?

3  **A.**   Kimrey, Agent Kimrey.

4  **Q.**   Agent Kimrey made that request of you?

5  **A.**   The term request is probably misleading.  We would have

6  had a conversation, like, would this -- continuing this be

7  worth it, or should we just call it and say enough?

8  **Q.**   And, ultimately, you're not a case agent, so it's not your

9  decision to make?

10 **A.**   Not my decision to make.

11 **Q.**   So it's Agent Kimrey's decision to cancel --

12 **A.**   We consulted and decided further actions were fruitless.

13 **Q.**   Fair.  Thank you.

14     Now, just going back to Government 4, looking at that

15 bottom of Page 2, again, where there would be additional

16 comments.

17 **A.**   Uh-huh.

18 **Q.**   I believe it was your testimony that, again, didn't try

19 Cellebrite, didn't try brute force extraction; is that correct?

20 **A.**   I don't recall specifically, but nothing further was

21 annotated for -- no purpose.  If there was no -- nothing

22 further for me to inven -- to document, I chose not to.

23 **Q.**   Okay.  So is it fair to say that in -- on this device,

24 brute force was canceled at case agent request as well?

25 **A.**   Can you scroll to my -- down, please.  This was -- or

1   Page -- the previous page, please.  And up.

2        I am forgetting off the top of my head which one this was.

3   But if there was no way for me to get an extraction, I would

4   not have -- there was nothing for me to annotate there.

5   **Q.**   So just to be clear, this is an apple iPad 6; is that

6   right?

7   **A.**   Correct.

8   **Q.**   With the serial numbers listed there.  I won't go through

9   those.  Again, not placed in airplane mode; is that correct?

10  **A.**   Correct.

11  **Q.**   Bluetooth and wifi disabled, not checked, right?

12  **A.**   Correct.

13  **Q.**   It says lock status, locked?

14  **A.**   Uh-huh.

15  **Q.**   With biometric lock checked as well?

16  **A.**   Correct.

17  **Q.**   Okay.  And also extraction obtained, no; is that fair?

18  **A.**   Correct.

19  **Q.**   Okay.  You don't recall independently at this time whether

20  you attempted a brute force extraction on this device?

21  **A.**   I do not recall specifically at this time.  We would have

22  tried it if it was available, but I don't recall specifically.

23  **Q.**   And you would have notated that in additional comments?

24  **A.**   If we had been successful, we would have continued.  If --

25  anything unusual, we would have annotated additional comments.

1  Q.   And -- and you said that you -- you prepared these reports

2  to capture the investigation that you do in these and to

3  maintain the sanctity of the evidence; is that fair?

4  A.   Fair.

5  Q.   And there's nothing checked in additional comments in this

6  section; is that fair?

7  A.   Yeah.  That is correct.

8  Q.   Okay.  Thank you.

9       Now, I'm going to show you, and I'm not going to be long,

10 I promise, this is Exhibit Number 5 of the government's.

11 Again, the date on that document, in the upper left-hand

12 corner, can you read that for me?

13 A.   June 9th, 2022.

14 Q.   Thank you.

15      And that's so -- fair to say that you didn't do any

16 examination of this device before that date?

17 A.   Not to my knowledge.

18 Q.   Okay.  Again, this one was not placed in airplane mode,

19 and the bluetooth and wifi disabled was not disabled; is that

20 fair?

21 A.   They are both marked no, correct.

22 Q.   Okay.  And then on this one, there were additional

23 comments in Section 3 there, received off and unsealed.  Can

24 you describe what that means?

25 A.   Well, received off means that it was received in a

1  powered-off state, which is not uncommon.

2      Unsealed simply means it was loose or otherwise was not

3  contained in any sealed package.  I --

4  **Q.**  Okay.  So just a loose iPad?

5  **A.**  Correct.

6  **Q.**  Okay.  And I'm sorry, I didn't mean to cut you off if you

7  were -- continue.

8  **A.**  No.  As I recall, this was a larger model, it may not have

9  fit.  I believe it had the label directly attached to it, so --

10  I think.

11  **Q.**  Okay.  I may have a photo that can help us determine that

12  in a moment.

13      Turning to the second page here, now, this one, under

14  Section 9, indicates that it was wiped reset?

15  **A.**  Uh-huh.

16  **Q.**  And you described that as a factory reset?

17  **A.**  All I can tell from -- it was in setup mode, so I don't

18  know whether it was unused and not -- and just sitting in a

19  drawer for a long time, or whether it had been reset

20  previously.

21  **Q.**  No way for you to determine when it was wiped or reset; is

22  that fair?

23  **A.**  No, not that I'm aware of.

24  **Q.**  Thank you.

25      And just for the completion of the record, this is 5A,

```
 1    which is the photograph of that device.  Does this jog your

 2    memory?

 3    A.   I'm -- unfortunately, I can't tell from the photo if --

 4    no, I'm afraid I can't tell you more than it was unsealed.  It

 5    was not in a sealed bag.

 6    Q.   Okay.  I'll just scroll down to the bottom here, you see

 7    there's a -- do you recognize that piece of paper there?

 8    A.   Yes.  That is -- that is the evidence tag.

 9    Q.   Uh-huh.

10    A.   And the background would indicate probably the manila

11    envelope that it was contained within.  And limitations of the

12    photocopier, I can't get the whole thing in, so --

13    Q.   Fair enough.  All right.  Thank you.

14         I just want to turn your attention briefly back to

15    Exhibit 3.

16         The -- you testified that the first item there is a

17    Chromebook?  Is that a Google Chromebook?

18    A.   Correct.

19    Q.   And you said that you can't examine that -- you're not

20    aware of any forensic capability for examining that?

21    A.   I don't have any capability available to me in our lab

22    facilities.  If there are ways to do it, I'm not aware of them.

23    They are difficult devices, and thus -- but, again, the

24    relevant information is going to be what was held in the Google

25    account, which can be obtained through warrants.
```

*CROSS OF MARK JOHNSON BY MR. GOLDMAN*

1  **Q.**  Okay.  Thank you.

2     And just not to get into too much, but just a brief

3  distinction between, sort of, a regular laptop and a

4  Chromebook, can you just describe that briefly for us?

5  **A.**  Chromebooks are, in simplistic terms, much more like an

6  iPad or an iPhone in that they are very tightly integrated with

7  the Google system, ecosystem.  They run on ARM, which is just

8  simply a different platform, very tightly locked down.

9  They're -- they're intended to be simple, turn them on and they

10 just work.

11 **Q.**  And is it fair to say that that's largely because much of

12 the operating capacity of a Chromebook takes place in the cloud

13 as opposed to the device?

14 **A.**  Correct.  Most of your -- as I said, most of the -- your

15 relevant information, your user documents, photos, and so forth

16 would be contained in the Google account, which in turn is kept

17 in the cloud.

18 **Q.**  Maintained by Google?

19 **A.**  Maintained by Google.

20        **MR. GOLDMAN:**  Okay.  Thank you.

21     I don't have anything further for this witness.  Thank

22 you.

23        **THE COURT:**  Can you do me a favor, Counsel?

24        **MR. GOLDMAN:**  Yes.

25        **THE COURT:**  Can you put D5 up so this witness can see

1    it?  I just -- since you're the author, sir, I just want to

2    make sure I understand what some of these columns mean.

3            **THE WITNESS:**  Okay.

4            **THE COURT:**  Okay.  Thanks.

5        Can you see the -- the first -- the first two columns that

6    start with those, what's indicated in the first two columns,

7    sir?

8            **THE WITNESS:**  These are the evidence voucher numbers,

9    document numbers, as we noted.  The reason you see two sets of

10   them there is back in the EPCD days, every time evidence goes

11   from one office to another, it gets a different number, and

12   that's why I'm recording them both, so I can keep them

13   straight.

14           **THE COURT:**  I see.  Okay.  So one device having two

15   numbers, and you needed to keep them straight?

16           **THE WITNESS:**  Correct.

17           **THE COURT:**  I get it.

18       Okay.  The -- let me ask you about -- I think everything

19   else is relatively self-evident.  I -- I did want to ask you

20   about the -- I think it's like the ninth column, it says approx

21   size.  What -- what's that?

22           **THE WITNESS:**  The approximate capacity of the device

23   in question.  Sometimes I can't tell exactly -- in fact, often

24   cases devices that we don't have access to, because we couldn't

25   get into them.

1          **THE COURT:**  Okay.

2          **THE WITNESS:**  So we're -- we're putting in the

3    rough -- the rough capacity.  The actual capacities of a device

4    are going to be not nice even numbers.  People are used to

5    seeing them in 16, 8, so forth, but the actual number would be

6    different, slightly.  So we're using the consumer term here.

7    Because that's all that we needed.  We're just trying to gauge

8    how much stuff we have.

9          **THE COURT:**  And is it -- so, for example, I'm just

10   looking at one, two, three, four, there's the -- there's a

11   MacBook Pro laptop under approximate size.  It says 1TB.  That

12   would be terabyte?

13         **THE WITNESS:**  Correct.

14         **THE COURT:**  Is that the capacity of the item or the

15   data that was extracted from it?

16         **THE WITNESS:**  That -- in this case, it would be the

17   documented of the storage capacity, not necessarily the actual

18   content.

19         **THE COURT:**  Okay.  Do you have a column for the -- on

20   this -- on this document for the content?

21         **THE WITNESS:**  No.  We only did extractions and

22   acquisitions, so no, I wouldn't be able to tell you exactly how

23   much actual data was stored.

24         **THE COURT:**  Okay.  So once -- does that mean that

25   once you acquire the device, extracted the data, what did you

 1  do with the data once you extracted it from a device?

 2          **THE WITNESS:**  Once we have acquisitions of these, the

 3  acquisitions are basically stored in an evidence file format,

 4  and that in turn is then turned back in and collected as

 5  evidence.

 6          **THE COURT:**  I see.  But you don't do anything with

 7  that file after you've extracted --

 8          **THE WITNESS:**  In this particular case, we were not

 9  requested to.  They just needed the acquisitions.  The case

10  agent or the other offices were going to be looking at it

11  themselves using some of their own tools.  We were just getting

12  them the raw dumps --

13          **THE COURT:**  If you will.

14          **THE WITNESS:**  -- and they would proceed from there.

15          **THE COURT:**  All right.  And so along those lines,

16  just so I understand your color coding, if these devices are

17  highlighted in green, what does that indicate?

18          **THE WITNESS:**  A green means I got something off of

19  it.  I got an acquisition, I got a forensic image, depending on

20  the type of device it was.

21      If it's in yellow, it means there's something we need --

22  you know, a red flag, something -- a caveat.

23      And if it's red, it means we didn't get anything of it for

24  one reason or another.

25          **THE COURT:**  Okay.  Now, there's been some testimony

*CROSS OF MARK JOHNSON BY MR. GOLDMAN*

1  about certain documents, certain items needing passcodes --

2       THE WITNESS:  Correct.

3       THE COURT:  -- for you to be able to access the data?

4       THE WITNESS:  Correct.

5       THE COURT:  And how did you indicate, if at all, on

6  these -- in this spreadsheet, those devices, the ones that you

7  needed a passcode to get the data extracted?

8       THE WITNESS:  That would be in the comments column on

9  the far right.

10      THE COURT:  Comments on the far right.

11    So if I'm looking at the comments column on the far right,

12  there are -- I see -- I see three on the top that say need

13  passcode for full extraction.

14      THE WITNESS:  Uh-huh, correct.

15      THE COURT:  Is that the place you would indicate if

16  you needed a passcode to get the data off the device?

17      THE WITNESS:  That is correct.

18      THE COURT:  And otherwise, if it doesn't say need

19  passcode in that comment section, you didn't need the passcode

20  to get the device -- to get the extraction?

21      THE WITNESS:  Either -- well, in this case, it would

22  either mean we -- there was no passcode, we had the passcode.

23      THE COURT:  Okay.

24      THE WITNESS:  There was -- there was no reason --

25  there was nothing blocking me in terms of a passcode.

1        **THE COURT:**  Got it.

2      And so that's going to be my next question which is, when

3   these devices came into your custody, and I believe the

4   attorneys have examined you on this, how shortly after did you

5   perform your extraction so you would know whether you needed

6   something more to get the data off the device?

7        **THE WITNESS:**  I don't recall specifically.  I mean,

8   we work as expeditiously as possible.  Obviously computer

9   acquisitions can take a while.  We collect them -- in this

10  case, I believe I pulled most, if not all of these items at one

11  time, and then working on them basically one at a time after

12  that.  So over a period of days and weeks.

13       **THE COURT:**  Okay.  Any followup, Counsel?

14  **BY MR. GOLDMAN:**

15  **Q.**  I would just say a couple of points.

16      I think to that point, you were -- you accompanied --

17  these devices were seized on April 6th, 2022, correct?

18  **A.**  Sounds correct, sir.

19  **Q.**  And they -- they went into your custody on June 7th --

20  roughly June 7th, 2022?

21  **A.**  I believe that's correct, according to the documents.

22  **Q.**  And then they were -- these reports have dates, June 9th,

23  June 13th, 2022?

24  **A.**  And so forth, correct.

25  **Q.**  So fair to say that the -- no -- no extractions were

1  attempted before those dates, as we -- we said from the dates

2  before?

3  **A.**   The only one I could say for certain, is nothing would

4  have been taken prior to me collecting them from the evidence

5  room.

6  **Q.**   Okay.  That's -- that's fair.

7       I wanted to ask just one other question, I'm sorry.

8       You talked about how you transferred from a paper system

9  to an electronic system --

10 **A.**   Uh-huh.

11 **Q.**   -- in your office?

12 **A.**   Correct.

13 **Q.**   For the chains of custody and other documents?

14 **A.**   Yes.

15 **Q.**   Do you recall when that happened?

16 **A.**   I do not.  It was in the midst of this particular case,

17 and, of course, that did create some logistical headaches for

18 us, because now we have two different systems operating semi in

19 parallel making it a little more challenging, and thus the

20 spreadsheet.

21      If I recall correctly, I believe we tried to stay on a

22 paper-based system as much as possible in order to avoid that

23 problem.

24 **Q.**   And then was the paper system migrated into the digital

25 system sometime --

1    **A.**    Ultimately, I believe all of the stuff was transferred,

2    but I can't testify to that.  I'm not the evidence custodian.

3            **MR. GOLDMAN:**  Okay.  Fair enough.  Thank you.

4        I don't have any other questions about that.

5            **THE COURT:**  Okay.  Thank you.

6        Any redirect, Mr. Manthripragada?

7            **MR. MANTHRIPRAGADA:**  Yes, Your Honor, just briefly.

8            **THE COURT:**  Sure.

9                        REDIRECT EXAMINATION

10   **BY MR. MANTHRIPRAGADA:**

11   **Q.**    Sir, during direction examination, it came up that you

12   were at a site where a search warrant was executed.  During

13   cross-examination it came up that that was Ms. Jackson's home.

14   Could you tell the Court why you would accompany a search team

15   to a site?

16   **A.**    Sometimes they ask us to come out, particularly when they

17   are expecting to have a large number of devices or in this case

18   a fairly complicated case with multiple defendants and a large

19   number of devices.  Where there is purely as a consultant or

20   advisors in case something comes up.

21   **Q.**    Okay.  You were also asked a question on -- on

22   cross-examination with regard to your comments, Section 9.  I'm

23   going to show you what's been marked as Government's No.

24   Exhibit 5.  And I'm going to flip it over to the next page.

25   And that's the last section on the evidence sheet.

1        And in this particular instance, you wrote wiped/reset,

2   and in another instance, you wrote nothing.

3        What's your practice, in terms of this particular section?

4   Obviously, it's titled additional comments.  So how do you --

5   how do view that?

6   **A.**    Additional comments is as the name implies.  It's whatever

7   I or anyone else would choose to add to refresh our memories

8   later, since these are basically our notes of what's going on,

9   so we can remember in the future.

10       I put wiped/reset here simply because I know it was wiped

11  or reset because of its condition.

12  **Q.**    Okay.  Lastly, counsel asked you with regard to Item

13  Number 5, I've just shown you, the -- let me show you, first,

14  Government's 3.  And in Government's 3, it would be Number 6,

15  Item Number 6.  Do you see that?

16  **A.**    I do.

17  **Q.**    And I want you to take a look at that, please.  You had

18  indicated that you didn't know on the factory reset whether it

19  was new or what condition it was in.

20       Please take a look at this note, at least the description,

21  and see if that recalls what kind of condition it was in when

22  you received it.

23  **A.**    Number 6, correct?

24  **Q.**    Yeah.  Number 6, please.  And specifically --

25  **A.**    Indicating a broken menu button.

*RECROSS OF MARK JOHNSON BY MR. GOLDMAN*

1  **Q.**   Correct.

2  **A.**   That would certainly be a clue whether it was used.  But

3  again, I can't say with any certainty.  But more than likely

4  this would -- based on the device being around, it's likely

5  this was a used device that's just out of service or had been

6  reset.

7  **Q.**   Okay.

8  **A.**   It's unlikely that it was a new device.

9          **MR. MANTHRIPRAGADA:**  No further questions, Your

10  Honor.  Thank you.

11          **THE COURT:**  And --

12          **MR. GOLDMAN:**  Just one followup.

13          **THE COURT:**  Sure.  Okay.

14                      **RECROSS-EXAMINATION**

15  BY MR. GOLDMAN:

16  **Q.**   You testified about with the additional comments, you said

17  you or anyone else who might indicate -- who might make notes

18  in there.

19  **A.**   That's -- that's a poor choice of words.  Anyone else who

20  might be doing something similar on a different form for their

21  own cases, general purpose.

22  **Q.**   On these forms, the ones that we've showed you, and other

23  forms like that, are you the sole forensic examiner who inputs

24  data on those forms, or is there anyone else who would be

25  inputting data on the forms that you're working on?

1   **A.**   For the ones that I'm working, I would currently be the

2   only one.   There shouldn't be anyone else editing them.

3   **Q.**   In -- in this case, did you collaborate on any of the

4   devices with any other forensic examiner?

5   **A.**   I did have on colleague, due to the number of devices,

6   that helped me acquire some of the other devices that were part

7   of this investigation.

8   **Q.**   And that colleague's name?

9   **A.**   Alfred Williamson.

10  **Q.**   Okay.  But -- so Mr. Williamson prepared parallel reports

11  on different devices, you prepared reports on this.  Did you

12  collaborate on any of the reports that have been presented?

13  **A.**   No.  No.  We do our individual work --

14          **MR. GOLDMAN:**  Okay.  Thank you, that's all.

15          **THE WITNESS:**  -- and then ultimately I brought them

16  together to submit.

17          **MR. GOLDMAN:**  Okay.  Thank you.  Nothing further.

18          **THE COURT:**  Okay.  All right.

19      Sir, that concludes your testimony.  You may step down.

20  You're free to leave.  Have a great day.

21      All right.  Government, what's next?

22          **MR. GARDNER:**  Your Honor, we have two witnesses that

23  are ready to testify, and I'll just sort of proffer what we

24  expect their testimony to be.

25      Alfred [sic] Jeffers is a custodian, and we expect him to

1    be able to say, for example, in the chains of custody, it might

2    switch from Jeffers to Snyder, that they are essentially

3    interchangeable.  We brought him for that purpose.  I haven't

4    heard any objection or contestation of that.  But if there is

5    any --

6                THE COURT:  Okay.

7                MR. GARDNER:  -- question --

8                THE COURT:  He's here.

9                MR. GARDNER:  -- we can bring him in to testify to

10   that point.

11               THE COURT:  Okay.

12               MR. GARDNER:  And then we also brought Alfred

13   Williamson, who is -- basically, essentially, the same forensic

14   examination expert as Mark Johnson, but on other devices, which

15   I think are not those directly in contention that were, you

16   know, not able to be accessed.  So he would have been the

17   person to do certain devices that were imagined.

18               THE COURT:  Okay.  Let me see from -- and so you

19   would put him on for the purpose of discussing what?

20               MR. GARDNER:  I mean, if there are any -- again, I --

21   he's here as a -- sort of a precaution, in case there were

22   challenges to any of the other chains of custody.  It just

23   depends on the scope of where we need to get into with him.

24               THE COURT:  Okay.  Let me see if the defense has any

25   questions for either of those witnesses.

1            **MR. GOLDMAN:**  May I just consult with the government

2  for a moment?

3            **THE COURT:**  Sure, of course.

4            **MR. GOLDMAN:**  Thank you.

5       I'm sorry, Your Honor.  Just one moment.  We may resolve

6  it.

7            **THE COURT:**  Sure.  Yeah.

8            **MR. GOLDMAN:**  I think, Your Honor, in the interest of

9  time, we would agree to a stipulation that if -- that Agent

10 Williamson -- or that Mr. Williamson -- we would stipulate, and

11 the government would, that no analysis happened before the

12 dates on the reports, June 13th, 2022, and that his testimony

13 on the process would not differ materially from Mr. Johnson's

14 testimony.

15           **THE COURT:**  Okay.

16      Is that the government's understanding, you would

17 stipulate to that?

18           **MR. GARDNER:**  Yes.  Although I -- I should state that

19 if -- if you're aware of any -- any clarifications or things

20 that you would request, if you're aware of those now, I think

21 it's useful to bring him up now to clarify those.  I mean, he's

22 here in the courtroom, so if -- if there are later going to be

23 issues that he has to come back, I would rather --

24           **THE COURT:**  I see.  I see what you're saying.

25           **MR. GOLDMAN:**  I think we're fine, as long as we're

1  talking about no analysis was done between June 13th, 2022, by

2  Mr. Williamson, and that his testimony would not differ in any

3  material way from Mr. Johnson's testimony.

4          THE COURT:  Well, let me -- let me ask you all, which

5  devices did Mr. Williamson have any role in?

6          MR. GARDNER:  Your Honor, if I'm just looking at

7  Government's, I guess -- I believe this is Government's 7.  And

8  it will be annotated in the --

9          THE COURT:  I see.  Okay.

10          MR. GARDNER:  -- the chain of custody column, so if

11  I'm just looking for the name, that would be 5, et cetera,

12  et cetera.

13          THE COURT:  Yeah, I see them.

14          MR. GARDNER:  And none of those are colored, and so

15  that's why I believe, unless there's some challenge, we don't

16  need to call him.

17          THE COURT:  Right.  And -- and let me make sure I

18  understand.  So when we look at the chain of custody documents,

19  and it shows the date in which Mr. Williamson took possession

20  of the item, and then the date in which he gave it back, the

21  stipulation is essentially that between those two dates are the

22  dates in which any examination occurred?

23          MR. GOLDMAN:  Correct.

24          THE COURT:  Am I getting that right?

25          MR. GARDNER:  Yes, Your Honor.

1      **THE COURT:**  Okay.  All right.

2     If you all are satisfied with that, I'm fine with it.

3      **MR. GOLDMAN:**  We're satisfied from the defense.

4      **THE COURT:**  Okay.  All right.  Very good.  Then

5   that -- that eliminates the last two witnesses.

6     Defense, were you prepared to call any witnesses?

7      **MR. GOROKHOV:**  No, Your Honor.  We do have two

8   exhibits to move into evidence.  We moved in D9, which we owe

9   the Court via e-mail.

10      **THE COURT:**  Right.

11      **MR. GOROKHOV:**  And we have a premarked e-mail, D4,

12   which we are moving into evidence, if -- with the Court's

13   permission, I'll approach.

14      **THE COURT:**  Sure.

15      **MR. GOROKHOV:**  Thank you.

16      **THE COURT:**  Thank you.

17      **MR. GOROKHOV:**  Thanks, Your Honor.

18     And the relevant portion of this e-mail, this is how it

19   was produced to us, Your Honor, so that's how we've produced it

20   to the Court.  However, the relevant portion of the e-mail is

21   an e-mail exchange, it's all the way at the back of the

22   document, Your Honor.

23      **THE COURT:**  Right.

24      **MR. GOROKHOV:**  And it's an e-mail from Mr. Ake dated

25   June 21, 2022, at 12:00 p.m.

1      And it discusses the fact that the government has been

2  unable to get into the devices.

3      And the lab was embarrassed because they have been trying

4  to get into the devices for several months now, to no avail.

5      Now, this relates back to the documents that we just

6  discussed, Your Honor, about --

7           **THE COURT:**  Right.

8           **MR. GOROKHOV:**  -- the dates when those examinations

9  were first undertaken.

10           **THE COURT:**  Right.  I -- I follow the bouncing ball.

11           **MR. GOROKHOV:**  Thank you.

12           **THE COURT:**  Thank you.

13           **MR. GOROKHOV:**  Sorry for being too obvious.

14           **THE COURT:**  No, no, you're not being.  There's a lot

15  of documents flying around.  But I get the point.

16      So, listen, so we have this in.  We've got two main areas

17  of evidence that's still outstanding, right?  All the remaining

18  e-mails concerning the taint and the discovery process

19  concerning Mr. Ake and the other -- I believe it was Mr. Phelps

20  and the other taint team individuals.  The taint team and

21  e-mails are coming to me first, right?  So the e-mails that we

22  discussed, coming to me by Tuesday.  And then I'll make the

23  call as to whether they are material and should be disclosed,

24  because I recognize this is sensitive, but it's also a really

25  unusual case.

1    The second bucket is ALERTS.

2    And, government, you're going to need a little time to

3  figure out how quickly you can get what's on ALERTS.  I would

4  imagine, even if it has to be staged, Agent Kimrey can -- he's

5  still at Army CID, right?  Did I hear that right?

6         **MR. GARDNER:**  Yes, Your Honor.

7         **THE COURT:**  Yeah.  So he should be able -- and he's

8  still the case agent on the case, right?

9         **MR. GARDNER:**  Yes, Your Honor.

10        **THE COURT:**  Okay.  So he should be able to get, at a

11  minimum, his and Mr. Johnson's, and any related sort of, you

12  know, documents that he has access to, or print out -- I don't

13  know in what form.  I still can't really -- it's like hugging

14  fog, I can't really figure out how this ALERTS thing works, but

15  you all have to produce it.  I would say produce it for him and

16  whatever reports he can access relevant to this inquiry, which

17  is the devices.  And the -- and the course of conduct.

18    And then the three agents that he testified about, having

19  access and reviewing Relativity, that's where we don't know

20  yet, right?  We don't know how long that might take?

21        **MR. GARDNER:**  That's right, Your Honor.  And frankly,

22  I don't know -- maybe Army CID has their own, you know, hey, we

23  need a subpoena for this.  It's all sort of up in the air.  I'm

24  as, sort of, unfamiliar with ALERTS as you are, and so -- or

25  the Court is then --

1        **THE COURT:**  Well, it seems to me that there -- if

2    this is your case agent, the agent on this case who has been

3    providing -- working as a team, team is Team USA, has been able

4    to provide whatever you need when you ask, if now the Army says

5    that they need a subpoena for this, that's going to be a little

6    unusual.

7        **MR. GARDNER:**  I'm sort of -- I'm just theorizing as

8    to potential -- I know how the Army works well enough,

9    especially we're dealing with DOD OIG.  I'm just basically

10   saying the reason we can't get you a date, is because we could

11   run into hurdles, and we'll cross those when we come to them.

12   But it's, sort of, something I wanted to front that, you know,

13   it's possible that some issues could come up, we'll solve them

14   when we get to them.

15       **THE COURT:**  Well, let's do this.

16       **MR. GARDNER:**  But they might not be a PDF printout,

17   it may not be as simple as pressing print.  That's all I'm

18   saying, Your Honor.

19       **THE COURT:**  Okay.

20    Defense, do you have any proposal as to how we should deal

21   with this whole ALERTS hornet's nest, since it's your request?

22   And now the government says this might not be so easy.  How

23   should we do this?

24       **MR. GOLDMAN:**  I think, Your Honor, that it's worth

25   their making an inquiry figuring out how difficult it's going

1  to be, and then we can cross that bridge.  If we need to get --

2  I think, Your Honor indicated a court order would be

3  forthcoming if need be to get this.  But it seems like --

4        **THE COURT:**  Yeah.  Okay.

5        **MR. GOLDMAN:**  -- but it shouldn't be if they are the

6  case agents and the agency investigating the case.

7        **THE COURT:**  Right.

8        **MR. GOLDMAN:**  I mean, if it were the FBI, we'd

9  certainly be able to get it as their -- as a normal case

10  they're investigating.

11        **THE COURT:**  Right.  I hear you.  So why don't we --

12  do you want to set a date by which you provide a status report

13  to me?  Because, listen, I don't want to close the record on

14  this until all of this information is shared with the defense

15  and you have an opportunity to digest it.

16        **MR. GOLDMAN:**  I appreciate that.  And I think

17  Mr. Greenberg is going to have a couple of points to follow up

18  on, sort of, beyond these two -- these two buckets that we may

19  have.

20        **THE COURT:**  Okay.  All right.

21        **MR. GOLDMAN:**  But I think it makes sense to set

22  status, and maybe we can consult afterward and let you know

23  when that status date should be.

24        **THE COURT:**  Yeah.  When that will be.

25        Before we leave today, though, I do want a date on the

1   books, otherwise this could get away from us.

2       **MR. GOLDMAN:**  Yes.  Thank you.

3       **THE COURT:**  So -- so you all will confer.  And at

4   least we'll put a status -- a date for a status report from you

5   all before we leave today.

6       Okay.  Mr. Greenberg, you have something to add?

7       **MR. GREENBERG:**  A few things, Your Honor.  I mean,

8   there's still actually a number of issues we're trying to pin

9   down, unfortunately.  But some things, I think, are clear and I

10  think Your Honor --

11      **COURT REPORTER:**  I'm sorry, could you please move

12  closer to the microphone?

13      **THE COURT:**  Yeah.  You've got to get closer to the

14  microphone.

15      **MR. GREENBERG:**  I'm sorry.

16      **THE COURT:**  You want to go to the podium?

17      **MR. GREENBERG:**  Sure.

18      **THE COURT:**  It might be easier.

19      **MR. GREENBERG:**  Thank you, Your Honor.

20      **THE COURT:**  Much better.

21      **MR. GREENBERG:**  There are just a few other things,

22  unfortunately, and we're still going through the materials, so

23  there may be more.

24      The filing yesterday by the government, Docket 265, on

25  Page 2, where they talk about the tax returns of Ms. Jackson,

1  and they said they were never provided by the IRS to the U.S.

2  Attorneys' Office.  But under *Kyles*, the government has an

3  obligation to get those materials.  And they say that -- they

4  admit they can get them through a court order.  They chose not

5  to ask for a court order.

6     On whatever IRS -- whatever the IRS's position might be,

7  the due process clause in *Kyles* trump the IRS's regulations and

8  require the government to obtain a court order.

9         **THE COURT:**  And understood that the government just

10 filed this, so have you had an opportunity to talk to the

11 government about this?  Because I don't have *Kyles* in front of

12 me, so there's not much I can do with this right now.  I just

13 want to know if you talked to them about it.

14    Because if you didn't, then there may be some good

15 movement that can happen.  If *Kyles* says what it says you say,

16 then you present, perhaps, the shortest -- or the easiest

17 solution is you talk about it and you present whatever you want

18 me to consider for a court order.

19        **MR. GREENBERG:**  We have not yet conferred with the

20 government about this issue, Your Honor.  And we can.

21        **THE COURT:**  Okay.  Okay.  Why don't you do that.  And

22 then you can let me know if you -- if the government agrees,

23 and you need a court order, and it's *Giglio* related, I'm not

24 sure what the problem is going to be, but there's a lot of

25 daylight in between there.  So why don't you start with the

1    government.

2        **MR. GREENBERG:**  Sure.  And the same goes formal

3    report -- well, they used the words formal reports, and there's

4    a lot of sort of changing wording, careful words used by the

5    government, wanting it to be returned to them in 12 hours.  And

6    they say, right before the motion to compel at ECF 262, Page 2

7    of the same filing, no formal reports or documentation related

8    to Ms. Peebles' tax loss were prepared by the IRS.

9        I don't know what that means, formal reports.  And, again,

10   I think this is a *Kyles* issue.  Based on Your Honor's approach

11   to the last issue, I think we should probably meet and confer

12   with the government on that.

13       **THE COURT:**  I agree.

14       **MR. GREENBERG:**  And also on other documents, whether

15   they were formal or informal, or just handwritten notes

16   prepared by the IRS.

17       **THE COURT:**  Well, I think -- I think the lot may

18   differ, you know, all depending on that.  I'm not sure.  You

19   know, the point is really this has all been flying so fast in

20   the last couple of days.

21       **MR. GREENBERG:**  Yeah.

22       **THE COURT:**  I haven't had really an opportunity to

23   dig into these issues, which is why I suggest you meet and

24   confer on this -- on these IRS related *Giglio* issues with the

25   government, get their final position on it.  And if you believe

 1  a court order is warranted, you know, file a letter pleading

 2  with me, give me *Kyles,* tell me what you think is necessary,

 3  and I'll review it.  And the government can respond.

 4       MR. GREENBERG:  And there's a similar *Kyles* issue,

 5  but probably more straightforward, the Loudoun County Sheriff's

 6  Office that was involved in this investigation.  And as far as

 7  I know, the defense has gotten nothing from the Loudoun County

 8  Sheriff's Office.  But, again, we can meet and confer with the

 9  government on that one, too.

10       THE COURT:  Yeah, because I'm not -- how is the

11  Loudoun County Sheriff's Office involved in the case?  What did

12  they do?

13       MR. GOLDMAN:  You know, our understanding is that the

14  initial reports by Marlon Johnson were at the Loudoun County

15  Sheriff's Office with Loudoun County Sheriff's officers

16  present.  And in my experience with the Loudoun County

17  Sheriff's Office, they often audio record and videotape

18  interviews with people and prepare reports when there are

19  investigations happening or reports of criminal activities

20  happening in their jurisdiction.

21       THE COURT:  So if I'm understanding it right, this

22  case initiated at the Loudoun County -- with Mr. Johnson making

23  a report; is that right?

24       MR. GOLDMAN:  That's my understanding.  I can't say

25  that there was ever any decision by the Loudoun County

 1   prosecutor in Virginia to make a decision.  I know there was

 2   some Eastern District of Virginia prosecution involvement in

 3   this early in the case.  I don't fully know the context of

 4   that.

 5       But the Loudoun County Sheriff's Office would be sort of

 6   an initial law enforcement agency that was involved in this

 7   investigation.

 8          **THE COURT:**  And that's vis-a-vis Mr. Johnson's

 9   reporting, is your understanding?

10          **MR. GOLDMAN:**  Yes.  And it was -- my understanding is

11   that it was Loudoun County Sheriff's Office and Army CID and/or

12   IRS.  I don't know -- at least one meeting, maybe two meetings,

13   in the Loudoun County Sheriff's Office in the initiation of

14   this case.

15          **THE COURT:**  And you're saying you haven't gotten any

16   documentation from Loudoun County, and you reasonably believe

17   that there would be some -- Mr. Johnson's *Jencks*, essentially,

18   right?  A recording or --

19          **MR. GOLDMAN:**  Correct.  And potentially Agent --

20   well, I mean -- I don't know who all was in the meeting.

21          **THE COURT:**  We don't know.

22          **MR. GOLDMAN:**  We don't know, yeah.

23          **THE COURT:**  Okay.  Government, do you have any

24   insight as to the role of the Loudoun County Sheriff's Office?

25          **MR. GARDNER:**  Your Honor, I -- I don't want to

 1  speculate.  I know this case was initially brought to Loudoun

 2  County as in, like, a whistleblower action, and Marlon Johnson

 3  brought it as a whistleblower.  And I don't think they took it

 4  seriously.  And I think he later went straight to the

 5  federal -- the federal system with the information.

 6      But this is all my -- my understanding at this point, and

 7  I will find out if Loudoun County ever officially got involved

 8  and what reports there might be.

 9          **THE COURT:**  Okay.  So we got IRS, Loudoun County.

10          **MR. GREENBERG:**  Also in the filing yesterday, Docket

11  Number 265, the very first bullet point about the so-called --

12  what they say is the interview of Mr. Clezie and they say our

13  position is not accurate, talking about the file title.

14      May I approach, Your Honor?  So I can actually hand you a

15  copy that we move into evidence as -- this is the interview

16  report they're referring to.

17      As Your Honor will see, the title says in bold, all

18  capital letters -- or maybe not the title, but the heading,

19  whatever you want to call it near the top, interview of

20  Ms. Barbara Rosas, Johnson in parentheses, comma, Infused

21  Solutions, LLC, and then in parentheses, Infused Operations

22  Officer, and then there's a few lines redacted.

23      And then it says in this document, in the second

24  paragraph, that both Mr. Clezie and Ms. Rosas were previously

25  interviewed.

1       I'll give Your Honor a copy.

2           **THE COURT:**  So that's the -- that's the report you're

3   inquiring about, is a prior interview to the one that's

4   documented in -- and I've been handed up -- I'm assuming you

5   know which one this is Mr. Gardner.  This looks like --

6           **MR. GREENBERG:**  I'm sorry, Your Honor, I forgot to

7   put a sticker on it, it's D10.

8           **THE COURT:**  D10.  Okay.

9       And this is a -- is a report from Agent Kimrey on

10  December 11 of 2020.  Is that the report that you're referring

11  to in your letter at ECF 265?

12          **MR. GARDNER:**  Yes, Your Honor.

13          **MR. GREENBERG:**  Oh, sorry.

14          **THE COURT:**  I'm just confirming that's what you're

15  talking about?

16          **MR. GARDNER:**  Yes.

17          **THE COURT:**  And given Mr. Greenberg's representation

18  that that report references a prior interview of both of these

19  witnesses, do you still stand by there was only that report

20  captures the -- all the interviews?

21          **MR. GARDNER:**  Your Honor, yes.  There is no other

22  interview report that the government is aware of.  So if it

23  was -- if it was a conversation, and it was never memorialized,

24  I don't know.  But in terms of whether or not that was -- this

25  was produced as Agent Kimrey's *Jencks*.

1        **THE COURT:**  No, I understand that.  And Agent Kimrey

2  memorializes that he had a -- can you point me to where in this

3  report at D10, this reference to the prior conversation?

4        **MR. GREENBERG:**  Yes, Your Honor.  The second

5  paragraph, starting with "as background, comma."

6        **THE COURT:**  As background, both Mr. Clezie and

7  Ms. Rosas were previously interviewed wherein they provided how

8  Infused billed the government, the timekeeping system used, and

9  how invoices were submitted from subcontractors to the prime

10  contractor and on to the government.  And then it goes on to

11  explain some of these terms.

12    Are you saying that was just like a chat that wasn't

13  memorialized in an interview?

14        **MR. GARDNER:**  I don't know, Your Honor.  And -- but I

15  do know that in the reports, which the reports that were given

16  to me did not include this -- this interview as his *Jencks*,

17  which it could mean that somebody else wrote the report.  I did

18  review many reports and took off ones that, you know, were

19  written by other people, because obviously this is his *Jencks*

20  production.

21    But what I can say is, he did not write a report of an

22  interview, another interview with Mr. Clezie.

23        **THE COURT:**  Okay.  Well, find out who did and produce

24  that report.

25        **MR. GARDNER:**  Will do, Your Honor.

 1          **THE COURT:**  Okay.  All right.  So that report,

 2    whoever wrote it, should be coming your way.

 3          **MR. GREENBERG:**  Thank you, Your Honor.  And there is

 4    at least one more issue.  And that relates to the motion to

 5    compel filed concerning the PowerPoint.

 6       Given what we saw today from Special Agent Kimrey, and

 7    given that PowerPoint was attached to an e-mail from him, I

 8    mean, that alone, in our view, is a sufficient reason to order

 9    it to be produced immediately.

10          **THE COURT:**  Well, the government asked that I take a

11    look at it first, that I do an in camera inspection.  And your

12    position, just so I understand it, defense, is this is

13    essentially Agent Kimrey's *Jencks*, at least at the time you

14    wrote -- you asked for it, because it was presented in

15    consultation -- as to whether this case should go forward, and

16    in what -- in what form.

17       Am I getting that right?  That it was his PowerPoint, in a

18    sense?

19          **MR. GREENBERG:**  That is -- that is the point we've

20    made, and we -- based on an e-mail that you've identified

21    separately, or maybe -- actually, maybe related, I can't

22    remember at this point, but there was a chain of e-mails --

23    actually, I'm sorry, it was actually attached to the motion to

24    compel.

25       And the chain shows that Kimrey, when he forwarded that

1  PowerPoint presentation, which, by the way, is identified as

2  V2 -- I'm sorry.  We have a separate PowerPoint presentation

3  prepared by Marlon Johnson that says V2 in it.  We never got

4  V1.  That one prepared by Marlon Johnson says V2 on the very

5  first page.  We don't know if this is the same PowerPoint that

6  Marlon Johnson prepared.

7      In addition, a separately and independently sufficient

8  reason for producing this PowerPoint to us immediately is that

9  the chain of e-mails attached to the motion to compel indicates

10 that Kimrey sent that PowerPoint to a colleague because she was

11 being considered as a potential expert for the government.  And

12 it appears that maybe things didn't work out as hoped, we don't

13 know.  And that maybe this other person didn't say what they

14 hoped.  And, you know, that alone is another reason to produce

15 it under --

16      **THE COURT:**  Well, I'm not -- I'm not totally

17 following that.  I just want to understand, the genesis of

18 this, it's the defense's contention that this PowerPoint was

19 created by -- or do you know who created this PowerPoint that

20 is supposedly Agent Kimrey shared with the government?

21      **MR. GREENBERG:**  We don't know.  And the government

22 uses the passive voice in its letter to obscure the identity of

23 the person.

24      **THE COURT:**  You mean in the letter filed to me last

25 night?

1          **MR. GREENBERG:**  Yesterday, yes, Your Honor.

2      It says, bottom of Page -- Docket 265 at 2, under motion

3  to compel, ECF 262, it says the slides in question were drafted

4  by someone other than Agent Kimrey before this case was

5  accepted by the U.S. Attorneys' Office.  And then on the next

6  page, it says the government has reviewed this document, which

7  was prepared -- again, passive voice -- as a summary of the

8  case until that point for the purpose of presenting the case to

9  prosecutors.

10      You know, it -- this --

11          **THE COURT:**  All right.  Who -- who wrote -- who made

12  this PowerPoint?

13          **MR. GARDNER:**  I believe it was the case agent before

14  Agent Kimrey, so there's a handover.  He created the entire

15  thing, and then, I believe -- and I'm saying I believe because

16  I think I remember this.  I'm being very careful.

17          **THE COURT:**  Got it.  Okay.  Very good.

18          **MR. GARDNER:**  I believe it was the case agent that

19  was handing the case over to Agent Kimrey as he was, basically,

20  disavowing himself of the case, or whatever.  He was moving on,

21  you know, to bigger and better things.

22          **THE COURT:**  In 2020 this was?

23          **MR. GARDNER:**  Yes.

24          **THE COURT:**  When Agent Kimrey took the case over --

25          **MR. GARDNER:**  That's correct.

1          **THE COURT:**  -- he got the PowerPoint from the prior

2   case agent?

3          **MR. GARDNER:**  That's -- that's my understanding, Your

4   Honor.

5          **THE COURT:**  And -- and then what did Agent Kimrey do

6   with that PowerPoint?  Did he then use it to present the case

7   to others, other witnesses and to you?

8          **MR. GARDNER:**  Your Honor, this -- this PowerPoint, I

9   believe, was used during the pitch to the U.S. Attorneys'

10  Office.  So --

11         **THE COURT:**  This is so usual.  Like, I usually don't

12  see sort of pre-charge pitches, if you will.  That's why I

13  think out of an abundance of caution, the government has

14  offered for me to look at it in camera, let me do that just to

15  figure out what it is.

16      Because, okay, now I do know that Agent Kimrey was, for

17  lack of a better term, its sponsor, the person who sort of ran

18  the deck, right?  Let me see what it says, and we'll take it

19  from there.  But I'm not prepared to give it over to the

20  defense.

21         **MR. GREENBERG:**  Understood, Your Honor.

22      Just for the record, this appears to be violation --

23  another violation of Rule 16.  We have also, by the way, as I

24  understand it, not received any report by this unnamed prior

25  case agent.

 1          **THE COURT:**  Yeah, I -- I don't know what to even say

 2     about this.  Like, who is this person?  And you're not going to

 3     call him, so it's not *Jencks*.  But maybe it's --

 4          **MR. GARDNER:**  Right, Your Honor.  It's two years

 5     before -- I mean, it's two years pre-indictment.

 6          **THE COURT:**  Yeah.  I'm not really sure how it's a

 7     Rule 16.

 8          **MR. GARDNER:**  So how is it relevant?

 9          **MR. GREENBERG:**  Well, they -- counsel said --

10     government counsel said there was a whistleblower who brought

11     this case to the government.  Whistleblowers have a financial

12     incentive to lie.  Marlon Johnson --

13          **THE COURT:**  Well, I don't know if they meant, like,

14     specifically, like, under the False Claims Act.  I don't know.

15     Maybe they did, maybe they didn't.  But that was with regard to

16     Mr. Johnson going to the Loudoun County Sheriff's Office.

17          I think I understand what you're saying.  If there's prior

18     *Jencks* of the investigating Army CID agent who was involved in

19     that interaction with Mr. Johnson, that that may potentially be

20     what?  Rule 16 because it's material to crossing Johnson?  I

21     mean, I'm not sure -- I'm trying to understand it.

22          **MR. GREENBERG:**  Yeah, it would be material to

23     crossing Johnson, to crossing Kimrey.  It also could -- and

24     perhaps likely does contain *Giglio* information, because, you

25     know, it was presented to a potential expert who ended up not

1  designated as an expert.

2          **THE COURT:**  Let's figure -- hold on.

3          **MR. GREENBERG:**  Yeah.

4          **THE COURT:**  So you're calling Mr. Johnson, Marlon

5  Johnson as a witness; is that right, Mr. Gardner?

6          **MR. GARDNER:**  Yes, Your Honor.

7          **THE COURT:**  Okay.  So it is potentially relevant to

8  that.  I don't -- it doesn't sound like the government has done

9  any -- any look-back from Marlon Johnson's initial blowing the

10  whistle.  Not an FCA blowing the whistle, but you're saying you

11  got to look into this, there's a crime that's being committed.

12      It sounds to me, from what I'm hearing from the

13  government, that there hasn't been any real due diligence going

14  back to that time to figure out -- I would -- I would imagine

15  that the prior case agent is in your -- in your possession,

16  custody, or control.  If that agent were involved in the

17  Loudoun County Sheriff's information, if you have information

18  about that that's in your control, that does seem to be, at

19  least, presumably relevant to preparing to cross Mr. Johnson.

20  And all depending on what the content is, it might be *Giglio*.

21  I have no idea.

22          **MR. GREENBERG:**  Your Honor --

23          **THE COURT:**  The first principle is, maybe, you all

24  should talk about it, because I don't know what the government

25  has or doesn't have.

1          **MR. GREENBERG:**  Well, it's a little surprising to us

2    that the government doesn't know for sure the identity of the

3    author after we filed the motion to compel and they responded

4    in writing to the Court.

5          **THE COURT:**  The identity of what author?

6          **MR. GREENBERG:**  Of the PowerPoint.

7          **THE COURT:**  Well, it sounds like they do, the prior

8    case agent.

9          **MR. GREENBERG:**  We heard "I believe."

10         **THE COURT:**  Well, I don't know.  I think Mr. Gardner

11   is just trying to be careful, because last week I really gave

12   him the business about being careful.  So that's -- that to me

13   is, he's qualifying this because he just wants to be really

14   clear with me.  That's -- I appreciate that.

15         **MR. GREENBERG:**  And that's fair, but we would assume

16   at this point that the government has actually looked at the

17   PowerPoint and knows who the author is and just doesn't --

18         **THE COURT:**  Well, we don't know that, because the fur

19   has been flying.  I mean, we've got 30 -- here's the main event

20   right now, so that I try not to, you know, lose -- lose sight

21   of this.  And it's still really significant.

22      There were 30 devices seized, kept.  Now we know many were

23   imaged, some were not.  All given back.  Some even that

24   inexplicably were given back, one that I can think of.  Right?

25   And I still don't have a clarity on who looked at anything

1    when.  Right?  That's a huge problem in this case.  It still

2    remains a huge problem.

3         So this other stuff right now is important.  I'm not

4    discounting it, but it's being dwarfed a little bit by the six

5    terabytes of raw data that I'm trying to figure out what

6    happened to it.

7              MR. GREENBERG:  Oh, your Honor, I'm not suggesting in

8    any way to the contrary.  We agree, that's the massive issue in

9    this case that, you know, is hugely problematic.

10             THE COURT:  So then how about the rest of it, right?

11   Okay.  I got the PowerPoint as part of the list, as part of the

12   meet and confer.

13             MR. GREENBERG:  But -- but we -- we just want to make

14   sure, you know, there's not delay in the other stuff.

15        And just one thing about the PowerPoint, I mean, you know,

16   it may well undermine the quality of the investigation if it

17   was prepared by Marlon Johnson, and then it would be *Brady*.

18             THE COURT:  Yeah, but that's very speculative right

19   now.  It's really speculative.  I don't have a whole lot other

20   than there was a V2 in front of a PowerPoint that Johnson

21   provided.

22        I'm not saying, you know, you're not onto something, but

23   you need to talk to the government first to get what -- what --

24   what they've done and what they haven't.  If you -- and I'm

25   happy to look at these items in camera, but I'm not going to

1  give them over yet.

2          **MR. GREENBERG:**  Understood, Your Honor.

3          **THE COURT:**  Okay.

4          **MR. GREENBERG:**  Just another point, we did ask the

5  government by e-mail, and got a response they had nothing.  We

6  asked if they had *Giglio* information, meaning communications

7  related to the decisions to not charge certain people, dismiss

8  charges against certain people, do deferred prosecution

9  agreements.  And we got a response saying they have nothing.

10     And I don't -- I'm not sure they understand their

11  obligation is to produce the information, even if it doesn't

12  exist in a document yet.

13         **THE COURT:**  Well, I don't know either, but I'm not

14  really sure the scope of the *Giglio* request versus -- well --

15  all right.  Is it your position that for all originally charged

16  codefendants, you're entitled to what?  What do you think is

17  *Giglio*?

18         **MR. GREENBERG:**  Any document relating -- well, I

19  mean, it's *Giglio* and eventually *Brady*, also.  Any document

20  related to the decision not to charge someone, such as

21  Ms. Rosas and Mr. Johnson.  And also, any document related to

22  the decision --

23         **THE COURT:**  Well, this is -- this is way overbroad.

24  **MR. GREENBERG:**  Okay.

25         **THE COURT:**  What I remember saying several days ago,

1    and maybe we can go back to this, because I'm still not

2    convinced this was produced as just a jumping off point, there

3    was conversation about Agent Kimrey's *Jencks* and/or reports of

4    interviews with witnesses that the government agreed the

5    government would be calling.

6         The defense made the point that many of those ROIs had

7    referenced documents that were attached, or documents that were

8    shown the witness.  But the documents themselves were not

9    attached, right?

10        That -- and -- and has that been produced to you?  Those

11   underlying -- because I said to the government, for at least

12   for the witnesses whom you are calling --

13             **MR. GREENBERG:**  Right.

14             **THE COURT:**  -- if -- if an agent interviewed that

15   witness and showed that witness a document, and the witness

16   commented on it, produce it to the defense with the ROI so that

17   it's a complete report.

18        Did you get those?

19             **MR. GREENBERG:**  I mean, I know we got a large -- we

20   got a series of productions from the government.  I'll let

21   Mr. Goldman speak to that because he's more familiar with the

22   productions.

23             **THE COURT:**  But you see what I'm saying?  Like, until

24   I get my arms around -- are we -- working from the government's

25   witness list, do you have what you're entitled to there?  These

1   other sort of -- you know, they may end up being very, very

2   important, but we've got to take a more sort of -- I think a

3   more methodical approach here.  You know, there's been a lot of

4   things that the defense stands up and says the sky is falling,

5   we need this document.

6       And I'm not convinced that a PowerPoint that I don't even

7   know who authored it yet, and I don't understand how it came

8   into the government's possession, is something I should just

9   turn over to you.

10          **MR. GREENBERG:**  Right.

11          **THE COURT:**  So help me out here by just -- first

12  step.

13          **MR. GREENBERG:**  Okay.  So Mr. Clezie, Your Honor has

14  already ordered the production of the -- a report on the

15  previous interview of him that wasn't produced.  He's on the

16  government's witness list.

17          **THE COURT:**  Right.  I agree with you.

18          **MR. GREENBERG:**  Okay.

19          **THE COURT:**  And that's in there.

20          **MR. GREENBERG:**  I believe, if memory serves, that

21  Mr. Johnson and Ms. Rosas are on the government's witness list.

22          **THE COURT:**  Yes, yes.

23          **MR. GREENBERG:**  So, you know, we are talking about

24  people on the government's witness list.

25      Now, if Your Honor is saying that we shouldn't be going

1  after communications related to the dismissal of charges

2  against people who are indicted and then let out of the case,

3  which is highly unusual --

4          **THE COURT:**  I'm not sure.  I'm not sure how you're

5  fitting this in to one of the -- the categories of documents to

6  which you're entitled.  And it just -- I don't know enough

7  about -- you haven't laid a factual predicate enough for me to

8  say, yep, it's all yours, turn it all over.

9          **MR. GREENBERG:**  Okay.  Well --

10         **THE COURT:**  Like, you know.  This is -- and you're

11 standing up at a very difficult, very complicated case making

12 these oral representations that are just, you know, we're going

13 from one to the other to the other without any conversation

14 with the government.  It's getting way far afield.

15         **MR. GREENBERG:**  Well, we've tried to have

16 conversations with the government about *Giglio*, and we

17 basically got blown off.  You know, we can submit the e-mails.

18 But we'll meet and confer with the government.  I mean,

19 hopefully --

20         **THE COURT:**  Yeah, let's do this.  Okay?  You all are

21 going to have a good faith meet-and-confer.  And you're going

22 to document that meet-and-confer.  And then you're going to

23 report to me the results of it.  I mean, you're going to

24 enumerate all of these things that you are now standing up --

25 every time we've been together, there's another issue.  They

1  may be real, but we've got to be organized about this,

2  otherwise, I'll never be able to keep track of it, and no one

3  will get relief.  Okay?

4      So how about we do this?  How about we set a date by which

5  you all will meet and confer.  And you will write to me a

6  status of the meet-and-confer, which means you'll -- you'll

7  document each category of item, of evidence that you've

8  discussed with the government, and memorialize their response.

9  And put your position as to why you believe you're entitled to

10  something the government is not giving over.  Hopefully, by

11  then, some of these issues will be narrowed.  But if not, then

12  I've got a written document I can work from.

13      Does that make sense?

14          MR. GREENBERG:  Yes, Your Honor.

15          THE COURT:  Okay.  So at least as a minimum, we know

16  that on this is going to be -- I've lost track.  Where -- what

17  were we just talking about?  What were you just raising?  The

18  universe of *Giglio* that may apply to defendants who are no

19  longer in this case?  That's something you all got to talk to

20  the government about, because I'm not going to call that today.

21          MR. GREENBERG:  Okay.

22          THE COURT:  Okay?

23          MR. GREENBERG:  Understood, Your Honor.

24          THE COURT:  All right.

25          MR. GREENBERG:  We will -- we will speak with the

1  government expeditiously and get a date, unless the Court

2  wants -- unless Your Honor wants a date now.

3          **THE COURT:**  We're going to set a date, a status date

4  in a moment.

5      But going back to sort of first principles, the reason why

6  I asked the government to produce the witness list was so we

7  had some idea of the government's case so that we could then

8  figure out what's the *Jencks*, the *Giglio*, the *Brady*, at least

9  as to those witnesses, right?  You have that.

10     I've ordered the government to produce the underlying

11  documents that were referred to in any interviews of those

12  witnesses, and you've gotten those.  Am I getting that right?

13         **MR. GREENBERG:**  Well, see I don't know that I can

14  answer that, and I would ask Mr. Goldman to --

15         **THE COURT:**  Okay.

16     Mr. Goldman, where are we with that?

17         **MR. GOLDMAN:**  With the -- we received a witness list

18  from the government.  We received an exhibit list from the

19  government.  We have -- I think the Court has those as well.

20         **THE COURT:**  Yeah, I have that.

21         **MR. GOLDMAN:**  We have those documents.

22         **THE COURT:**  Right, right.

23         **MR. GOLDMAN:**  Which other categories --

24         **THE COURT:**  What I said at the last hearing was,

25  government, if you have reports of interviews of the witnesses

1  on your witness list, and those ROIs refer to documents shown

2  to the witness, produce the documents to the defense.  Because

3  one of your concerns was you can't make heads or tails of what

4  was discussed if you don't have the underlying documents.

5          MR. GOLDMAN:  We received a folder of documents.  I

6  can't say whether we have all of them or whether they are

7  clear -- whether they are clearly connected.  I -- I'm going to

8  do my best to review them.  We've been, you know, obviously

9  there have been a lot of other issues as well.

10         THE COURT:  Yeah, you've been busy.  Exactly.

11         MR. GOLDMAN:  But I will absolutely analyze that and

12  let the Court know if we have that, and if there's anything

13  missing, absolutely.

14         THE COURT:  Okay.  Great.  The government made that

15  production.  Now it's up to you to review it, and if there's

16  anything missing, add it to the list on the meet-and-confer.

17  Okay?

18         MR. GOLDMAN:  Yes, Your Honor.

19         THE COURT:  All right.  Very good.

20         MR. GOLDMAN:  Thank you.

21         THE COURT:  Okay.  Anything else before we set some

22  dates?

23         MR. GREENBERG:  Your Honor, our position is that, I

24  think it's quite apparent, the government has caused the delays

25  from -- the issues with the devices most notably and all these

1  other issues.  The Court should order that the meet-and-confer

2  occur as early as feasible and the status report be filed as

3  early as feasible.

4        **THE COURT:**  Okay.  I don't disagree with you.  Let's

5  talk about a date.

6     So my understanding, again, Tuesday is when I'll get the

7  e-mails regarding taint, discovery for Mr. Ake, and any other

8  sort of internal taint related documents for my review.

9     That's Tuesday.  But beyond that, I don't -- I don't know

10  when we're going to get ALERTS, so let's set -- let's see.  We

11  need a status report.

12     Okay.  My proposal would be that you meet and confer

13  sometime early next week.  Defense, come up with your list now,

14  share it with the government in advance.  You all meet Tuesday,

15  Wednesday, work through them, and then you provide a status

16  report to me next Friday on both ALERTS and the results of the

17  meet and confer.

18        **MR. GREENBERG:**  That sounds --

19        **THE COURT:**  Does that work?

20        **MR. GREENBERG:**  That sounds entirely reasonable, Your

21  Honor.

22        **THE COURT:**  Okay.  All right.

23     That will then have given me some time to review the rest

24  of the taint team information.

25     And, government, if there is any legal position you want

1   me to consider, and to provide it to the defense as well,

2   provide me the law on this.  Because I -- I really don't have

3   any guidance from you all as to when the -- when the -- when a

4   taint team process is used as a ground for delay, or frankly,

5   denial of what the government has already, you know, made

6   clear, you're not walking away from this, this is squarely

7   Rule 16, all these devices.  And there's some question in my

8   mind as to the process and how much time it really took, and

9   how much of it really involved which devices, right, which all

10  goes to good faith, bad faith, inadvertence.  What's your legal

11  position on whether I can share those with the defense?

12       If -- you know, if your position is, listen, it is what it

13  is.  This is what occurred with the taint team, there's no

14  privilege here, there's no legal basis to hold it back.  And in

15  this unusual circumstance, where it's the government's burden

16  to prove a lack of bad faith or a lack of one judge called it

17  recklessness, but a good reason for this, it seems like you

18  would want to give it over, right?

19       But there might be some legal reason that I'm missing

20  because this doesn't happen very often.

21       If there is law that you wish for me to consider, give it

22  to the defense and to me when you turn over the rest of the

23  taint team information.

24       Does that make sense, Mr. Gardner, and Mr. --

25            **MR. GARDNER:**  Yes, Your Honor.

1        **MR. GREENBERG:** Your Honor, one other thing. And

2   Your Honor may have made this clear, but there was a lot of

3   things going on, I just want to make sure.

4        **THE COURT:** Yeah.

5        **MR. GREENBERG:** With respect to the database called

6   the system ALERTS that Special Agent Kimrey repeatedly referred

7   to, we would ask that the Court direct the government to give

8   us a time frame when it can produce the database and how by the

9   time we meet and confer on Tuesday or Wednesday of next week.

10       **THE COURT:** I think that's reasonable. And if for

11  some reason you're getting stonewalled by Army, you let the

12  defense know that, right? And then you'll let me know that.

13  Because if -- if you're having trouble from Army, then, you

14  know, that's -- that's one thing. Or otherwise, I would

15  imagine it's not going to take that long to get the

16  information. But that seems fair.

17       Do you think so, Mr. Gardner, you can get to that?

18       **MR. GARDNER:** That's reasonable, Your Honor.

19       **THE COURT:** Okay. All right. Okay.

20       **MR. GREENBERG:** Thank you, Your Honor. I think

21  that's probably all we have.

22       Thank you, Your Honor, for the all time and careful

23  attention you're paying to this matter.

24       **THE COURT:** Of course. Thank you. I appreciate it.

25       Anything else from the government's perspective?

1           **MR. GARDNER:**  No, Your Honor.

2           **THE COURT:**  Okay.  All right.

3      So then, Mr. Ulander, can we do a paperless order that

4  says for the reasons discussed on the record, the government's

5  supplemental in camera production shall be uploaded to the

6  Court by Tuesday, what is it, September 3rd.  And the parties

7  shall conduct a good faith meet-and-confer on the outstanding

8  discovery and other related issues next week and provide a

9  joint written status report to the Court by no later than

10  Friday, September 6th.  Okay?

11      All right.  And then once I get that report, we'll figure

12  out what we do next.

13      Okay?  Very good.  All right.  Thank you all.

14           **MR. GREENBERG:**  Thank you, Your Honor.

15           **DEPUTY CLERK:**  All rise.  This Honorable Court now

16  stands adjourned.

17      (Recess taken.)

18           **MR. GREENBERG:**  I'm sorry, I meant to bring this up,

19  it's just a housekeeping thing, I think it's unobjectionable,

20  but I'll just propose it.

21      Just so the record is very clear, we would ask that all

22  the exhibits used by each side be filed by the sponsoring party

23  on the docket.

24           **THE COURT:**  Let me -- government, do you object to

25  that, just so that we've got a really clean record?

1          **MR. GARDNER:**  I don't object, Your Honor, I just

2    don't know how to do it, frankly.

3          **THE COURT:**  Well, first of all, let's make sure that

4    we've got a full record with Mr. Ulander of all of the exhibits

5    that were admitted.  What you all can then do is, if you wish,

6    to have them on the docket, get together, make sure you've got

7    one clean copy of them all, and upload them on ECF, hearing

8    exhibits.  I don't have a problem with it either way.  I just

9    want the record to be clear as to what came in.

10         **MR. MANTHRIPRAGADA:**  I'm just curious as to why

11   there's a reason for doing that, when they were admitted in

12   court.  Why can't we --

13         **THE COURT:**  Well, one reason may be because this has

14   been a very complicated road down -- down the evidence path,

15   and it involves chain of custody.  There may be future --

16   future pleadings that refer back to those exhibits that both

17   sides would -- and the Court would find helpful to have the

18   exhibits in one place.  That could be it.

19       But I'll leave it up to you.  I have no problem if you

20   want to put it on the -- on the ECF.  At a minimum, though, you

21   got to make sure that we know all the exhibits that are in with

22   Mr. Ulander, and anything that, you know, you showed on the

23   screen that you're going to admit, that you get it in and get

24   us a copy.  Okay?

25         **MR. GREENBERG:**  Yes, Your Honor.  And just to be

1  clear, in addition to making the record just unambiguously

2  clear, and so there's no more -- there's no confusion, it will

3  save the Court time and reduce the amount of paper that comes

4  in when we can just cite previous docket entries that are, you

5  know, the exhibits that were filed.  We don't have to attach

6  them.

7         **THE COURT:**  The only problem you're going to run

8  into, though, is, you know, throughout the day today, you

9  referred to Exhibit D4, D5, and now it has an ECF number.  It

10 could be more complicated than it's worth.  It may just be more

11 helpful to have -- make sure you all have a clean copy of the

12 exhibits, make sure you each have copies of it, make sure I

13 have a copy of it.  And then any future pleadings, you know,

14 you're going to refer to these court exhibits.  Right?

15        Anyway, it's late.  It might not be the Gordian knot we're

16 going to untie right now.  But -- but whatever, sort of, works

17 for you all for future pleading, works for me.

18        From Mr. Ulander's perspective, though, you have to

19 confirm what documents, what exhibits are in before you leave

20 today.  And I'll give you what I have.

21        **MR. GREENBERG:**  All right.  Thank you, Your Honor.

22        **THE COURT:**  Okay.  Thank you, all.

23        **DEPUTY CLERK:**  All rise.  This Honorable Court now

24 stands adjourned.

25        (Proceedings were concluded at 5:18 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Paula J. Leeper, Federal Official Court Reporter, in

5    and for the United States District Court for the District of

6    Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7    the foregoing is a true and correct transcript of the

8    stenographically-reported proceedings held in the

9    above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                              Dated this    day of    2024.

13

14

15                              /S/ Paula J. Leeper

16                              _____

                                Paula J. Leeper, RPR
17                              Federal Official Reporter

18

19

20

21

22

23

24

25