IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

```
_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
       Plaintiff,                       )
                                        )Docket Number
            vs.                         )8:22-cr-00091-1
                                        )
AKBAR MASOOD,                           )
                                        )
       Defendant.                       )
_____)
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE PAULA XINIS
UNITED STATES DISTRICT COURT JUDGE
FRIDAY, NOVEMBER 1, 2024, AT 10:00 A.M.


APPEARANCES:

On Behalf of the Plaintiff:

       BY:  DARREN GARDNER, ESQUIRE
            RANGANATH MANTHRIPRAGADA, ESQUIRE
       OFFICE OF THE UNITED STATES ATTORNEY
       6406 Ivy Lane, Suite 800
       Greenbelt, MD  20770
       (301)344-4029


(Appearances continued)










       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

```
1   APPEARANCES CONTINUED:

2   On Behalf of the Defendant:

3       BY:   EUGENE GOROKHOV, ESQUIRE
              Burnham & Gorokhov, PLLC
4             1634 I Street NW
              Suite 575
5             Washington, D.C.  20006
              (202)386-6920
6
        BY:   DANIEL GOLDMAN, ESQUIRE
7             The Law office of Daniel Goldman, PLLC
              421 King Street, Suite 505
8             Alexandria, VA  22314
              (202)677-5709
9
        BY:   JOSH GREENBERG, ESQUIRE
10            The Josh Greenberg Law Firm
              1717 K. Street NW
11            Suite 900
              Washington, D.C.  20006
12            (202)422-0809

13  ALSO PRESENT:  Akbar Masood, Defendant

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2    (Court called to order.)
 3              DEPUTY CLERK:  All rise.  The United States District
 4    Court for the District of Maryland is now in session.  The
 5    Honorable Paula Xinis presiding.
 6              THE COURT:  Good morning, everyone.  You all can have
 7    a seat.  Will the government call the case?
 8              MR. GARDNER:  Good morning, Your Honor.  The
 9    government calls United States v. Akbar Masood, Criminal Number
10    PX22-22-91.  AUSA Darren Gardner on behalf of the United
11    States.  With me at counsel table is AUSA Ranganath
12    Manthripragada.  We're here for a hearing on motions to compel.
13              MR. GOLDMAN:  Good morning, Your Honor.  Dan Goldman
14    on behalf of Mr. Masood, who is present.  Also present is Josh
15    Greenberg and Eugene Gorokhov.
16              THE COURT:  Okay.  Thank you all.  So today I intend
17    to resolve ECF 262, 283, 286, 302, 309 and 310.
18         Before we get started, a couple of observations and
19    orders.  Okay?
20         You have a scheduling order.  Filing deadlines are in the
21    scheduling order.  There will be no more supplements, none.
22    You have papered me to death.  It is -- the docket is a mess
23    and it is not necessary.  I do not need to be apprised in real
24    time every time a lawyer has an idea or an update.  You can
25    wait until your filing deadline, or you can bring it to my
```

4

attention in court, because I can follow it.

So I'm not happy.  And I'm principally not happy because I know I have said this before.  I said it in the last recorded conference, and I made it clear because the docket was so a mess that we had to find a new date for the trial, because I couldn't physically get to all of the issues that have been thrown at the Court.  So stop it.

And if it needs to happen, you have to preview it with a motion for leave to file for extraordinarily good cause.  And if you don't demonstrate extraordinarily good cause, I will summarily strike that motion for leave.  That's number one.

Number two, each side, one lawyer; one lawyer to talk about discovery, one lawyer to talk with each other.  I'm not going to get triple teamed from the defense.  And in that regard, I do agree with the government, that it's pretty hard to follow what's going on when you get different e-mails from different people at different times.

This is -- I'm doing this in the exercise of my inherent authority to keep the case going on track and have it be clear to me, because I'm not going to continue this way.

Is this understood by all parties?

**MR. GARDNER:**  Yes, Your Honor.

**MR. GOLDMAN:**  Yes, Your Honor.

**THE COURT:**  All right.  Thank you.

Now, with respect to the first motion, ECF 62, for which

5

1    there were many supplements, and I'm not going to list the

2    supplements, my understanding is that the take-home point for

3    ECF 62 is that the defense believes it is entitled to the

4    PowerPoint -- 262.  262.

5        That the defense believes it's entitled to the PowerPoint

6    that Agent Kimrey and the government has said is not Agent

7    Kimrey's *Jencks*.  That's the principle thrust of ECF 262, am I

8    right?

9            **MR. GREENBERG:**  Your Honor, that's partially right.

10   There were, for the first time, e-mails from Barbara Rosas

11   produced on October 4th by the government.

12           **THE COURT:**  Yeah, I understand that.  That may be a

13   different question about Rosas *Jencks*.  But 262 -- 262, that

14   motion, when you filed 262, that was principally about the

15   PowerPoint, right?

16           **MR. GREENBERG:**  At that time.  One of those

17   PowerPoints appears was attached -- was shown to Rosas in

18   reference --

19           **THE COURT:**  I understand.  There's two PowerPoints.

20   There's one that was presented to the DOJ, and that there were

21   slides that were presented -- or potentially presented to

22   Ms. Rosas.  The government has given me both to look at in

23   camera.

24       So I want to be clear, you're asking for the PowerPoints,

25   am I right?

6

1              **MR. GREENBERG:**  Yes, Your Honor.

2              **THE COURT:**  Are you asking for anything else pursuant

3    to 262?  Because all I saw were the PowerPoints.

4              **MR. GREENBERG:**  Those two PowerPoints.

5              **THE COURT:**  Okay.  Very good.

6       Government, are you persisting in the position that the

7    PowerPoint presented to the DOJ is not Agent Kimrey's *Jencks*?

8              **MR. GARDNER:**  Yes, Your Honor.

9              **THE COURT:**  Then how do you explain his name on the

10   cover of it, on the first slide, now that I've taken a look at

11   it in camera, with Agent Goins and Agent Smith on it?

12             **MR. GARDNER:**  Your Honor, he was part of the case

13   team, I think, and they put the Power -- the names on the

14   PowerPoint of the people who were giving the presentation.

15             **THE COURT:**  Well, I think that it's a fair inference

16   that when you put your name on it, you adopt it.  And so in the

17   future, if you don't intend to adopt it, the agent shouldn't

18   put his name on it.

19       But given the underlying back-and-forth that I've seen,

20   the e-mails that I've seen, and the time that we have wasted on

21   this question of the PowerPoint, I'm going to grant the

22   disclosure.  So please turn over both PowerPoints to the

23   defense.  Okay?

24             **MR. GARDNER:**  Yes, Your Honor.

25             **THE COURT:**  So I'm granting ECF 262, and the

1  principle reason is because in addition to e-mails where Agent

2  Kimrey is discussing the contents of the PowerPoint, i.e., I've

3  attached a good summary of the case in the PowerPoint, when one

4  puts his name on the PowerPoint, it is a fair inference that

5  he's adopted the contents.

6       And he is the case agent, and so that in and of itself,

7  especially given the posture of the discovery issues in this

8  case, which are legendary, it is appropriate to order the

9  disclosures.  So 262 is granted as to both PowerPoints, because

10  one was referenced in the interview, and Agent Kimrey was part

11  of that interview.  And out of an abundance of caution, we're

12  going to make sure the defense has it.

13       Okay.  ECF 283, the government's motion for appropriate

14  relief, if I understand this motion, government, this was the

15  one where you were asking for -- let's just have one -- one

16  defense attorney, let's do this by way of good faith, meet and

17  confer, and then let's have some order to this.

18       Am I right?

19            **MR. GARDNER:**  That's right, Your Honor.

20            **THE COURT:**  And the defense's response was, "We don't

21  have to" -- "we're not bound by these rules."

22       Well, they are going to be my rules now.  I have asked you

23  all to meet and confer in good faith, and -- and when you

24  can't -- when you come to a roadblock, then you involve me.

25  You don't involve me and then try to work it out.  And so that

1   is why I am granting ECF 283 in part by saying one discovery

2   lawyer for the defense, one discovery lawyer for the

3   government.  Before you bring anything to this court, you try

4   your best to work it out.

5        Whether the local rule specifically and, you know, to the

6   letter applies to the criminal case or not, I thought I had

7   made it clear that in my court, that's how we do things.  So

8   283, to the extent that that's the relief you've asked for, is

9   granted.

10       All right.  Now, 286, which is the defense specifically

11  requesting in this motion the legal instructions that were

12  provided to the grand jury on the question of whether the

13  victims in this case qualify as healthcare benefit programs

14  under 18 U.S.C. 1347(a).

15       I want to start with the government on this, because I've

16  read the pleadings thoroughly, and one issue that I have,

17  Mr. Gardner, is that you really didn't take on *Stevens* at all.

18  You basically said, like, this is proper for a motion to

19  dismiss, but they are not entitled to, you know -- no one is

20  entitled to look at the grand jury legal instructions.

21       And my question to you is, given that there has been at

22  least a -- you know, I think a showing that there's a problem

23  here, why not, under *Stevens*, am I, at least, entitled to do an

24  in camera review to see what the instructions to the grand jury

25  were?

1          **MR. GARDNER:**  Well, Your Honor, I think the response

2    sort of does -- if there's -- if the standard is particularized

3    need for what was presented to the grand jury, if that's the

4    standard we're working under, there can't be any showing of a

5    particularized need given what we've argued about the substance

6    of a disagreement.  I think piercing that veil of the grand

7    jury is talking about improprieties.  I mean, almost every

8    case --

9          **THE COURT:**  Hold on.  Do you know -- you're familiar

10   with the *Stevens* case, or are you?

11         **MR. GARDNER:**  No, Your Honor.

12         **THE COURT:**  Okay.  Well, that was quoted extensively

13   from the government, and if you were in this courthouse in

14   2011, it's pretty hard to have not heard about the *Stevens*

15   case.

16       So this was a case before Judge Titus.  It was a -- there

17   was a defense that was raised by the defendant.  She was an

18   attorney at -- in house, I can't remember what kind of place it

19   was, but it was an advice-of-counsel defense and -- to -- to

20   the charges.

21       And the -- the way in which the case unfolded, it became

22   somewhat clear to Judge Titus that the grand jury may have been

23   misinstructed on the law.  And misinstructed as to the

24   availability of the defense, so it wasn't even on the elements.

25       And the first step that Judge Titus took was to look at

1  the grand jury instructions, the legal instructions.  Not

2  invading the province of the grand jury, but simply what did

3  the government tell the grand jury they can and cannot

4  consider.

5      In this case, it would be the elements, like, how, if at

6  all, was the grand jury instructed on the question of a

7  healthcare benefit program.

8      And in the end, Judge Titus dismissed the indictment

9  without prejudice.  But because the grand jury had been

10  misinstructed, and the opinion makes a distinction between the

11  particularized need in a factual context, like all the things

12  that we're talking about that you don't want to invade the

13  grand jury for, their deliberations, the evidence that they

14  were given, the questions that they may have asked, and --

15  that's one bucket.  And then the other bucket being legal

16  instructions.

17      So that's why, you know, without your taking on *Stevens,*

18  I'm inclined to say let me look at it -- right? -- in camera,

19  let me see what the legal instructions were to the grand jury

20  on this element.  Then separately, you all can move to dismiss,

21  because you believe that as a matter of law, the indictment

22  doesn't charge a healthcare benefit program.

23      But at this juncture, you know, I'm not sure how else to

24  slice this, especially since you gave the wrong -- if I'm

25  seeing it right, you gave the wrong jury instructions or an

1   incomplete set of jury instructions to me, which suggests there

2   may be -- that's what the defense is arguing.  They are saying,

3   you know, we're on the eve of trial, you give over jury

4   instructions, the jury instructions are not complete at best on

5   this question of healthcare benefit program.

6       And then there's another case in this district where these

7   two entities are not healthcare benefit programs, if I'm seeing

8   it right.

9       So what's the harm -- let me ask you this:  What's the

10  harm in my taking a look at it?

11          **MR. GARDNER:**  I --

12          **THE COURT:**  In camera?

13          **MR. GARDNER:**  Your Honor, I guess there is no harm in

14  you taking a look at it.  But I think it gives credence to some

15  of the arguments, which it -- there is no harm to the Court

16  looking at it, of course.  I mean, the Court is imminently

17  qualified to take a look and see if there's any issue there.

18      But I think opening the door to these kind of inquiries,

19  when the defense is not entitled to it, the -- the base matter

20  here is that there doesn't seem to be a disagreement.  There's

21  no bona fide disagreement about the law here.  I mean, not

22  about the law, I'm sorry, but what was presented to the grand

23  jury.  This does seem to be sort of, you know, peeking --

24  peeking, you know -- or piercing that veil for no reason.

25          **THE COURT:**  There is a bona fide disagreement.  I

1  mean, the defense is vigorously arguing you didn't instruct

2  them on the law correctly, because, one, these entities are not

3  healthcare benefit programs, they are just not; two, the

4  instructions that you gave me in preparation for trial were not

5  accurate; and three, there's another case in this district

6  which supports the first argument.

7       So why isn't that enough to raise a concern that was the

8  grand jury on this -- on this count, at least, were they --

9  were they properly instructed?

10            MR. GARDNER:  Your Honor, I think it's safe to

11  assume, based on the pleadings, and the parties' legal

12  positions are pretty clear, and the instructions would have --

13  would have -- would have come from that understanding what the

14  law is.  So I just don't know what we're accomplishing by

15  opening that door.

16            THE COURT:  Well, let me ask you, did you include the

17  definition in this sort of standard instruction on healthcare

18  benefit program under this particular statute in the jury

19  instructions to me?

20            MR. GARDNER:  No, Your Honor.

21            THE COURT:  Okay.  Why?

22            MR. GARDNER:  An oversight, Your Honor.  I'm not

23  sure.

24            THE COURT:  Well, then, if there's an oversight

25  before me in preparation for trial, given the sort of posture

1   of this case, I don't think it's an unfair question as to

2   whether the same oversight occurred with the grand jury.  And

3   again, it's not -- it's not fatal for all time unless the

4   defense, you know, demonstrates that to me.  And I don't even

5   know if there's any there there.  But given, again, that --

6           **MR. GARDNER:**  So, Your Honor --

7           **THE COURT:**  On this very element, it wasn't even

8   given correctly to me.  What do I do with that?

9           **MR. GARDNER:**  Sorry, Your Honor.

10          **THE COURT:**  Go ahead.

11          **MR. GARDNER:**  If we just assume that the instructions

12  given to the grand jury, or their understanding of what the law

13  is was the same as the government's understanding, we've put it

14  in our pleadings, we have a fundamental legal disagreement.

15      So what's the right venue for hashing out the

16  disagreement?  I sort of analogize it to if this was a gun

17  case, and we had charged possession of a machine gun, and we

18  said, you know, the instructions are if the defendant knowingly

19  possessed a machine gun.

20          **THE COURT:**  Okay.

21          **MR. GARDNER:**  And then the defense says what this

22  device actually was did not qualify -- did not meet the ATF's

23  definition of machine gun.  Well, is that a grand jury issue or

24  is that an issue for the Court in a motion to dismiss?  It's

25  the latter.  Almost certainly, it's the latter.  It doesn't

matter what the jury was instructed if we're saying that our

legal disagreement is over what the law fundamentally is, then

what are we -- I mean, are we just spinning our wheels, you

know, with grand jury stuff?

        **THE COURT:**  I hear you.  And that's a point that I --

the defense needs to respond to, for sure.  Because if you flip

this, then every time there is a bona fide motion to dismiss,

there's a companion motion for the Court to look at what

happened -- how the grand jury was instructed, and that maybe

is a bridge too far, so --

        **MR. GARDNER:**  And, Your Honor, I just -- it is very

clear what the parties' positions are, and we can --

        **THE COURT:**  Where do you get that from, that you say

it's very clear what the parties' positions are?

        **MR. GARDNER:**  They have put forth the law, as they

understand it, in their motion to compel.  And we have

responded, basically, giving our interpretation of what the law

is in our response.

        **THE COURT:**  No, but you're saying on the question of

whether they are entitled to see the instructions to the grand

jury, that's what you're saying positions are very clear on?

        **MR. GARDNER:**  No, Your Honor.  But, I mean, I think

that answer is a bit easier.  Just there is no need.  I mean,

there is absolutely no need.  I can't see it.

        **THE COURT:**  Where is the clear position stated by the

1  government that Walter Reed and DHA qualify as healthcare

2  benefits programs?  I mean, you say you're prepared to argue

3  it.  You do say that at Page 19 of your brief, but where is

4  this clear statement of your respective views?

5      **MR. GARDNER:**  Your Honor, on Page -- is this Page 14,

6  I believe?

7      **THE COURT:**  Page 14.

8      **MR. GARDNER:**  Of ECF 314, Your Honor.

9      **THE COURT:**  314.  Okay.  Page 314.  Okay.

10     **MR. GARDNER:**  And continuing on to the next page,

11  Your Honor.  I mean, it says, quote, the government purely of

12  the belief that the extremely broad definition of healthcare

13  program in this includes Walter Reed, slash, DHA.

14     **THE COURT:**  But why?  I mean, I thought when you said

15  "our position is really clear," I thought what you meant by

16  this is you -- you already set out what the legal argument is.

17  Because you do say, like, "we believe it falls under the

18  statute," and then you said you're prepared to make that

19  argument.  And I guess I just wanted a 30-second,

20  down-and-dirty as to what the argument is.

21     **MR. GARDNER:**  Your Honor, well, I -- I can certainly

22  give it here.

23     The case law is replete with instances of insurance

24  companies being included under that -- under that -- under that

25  section, under that very, very broad definition.  I mean, you

1  have all sorts of healthcare providers, ambulance services.  I

2  mean, there is just so many case law -- so many cases that are

3  expanding that definition to the point where it easily

4  encompasses something like a hospital where we look at, you

5  know, the individual or entity.  It's such a broad definition.

6  And the cases will show that the definition has been expanded

7  and expanded to include other entities that you might not think

8  of a TRICARE or a Medicare or Medicaid.

9           **THE COURT:**  And this would be binding Fourth Circuit

10  authority that you can give me?  I mean, the only reason I ask

11  is because the defense raised a case in front of my colleague,

12  Judge Hollander, where it at least suggested that the

13  government took -- or the Court took ultimately the opposite

14  position.  And Judge Hollander isn't -- you know, she's pretty

15  careful.  So I'm a little bit concerned as to --

16           **MR. GARDNER:**  I think the -- in -- truthfully, Your

17  Honor, I had the brief ready and took out the parts that the

18  Court seems to be interested in because it seems to be more

19  appropriate a motion to dismiss, where we can fully flesh out

20  the issues; not, you know, at this point deciding a legal issue

21  of fact, you know, that should be decided down the road and

22  would, you know, knock out one of the counts, or at least part

23  of a count, as opposed to here in a motion to compel.

24       It's a weird posture, and so I took out half of my brief,

25  because I just didn't think it was appropriate for this venue,

1  and it would look like bloat on an otherwise, you know, pretty

2  streamlined issue-by-issue response.

3       I think the actual case that you're referring to, as I

4  recall, it was sort of a -- not mentioning it doesn't include

5  it.  So it wasn't -- it wasn't -- I'm having a bit of trouble

6  remembering, but I think that issue and our response was, just

7  because the government didn't allege that it was in that case,

8  doesn't mean that it wasn't, because they were alleging

9  something else.  It was even more clearcut, or they had chosen

10 a different route to take that indictment.

11           **THE COURT:**  I had a hard time sort of navigating the

12 docket in that case, so -- all right.

13      Anything else you want to say to that, before I turn to

14 the defense?

15           **MR. GARDNER:**  No, Your Honor.

16           **THE COURT:**  Okay.  Who is arguing 309 -- wait a

17 minute, which one is it?  302?  Nope.  On the wrong page.

18 Sorry.  Hold on.

19      286.  Who is arguing 286?

20           **MR. GREENBERG:**  I am, Your Honor.

21           **THE COURT:**  Okay.  Go ahead.

22           **MR. GREENBERG:**  So this is not just a matter of a

23 typical situation where there could be a motion to dismiss on

24 legal grounds.  Here we have a proposed jury instruction that

25 was submitted days before the trial is going to happen, eight

1  days after the superseding indictment was obtained, where the

2  U.S. Attorney's Office for the District of Maryland included a

3  false statement of the third element saying that --

4        **THE COURT:**  Can you stop using "false statement" so

5  cavalierly?  I got to tell you, it's rubbing me the wrong way,

6  because when you -- when you start affirmatively representing

7  that people are making knowing false statements, you're getting

8  into really choppy waters, and I don't know if that's

9  happening.

10       And I did not represent that to the government.  I said,

11  "You filed the wrong jury instruction," or, "It wasn't a

12  complete jury instruction."  I think that's fair.  Okay?

13       Now, tell me, without -- let's try to peel away some of

14  the performance here and just tell me why, in a situation where

15  you may have a good argument to dismiss the count, that somehow

16  entitles you to -- or me to look at grand jury proceedings?

17  Why don't you just litigate it first as a motion to dismiss?

18       **MR. GREENBERG:**  Because here the proposed jury

19  instruction that was submitted eight days after the superseding

20  indictment incorrectly says that Walter Reed and DHA provide

21  healthcare services -- provide health services.  That's in our

22  motion at Page 7.

23       **THE COURT:**  Okay.

24       **MR. GREENBERG:**  That's an incorrect statement.  It's

25  factually inaccurate.

1      And to be clear, Your Honor, when I say it's false, that's

2 not imputing any mens rea.  I mean, we made clear that under

3 *Feurtado* and *Stevens,* it can be unintentional, it can be in

4 good faith.

5          **THE COURT:**  Yeah, but that's not the tone of these

6 pleadings, and it hasn't been for months.  So that's why I'm

7 saying it in open court, so you can get my message.

8          **MR. GREENBERG:**  I'll just say it's factually

9 inaccurate to say that Walter Reed, and the other entity, which

10 is not even hardly mentioned in the superseding indictment,

11 provided health services.  That's just not accurate.

12          **THE COURT:**  Well, hold on.  But you're saying it's

13 not factually accurate.  I thought the argument was more as a

14 matter of law, healthcare program was not defined or not

15 properly defined.  If -- if -- you see what I'm saying?  There

16 seems to be a difference there, one is you -- go ahead.

17          **MR. GREENBERG:**  So the case agent incorrectly

18 testified before the grand jury, and the government did not

19 respond to us on that point, and, therefore, waived the issue,

20 that Infuse, quote, provided medical services, unquote, and an

21 HMA, quote, regularly billed for patient interactions.

22      Those are both incorrect statements.  Neither one of those

23 entities did those things.

24          **THE COURT:**  I understand that.  And I know that's

25 your position.  And why is that not squarely proper for trial?

1    I mean, he testified that an entity provides medical services.

2    Right?  Isn't that what you're saying is the first incorrect

3    statement, Walter Reed provides medical services?

4         **MR. GREENBERG:**  And that creates a substantial risk,

5    a grave risk that the grand jury was misled by the legal --

6         **THE COURT:**  Let's just stay with that statement.

7    That statement is the agent says they provide medical services.

8    Right?  That's a fact that he testifies to at trial.  He may or

9    may not be able to testify to that.  I don't know what

10   foundation he has or what examples he would have, right?  But

11   that's not -- we're not at trial.  Grand jury is a mere

12   probable cause determination.  You say it's a matter of fact.

13        So why -- again, why isn't that then a question for the

14   jury?  Does this entity fall into the definition of healthcare

15   benefit program?

16        I thought you were making a different argument, which is

17   it can never, because a benefit program is defined in the

18   following ways, and this is just so not that.

19        **MR. GREENBERG:**  That's the argument for the motion to

20   dismiss.  That's different from the argument we're making now.

21        The argument we're making now is that -- especially after

22   government counsel's admission that they didn't include in the

23   proposed jury instruction, that presumably mirrors the legal

24   instruction of the grand jury, they didn't include the

25   definition of healthcare benefit program.

1     When the case agent testifies incorrectly about what these

2     entities did, and then the proposed jury instruction says these

3     entities provided health services, that creates a substantial

4     likelihood that the jury was misled.

5          **THE COURT:**  Well, then, how about we do this?  Let's

6     just wait to see what happens with the motion to dismiss?  It

7     will moot the issue if I grant your motion.  If as a matter of

8     law the government cannot go forward on this issue, then I'll

9     know it and I'll dismiss.

10     If they can go forward, I'll have a much better

11     understanding of the landscape of the law, and then I can

12     really revisit, sort of under *Stevens*, whether I should be

13     looking at how the grand jury was instructed.  Right?

14     Instead of, like, decide -- give you the transcripts now

15     and then ultimately it -- I look at it, but I render it moot if

16     I grant your motion to dismiss.  So why am I doing that?

17          **MR. GREENBERG:**  Because -- because the government has

18     now conceded that the proposed jury instruction was inaccurate,

19     because it didn't define healthcare benefit program.

20          **THE COURT:**  Okay.

21          **MR. GREENBERG:**  It's a reasonable inference, at a

22     minimum, that the legal instruction to the grand jury eight

23     days earlier was -- and the reason it matters is because when

24     there is inaccurate evidence presented to the grand jury, and

25     the grand jury returns an indictment based on inaccurate

1  evidence --

2         THE COURT:  See, I disagree with your position that

3  it's inaccurate evidence.  And you called it something much

4  stronger in your pleading, and I don't think you have the goods

5  yet to back that up.  Okay?  So that's one.

6     And, two, if what you're saying is any time we get to

7  trial and the government presents a -- an instruction on an

8  element that is wrong, I now have some evidence I should go

9  back to a recently filed indictment and say, well, maybe they

10 have misinstructed the grand jury?  I mean, it just sweeps so

11 broadly, and it is unusual to start looking at grand jury --

12 the entirety of the grand jury record.

13        MR. GREENBERG:  Well, and as we pointed out in our

14 reply, Your Honor, yes, it's unusual, but this is an

15 extraordinarily rare situation where we've got three factors

16 that militate heavily under either the (indiscernible) needs

17 standard or the particularized needs standard.

18        COURT REPORTER:  I'm sorry?

19        THE COURT:  I'm sorry?

20        MR. GREENBERG:  We have three extraordinarily rare

21 factors here that combine to militate heavily in favor of

22 production or, in the alternative, an in camera review.  We got

23 this same U.S. Attorney's Office taking the position very

24 recently in the *Blair* case that neither Walter Reed nor DHA is

25 a healthcare benefit program.  That's number one.

1    We've got a proposed jury instruction.

2    **THE COURT:**  Let's just stay on that for a second.

3    Can you give me the ECF -- the case in the ECF filing

4    where you say the government took the opposite position so that

5    we can pull it up and I can ask the government here about that?

6    **MR. GREENBERG:**  Yes.  One moment, Your Honor.

7    So, Your Honor, we cited the -- Judge Hollander's opinions

8    *in Blair*.  In terms of -- you're asking what the docket

9    entries --

10    **THE COURT:**  Well, you just made the point that the

11    government took the opposite position where -- that these

12    entities were not a healthcare benefit program, and --

13    **MR. GREENBERG:**  Yes, Your Honor.

14    **THE COURT:**  Yeah, that's what I'm interested in, so

15    that I can give it to the government and have them respond,

16    because --

17    **MR. GREENBERG:**  So we quoted these opinions without

18    referencing the docket entries, *Blair*, 223 WL 48966.

19    **THE COURT:**  Hold on.  Okay.  So I need to go to -- I

20    need to go to West Law, then.  You're saying -- you're not

21    taking me to the docket.  You're taking me --

22    **MR. GREENBERG:**  Are you asking -- well, we have the

23    case number, but, I mean, we don't have the actual docket

24    entries cited.

25    **THE COURT:**  Okay.  Then let me ask it this way:

1          Are you pointing me somewhere in Judge Hollander's opinion

2    where she summarizes the government's position so that I can

3    say -- because, listen, this is your point, the government took

4    the opposite position.  That's a fair point if supported, and I

5    want to give it to the government.  So that's why I'm asking.

6          MR. GREENBERG:  Yes, Your Honor.  On Pages 3 to 4 of

7    this motion, we quoted the opinion, which was quoting the

8    stipulation of facts for the defendant's plea agreement.

9          THE COURT:  Okay.  So then give me the opinion real

10   quick.

11         MR. GREENBERG:  Okay.  That's *United States* v. *Blair*,

12   Number CRELH-19-00410.

13         THE COURT:  Right.  You're saying the opinion,

14   actually, right?

15         MR. GREENBERG:  Yeah, I'm just getting to it.

16         THE COURT:  Just give me the West Law.

17         MR. GREENBERG:  2021 WL 424411 at Asterisk 2,

18   District of Maryland, February 5th, 2021.

19         THE COURT:  Okay.  Thank you.  Let me just pull it

20   up.

21         MR. GREENBERG:  And that discusses the stipulation of

22   facts accompanying the defendant's plea agreement.

23         THE COURT:  Okay.  So -- and you say you're on Page

24   2; is that right?

25         MR. GREENBERG:  Yes, Your Honor.  Well, the quotes

1    actually go on to quote Page 3 as well, and 5.

2              **THE COURT:**  All right.  So I see that there's a

3    summary of the superseding indictment allegations, right?  And

4    that he submitted -- *Blair* submitted reimbursement claims to

5    insurance companies and healthcare benefit providers such as

6    Blue Cross, TRICARE -- TRICARE is a federal healthcare benefit

7    program managed by the Department of Defense Health Agency.  It

8    provides healthcare and pharmacy benefits -- am I reading from

9    the right place, or is it somewhere else?

10             **MR. GREENBERG:**  Your Honor, are you reading from

11   Page 2?

12             **THE COURT:**  I am.  This is all the superseding

13   indictment.  But, again, I'm looking for the place in which you

14   say the government took the opposite position than they are

15   taking here so I can give it to the government and they can

16   respond right now.

17             **MR. GREENBERG:**  So on Page 2, there's a quote,

18   TRICARE is a federal healthcare benefit program managed by the

19   Department of Defense Health Agency, end parentheses, DHA.

20             **THE COURT:**  Right.

21             **MR. GREENBERG:**  It does not say that DHA itself is a

22   healthcare benefit program.

23             **THE COURT:**  Right, which is to Mr. Gardner's point.

24   Simply because the government says, A, TRICARE, is a healthcare

25   benefit program, does not mean B isn't.  So, again, you say in

1    open court they took a completely opposite position.  I ask you

2    for the support of that, because that's an important point.

3         This is not taking a completely opposite position.

4    It's -- it's putting the accent on a different syllable.

5         I don't know what the government's position is on -- in

6    this case, in *Blair*.

7         Are you telling me that Judge Hollander found somewhere,

8    as a matter of law, that DHA and Walter Reed are not healthcare

9    benefit programs under this particular definition, legal

10   definition?

11        **MR. GREENBERG:**  Your Honor, no, I -- we're talking

12   about the government's position, not what Judge Hollander

13   found.

14        **THE COURT:**  All right.

15        **MR. GREENBERG:**  But when the government says, you

16   know, patients who receive medical care at Walter Reed were

17   covered by the TRICARE program, and they say that TRICARE is

18   managed by DHA, to not say that DHA is a federal healthcare

19   benefit program, I mean, it would make no sense --

20        **THE COURT:**  Except it may not have been the live

21   issue in *Blair*.  It just may not have been relevant to the

22   question before the Court.  I don't know.  I mean, you can have

23   a principal and an agent achieving the same goals and same

24   objectives, and you're only talking about the agent because the

25   agent is the direct victim.  I don't know.

1      But your statement -- here is my take-home point, the

2  statement that you made to me, which is the government took the

3  opposite position, there's not any support for that right now.

4  So that's -- you know, one of your grounds is, at this point,

5  not as -- not as solid.

6      And then the second one is, again, an error of law in the

7  instructions, when we never got to trial.  And my thought on it

8  right now is that's not enough for a -- an inquiry into the

9  grand jury proceedings.

10     Third -- third, you might get what you want, which is

11 dismissal of the indictment based on a motion to dismiss, which

12 would moot this.  So why am I going here now?  I still don't

13 have a good -- good handle on that.  So maybe we can try --

14         **MR. GREENBERG:**  The other opinion we cited from *Blair*

15 addresses Walter Reed.  And on Page -- Asterisk 3, just before

16 Asterisk 4.

17         **THE COURT:**  Okay.  So give me the cite for that,

18 please.

19         **MR. GREENBERG:**  2023 WL 4896604.

20         **THE COURT:**  4896604.  And you say between Pages 3 and

21 4?

22         **MR. GREENBERG:**  Right.  And, Your Honor, it says

23 here, TRICARE -- it describes in the superseding indictment

24 that TRICARE -- superseding indictment in *Blair* says --

25 actually, wait.  What page is this?  This is actually Page 2.

1      TRICARE, a federal healthcare benefit program, provides

2  benefits to members in the military, military retirees and

3  their families.

4      And then it goes on to talk about Walter Reed at the

5  bottom of Asterisk 3, and describes Walter Reed -- patients who

6  received medical care at Walter Reed were covered by the

7  TRICARE program.  So it describes Walter Reed as a hospital,

8  not a healthcare benefit program.

9          **THE COURT:**  Right.  But it's not the government

10 taking the opposite position.  I mean, they are not taking an

11 opposite position.  They are not saying -- Mr. Gardner's point

12 is right now the law is expansive.  If you look at this

13 definition, it is not exclusive, it's expansive, and we're

14 prepared to argue that in a motion to dismiss.

15     You say, no, they've taken an opposite position as a

16 matter of fact as to Walter Reed.

17     I give you that it's been described as TRICARE is the

18 healthcare benefit program that was the subject of *Blair*, but I

19 don't think I can go with you that that necessarily means

20 Walter Reed couldn't.  I just don't --

21         **MR. GREENBERG:**  Well, it would be very odd at a

22 minimum, Your Honor, for this office to say expressly that

23 TRICARE is a healthcare benefit program, talk about Walter

24 Reed, and not say the same thing for Walter Reed if you

25 believed that was a healthcare benefit program.

 1          **THE COURT:**  Well, but TRICARE was the target of the

 2   offense, right, in this case?

 3          **MR. GREENBERG:**  But the procedures were at Walter

 4   Reed, which is -- I mean, it -- but -- but putting -- we can

 5   put aside the *Blair* case, if Your Honor is not persuaded by

 6   that.

 7      I mean, the other two points are sufficient standing

 8   alone.  And we've got -- the reason why we shouldn't wait for a

 9   motion to dismiss here, we're very late in this case, the

10   investigation is over, the grand jury is done.

11          **THE COURT:**  We have a briefing schedule for motions

12   to dismiss.  You asked for a briefing schedule.

13          **MR. GREENBERG:**  But, Your Honor, this is about the

14   legal instructions.  And the legal instructions --

15          **THE COURT:**  I understand that.  But you're very late

16   in this case with a briefing schedule for a motion to dismiss.

17   I mean, what?  Like, we're going to see each other again in

18   January because you told me you have robust motions to dismiss.

19          **MR. GREENBERG:**  Yes, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. GREENBERG:**  As you pointed out, as you asked

22   government counsel, what's the harm in at least providing legal

23   instructions in camera?

24          **THE COURT:**  Because I think that the government's

25   point is a fair one, which is if I do it here, and I'm not on

1  solid ground, then every time the government makes a mistake in

2  the jury instructions on an element, a defense attorney will

3  ask me to go back and make sure that the grand jury was

4  properly instructed.

5      And now what's supposed to be an exception to the rule,

6  grand jury secrecy is very important, now a judge is going back

7  and looking at it sort of as a matter of course.  That's my

8  concern.

9      *Stevens* is 13 years old, and I don't remember a case after

10  that.  So I'm really concerned about this.

11          **MR. GREENBERG:**  Well, Your Honor, the notion that

12  this would come up in any case where the government proposes a

13  jury instruction that's legally inaccurate, I mean, that's not

14  all that we have here.  We have -- the government has not

15  disputed that the case agent gave inaccurate testimony -- no

16  response at this point, it's undisputed, they waived it.  That

17  before each grand jury, the case agent testified that Infused

18  provided medical services and HMA performed patient

19  interactions.

20      There's simply no evidence of that.  It is incorrect,

21  inaccurate.  And that, combined with the proposed jury

22  instruction that -- it's also undisputed, materially misstates

23  the healthcare benefit program element, now we have the

24  additional concession that they didn't even include the

25  definition of healthcare benefit program.

1      This is not a normal case.  This is an extraordinary case.

2   It would not be every time there is a motion to dismiss, every

3   time -- and by the way, what is this office doing making

4   instructions -- giving legal instructions that are incorrect?

5   I mean, how can the U.S. Attorney's Office be giving

6   materially -- materially -- materially misstating the law in

7   its proposed jury instructions and somehow that's just okay,

8   and we're just going to --

9           **THE COURT:**  It's not okay.  I'm not suggesting that.

10  But I'm suggesting that we stay very focused on what the issue

11  is right now, which is whether I review grand jury proceedings.

12      And where I'm stuck right now is it's not right, because

13  if I can get to where you want me to be, as a matter of law,

14  which would support your position that the government gave

15  wrong jury instructions, if you're right about that, their

16  instructions were wrong, then the motion to dismiss is going to

17  sus that all out, and I won't have to reach this issue.  So why

18  not -- you still haven't given me why I shouldn't do it that

19  way.

20          **MR. GREENBERG:**  Because we have substantial evidence

21  that you hardly ever have in a case.  Here we've got -- you

22  know, the government has turned over what we understand to be

23  the only grand jury transcript of testimony, it's the case

24  agent.  And the case agent inaccurately stated what Infused did

25  and what HMA did.

1          **THE COURT:**  So let me hear from Mr. Gardner on that.

2          **MR. GREENBERG:**  If I can --

3          **THE COURT:**  Because that sound -- sure, tell me what

4    else.

5          **MR. GREENBERG:**  So we've got -- all of the grand jury

6    testimony has been produced already, the grand jury

7    investigation is over.  We've got, you know, eight days after

8    the superseding indictment a material misstatement of the law,

9    it's -- and the reason, Your Honor, that this matter is -- this

10   shouldn't be a motion to dismiss, this is Mr. Masood's Fifth

11   Amendment right to be properly charged by a grand jury.  And

12   there are all indications here that that right was gravely,

13   adversely affected by what happened with the evidence we've

14   discussed.

15         **THE COURT:**  And if I don't decide it now, Mr. Masood

16   is not being prejudiced because you're going to have another

17   round of motions to dismiss.  I can simply deny it as not

18   right.  I want to see what the legal arguments are most

19   specifically on the law, and then look more closely at this

20   motion.  So -- so Mr. Masood's rights, his due process rights

21   are adequately protected, in my view.

22         **MR. GREENBERG:**  But there is another issue, Your

23   Honor.

24         **THE COURT:**  Yes, go ahead.

25         **MR. GREENBERG:**  There is a pattern of inaccurate

1    representations by the government in this case.  And here, they

2    were to the grand jury.  We know that from the case agent's

3    testimony; again, undisputed.  And the proposed jury

4    instruction indicates there was an inaccurate representation to

5    the jury about the law.  This is a part of an overall pattern

6    that will be together a basis for a motion to dismiss.  That's

7    another reason we need the legal instructions.

8        And, there's no -- there's no legitimate secrecy interest

9    in keeping those from us at this point.

10       **THE COURT:**  Well, that I'm not going to credit,

11   because, again, that means any time, if I say, yep, you're

12   right, any time a defense attorney wants the legal instructions

13   to the grand jury, if that were the case, you would be getting

14   them already.  There is something to the -- the sanctity of the

15   grand jury that we not go back and revisit it every time there

16   is a problem in the case itself.

17       **MR. GREENBERG:**  Again, this is not every time.  This

18   is a time where we've got the government not disputing the case

19   agent gave incorrect testimony about material facts.

20       **THE COURT:**  Well, that's -- I'm going to hear

21   Mr. Gardner on that.

22       So Mr. Gardner, let me hear you on this position.

23       And can someone holler out the attachment where the

24   agent -- that includes the agent's grand jury testimony?

25       **MR. GREENBERG:**  Your Honor, I believe I can do that

1    momentarily.

2            THE COURT:  It's ECF 280 -- I have Exhibit B, which

3    is -- yeah.  I think it's --

4            MR. GREENBERG:  So it would be --

5            THE COURT:  286-3.

6            MR. GREENBERG:  I think it would be ECF 286-2.  It's

7    Exhibit A to that motion.

8            THE COURT:  Okay.  286-2.  There we go.

9            MR. GREENBERG:  Well, actually, there's two separate

10   transcripts.  There's -- so it would be -- I think Exhibit A

11   and Exhibit B.

12           THE COURT:  And B, right.

13      Okay.  And I'm on Page 4 of 286-2, where Agent Kimrey

14   agrees with the question, "Infused was in the business of

15   providing medical services by contract to the Department of

16   Defense and other government agencies; is that correct?"

17      "And then, specifically, did Infused provide a lot of

18   contract services that helped the Defense Department with their

19   medical coding needs?"

20      "That's correct."

21      Isn't that one of the places that you pointed me to,

22   Mr. Greenberg?

23           MR. GREENBERG:  So it's Page 4, Lines 3 to 6.

24           THE COURT:  Right.  And then the followup, which is a

25   clarifying question, you didn't include, but I noted it because

1    that's where -- I think this was Mr. Ake, at this point, made

2    clear to the grand jury what they are saying the medical

3    services were -- was helping with coding needs, right?

4         **MR. GREENBERG:**  Your Honor, I don't read that to be a

5    clarifying question.  I believe it to be saying in addition to

6    the medical -- supposed medical services, there were coding

7    contract -- coding services.

8         **THE COURT:**  No, it says "specifically,"

9    "specifically."  After the general question, "Specifically, did

10   Infused provide a lot of contract services that helped the

11   Defense Department with their medical coding needs?"

12        Answer, "That's correct."

13        Right?

14        **MR. GREENBERG:**  Well, if you read the "specifically"

15   as part of the previous question, which is more generally,

16   that's still a problem, because that's implying that coding

17   services are medical services.

18        **THE COURT:**  Well, that's for the grand jury to

19   decide.  And I hear you, that you're entitled, you believe, for

20   the instruction.  But, you know, to say that it was a

21   misstatement of the fact, what does Infused do, I read you the

22   next question and answer which clarifies for the grand jury

23   precisely what they did, medical coding, right?

24        **MR. GREENBERG:**  Your Honor, I don't think that saying

25   specifically there's -- and then talking about coding somehow

```
1   retracts the statement or the testimony that they provided
2   medical services.  And that's not the only example, either.
3             THE COURT:  Well, no, that's what I was going to ask
4   you.  Give me the next one so that the government can look at
5   it.
6             MR. GREENBERG:  Sure.
7        The other one is Page 18, Lines 15 to 19.  I'm sorry, Page
8   28, Lines 15 to 19.
9             THE COURT:  Page 28.
10            MR. GREENBERG:  So it's ECF 286-2 at 10.
11            THE COURT:  Okay.  28, Lines 15 -- 15 through 19?
12            MR. GREENBERG:  Yes.  And here, Your Honor, it
13  says -- referring to -- I think it's HMA here, they are
14  regularly billing for hours that are performed in the
15  subcontract or for patient interactions that are performed in
16  the subcontract, right?  And then there's nothing after that
17  that somehow excuses the grand jury of the notion that HMA was
18  handling patient interactions.
19            THE COURT:  Well, but the whole context, the question
20  and answer, is all about these invoices and whether they are
21  accurate, right?
22            MR. GREENBERG:  Well, but if they are -- if they are
23  billing for patient interactions, that's telling -- as it says,
24  that's telling the grand jury that they are actually doing
25  patient interactions -- patient interactions performed under
```

1    the subcontract.  It's HMA's subcontract.

2              **THE COURT:**  Okay.  Anywhere else, before I turn back

3    to the government?

4              **MR. GREENBERG:**  I believe those are the two spots.

5              **THE COURT:**  All right.  Mr. Gardner?

6              **MR. GARDNER:**  Your Honor, with regard to the first

7    instance, the one on Page 4, it -- couple of things.

8         One, in this context, they weren't asking about a legal

9    definition.  And so to expect a -- you know, well, from the

10   response, you know, something like, well, technically, this is

11   a legal definition.  It was -- it was a question and, of

12   course, he followed up right after, as Your Honor pointed out.

13        It's also important to note that this was a yes-or-no

14   question posed by the AUSA, and he agreed with it.  And then,

15   as I said, immediately there was a followup question about what

16   they actually did.

17        This broader point I think answers this one and the next

18   one, which if you read the entire transcript, it's quite clear

19   what is being done here.  It's that these people would look at

20   a patient interaction and code it.  They were dealing with

21   patient interactions.  That's exactly what they were doing.

22        I also kind of -- well, I -- I really disagree with the

23   notion that there was any false testimony.  I think anything

24   Agent Kimrey said is very well established by the understanding

25   of the law as we -- as we see it.  And, of course, he's also

1    not a lawyer, but what he said was factually accurate.

2         There was no inaccuracies that they keep kind of pounding

3    that there was a -- an admitted inaccuracy.  It's just not

4    true.  We would do the same -- same thing again, and we would

5    get the same answers.  I would ask the same questions.  Agent

6    Kimrey would say the same things.

7         And so, I mean, if that's the standard, you know, Your

8    Honor's point is accurate, that as soon as you can point to any

9    part in the transcript that raises any sort of questions, all

10   of a sudden, the grand jury is an open book.

11        I think what we've heard here is -- is a motion to dismiss

12   argument.  I mean, it seems like -- in a -- in a box, this is a

13   microcosm of a motion to dismiss, and that's exactly sort of

14   the problem here.

15        I don't want to go on any further than would be helpful,

16   but --

17            **THE COURT:**  I would just say this, be prepared,

18   Mr. Gardner, that when we discuss this at the motion to dismiss

19   stage, if I find that there's grounds for dismissal, I may very

20   well be asking you whether you recited a very similar

21   perspective on the law to the grand jury.  And at that point,

22   whether you tell me in camera or you show me the instruction,

23   that what you gave the grand jury at that point, I may have to

24   cross that rubicon.

25        But I'm not prepared to do it today, and I'll put my

1    findings on the record in a moment.

2         And, yes, Mr. Greenberg?

3              **MR. GREENBERG:**  If I may just quickly respond to that

4    point.

5         I mean, as Your Honor said earlier, there's no harm in

6    looking at the legal instruction in camera now.

7              **THE COURT:**  There is harm, though.  I can have an

8    iterate conversation with you, and I don't get -- because I

9    asked that question the way I did, that doesn't become a

10   sentence known as a finding.  There is harm.  Because, again,

11   if I do it here, that means any time that there is what you

12   believe to be false testimony, which I disagree with, I don't

13   think that this was false testimony, that's number one.

14        And number two, any time there's a misstatement of law by

15   the government, now you're asking me to go back and get the

16   grand jury transcripts.

17        And there's -- I am supposed to have a healthy

18   appreciation for the secrecy of the proceedings, so there is

19   harm.

20             **MR. GREENBERG:**  Well, I mean, under U.S. Supreme

21   Court and Fourth Circuit precedent, at this stage in the

22   proceedings where the grand jury is done, there's very little

23   interest in secrecy.  There's is a sliding scale approach that

24   applies under *Douglas Oil Company* and the Fourth Circuit case

25   with all the numbers that we cite.

1      I mean, in terms of what Your Honor is proposing, this

2   could end up causing a delay down the road.

3          **THE COURT:**  No, it won't.  It will not.  I promise

4   you that.  It's not.  We are going to trial in March if this

5   case is being tried.  There will be no delay.

6          **MR. GREENBERG:**  But the point about the legal

7   instructions, if Your Honor has not yet already reviewed them

8   in camera, and then has to then ask the government --

9          **THE COURT:**  I think it will take me about 15 minutes

10  to review what the government told the grand jury before the

11  grand jury handed down the indictment.  This is not going to be

12  an exercise that takes, you know, an extraordinary amount of

13  time.

14         **MR. GREENBERG:**  Just one last point, Your Honor.  I

15  mean, so the issues before the grand jury are an independent

16  basis for dismissal, they would support a separate motion to

17  dismiss, and I would just ask Your Honor to please consider

18  that in terms of what's most efficient in terms of time.

19         **THE COURT:**  Okay.  All right.  So with respect to

20  ECF 286, the standard is the following:

21     That Rule 6(e)(3)(E)(i) empowers the Court to order

22  disclosure of grand jury materials when a defendant, quote,

23  shows that a ground may exist to dismiss the indictment because

24  of a matter that occurred before the grand jury.

25     So in furtherance of that, I can order disclosure.  And

1    that although a party seeking disclosure bears the burden of

2    showing a particularized need for the grand jury materials,

3    even when the grand jury whose transcripts are sought has

4    concluded its operations, disclosure is appropriate where the

5    need for it outweighs the public interest in secrecy.  And

6    that's a directed quote from *Douglas Oil.*

7        *Stevens* says, where a prosecutor's legal instruction to

8    the grand jury seriously misstates the applicable law, the

9    indictment is subject to dismissal if the misstatement casts,

10   quote, grave doubt that the decision to indict was free from

11   the substantial influence of the erroneous instruction.

12       There does seem to be a live debate today about whether

13   the victims in the indictment qualify as healthcare benefit

14   programs as a matter of law.

15       Today's argument seemed to bleed into facts which I don't

16   quite know what to make of it, but my view on this motion is

17   that it is not ripe.  And the reason why it's not ripe is

18   because if there is, in fact, a -- a grave legal error that the

19   government has committed, in that they have charged entities,

20   which, as a matter of law, cannot be healthcare benefit

21   programs under the relevant statute, then the great likelihood

22   is the count will be dismissed.

23       And if the count is dismissed, then we do not get to -- we

24   don't have to kill it twice.  We don't have to dismiss it again

25   because the same legal error was made to the grand jury.

1    On the other hand, if the legal argument does not hold on

2    the government's end, then the motion that's before me, which

3    is to compel the disclosure of the legal instruction to the

4    grand jury, now becomes relevant, it becomes ripe because maybe

5    there is a -- an error that is more teed up based on what

6    happened leading up to the grand jury proceedings.

7    What I am concerned about is I do not wish to invade the

8    province of the grand jury unless I absolutely must.  And so in

9    the balancing act of, at this stage, does -- has the defense

10   made the particularized need and has the need outweighed the

11   public interest and secrecy, I find that need has not yet been

12   met.

13   That said, it may in the future.  And so I'm not going to

14   deny the motion with prejudice, it will be because it's not

15   ripe, and we can revisit it at a later time.

16   So ECF 286 is denied for the reasons stated, and I imagine

17   I'll hear more on this on the motion to dismiss stage, and I'll

18   consider it at that point.  Okay?

19   So that's 286.

20   Okay.  Okay.  302 is Mr. -- I think that's the next one

21   up, Mr. Masood's motion to compel the government to make

22   past-due court-ordered affirmative representation that it has

23   provided all discovery material to the defense.

24   Okay.  I'm not sure where we are with all of this.  So

25   government, why don't I start with you.  And please put on the

1    record what you have provided and what you have done to ensure

2    that you have given the defense at this juncture all *Giglio*,

3    *Brady*, Rule 16 -- and, I would assume, *Jencks*, since we were on

4    the eve of trial -- *Jencks* for anything that's within your

5    possession, custody and control.

6            **MR. GARDNER:**  Your Honor, I think this motion and the

7    government's response sort of came about -- it looked like a

8    semantic argument, at least to the government, because what I

9    said was, we've given you everything we have, according -- you

10   know, under *Jencks*, *Giglio*, *Brady*, and if we find anything

11   else, we will, of course, give it to you.  That was essentially

12   the -- you know, things will maybe come up.  You know, *Jencks*

13   can be created.  I mean, if Agent Kimrey writes me an e-mail

14   tomorrow, I'll disclose it.  That's all I was saying.  I think

15   that spurred --

16           **THE COURT:**  Drill down on this a little bit, okay,

17   because of the posture of this case.

18       The affirmative representation that I want is that

19   anything in your -- your possession, custody or control, you

20   have now made a thorough review, and you have disclosed *Brady,*

21   *Jencks*, *Giglio*.  Not -- and the reason why that's important, is

22   because it -- it puts to bed any notion that there's discovery

23   you've had for a period of time that you haven't reviewed.

24           **MR. GARDNER:**  And, Your Honor, we unequivocally make

25   that representation.

```
 1        So, again, I thought it was a semantic difference at the
 2   time.  I still think it may be, because we wouldn't have come
 3   to the Court having not done that thorough search for Brady,
 4   Giglio, Jencks.  We have searched our records.  I've consulted
 5   with everybody in terms of what they have, what other databases
 6   may exist.  I personally searched through e-mail databases
 7   myself.
 8            THE COURT:  Relativity -- the whole Relativity
 9   database has been searched for Brady, Giglio and Jencks and
10   Rule 16?
11            MR. GARDNER:  Yes, Your Honor.
12            THE COURT:  And we'll talk -- so that's clear.
13            MR. GARDNER:  That's clear.
14            THE COURT:  And what this e-mail back and forth
15   sometimes inartfully said was if you come into new evidence,
16   you will perform that review and you will turn it over to the
17   defense --
18            MR. GARDNER:  Right.
19            THE COURT:  -- timely.  Is that right?
20            MR. GARDNER:  That's what the government was
21   intending to do.  If it was inartfully said, that's our fault.
22   We were just saying we have a continuing obligation to disclose
23   as sort of a matter of fact, which I think is factual, and I'll
24   represent that now.
25            THE COURT:  And you've done it.  You've done it.  So
```

 1  if at some point the defense comes upon something that they

 2  believe was *Giglio* or *Brady* or *Jencks* --

 3          **MR. GARDNER:**  Your Honor, I have no doubt we'll hear

 4  about it.

 5          **THE COURT:**  -- then -- right, that's the point.

 6  Okay.

 7      So the record is clear, the government has made that

 8  representation, and we're done in that regard.

 9      But I do have an outstanding question for the defense.  I

10  think up until recently, you were saying that you can't access

11  the Relativity database.  Did I understand that right?

12          **MR. GOLDMAN:**  So, Your Honor, there has been a lot of

13  back-and-forth about the Relativity database, and I think there

14  are mixed definitions here in terms of what is the Relativity

15  database and what are the forensic images of the drives.

16      So our understanding from the prior hearing is there are

17  roughly 500,000 items on the devices.  From those, my

18  understanding from Mr. Gardner, and he'll correct me if I'm

19  wrong, but is that the whole drive was sent to Atlanta where

20  they do their Relativity upload for the U.S. Attorney's Office.

21  That office said, "We can't put all of this on Relativity, so

22  you need to remove things, send it back to us, and" --

23          **THE COURT:**  Right.  Like the operating programs and

24  things that were taking up space that weren't the discovery?

25  Or the data, if you will?

1          **MR. GOLDMAN:**  I suppose.

2      I think that there -- there's going to be some question, I

3   suspect, about how they got from 500,000 to 34,000 items.  But

4   as of right now, what we have are 34,000 items that are in a

5   readable format.

6          **THE COURT:**  Okay.

7          **MR. GOLDMAN:**  And have indexes.  We had some

8   back-and-forth about -- I had some questions about whether

9   those indexes were what had come out of Relativity or what had

10  gone into Relativity, but they were organizational and went

11  into Relativity.  That's the representation we understand right

12  now.

13     So 34,000 readable documents with indices as to what was

14  put into Relativity.

15         **THE COURT:**  Okay.

16         **MR. GOLDMAN:**  That we have.

17         **THE COURT:**  Okay.

18         **MR. GOLDMAN:**  And then separately, we have the

19  forensic images of the devices on a drive.

20         **THE COURT:**  Okay.

21         **MR. GOLDMAN:**  Now, those forensic images, the file

22  format of those is a forensic image, it's not a readable

23  format.  So between -- so that should include everything that's

24  in the 34,000, so it would allow us to check their work as to

25  how they whittled down to 34,000, and it would allow us to

1  further, you know, check to make sure that everything that

2  should have been in that actually is in that actually, but we

3  can't access that without substantial expenditure, substantial

4  forensic assistance.

5          **THE COURT:**  Okay.  So what -- have you and the

6  government discussed any assistance that the government could

7  provide in accessing that without all of that expenditure and

8  time?

9          **MR. GOLDMAN:**  So we had a brief conversation, and

10  I'll say part of the reason why I filed that last short

11  supplemental earlier in this week, which I will not do in the

12  future --

13          **THE COURT:**  Yeah, Section 3B is now resolved.  You

14  can just tell me now.

15          **MR. GOLDMAN:**  Fair enough.

16      But as to that question, I think the -- so our position is

17  that -- well, to -- to answer your question, no, we do not have

18  a resolution as to how we would be able to review those things,

19  or how they could be made reviewable to us.  That is something

20  that I would like to further discuss with Mr. Gardner to see if

21  the government is willing to provide some of that assistance,

22  because it does seem like an unfair burden on Mr. Masood to

23  have to retain a forensic expert just to make what they gave us

24  reviewable.  And it is a substantial expenditure.  We're

25  talking about a forensic expert of at least 100 hours just to

1  make it reviewable.

2          **THE COURT:**  Why did your expert -- when your expert

3  sort of gave you the bad news, what did your expert say is

4  required to get into these devices?

5          **MR. GOLDMAN:**  And effectively what it is --

6          **THE COURT:**  Let me make sure I understand -- sorry.

7      You're talking about the hard drive that includes the

8  image of the device, am I right about that?

9          **MR. GOLDMAN:**  Exactly.  And what I -- I think this

10  was done at CID initially, was they -- they took those devices,

11  they imaged them so that it's file by file, item by item a

12  mirror image or a forensic image of each thing.

13          **THE COURT:**  Right.

14          **MR. GOLDMAN:**  It's in this E01, E02 format, which is

15  not a readable format unless you put it through forensic

16  software.

17      So normally -- let's say we get cell phones in a case.

18  Normally, when we get cellphones in a case, what we get is a

19  Cellebrite export that has the report, it says what's in there,

20  it makes it readable, and then we have them matched up by

21  forensic hashes and everything that tied these specific items

22  to what is actually in the report.

23          **THE COURT:**  Right.

24          **MR. GOLDMAN:**  We don't have that in this case.  What

25  we have is just the forensic images pre putting them through

1  forensic software.

2      And our concern there is that it would seem to me in order

3  to get from the 500,000 to the 34,000, it had to have been

4  converted into some other format.

5          THE COURT:  I assume you asked the government what

6  forensic software was used to get the 500,000 to the 34,000?

7          MR. GOLDMAN:  So my understanding is that was not

8  done by forensic software.  That was done by an IT person in

9  the U.S. Attorney's Office, I believe Derek Johnson, if I'm not

10  mistaken, is the person.

11          THE COURT:  Who must have used some software, though?

12  I mean, he had to have used something to get there, right?

13          MR. GOLDMAN:  In order -- yeah, there are a handful

14  of gray key sort of cover pages that are readable in that large

15  hard drive.  They are not like full gray key reports.  I'm sure

16  gray key was at issue here.

17      Probably it was multiple forensic platforms, given the

18  nature of the devices, because you have some things that would

19  have been reviewed by Cellebrite, some things that would have

20  required gray key, some things that would have required a

21  different forensic program.  That's part of the issue.

22      It's as if I went to my forensic expert and I said, here

23  are 17 devices, iPads, computers, phones, can you make them

24  readable for me?

25          THE COURT:  Right.

1      **MR. GREENBERG:**  That's effectively the situation that

2  we're in right now.

3      Now, we don't have the actual devices, and those are lost

4  so there's -- or returned, so obviously there's nothing --

5      **THE COURT:**  Well, you had what Derek Johnson had.  He

6  didn't have the devices either.

7      **MR. GOLDMAN:**  Correct.  We have what Derek Johnson

8  had, precisely.

9      But then the assessment of what was done with that is

10  outside of our reach at this point in time.  So while -- you

11  know, obviously initially, we're focusing on what was put into

12  Relativity, the 34,000 that were readable.  So we're, you know,

13  trying to make sense of that stuff and see whether there appear

14  to be gaps.

15      And that sort of -- well, I don't want to get onto the 309

16  relief.  But, effectively, we're in a situation where we know

17  what we know, we know that there are things we don't yet know,

18  and so we know that there are some things that are left hanging

19  there.

20      And, obviously, we're working together, and Mr. Gardner

21  and I had reasonable conversations about this, we had one

22  earlier this week, so we are trying to meet and confer and work

23  this out.

24      At this time, we don't have the hard drive, the forensic

25  images of the devices in a format that we can review --

1          **THE COURT:**  Okay.

2          **MR. GOLDMAN:**  -- without further assistance.

3          **THE COURT:**  Let me propose something, then.

4      What would be -- like, we've got to get this case tried.

5  The government's position is always that nothing on the devices

6  matters to the government's case, which is not the whole story.

7  And so the government has to -- has to aid in the production

8  of -- of the devices in a readable format.  And it does, at

9  least on its face, appear to be not -- not fully complying with

10 discovery obligations if you make it available in a format that

11 the defense has to spend a significant amount of time and money

12 to get to it.

13     Now -- especially because you all have crossed this

14 rubicon, and when we get to the in camera production, I'll talk

15 a little more about that.

16     But it's clear that DOJ's IT department, LTSC, whatever

17 that sort of acronym is, took a long time to get this

18 downloaded.  It was not easy.

19     And Mr. Johnson was at the helm of that.

20     Am I right about that, Mr. Gardner?

21          **MR. GARDNER:**  Yes, Your Honor.

22          **THE COURT:**  It seems to me that the quickest way to

23 get to this is for your forensic expert, defense, to confer

24 with Mr. Johnson in a call where you're all on the line so

25 there's no mystery as to who is saying what, and have the

1  experts talk and figure out how can Mr. Johnson get to your

2  expert what you need to do a proper comparison.

3      And I'll say that there is -- there is -- you know, you

4  all are retained for Mr. Masood; is that right?

5          **MR. GOLDMAN:**  We are, Your Honor.

6          **THE COURT:**  But Mr. Gorokhov, I know you do a good

7  amount of panel work, and there is resource counsel, IT

8  resources out there.  And they are really good at what they do.

9  They are the ones that brokered the January 6th disclosures --

10  right? -- which were huge, I mean, the biggest IT dump ever.

11      This seems to be resolvable, but you have to be willing to

12  have your relative experts talk to one other and figure out the

13  path.

14      Can we do that?

15          **MR. GOLDMAN:**  I think we can.  I would say that I

16  think the first step, before doing that, would be to get the

17  forensic extraction reports, like the Cellebrite, the gray key,

18  the whatever else was done by either -- I don't know whether

19  this was done by Army CID in order to get it to Derek Johnson,

20  but there must have been some forensic reports that were

21  prepared in terms of making that device, because I -- what I

22  don't understand is how anyone would have cut down 500,000 to

23  34,000 in the format that it now -- that it exists in as we

24  have it.

25      There has to have been some other step in there.  So to

```
 1    the extent that there are forensic reports there, we can look
 2    at those forensic reports, we can show those to our expert and
 3    see if that needs -- if there needs to be further conference
 4    with Mr. Johnson about that.  And we certainly would be open to
 5    doing that to the extent that that is -- you know, it's
 6    something that we can do, but we would need actual forensic
 7    reports.
 8              THE COURT:  Preliminary step --
 9              MR. GOLDMAN:  I think there's a preliminary step that
10    might cut out some of it, because it could be that the forensic
11    reports answer our question.
12              THE COURT:  Well, if I remember correctly from the
13    timeline, the culling down happened relatively quickly.  My
14    memory is -- and I think I have notes on this, is that within
15    the first month or two of the devices coming into the
16    custody -- maybe not month or two.  It was -- it was -- it
17    looks like, from my review of the in camera production, that
18    the filter team request was made in May of 2022, and by
19    October, the drive had been culled down.
20         So are there reports, Mr. Gardner, that were generated as
21    a result of that process?
22              MR. GARDNER:  So in terms of, like -- if the analogy
23    is to Cellebrite, I mean, the report would have been what was
24    done to slim it down.
25              THE COURT:  Right.
```

```
 1            MR. GARDNER:  And I think the right analogy here, the
 2   way I'm sort of thinking about this, let me preface it by
 3   saying that given a few more days, a few more conversations, we
 4   would have solved this, and I -- I think it's abundantly clear,
 5   based on, you know, issues dropping off that we're -- we're
 6   working behind the scenes, and there's absolutely no bad faith
 7   in terms of getting them everything they need, because the
 8   government also wants to get to the finish line on this one,
 9   whatever it is.
10       I think the thread analogy is the raw download would be
11   equivalent to a cell phone image.  When somebody seizes
12   somebody's cell phone, it's imaged and then it's run through a
13   Cellebrite software.
14            THE COURT:  Right.  Right.
15            MR. GARDNER:  And generally, what we give in
16   discovery is the Cellebrite software because that's what
17   contains the formats that a defense attorney can open.
18            THE COURT:  Correct.  Right.
19       But this time you gave the image, right?  Well, you gave
20   the culled-down and then you gave the image of each device,
21   right?
22            MR. GARDNER:  Which, in this analogy, is both.  So
23   the equivalent to Cellebrite is the culled-down, the PDFs, the
24   Word documents, the PowerPoints, everything that can be
25   readable, which is exactly what a Cellebrite is.
```

1          **THE COURT:**  I understand that.  But the analogy isn't

2    quite apt, because we're talking 17 devices that took five

3    months to cull down, and the defense is saying they just want

4    to check your work.

5          And so if we were just sticking with one device, you could

6    give the image, the Cellebrite report, and then the

7    extractions.  You could give that all to the defense.

8          And what they are missing here are the reports, the thing

9    that tells them how you got from the images to the culled-down

10   version.  And given how complex it is --

11          **MR. GARDNER:**  Your Honor, I don't know if this

12   software produces the same sort of reports one might find with

13   Cellebrite.

14          But if there are those reports, they will have them

15   today -- this is sort of an issue that, you know --

16          **THE COURT:**  Right.

17          **MR. GARDNER:**  Mr. Goldman and I do work very well

18   together, and we're trying to solve these issues, and I just

19   don't think this is -- this is something we're going to solve.

20   That's what I'll say.  It's not the most complicated thing.

21          **THE COURT:**  How about we do this, then, give me a

22   date by which you will tell me if you need me still.  Do you

23   know what I'm saying?  Like, if you're talking well and talking

24   productively, it seems like there were two Mr. Johnsons that

25   can be relevant here, right?  The CID Johnson and the DOJ

1    Johnson, am I right?

2            **MR. GARDNER:**  Correct, Your Honor.

3            **THE COURT:**  And that the reports, if they do exist --

4    or could be generated.  I mean, this might be press a button

5    and here's the report that the expert would look at, would come

6    from those two gentlemen, and then give me the date by which

7    you think you're either going to solve it or not.  I would

8    think like two weeks would be appropriate, but you tell me.

9            **MR. GARDNER:**  Your Honor, I think that makes sense. I

10   will say we have proposed a couple of solutions, and these what

11   might be what comes in that status report that the Court is

12   asking for.  And one is, we've offered from the beginning sort

13   of to make a review station available to the defense, if

14   everything else absolutely fails.

15           **THE COURT:**  So you're saying that you know on your

16   end you've got whatever hardware or software is needed to

17   review the actual device?

18           **MR. GARDNER:**  Right.  And let's say it costs, you

19   know, $500,000, and it's absolutely crazy to think defense is

20   going to be able to acquire this ability, of course we can make

21   any station available for searching, printing, that sort of

22   thing, if that's the case, that it absolutely can't be opened

23   up.

24       I don't think that's true.  This is -- this is something

25   that is sort of a late-breaking issue, and I think we're going

1  to solve it.  I would -- I would put money on there's a way to

2  make these readable to the lay person, and they just aren't

3  because what they wanted was the images, and they got the

4  images as extracted, and there was not that understanding that

5  they would not be able to read them on the other side, because

6  who knows what resources anybody has.

7      Like I said, Your Honor, this is going to be solved.  And

8  if you want to propose a date, or maybe in the absence of

9  notice, you know, it's been solved, or however the Court wants

10 to proceed, I think all of those are all reasonable options.

11         THE COURT:  Okay.  Mr. --

12      MR. GOLDMAN:  Your Honor, I would ask that we, by

13 next Friday, report back to the Court, if we need additional

14 assistance.  I think we can have conversations about that.  I'm

15 sort of mindful that I think two weeks is a little long,

16 because we do have a deadline for our motions --

17         THE COURT:  That's fine.

18      MR. GOLDMAN:  Once we get it, there's a huge amount

19 to actually review with it, right?

20         THE COURT:  Right.

21      MR. GOLDMAN:  So we appreciate the -- you know, the

22 offer of a Relativity platform or something in the U.S.

23 Attorney's Office, but that's just not really feasible for us

24 to actually do that review and do that work with three lawyers

25 and our client.

1          **THE COURT:**  And to make sure I understand -- I'm

2    sorry to talk over you, Mr. Goldman.

3          I just want to make sure I understand what the end goal

4    is.  What you want to be able to do is compare the hard drive,

5    the raw data on the devices, to what you were ultimately given

6    in the Relativity database, the culled down version, to make

7    sure that you're not missing any relevant evidence.

8          Am I getting that right?

9          **MR. GOLDMAN:**  Correct.

10          And also -- I mean, I would say also to review what has

11    been reviewed by the U.S. Attorney's Office in terms of

12    conducting, you know, *Brady* review, taint review.  Also to

13    check the timeline.  Obviously this timeline of the taint

14    review that Your Honor has, you know, those e-mails about, that

15    timeline is important.

16          The disclosure timeline is important to us to our motions

17    to dismiss.  It's part of the issue that we have here.  So in

18    order to sort of see what they had when, when it was reviewed,

19    how it was reviewed, if it could have been reviewed, if not --

20    those are all issues that I think are live for us, and we

21    just -- I mean, I'll say the 34,000, I think, is -- is more of

22    our focus, but I don't think we can just accept that the 34,000

23    is -- is necessarily everything without doing our due diligence

24    to make sure.

25          **THE COURT:**  Okay.  So the 34,000 you do have access

1    to, you are able to manipulate it, you have no issues with

2    that; am I right about that?

3          **MR. GOLDMAN:**  Yes, I can say that I have not laid

4    eyes on all 34,000 documents thus far, but I'm sure if I come

5    across one that is corrupted, Mr. Gardner would provide it to

6    me.

7          **THE COURT:**  Right.  You're not having -- this is not

8    the -- the 34,000 is not the subject of this motion.

9          **MR. GOLDMAN:**  Is not the subject of this.  I will

10   say -- I don't want to belabor it, but there was some

11   back-and-forth about the drives and what we were actually able

12   to make work, and things like that, there was some

13   back-and-forth, but we have things that work now except for

14   those forensic images, which we need additional help with, but

15   we'll work on that.

16         **THE COURT:**  Okay.  So then with respect to 302, given

17   the government's representation today, I'm going to deny it as

18   moot.  However, there is one outstanding issue, and that is you

19   all are continuing to meet and confer about the defense

20   receiving a usable version of the images for each of the

21   devices, and that you're still making progress on that, you

22   will let me know -- I'd say let me know if there is still

23   outstanding issues.

24       If there aren't -- if I don't hear anything, then I know

25   you all have worked it out.  If I do, put in a status to me

what the outstanding issue is by next Friday, a week.

**MR. GARDNER:**  That should be fine, Your Honor.

**MR. GOLDMAN:**  Yeah, thank you.

**THE COURT:**  Okay.  All right.  So that takes care of ECF 302.

309 had to do with the 408 rows of exhibits that I believe ended up being Agent Kimrey's e-mails, and those have been produced.

Did I read that right?

**MR. GARDNER:**  Yes, Your Honor.

**THE COURT:**  Any issue -- any remaining issue with 309?

**MR. GOLDMAN:**  The issue with the -- with those is that we did get a supplemental index which does now label those.

**THE COURT:**  Okay.

**MR. GOLDMAN:**  It was -- I think we laid it out in the briefing, I don't need to belabor that.

But the question that remains, and why we sort of left this as potentially a motion to compel in the future, is that we don't know that we have them all.

They have represented, we have now an affirmative representation, but we've had several representations along the way that we've had all of the e-mails.  Going back to August 15th -- August 16th, we've had multiple representations

1    that we've had everything.

2        So we are satisfied that they have told us that they have

3    given us everything.  Obviously, if we read something and it

4    says there's another e-mail, and they say we're not entitled to

5    it, we would ask the Court to compel them to provide it to us.

6        I suspect that if I talk to Mr. Gardner and say there's an

7    e-mail that we don't have, I suspect he'll give it to me.

8        **THE COURT:**  Yeah, I mean, at this point, like, if

9    there's an e-mail that's written by Agent Kimrey, give it over.

10   Do not -- do not make it the subject of another motion, with

11   that caveat.

12       **MR. GOLDMAN:**  Unless there's a dispute, we won't

13   bring it back to Your Honor's attention.

14       **THE COURT:**  So then all of the issues that were

15   initially raised in 309 appear to have been resolved,

16   including --

17       **MR. GOLDMAN:**  There's one that's not resolved, and

18   that's the taint team review stuff, which Mr. Greenberg will

19   address, but the first three --

20       **THE COURT:**  Well, the taint team review, I'm prepared

21   to put on the record where I am with that.

22       **MR. GOLDMAN:**  Okay.

23       **THE COURT:**  So -- but in terms of the 408 lines,

24   those e-mails have been produced, and the index has been

25   produced, which is what I understand the subject of the motion

```
 1   is, so you can figure out what you've got.  Am I right?
 2            MR. GOLDMAN:  Right.
 3            THE COURT:  Okay.  And then the reports, the
 4   attachments to reports you've been given?
 5            MR. GOLDMAN:  Again, we have not identified any
 6   outstanding attachments to reports.  If we do, we will ask
 7   Mr. Gardner -- if he says we're not entitled to them and we
 8   have to bring it to Your Honor, we will, but we will do our
 9   best to not bring it back to Your Honor.
10            THE COURT:  As far as we know right now, though --
11            MR. GOLDMAN:  As far as we know right now.
12            THE COURT:  -- there's no issue.
13       And then all search warrants and returns for Google, et
14   cetera, I think that was your -- one of the subjects in the
15   supplement in 319, am I right?
16            MR. GREENBERG:  Again, we seem to have resolved that
17   again with the same caveat, upon review if there's nothing that
18   we can't get, we'll try to keep it out of -- off Your Honor's
19   docket.
20            THE COURT:  Great.
21       And in fairness, in that motion, you did raise it, I
22   haven't yet put my findings on the record as to what the in
23   camera review showed me, so I'm prepared to do that now.
24            MR. GOLDMAN:  Okay.
25            THE COURT:  Based on the last -- the evidentiary
```

hearing that we had regarding defense's motions, which still remain outstanding, and it includes a motion to dismiss, I took it upon myself to conduct an in camera review of the correspondence or any information that was in the possession of the U.S. Attorney's Office with respect to obtaining -- requesting, obtaining and conducting the taint team review, which was largely the -- or the filter team review, which is largely the stated grounds from the government for why it took so long to produce the devices and the sort of history of these devices.

So what I was given as part of that production was 70 documents totaling 275 pages. I was performing this review largely to ascertain whether there could be a bad faith finding, or whether this was in good faith, whether the government was performing its diligent review so that this could be a point that is incorporated into the larger motions with respect to the government's late disclosure of the data from the 30 devices, and its late review of *Brady, Giglio* and *Jencks*.

So what the review demonstrated to me is that substance of the documents was largely communications between attorneys -- attorneys, some agents, but mostly within the U.S. Attorney's Office, or the Department of Justice. Shortly after the -- I believe it was the initial appearance, AUSA Ake, who was the AUSA on the case at the time, does request the filter team

64

1    process, and it begins shortly thereafter.

2        Mr. Ake timely requested within, you know, a month or two

3    of that process being initiated, the passwords from defense

4    counsel so that some of the devices could be accessed.  He does

5    discuss shortly thereafter the return of the devices.

6        He also discusses with defense counsel making all devices

7    available to all counsel, but there was not full consent.  And

8    I think this is relevant, because this was a choice that

9    counsel made, and I understand that it wasn't you all at the

10   table now, but defense counsel made the decision that that

11   workaround, this very issue, was not appropriate at the time.

12       The filter team review of documents is completed in

13   September.  But in September of 2022, the size of the drive,

14   the sheer volume, presented the problem, and that's when it was

15   culled down -- presented the problem to uploading it to

16   Relatively, and so the hard drive had to be culled out.  And I

17   cannot remember whether it was in our hearing the last time,

18   during the evidentiary hearing, or in this production that I

19   learned that some of this was just getting the operating

20   programs off of the devices themselves.

21       Then it seems like from the review, the biggest holdup was

22   waiting on the Litigation Technology Center, the LTSC at the

23   Department of Justice, which was the -- they are based in

24   Florida, perhaps, I can't remember, but they were the ones who

25   were responsible for uploading the culled-down version into

 1    Relativity.

 2         And Mr. Ake follows up with them.  He follows up in

 3    December more than once.

 4         The taint team does conduct a partial review of what they

 5    could review of messages that were given to them.

 6         But the database was not yet produced in February, in

 7    March, in April.  Mr. Ake keeps following up, following up.

 8         And then finally, the review -- after discussion of

 9    alternative solutions, finally the review is complete in

10    November 2020 -- do I have the right date here?  November 20 --

11    I'm sorry, November 2023, I believe it is.  It took quite some

12    time.  Don't quote me on that.

13         But the bottom line is, what I don't see is any evidence

14    of bad faith.  I don't see Mr. Ake ignoring this or deciding

15    it's not important or not communicating with the defense or not

16    trying to find a workaround.  That, you know, for what it's

17    worth, may or may not be the dispositive issue in these

18    motions.  But that's my -- that's my take on this, nor do I

19    find that it's really properly discoverable.  These are all

20    internal communications which are not -- are not relevant to

21    the matter at hand.  They are not relevant to the criminal

22    allegations.  They would be relevant only to the question of

23    bad faith.

24         And if I -- if there were evidence of bad faith, I would

25    think that that would be the appropriate -- the appropriate

1  aspect of the -- of the production to me that I would turn

2  over.

3      But absent that, and we'll talk about this with other --

4  other requests that the defense has made, absent that, I am not

5  going to make it the practice of this Court that I'll turn over

6  internal communications of AUSA's filter team versus the AUSA

7  assigned to the criminal matter simply because there had been a

8  delay in the production that wasn't even really at Mr. Ake's

9  feet, as far as I can see.

10      So that's -- those are the findings of the Court after

11  the -- after the review.

12      So any questions or anything else you want me to put on

13  the record about that at this juncture?

14          **MR. GOLDMAN:**  I don't think so, Your Honor.  Thank

15  you.

16          **THE COURT:**  Okay.  All right.  So I think that

17  resolves -- what are we up to?  That resolves 309.

18          **MR. GOLDMAN:**  If we could, just for the record, we

19  would reserve leave to ask for that should additional evidence

20  come up in the future.

21          **THE COURT:**  Sure.  Okay.  And that's understood.

22  You're not waiving that.

23          **MR. GOLDMAN:**  Okay.  Thank you, Your Honor.

24          **MR. GREENBERG:**  And just again to preserve the

25  record, sorry about the multiple attorneys, but to the extent

that there are disclosures in the ALERTS database or otherwise,

that we haven't yet presented to the Court, we would reserve

the right --

        **THE COURT:**  I'm sorry, that you haven't what?

        **MR. GOLDMAN:**  To the extent that there's information

in the ALERTS database or otherwise that's different from this

timeline, I would reserve the right to --

        **THE COURT:**  Well, do you have an ALERTS data -- you

have the ALERTS database, and what do you mean to the extent

it's different?

        **MR. GREENBERG:**  Well --

        **THE COURT:**  Because obviously you were thinking about

something, so I would rather know a little bit about that now.

        **MR. GREENBERG:**  So, for example, I mean, in -- in or

about -- on or about August 22nd, 2023, there is a -- there's

an entry that -- actually, I think this might be an e-mail, not

in the ALERTS database, where Ake writes to Kimrey, "Let me

kick the can with Phelps and see if he can get going on the

filter now that he's done with trial.  You can send me the

search warrant affidavit for the HMA e-mails; Thanks, Adam."

        And then on November 9th, I think it's the same year, in

the same e-mail chain that was produced in heavily redacted

form to us, Kimrey says he wants to, quote, jump in Relativity

and prepare for trial, and is looking for a golden egg as to

Masood.  And he asks if Phelps completed the filter review or

1    plans to.

2          **THE COURT:**  Okay.  And how does that advance a bad

3    faith finding on the government's part?  I mean, that's what

4    you wanted me to look for, right?  So, sure, there's some other

5    e-mails about this hasn't been done yet, and -- but I want to

6    know why you think that that would be relevant to a bad faith

7    finding.

8          **MR. GREENBERG:**  Well, Your Honor, I'm not sure that

9    we have to show bad faith for this issue and the length of time

10   it took to be relevant for speedy trial purposes.

11         **THE COURT:**  Well, that speedy trial is different.  So

12   I was looking at this way back when because there was a motion

13   to dismiss the indictment for the discovery, *Jencks* and *Brady*

14   failures.  And I haven't yet put the ruling on the record,

15   because I think there's still some outstanding you wanted time

16   to supplement.  That's why we have a motion to dismiss

17   deadline.

18        But at the time, what was relevant was bad faith, because

19   the law is pretty clear in the Fourth Circuit.  In my view,

20   this is -- again, subject to change, but this is where I am on

21   it, is if I can cure the prejudice through a continuance, then

22   that's what I've got to do.  And that the analysis changes if

23   there's a finding of bad faith.

24        And I don't have the evidence of bad faith, which is

25   really the reason I was looking for it, is -- is do I dismiss

1    the indictment, do I prevent the government from putting on

2    witnesses?  Like, what's the remedy for the clear violation

3    that we had talked about back then?

4         So maybe we're talking past each other.  Maybe you're

5    thinking about these issues for a different purpose.  That's

6    why I -- I wanted to be clear that my review was for this bad

7    faith question, really not beyond that.

8              **MR. GOLDMAN:**  I think I understand what Your Honor is

9    saying, and that you're only looking for bad faith, and that

10   we're free to raise other issues.

11             **THE COURT:**  I suppose, right, but please make them --

12   you know, make them tight.  Like I'm not quite sure if these

13   two e-mails you cite to me, I'm not sure what they -- if you're

14   going to raise a speedy trial issue, I guess that would be a

15   whole new --

16             **MR. GREENBERG:**  That is the most likely issue on

17   that.

18             **THE COURT:**  Okay.  Got it.  All right.  Thank you.

19        Okay.  Let's see.  We are up to ECF 310, which is the

20   defense motion on outstanding items from the joint status

21   report.

22        And if I see it right, there were four categories of

23   information that you believe you're entitled to, and they are,

24   first, Item Number 6, native versions of Excel files with the

25   electronic devices.  They were the subject of two exhibits, I

1  believe, at the hearing.

2      Second, IRS investigative report, that's Item Number 7.

3      Item Number 8, Loudoun County Sheriff's Office

4  investigative materials.

5      And then Item Number 11, information related to decisions

6  not to charge Barbara Rosas and Marlon Johnson.

7      Who's arguing this one?

8      **MR. GREENBERG:**  I'll be doing the native Excel files,

9  Mr. Goldman will be doing the rest.

10     **THE COURT:**  Okay.  So on the native Excel files, I --

11 I really do not understand the relevance of -- these are

12 demonstrative exhibits that the government used, that the

13 government has conceded, at least one of them, the Agent Kimrey

14 one, it was made in preparation for the hearing with

15 Mr. Gardner.  And you want the prior versions of that -- the

16 meta data, essentially, that would show the changes that they

17 made to it, or the -- am I getting that right?

18     **MR. GREENBERG:**  Yes, Your Honor.  And also for

19 Government 7.  And the reason -- the main reason for Government

20 10 is that's the first time, in Row 1, that we see that there

21 was a laptop from Walter Reed that was seized from Ms. Jackson

22 and returned to Ms. Jackson without being imaged.

23     **THE COURT:**  Okay.

24     **MR. GREENBERG:**  We want to know how that came about.

25 And the earlier versions of this Excel file may shed some light

1    on that, and that's very important.

2          **THE COURT:** Have you made any requests specifically

3    to the government, like a discovery request on that laptop?

4    Specifically, we want all information, all evidence, all

5    reports, all underlying data with regard to that laptop?

6          **MR. GREENBERG:** Yes, Your Honor. And, I mean, this

7    came up at one of their earlier hearings, because that was --

8    as with the other devices that were returned to the alleged

9    co-conspirators without being imaged, I mean, the data is

10   effectively gone.

11         **THE COURT:** Okay. No, I understand that. I guess

12   what I'm trying to get at is, I'm not quite sure that what

13   you're asking for is relevant or probative evidence of

14   anything.

15         So the government creates an Excel spreadsheet for me to

16   look at, again, as a demonstrative. For the first time in that

17   sheet, you learn that a device exists, and I learned it, too.

18   What went into making that spreadsheet as a demonstrative seems

19   to have not a whole lot of relevance to the device itself.

20         I mean, maybe it would show two weeks prior they had

21   created the sheet, maybe it would show that that night they

22   created the sheet. I just do not understand. And, again, I am

23   very mindful now that I am not going to allow discovery

24   requests to bleed into areas of preparation, defense

25   preparation or government preparation. That is just not a

1  proper area of discovery.

2       So if I'm understanding you right, you're saying no, but

3  here, it's important, because this is the first we've learned

4  about this laptop and that the laptop was given back.

5       Am I getting that right?

6            MR. GREENBERG:  That is the main reason why, with

7  respect to the Walter Reed laptop, this is so important.

8       Now, there is no claim of work product by the government

9  in their opposition.  And even if there had been a claim, they

10  would have to substantiate it under the Fourth Circuit's

11  decision in *Solis v. Food Employers Labor Relations*

12  *Association.*

13            THE COURT:  You're citing me a civil case for a

14  criminal matter?

15            MR. GREENBERG:  For the work product doctrine, yes.

16            THE COURT:  Well, I'm asking you why you think you're

17  entitled to it under -- is sort of under Rule 16 because it's a

18  document that the government -- it's not evidence.  It's not

19  the original report.  It's not the search warrant.  It's not

20  the agent's contemporaneous notes.

21       It is a document that was prepared in preparation for

22  litigation as a demonstrative.  So it's not even, like, itself

23  evidence.

24       So tell me why under Rule 16 you're entitled to it.

25            MR. GREENBERG:  Well, I mean, Kimrey testified

73

1   unambiguously, and the government has represented repeatedly,

2   that he prepared this Government Exhibit 10 from scratch.  And

3   that is just impossible.

4         And in -- you know, a prior draft that shows that he did

5   not prepare it from scratch, that he used other materials to

6   prepare it, will undermine his credibility, and that's relevant

7   to the defense.  And that is evidence.  That would be helpful

8   to the defense under Rule 16 and under *Brady, Giglio*.

9         **THE COURT:**  All right.  So that's -- that's

10  Government 10.

11        What about Government 7?

12        **MR. GREENBERG:**  Government 7, similar issues.  Why

13  was the Walter Reed laptop not mentioned there, and the

14  previous drafts are likely to shed light on that.

15        I mean, how did the Walter Reed laptop suddenly appear on

16  this spreadsheet, on this Excel file that Kimrey prepares, you

17  know, shortly before the -- I think within a day, shortly

18  before the August 29th hearing.

19        **THE COURT:**  And let me make sure I'm clear.

20        You, in discovery, had never been given any information

21  about this Walter Reed laptop before?  I just need to be

22  refreshed on this.

23        **MR. GREENBERG:**  Correct.  I mean, that was --

24        **THE COURT:**  It wasn't in the search warrant returns

25  or anything?

1              **MR. GREENBERG:**  I don't think we had the search

2  warrant returns before that government exhibit was produced.

3              **THE COURT:**  No, I thought you did.  I mean, because I

4  saw them.  You had just gotten in the case.  That's what I

5  remember, is, like, there wasn't -- everyone was pulling the

6  fire alarm because you realized that you hadn't gotten any of

7  the devices, and we were a week before trial.

8       And so at the hearing, one of the things I made the

9  government produce, if my memory was right, is all the search

10  warrants, all the returns, all the inventories.  And so what

11  I'm just trying to make sure I understand is, was that device

12  listed as part of the evidence seized or reviewed before it was

13  given back to Ms. Peebles?  Does it show up anywhere else

14  besides those Excel sheets?

15              **MR. GREENBERG:**  I mean, to the best of our knowledge,

16  Your Honor, it had not been disclosed before this Government

17  Exhibit 10 was disclosed.  But, you know, we are uncomfortable

18  making an affirmative representation on that because there's so

19  much discovery and so much was going on that we can't say for

20  sure.

21       What we can say for sure is that I think it was maybe the

22  night before August 29th, or very shortly before August 29th,

23  you know, we got this new production, and it has, suddenly,

24  instead of the grayed-out Row 1 that was in Government 7,

25  prepared by Mark Johnson, 2022, now it's a green line, and it

1   says Walter Reed laptop.

2       And it's -- you know, that's brand new information.  And

3   that laptop could be -- that could be -- the fact that that

4   laptop was seized and returned to an alleged co-conspirator

5   without being imaged, even though it wasn't even her property,

6   and Walter Reed is the alleged victim, that alone could be a

7   basis for dismissal.

8       **THE COURT:**  Well, we'll see about that.

9       But my point is, you want the Excel spreadsheets because

10  you think there might be some information about that laptop on

11  prior iterations?

12      **MR. GREENBERG:**  Yes.  And we think it's implausible

13  that the case agent created this Government Exhibit 10 from

14  scratch, as the government has represented repeatedly.

15      **THE COURT:**  Okay.  All right.  So let me ask you,

16  Mr. Gardner, you want to give me a general response first

17  before I ask you some specifics questions?

18      **MR. GARDNER:**  Your Honor, the general response is

19  there's not going to be much there, only because -- I mean, I

20  was there, I helped make it.  And when -- when one column

21  changes from gray to green, that's me saying, oh, this would be

22  easier for the Court to look at, or this might distinguish it

23  visually.  And that's what's going to show on drafts.

24      These were pulled from property records.  These were,

25  like, the custodial records of these devices, which we

1  submitted to the Court, which we submitted to the defense.  The

2  chain of custody documents created that spreadsheet.

3      And, of course, during that hearing, all we did is say,

4  okay, here is Line 1, now let's go into the underlying chains

5  of custody documents, Line 2.  It was a visual aid that

6  basically summarized the chain of custody documents.

7          **THE COURT:**  So let me ask you, with regard to this

8  laptop, is there a chain of custody document that links to the

9  laptop?

10          **MR. GARDNER:**  There was, Your Honor.

11          **THE COURT:**  Okay.  And so you're saying that all that

12  was -- I think the defense is saying the difference is that for

13  the first time, they saw this laptop on this chart, where there

14  had not been this laptop, I guess, disclosed -- did you give

15  prior charts to the defense?  I just don't remember.

16          **MR. GARDNER:**  No, Your Honor.  So that chart was

17  created -- the -- I think Government 10 which is the previous

18  chart created by Mark Johnson, that was provided to defense.

19  And, in fact, they used it as one of their exhibits at that

20  hearing.

21      The new one that Agent Kimrey and I had created,

22  Government 7, that was brought to the hearing.

23          **THE COURT:**  You did.  Okay.

24          **MR. GARDNER:**  As a visual.

25          **THE COURT:**  So part of the reason, I suppose, then,

1 the laptop would not have been on Mr. Johnson's schedule is

2 because the laptop was given back.

3        Am I right about that?

4            **MR. GARDNER:**  Your Honor, it was.  It was on the

5 schedule, it just had changed colors.

6        I asked Agent Kimrey, well, what's the story behind here?

7 And we looked on the property hand receipt, and we had more

8 detail, so we put it because it was helpful.  That's the whole

9 story.

10           **MR. GREENBERG:**  Your Honor, it is not accurate to say

11 it just changed colors.  The comments field in the exhibit, I

12 think, which was produced on August 24th, that comparable to

13 Mark Johnson, 2022, the comments are in gray.  But that's not

14 the important point.

15       It says, in request but not provided per case agent.  It

16 doesn't say anything about Walter Reed there.

17       It does say, in the description column, I think the fourth

18 column from the left, laptop.  And it does -- some of this is

19 hard to read.

20       But the Walter Reed aspect of it, brand new, I think, the

21 day before the hearing.

22           **THE COURT:**  Well, you're saying brand -- brand new

23 according to you, based on that summary.  But if I'm

24 understanding it right, Mr. Gardner is saying there's

25 underlying documents that reflect that laptop.

1    Okay.  The agent testified it was a Walter Reed -- he gave

2    the reason why he gave it back, that I do remember, right?  And

3    it was a -- there was a different card in there to someone

4    else's identity.  "It was a Walter Reed laptop, so I gave it

5    back."  Query as to why.

6    I'm trying to get at why prior versions of a demonstrative

7    would be at all helpful.

8    And Mr. Johnson, in his report, identified the laptop but

9    didn't fully identify it.

10    **MR. GREENBERG:**  Well, to leave out that it was a

11    laptop from Walter Reed, which is the alleged victim in this

12    case --

13    **THE COURT:**  But that was the forensic reviewer,

14    right?  That just may not have been relevant to him.  Like, why

15    is that -- to the guy who is collecting the devices and then

16    trying to image them, if he is not describing it exactly as the

17    government would at the hearing, why is that somehow grounds to

18    get the meta data of the demonstrative that the government

19    created?

20    **MR. GREENBERG:**  So Johnson writes, in the comments

21    field, "in request but not provided per case agent."  Doesn't

22    mention Walter Reed.

23    Kimrey -- and that was produced to us on Saturday,

24    August 24th.  I believe the chain of custody records were

25    either produced -- I think they might have produced them on

1  August 28th, or maybe they were also on August 24th.

2          **THE COURT:**  Okay.

3          **MR. GREENBERG:**  But very late in the game.  Very late

4  in the game.

5          **THE COURT:**  Well, no, we were having a hearing on it,

6  because what was late in the game is you guys got in the case a

7  week before trial.  And now you're saying we don't have this

8  discovery.

9      And Mr. Gardner had made some unfortunate comments about

10 that that got us in a big -- took a left turn on this case, and

11 I had an evidentiary hearing.  That's why it was late in the

12 game.

13     So, again, I'm trying really to understand why it is that

14 because there were chain of custody documents produced in

15 advance of this very hurry-up hearing, right, that shows this

16 laptop, and we got an agent saying, "It came from Walter Reed,

17 I gave it for the following reasons," you have that, you have

18 Mr. Johnson's spreadsheet that he kept to keep track of his

19 role in this, what are you -- what are you trying to find?

20 What do you think you're going to find in these -- the meta

21 data that is going to be relevant and probative?  Maybe I

22 should ask it that way.

23         **MR. GREENBERG:**  We think it's likely that the meta

24 data and the history and creation of this document will show

25 that there are incorrect statements made by the government and

1 the case agent about the evolution of this document and why

2 Walter Reed was added at that time.

3          **THE COURT:** And, again, what are you -- what do you

4 think it's going to show? You think it's going to show, like,

5 the night before they didn't have the laptop on it and then

6 they put it on?

7          **MR. GREENBERG:** Well, Your Honor, we can't know what

8 it's going to show. I mean, and that's why, you know, as an

9 alternative request for relief, we propose that Your Honor

10 review it in camera.

11          **THE COURT:** But, see, then the flip of that is it's

12 kind of a fishing expedition. Like, if you can't give me some

13 proffer as to what you think the relevance is, then what you're

14 asking me to do is just look behind a summary document because

15 we had to have this hearing. And I'm not -- I'm not prepared

16 to do that.

17          **MR. GREENBERG:** Well, Your Honor, under the Fourth

18 Circuit's decision in *King,* 628 F.3d at 703, quoting the Fourth

19 Circuit's decision in *Love* 57 F.3d at 1313, where the defendant

20 doesn't know exactly what the material is, the defendant need

21 only make some plausible showing that exculpatory material

22 exists.

23          **THE COURT:** Right, but you haven't made that showing.

24 Exculpatory material, what's exculpatory about this?

25          **MR. GREENBERG:** Well, if it casts further doubt on

1  the case agent's credibility, or further undermines the

2  accuracy of the government's representations about the devices,

3  that's exculpatory.

4      **THE COURT:**  Okay.  Not the government's necessarily,

5  the representations were at large, but the case agent's casting

6  doubt on the agent's credibility.  The agent testified under

7  oath, "I seized the document" -- "I seized the laptop, I opened

8  it up," however he put it, we can go back to the testimony, "I

9  found that it was some other card of some other person, it was

10  a Walter Reed laptop, I gave it back."

11      Do with that what you will, but that, from what I

12  understand from the government, is corroborated by the chain of

13  custody documents, right?  Am I wrong about that?  I mean, it

14  shows the laptop was returned.

15      **MR. GARDNER:**  Correct, Your Honor.

16      **THE COURT:**  Okay.  So what -- again, what on this

17  summary chart, the meta data is going to cast doubt any more

18  than the testimony itself?  What else do you think you're going

19  to get?  And the reason why I'm making such a big deal out of

20  this is because, you know, you have -- you have really good

21  arguments that are buried in this other stuff that is very time

22  consuming and, really, quite confounding to me.  And I'm trying

23  to understand it.

24      So tell me again, what is the basis for believing that if

25  I -- if I say, Mr. Gardner, you've got to turn over what that

1    chart looked like at 7:03, not the one that you gave me at

2    9:05, you're going to find something that casts doubt on this

3    agent's credibility?

4            **MR. GREENBERG:**  Well, so I'll go back to Your Honor's

5    initial reaction, when I asked for the native Excel files that

6    were turned over at the hearing on August 29th, and Your Honor

7    said this is obviously a pretty big issue, this witness

8    testified repeatedly that was there a document which at least

9    the defense has generated some evidence in this native form was

10   modified by this witness, but yet the witness told me over and

11   over again he really -- he didn't create it, he didn't modify

12   it.

13           **THE COURT:**  Right.  And you got it, right?  Didn't

14   you get that stuff?  Did you get -- I mean, you had the witness

15   on the stand.  You had him --

16           **MR. GREENBERG:**  But we haven't --

17           **THE COURT:**  You all -- you all examined him for

18   hours.

19           **MR. GREENBERG:**  But we didn't get the meta data.

20   And, Your Honor, it seems fair to get to the meta data on some

21   of this.

22       And the government then represented that Mark Johnson's

23   testimony would clarify the matter.  But it didn't, for the

24   reasons we explained in our papers.  Mark Johnson was not asked

25   any question that would clarify it.

1          **THE COURT:**  And you didn't ask it either, right?  You

2  didn't ask Mr. Johnson questions to this -- about this, did

3  you?

4          **MR. GREENBERG:**  It wasn't our burden to clarify.

5          **THE COURT:**  Well, it is now.  I mean, I don't

6  understand that.  You tell me that it's the government's burden

7  to ask questions about something that now you say you need the

8  meta data for when you had a full opportunity to do it, and you

9  didn't.

10          **MR. GREENBERG:**  But, Your Honor, the government said

11  that Mark Johnson's testimony was going to clarify it.  They

12  made an affirmative representation to the Court on that.  And

13  then the questions I asked Mr. Johnson didn't clarify it.  He

14  didn't -- he talked about when documents are e-mailed

15  generally, he never said he e-mailed that document to the case

16  agent.

17          **THE COURT:**  Okay.  Anything else?

18          **MR. GREENBERG:**  Well, yes, actually.  I mean, another

19  point is that Government Exhibit -- I think it's 10, which is

20  also Defense Exhibit 5, Row 1, which ended up later having the

21  Walter Reed laptop added, is the only one where the subject is

22  empty and doesn't say Jackson, Peebles or Masood.

23      I mean, there's just a lot of discrepancies here, and, you

24  know, we got from the witnesses who testified, you know,

25  either -- basically they didn't remember about, you know, a lot

1   of things.

2       The meta data, which could shed light on what exactly

3   happened and why did the Walter Reed laptop suddenly appear on

4   this chart.

5           **THE COURT:**  Okay.  I'm going to deny that motion with

6   respect to that request.  I do not find you've made a

7   sufficient showing of relevance or probity.  And it really will

8   constitute going down these -- these roads with respect to

9   summary documents that are prepared in anticipation of

10  litigation without a whole lot of basis for relevancy.

11      The case that you cited to me is a case regarding *Brady*.

12  I don't believe you have made a sufficient showing that --

13  *Brady* or *Giglio* that this will somehow exculpate Mr. Masood or

14  cast further doubt as to this agent's credibility.

15      To the extent that the agent's credibility has been placed

16  in doubt, it's based on the testimony he gave, and -- I'm not

17  making that finding, let me be clear, because it's been the

18  subject of you -- you spilled a lot of ink on that, Counsel.

19      But what I'm saying is that there is a point of

20  diminishing returns were there, and it would invade the

21  government's -- like, it's not even evidence, frankly.  It's a

22  document that was prepared for me to understand what the

23  evidence is.

24      And so I -- I am going to deny any further motion to

25  compel, on six, at this juncture.

1        Seven, the IRS investigative reports.  If I understand it

2  right, the defense is saying because there was a time in which

3  Mr. Ake was exploring with the IRS, the potential of the IRS

4  joining the case, and then resolving some of the defendants by

5  way of a tax count, that that's sufficient to trigger a

6  joint -- joint prosecution, is my word, but basically, that the

7  agent -- the agencies are joined such that anything in the

8  IRS's possession, custody or control that is Rule 16, *Jencks,*

9  *Giglio*, et cetera, must be turned over.

10       Am I getting it right?

11           **MR. GOLDMAN:**  I would say that that is part of --

12  part of the issue here.  I think that -- I mean, what we're

13  saying is that the IRS was part of the prosecution team for a

14  period of time in this case, based on the fact that they --

15           **THE COURT:**  Right.

16           **MR. GOLDMAN:**  -- in fact -- I recognize that Ashar,

17  SA Ashar says he's not part of the prosecution team, but they

18  were in proffer sessions with Mr. Masood, with Ms. Jackson.

19  There are reports that cut off part way and say Ashar took over

20  questioning at this point.  There are Special Agent Smith and

21  Kimrey who are doing investigation and providing that

22  information to Ashar, and they are part of -- they are making

23  decisions together.

24           **THE COURT:**  Right.  And what you're looking for, any

25  reports generated by Ashar?

1          **MR. GOLDMAN:**  Right.  For example, the second half of

2    the reports that we have, where it says SA Ashar took over

3    questioning from this point, the agents -- that the special

4    agents in the case, Kimrey or Smith, were in the room at that

5    time but didn't memorialize it anymore because Ashar took over

6    the questioning and he memorialized it.  They didn't write

7    anything else done.  So only --

8          **THE COURT:**  Right.

9          **MR. GOLDMAN:**  Only SA Ashar's report would have that

10   information in it as to the issues surrounding the tax counts.

11        Now, the issues surrounding the tax counts are relevant as

12   to impeachment of the co-conspirators in this case.

13          **THE COURT:**  Jackson and Peebles?

14          **MR. GOLDMAN:**  Jackson and Peebles.

15          **THE COURT:**  I mean, are those just because there's so

16   many defendants in this case?  And I'm not quite sure -- I just

17   wanted to get clear what you are looking --

18          **MR. GOLDMAN:**  I would say primarily Jackson and

19   Peebles.

20        I would say to the extent there are tax accounts that are

21   being explored for others -- I mean, there's clearly -- there's

22   tax liability for other people in this case.  Right?  There are

23   people who were earning income, ostensibly.

24          **THE COURT:**  Yeah.

25          **MR. GOLDMAN:**  But that income wasn't going to them.

1   But there would be tax implications for that.  So whether

2   that's a charge to them, I don't know.

3        But there are misrepresentations.  It's not just whether

4   or not there's a count, it's whether there are

5   misrepresentations on tax forms, for example, for witnesses who

6   are going to testify.

7        **THE COURT:**  Right.  That was going to be my question.

8   You have the government's witness list.  Who else besides

9   Jackson and Peebles do you think this would implicate?

10        **MR. GOLDMAN:**  Those are the two primarily that we

11   think that it would implicate at this time that they plan to --

12   that they have listed on that witness list as of right now.

13        I think it also implicates questions for the agent,

14   certainly for Agent Kimrey, in terms of what was happening with

15   the investigation, the quality of the investigation, whether

16   there are discrepancies between us.

17        Because ultimately what we have is the IRS saying we don't

18   think this is worth our time, we're not -- we're not going to

19   go forward.

20        **THE COURT:**  How is that relevant to examining --

21   you're going to ask me to let you examine Agent Kimrey in front

22   of the jury about this potential resolution --

23        **MR. GOLDMAN:**  Well, not necessarily about the

24   potential resolution, but about the content of the

25   communications that he was a party to, that he was present for,

1  that he was hearing about that were not reduced to writing by

2  him but were reduced to writing by SA Ashar.

3          **THE COURT:**  I guess I'll need more education as to

4  how that's relevant, and how you get around hearsay and all

5  kinds of other problems that I see with that.

6      But let me -- let me focus on what you're asking for

7  today.

8      Today, you're asking for any reports generated in

9  connection with interviews of Jackson and Peebles -- is it

10 Agent Ashar was available?  That was in the room, was asking

11 questions?

12         **MR. GOLDMAN:**  I would say that what we're asking for

13 is the investigative reports prepared by the IRS in conjunction

14 with the prosecution of this case, the tax counts of this case,

15 which were ultimately dropped.

16         **THE COURT:**  Who, though?  Who in the IRS?

17         **MR. GOLDMAN:**  My understanding it's Ashar.  He's the

18 special agent that we have a name for.

19         **THE COURT:**  Right.

20         **MR. GOLDMAN:**  I don't know if there were other

21 Special Agents involved in the -- you know, from the IRS.  But

22 from our knowledge, what we know is that it's SA Ashar.

23         **THE COURT:**  And it would be relevant to Jackson and

24 Peebles?

25         **MR. GOLDMAN:**  It would be relevant to Jackson and

```
 1   Peebles.  I would say to the extent that he prepared a separate
 2   report that was relevant to Mr. Masood, we would get that as
 3   well.
 4            THE COURT:  To Masood.  Okay.
 5            MR. GOLDMAN:  Certainly, if there are statements that
 6   Mr. Masood made in there that Mr. Ashar wrote down, we would
 7   say those are discoverable to us and we should have access to
 8   those.  I would say --
 9            THE COURT:  Wait, wait.
10        Was Mr. Masood interviewed by --
11            MR. GOLDMAN:  There was a -- there was a -- yeah,
12   there was a proffer session.
13            THE COURT:  Where Agent Ashar was in the room?
14            MR. GOLDMAN:  Yes.
15            THE COURT:  And you don't have that report?
16            MR. GOLDMAN:  Correct.
17            THE COURT:  Okay.  That doesn't seem quite right.
18   Because aren't you entitled to if anybody memorialized your
19   client's statements --
20            MR. GOLDMAN:  Exactly, that's what we're saying.
21            THE COURT:  -- it's squarely Rule 16?
22            MR. GOLDMAN:  That's what we're saying, we should get
23   it squarely within Rule 16.  We should get it if Ashar prepared
24   a report of our client's statements that's not included in --
25            THE COURT:  In a proffer session.
```

1          **MR. GREENBERG:**  -- in a proffer session, we should

2     have that.

3          **THE COURT:**  Okay.  So that's the sweet spot of what

4     you're looking for.

5          **MR. GOLDMAN:**  That's the scope of what we're looking

6     for.  And I think it's narrow.

7          I mean, in the case the government cites, the *Brodnik*

8     case, it's really -- it's not really on point.  They are

9     talking about -- I mean, I recognize, you know, there's maybe

10    persuasive argument in there.

11         But what they are asking for in the *Brodnik* case is IRS

12    policies and things that went into making all this stuff.

13    We're not asking for any of that.  We're asking for stuff that

14    investigative agents prepared in conjunction with the

15    prosecution that they ultimately decided not to go forward with

16    but was clearly part of a prosecution team here for a period of

17    time.

18         And late in the case, too, because these proffers were

19    late in December of 2023.  So we're not talking about, you

20    know, it was early on and they said, okay, we're not going to

21    go forward with this.  But we're talking about stuff that

22    happened, you know, relatively recently in the course of this

23    case that's been going on for some time.

24         And so those -- those -- that information would be

25    relevant for our preparation both under Rule 16 and

1    potentially, you know --

2            **THE COURT:**  Right.

3            **MR. GOLDMAN:**  -- *Brady* and *Giglio*.  I think for

4    Jackson and Peebles, there's almost certainly -- I think

5    there's absolutely going to be *Giglio* information in what

6    Jackson and Peebles say about their, you know, tax

7    misrepresentation.

8            **THE COURT:**  Right.

9            **MR. GOLDMAN:**  The returns themselves may be a

10   separate issue, right?  I think we are entitled to them.  If

11   there are factual misrepresentations on tax returns that their

12   witnesses that they are going to put on against Mr. Masood, if

13   there are factual misrepresentations under oath that they

14   wrote, I think we should get those.

15       I recognize that's a heavier lift.  And we're not -- I

16   mean, I think we should get it.  But primarily, what we're

17   asking for right now is the reports that will give us some

18   light on that, and maybe that will further support a stronger

19   motion for the IRS, you know, tax returns and things like that.

20           **THE COURT:**  Okay.  So you're not asking for that now,

21   but you want -- I think the incrementalist approach, let's get

22   the reports from Agent Ashar and then you see what those would

23   say.

24           **MR. GOLDMAN:**  I would say for the record, I am asking

25   for the IRS tax returns now, but I recognize that it would be a

92

1    stronger, heavier lift.

2            **THE COURT:**  I don't have any -- and I don't have

3    anything really in front of me to make that call.  Right?

4            **MR. GOLDMAN:**  Okay.

5            **THE COURT:**  I mean, that is -- that is a heavier

6    lift.

7            **MR. GOLDMAN:**  We will raise that issue again --

8            **THE COURT:**  At the appropriate time.

9            **MR. GOLDMAN:**  -- more fully with better support.

10           **THE COURT:**  Okay.  Let's start, Mr. Gardner, with

11   Rule 16.

12       I mean, Rule 16 says that upon defendant's request, the

13   government must disclose to the defendant and make available

14   for inspection, copying or photographing all of the following:

15       The portion of any written record containing the substance

16   of any relevant oral statement made before or after arrest if

17   the defendant made the statement in response to interrogation

18   by a person the defendant knew was a government agent.

19       That sounds like it fits, right?  I mean, I'm not sure you

20   can say, well, they weren't part of the prosecution team and

21   get out of Rule 16 here.

22           **MR. GARDNER:**  I would say that it does that, Your

23   Honor.  That if they are not part of the prosecution team, they

24   may -- they may have materials, but --

25           **THE COURT:**  But this is Rule 16, and it's the

defendant's statements, and it's a government agent. And I'm

not sure that -- this is -- I really wasn't focused on the fact

that we've got sort of two buckets of agent interactions. One

is the defendant who is going to trial, which is squarely,

like, this is Rule 16 that says you have to give over the

substance of any oral statements made to him by a government

agent.

      And maybe I'm -- I'm troubled by it because for a time,

Mr. Ake represented this and recorded status conferences, we're

working with the IRS to see if the IRS will take this case, and

authorized a tax resolution.

      And, you know, I don't -- I'm paraphrasing.

      So he may not have said those exact words, but basically

it was give us a little more time, because if we resolve it

that way, it will -- and then we came back, and he said, you

know, IRS isn't interested, or however he put it. But they

were aligned for purposes of investigation.

            **MR. GARDNER:**  Well, Your Honor, I maybe quibble with

that alignment for purposes of investigation, only because at

the point when IRS was involved, they were six months, twelve

months, you know, behind. And we had already authorized the

case.

      So we were prosecuting the case, and we were bringing in

somebody who could potentially add a count or may be interested

in prosecuting it.

1      I imagine the same thing happens all the time with the

2   antitrust division of DOJ, or the fraud division, if we say,

3   hey, you know, there might be something here you're interested

4   in, sit down on this call, for example.  I don't think that

5   makes them part of the prosecution team.

6          **THE COURT:**  Well, maybe, but -- except when they

7   decide to sit in on a proffer with the defendant and take notes

8   and ask questions.  I mean, the agent took over the

9   questioning.  That's more than just, hey, let me give you the

10  file and review it, you see if you're interested in picking

11  this case up.

12      That's a -- factually, that's a bigger step in terms of

13  joining -- even if it's just for a brief period of time,

14  joining the prosecution in a -- in interviewing witnesses, in

15  interviewing the defense.

16         **MR. GARDNER:**  Your Honor, as I understand the case

17  law, once you're on the team, you're on the team.  That's why

18  we're saying, you know, Loudoun County --

19         **THE COURT:**  Sure.

20         **MR. GARDNER:**  -- is, you know, there from the getgo

21  and then cut off real quick.  They were on the prosecution

22  team.

23         **THE COURT:**  Yeah, right.  And so is the IRS for the

24  period of time that they interviewed Mr. Masood and the other

25  two codefendants.  And then when they declined to authorize --

1  because that was my understanding, is they were going to

2  authorize a tax count for some of the parties.  Or that's what

3  you all were exploring.

4      And when they decided the juice wasn't worth the squeeze

5  for them, now they are out of the case.

6      So how is it -- let me ask it this way:

7      In that regard, how is it different than Loudoun County?

8  Loudoun County got, you know, the first information, and then

9  they got out of the case at some point.  But you're taking the

10  position that they were aligned for the period that they

11  provided the information.

12      **MR. GARDNER:**  Your Honor, I think I was making a bit

13  of a different point.  So Loudoun County is in the prosecution

14  because they -- they initiated the case.  They decided there's

15  something here.

16      So they are in an appreciably different position than IRS,

17  who is saying, yes, we'll sit in on your proffer, we'll ask a

18  few questions, and at that point we'll make a determination.

19      Loudoun County was an entirely different situation because

20  they had already referred the case to us, saying we think there

21  is something here, and they had, you know, been sharing

22  evidence.

23      I think what -- a rule that says IRS, if you sit on the

24  proffer, you're now part of the prosecution team, that creates

25  a chilling effect for anybody in the DOJ.  Any time we want to

1  bring in a partner, refer the case, maybe we find --

2        **THE COURT:**  Well, then, you just -- you know, you put

3  a wall between you and the agency.

4        But if the agent is interested enough to come in and sit

5  in a proffer with a defendant and take notes and ask questions,

6  I don't understand -- explain this to me.  What's the real

7  resistance to turning over the Rule 16?  What I see as Rule 16,

8  the substance of Mr. Masood's answers to this agent, what's the

9  concern?

10        **MR. GARDNER:**  If Your Honor's concern is just about

11  those statements, so if -- if, for example, there's a read-back

12  of a quote from Mr. Masood during that in a report prepared by

13  the IRS, I think our concerns are diminished.

14        What I -- what I understand the defense to be asking for,

15  notwithstanding the tax returns, which was the initial request,

16  is a full readout of every question asked, and it would pertain

17  not to just his statements but the report might contain

18  thoughts, it might contain, you know, comparisons to their tax

19  returns, it may contain tax return information, it could

20  contain, and probably does contain, information well outside of

21  any quotation, and I will say, those are rarely made anyway to

22  the point where it would become anybody's *Jencks*.

23        **THE COURT:**  Well, let me ask you -- hold on.

24        So let me -- let me make sure.  In my mind's eye, I'm

25  thinking you have the equivalent -- or IRS has the equivalent

1    to a 302.  Ashar is a special agent, right?  With the IRS?

2            **MR. GARDNER:**  Yes.

3            **THE COURT:**  He's not a lawyer like you, he's not the

4    prosecutor?

5            **MR. GARDNER:**  Right.

6            **THE COURT:**  Okay.  And he's the fact guy, am I right?

7            **MR. GARDNER:**  Yes.

8            **THE COURT:**  Okay.  So there's a form, I would

9    imagine, that that fact person has to fill out once they

10   conduct an interview, like an FBI 302?

11           **MR. GARDNER:**  Likely, Your Honor.

12           **THE COURT:**  Okay.  And that seems on all fours with

13   what is required under Rule 16, if that special agent sat down

14   with this proffer and asked Mr. Masood or the codefendants

15   questions, right, and then memorialized that in a report, you

16   turn over the report.  Because at least -- let's stick with

17   Rule 16, it's squarely Rule 16, and you're saying no, it's not

18   because he wasn't formally part of the prosecution team.

19           **MR. GARDNER:**  That's one reason, Your Honor.

20       The second reason is -- well, let's say I ask SA Ashar,

21   you know, what's -- what's in the report?  Did you quote

22   Mr. Masood?  Did you write down -- you know, I guess at what

23   point are we saying -- are we going to heavily redact his

24   report to only mention Mr. Masood's statements?

25           **THE COURT:**  No.  Why would you?  If it's a 302, if

1    it's the equivalent of a 302, it's going to read like a 302.

2    On such and such a date, I was called to interview so-and-so

3    about the following things.  I asked X, he told me Y.

4        And then -- and then you sort of -- if you're saying that

5    there may be part of that report that then the agent gave his

6    musings, or his impressions, I don't know about that.  That's

7    usually not what 302s look like.

8        So you see what I'm saying?  I'm just really interested

9    in -- agents are trained to memorialize their interviews.  Do

10   you have a copy of that memorialization of Agent Ashar's

11   interview of Mr. Masood?

12            **MR. GARDNER:**  No, Your Honor.

13            **THE COURT:**  You don't?

14            **MR. GARDNER:**  No.

15            **THE COURT:**  So what we're talking about right now is

16   pretty speculative.

17            **MR. GARDNER:**  Everything is hypothetical.

18            **THE COURT:**  Okay.  So at a minimum, it appears to me

19   appropriate, because he -- if I have to make the call, I would

20   find that this agent, on that day, knowing what I know about

21   the government seeking to explore an alternative charge for the

22   same underlying facts, this agent sits in on a proffer with

23   Mr. Masood and asks questions of Mr. Masood, and Mr. Masood

24   gives answers, that's in a report, the report needs to be

25   turned over because, as a matter of fact, for that day, and

given the -- the objective here, that agent is part of the

prosecution team.  You're aligned.  You're -- the agencies are

looking at whether you can -- they would authorize a criminal

tax count.  And this agent is asking questions about this case

based on that.

I don't see a whole lot of daylight on that.  But that

doesn't mean, you know, they get everything.  They get the

report.  They get the report of the agent who conducted the

inquiry.

So that's -- that's with regard to Mr. Masood, unless

there's something, you know, else.

And then with respect to Ms. Peebles and Ms. Jackson, I

mean, it -- it really does seem to me grounded in *Giglio*.  They

are being asked about conduct that may give rise to criminal

charges, tax evasion, or tax -- you know, filing false tax

returns.  And the Q and A was -- it's -- it's squarely at issue

in this case.

So, again, I don't -- I'm trying to find the principal

distinction why I wouldn't say turn it over.

**MR. GOLDMAN:**  Sorry.

**MR. GARDNER:**  I think if the Court is inclined to

rule that for that day, the IRS was part of the prosecution

team, I mean, we would respectfully disagree.  But if that's

the ruling, then I don't think we have grounds for withholding

it, unless the IRS -- I mean, not unless, but if the IRS

1  disagrees and they say "we have very strict tax laws, and if at

2  any point we referred to anybody's tax returns, we're not

3  turning over the report," or -- that was initially -- sorry.

4          THE COURT:  Well, then I suppose -- right.

5       I guess I suppose what would happen is that, you know,

6  you've got -- they have got to do what they have got to do.

7  They file a motion to quash, they come in, they tell me why

8  they can't turn over their reports.

9       And you did make that point in your pleadings, like, if

10  you disagree, the agent said he's not turning it over, that's

11  all I was told, is my memory, then they are going to have to do

12  what they have to do.

13       But in terms of, if I understand it right, this agent sat

14  in and asked questions in a proffer session with Mr. Masood,

15  but also with Ms. Peebles and Ms. Jackson; is that right?

16  Those exist?

17          MR. GARDNER:  I don't know if he sat in on those

18  proffers.  I know there was a proffer with Mr. Masood.  There

19  might be a proffer with Ms. Jackson as well.

20          MR. GOLDMAN:  I know from the Jackson report that we

21  have, it says SA Ashar took over questioning at this point.  So

22  I know Jackson is the case.  I would assume it's for Peebles

23  too, but I don't know that for sure.

24          THE COURT:  All right.

25          MR. GOLDMAN:  I would say that our understanding is

1   that a tax -- a tax evasion count was authorized against

2   Ms. Jackson as a possible plea in this case.  So the IRS did

3   authorize -- presumably, the IRS is the only one who authorizes

4   the tax evasion counts, they authorized that count.  Whether

5   they took it or left it, you know, is a different issue.

6       But it does seem that that makes it more squarely part of

7   the prosecution team, because it's an alternative resolution

8   for Ms. Jackson to the U.S. Attorney's Office's, you know,

9   prosecution here.  If they say it's going to be a tax count or

10  it's going to be, you know, aggravated identity theft --

11          **THE COURT:**  You pick, or whatever.

12          **MR. GOLDMAN:**  -- you pick.  That's relevant certainly

13  under *Giglio*.  I think it's also -- all of this stuff, I think,

14  is also relevant in the event that there's a sentencing in this

15  case, it's relevant as *Brady* for Mr. Masood about -- about

16  the -- the relative, you know, gravity of the offense and role

17  in the offenses when you have multiple codefendants.  So I do

18  think, potentially, it would become --

19          **THE COURT:**  But we're looking at trial right now.

20          **MR. GOLDMAN:**  We're looking at trial.  But the *Brady*

21  right extends to potentially sentencing --

22          **THE COURT:**  Sure.  I'm not sure it's *Brady.*  I'm just

23  trying to -- okay.  I want to just sort of -- shortest road to

24  the biggest house.

25      Where right now, it seems to me, that if there are agent

1    reports akin to the 302 for the FBI, memorializing interviews

2    with Mr. Masood, Ms. Peebles, Ms. Jackson, at a minimum, those

3    need to be turned over for -- and that is because I do find

4    that for that brief period of time, if an agent -- if a federal

5    agent takes the step to sit in on the proffer for purposes of

6    determining whether an alternative charge will be authorized,

7    and that agency is now involved, then that agency is part of

8    the prosecution team.  At least those are the facts that I'm

9    seeing here.

10         **MR. GOLDMAN:**  I would ask only that that extend to

11   any witness on the government's witness list.  We're aware of

12   these three.  To the extent that there are other people that

13   the IRS interviewed --

14         **THE COURT:**  Are there -- okay.

15         **MR. GOLDMAN:**  I don't believe there are, but to the

16   extent that there are, it would seem the same rule would apply.

17         **THE COURT:**  Okay.  Let's see if there are any.  I

18   don't know.

19      Mr. Gardner, do you know?

20         **MR. GARDNER:**  The answer, I think, is just going to

21   be Jackson and Masood.  I don't think there was any others.

22   Even Peebles, I think, was not interviewed by the IRS.

23         **THE COURT:**  Okay.  Let's start with the

24   memorialization of those interviews.  Because that, I mean, I

25   think is squarely Rule 16.  And given the objective of bringing

1  the IRS in to generate an additional or alternative charge,

2  I -- that would ultimately be prosecuted by this U.S.

3  Attorney's Office in this court, I'm -- I'm hard pressed to

4  find that it's not part of the prosecution team.  It -- it

5  appears to be.

6       So -- so I'm going to grant the motion, and so far as it,

7  for now, covers any agent reports of interviews with

8  Mr. Masood, Ms. Jackson, Ms. Peebles, or any other government

9  witness, if it exists, and we'll take it from there.

10            MR. GOLDMAN:  Thank you.

11            THE COURT:  All right.  So that's tax.

12       Loudoun County Sheriff's Office.  If I'm understanding

13  this right, the subject of this is Agent -- Officer Vargas,

14  whether he had a body-worn camera on.  And you want it, right?

15            MR. GOLDMAN:  I would say we're asking for any video

16  that was done, whether it's body worn or whether it was in an

17  interview room.

18       We understand that they don't have any video.  We believe

19  we have the three reports for the three touches by the Loudoun

20  County Sheriff's Office at this time.  We would simply reserve

21  the right, if we learn that there were other touches and

22  there's video, we would ask for that.  But I think because we

23  have the reports, the question of the video itself is less

24  crucial on those three.

25            THE COURT:  Although, if I get it -- if I get it

1   right, too, you're saying, like, you know, you're making this

2   motion to confirm that the government has done its due

3   diligence, and it appears to have done that.  And so in the

4   event that there's a video that surfaces, you've preserved your

5   position.

6        Am I getting that right?

7             **MR. GOLDMAN:**  Yes, Your Honor.

8             **THE COURT:**  Okay.  All right.  So I'm going to, for

9   now, deny it as moot, because there's no issue.  It seems like

10  the government has done what it can to make sure that Loudoun

11  County has turned over whatever relevant and probative

12  discovery it had.  And for now, it does not include any video.

13       Okay.  And the last one is information related to

14  decisions not to charge Barbara Rosas and Marlon Johnson.  And

15  I'm not sure what else the defense thinks exists that you're

16  entitled to on this one.

17            **MR. GOLDMAN:**  So our position is, and I think maybe

18  we were a little bit cross purposes in our arguing past each

19  other on this a little bit.

20            **THE COURT:**  Okay.

21            **MR. GOLDMAN:**  But our primary focus is not the

22  internal deliberations of the U.S. Attorney's Office.  It's any

23  information, whether written or otherwise, that is conveyed to

24  Ms. Rosas or Mr. Johnson that would lead them to believe that

25  they are immune from prosecution in this case, that they are

1  not going to face prosecution in this case.  That they are

2  getting a benefit, effectively, by providing information, and

3  that they are not at risk under their testimony.

4      Now, primarily it's information provided to them in

5  whatever form.

6      The deliberative process, I would say, is only relevant to

7  the extent that that is the only evidence of information

8  provided to Rosas and Johnson leading them to believe that they

9  would not be prosecuted in this case, because there are

10  multiple instances -- I mean, they are certainly liable for any

11  of the criminal charges here, based on similar theories, and

12  they weren't prosecuted.  Okay?  So --

13      **THE COURT:**  And you have not been given any sort

14  of -- in discovery, a letter that the U.S. Attorney's Office

15  sent to them saying "you're a target, but we're not going to

16  prosecute you," anything like that?

17      **MR. GOLDMAN:**  We had asked.  I don't think there was

18  a target letter, but I think they came forward, and so that's

19  why -- he'll correct me if I'm wrong, but I believe they came

20  forward, so there was sort of like a whistle blower type of

21  arrangement.

22      There was a lot of complexities to the business

23  arrangements behind the scenes of this case, and there was --

24  there were business disputes between Mr. Johnson and Mr. Masood

25  that were being litigated in other courts.  And there are --

1    there are -- there's a lot of reason for these things to come

2    out.

3        So the expectation that Mr. Johnson or Ms. Rosas would

4    have that they weren't going to be prosecuted here provided

5    they continued to provide information that was putting

6    Mr. Masood at risk here, that is all -- that should be

7    discoverable to us.

8        Now, we understand, because we asked the government if

9    there were any formal letters, and they advised that there were

10   no formal letters.  There was no immunity, you know, queen for

11   a day, king for a day kind of letter that was provided to them.

12   And to the extent that that exists, we would get it.

13           **THE COURT:**  Right.

14        **MR. GOLDMAN:**  But we understand that that didn't

15   exist.

16        But it's not just written information.  And that's why we

17   attached that video clip, and, you know, I apologize for

18   providing -- requiring the Court to, you know, view additional

19   information, but we thought it was -- provides a good faith

20   basis for why Mr. Johnson -- based on that conversation with

21   Adam Ake, why Mr. Johnson was being led to believe that he was

22   not going to be charged for a crime in the course of that

23   interview.

24           **THE COURT:**  Right.  But you have that.

25        **MR. GOLDMAN:**  We have that interview.

1          **THE COURT:**  And the government gave it to you, right?

2          **MR. GOLDMAN:**  They did give us that interview.

3      And so the question is, is there anything like that for

4  Ms. Rosas?  Is there anything additional for Mr. Johnson?

5      I would say that to the extent that, you know, Mr. Ake was

6  having conversations with Mr. Johnson by phone, the substance

7  of those conversations leading him to believe that he was not

8  going to be prosecuted, that he was safe unless he killed

9  someone, was sort of the language from the video clip -- well,

10  it wasn't even that.  It was just don't tell me if you killed

11  someone was more, I think, the language there.

12      But ultimately, it was anything that any member of the

13  prosecution team conveyed to these two integral witnesses that

14  would lead them to believe that they were immune from

15  prosecution, that they were protected from prosecution in

16  return for their cooperation in this case or connected to their

17  cooperation in this case.

18          **THE COURT:**  Okay.  All right.  So let me ask the

19  government since -- I mean, you saw it fit to give over -- not

20  necessarily -- well, one, are there any formal letters?

21          **MR. GARDNER:**  No, Your Honor.

22          **THE COURT:**  Or offers?  Okay.  All right.  Great.  So

23  we're done with that.

24      And then there was a memorialized interview with

25  Mr. Johnson.  Are there any other -- is there any other like

1    source out there of this -- the video that Mr. Goldman just

2    referred to?

3              MR. GARDNER:  No, Your Honor.  And that was produced

4    pursuant to *Jencks*, not in any way information related to

5    promises or agreements to prosecute or not.

6              THE COURT:  Well, now that it's been raised, did you

7    go back and make sure that there aren't any -- any -- there's

8    no memorialization of any conversation that could be construed

9    as if you keep helping, you won't be prosecuted?

10             MR. GARDNER:  Yes, Your Honor, I know those don't

11   exist.

12        And I -- with this one, I'm not sure why it was filed in

13   the first place.  If there was some formal -- formal concession

14   and plea bargain, whatever it may be, that's obviously covered

15   by *Giglio*, we would have given it over.  So to ask for more

16   than that is getting to internal deliberations, because that's

17   all that's left.  After you've taken out --

18             THE COURT:  Well, maybe the government is just --

19   maybe the defense is just trying to be very careful to make

20   sure, since you came into the case after Mr. Ake, and Mr. Ake

21   was having direct involvement with these individuals, that

22   there wasn't anything else like this.  That there wasn't, you

23   know, I don't know -- if the agent had had that conversation,

24   it would be in the agent's 302.  If there's anything else akin

25   to that that, you know, you've done the -- you've done the

1  search for it, and you've turned over anything that you have

2  found.

3        **MR. GARDNER:**  And I will say anything -- anything

4  formal, anything decided upon.

5        **THE COURT:**  You keep saying "formal."  You keep

6  saying "formal."

7     A video interview that you say you turned over for *Jencks*

8  is not necessarily formal.  That's why I'm asking.

9     Vis-a-vis the targets, the individuals, Rosas and Johnson,

10 is there any -- anything that says, you know, "I had a

11 conversation with Johnson and I told him don't worry about

12 getting prosecuted"?

13       **MR. GARDNER:**  I think when I'm saying formal, I mean,

14 not deliberative.

15    So I was including --

16       **THE COURT:**  Right.  Okay.  Got it.

17       **MR. GARDNER:**  As in, you know, formal communicated,

18 expressed between the parties that there would be some sort of

19 quid pro quo, you know, or whatever it may be, that would

20 obviously be *Giglio*, and it doesn't exist because we would have

21 turned it over if it had.  That's why I think the only thing

22 left is internal communications of, you know, should we, what

23 does the evidence show.

24       **THE COURT:**  Yeah, and put those to the side.

25    What I want to make sure you've done is -- hold on one

1   sec.

2        Just give me one second.  Sorry about this.

3        Ah, the connection in here.  Just give me one minute.

4   Okay.  Shoot.

5        All right.  Yeah, what I wanted to confirm was simply that

6   if you have any memorialization of communication with Ms. Rosas

7   or Mr. Johnson along the lines of think broadly, you're not

8   going to get charged, you're not going to get prosecuted, just

9   keep doing what you're doing, keep cooperating, whatever, that

10  you've turned those over.

11            MR. GARDNER:  Yes.

12            THE COURT:  Okay.  So then beyond that, I think

13  that's the confirmation that the defense wanted.

14       Am I right about that?

15            MR. GOLDMAN:  Well, I would say it's not -- I mean

16  *Giglio* itself wasn't written -- wasn't a written report.  It

17  was oral communication.  So I think that --

18            THE COURT:  No, that's what I asked.  I asked -- I

19  mean, it has to be memorialized somewhere for them to turn it

20  over to you.  In other words, how else --

21            MR. GOLDMAN:  It could be memorialized in the

22  recitation to us.  I mean, to the extent that there were

23  conversations that were never put in writing --

24            THE COURT:  Yeah, but the chances of that, I mean,

25  what -- when -- when an agent or a -- any -- an AUSA has a

1    conversation with a target or a witness, it's memorialized

2    somewhere.  I mean, are you asking the government to go back

3    and ask anyone who touched this case whether they ever made any

4    promises to the witnesses?

5            MR. GOLDMAN:  I mean, I think at least AUSA Ake, who

6    was in primary conversation here, and Kimrey.  And I would say

7    that to the extent that they were telling them you're not going

8    to be prosecuted if you continue to provide us information, or

9    please continue providing us information and you're not going

10   to be prosecuted on that, that I think that would be -- that

11   would be discoverable -- I mean, that would be *Giglio*

12   information.

13           THE COURT:  Well, first, you've gotten all of the

14   reports with the agent, right?  Do you have any indication that

15   there was conversation with Rosas or Johnson that Kimrey had

16   that was not memorialized in a report that you've been given?

17           MR. GOLDMAN:  I'm hard pressed to say that I can

18   believe wholehearted -- that I can make an assurance that I

19   have everything from Agent Kimrey, because each time it's been

20   represented that Agent Kimrey has given us everything, there's

21   been more.

22       So based on what we have so far, no.  But we've been told

23   we have everything from Kimrey multiple times, and we found

24   that we didn't in each of those --

25           THE COURT:  So at trial -- at trial, you ask Kimrey,

1  did you make any other promises to these two witnesses?  And

2  you get a yes, we have a problem.

3              **MR. GOLDMAN:**  Right.

4              **THE COURT:**  If you get a no --

5              **MR. GOLDMAN:**  But, also, with -- but with AUSA Ake,

6  where it wouldn't be writing reports, it wouldn't be

7  memorialized necessarily, we wouldn't have a report from AUSA

8  Ake, we wouldn't ask for a report from Mr. Ake.  We would just

9  ask for the representations about that information --

10             **THE COURT:**  Okay.  So let me ask Mr. Gardner, when

11 you took over the case, was there any, like, "Now that I'm

12 getting handed this case," were there, you know, any sort of

13 promises or agreements or understanding with any of these

14 witnesses?  Did that conversation ever happen?

15             **MR. GARDNER:**  No, Your Honor.

16             **THE COURT:**  Out of an abundance of caution, can you

17 do that?

18             **MR. GARDNER:**  Yes, Your Honor.

19             **THE COURT:**  Okay.  Do that with Mr. Ake.

20             **MR. GARDNER:**  And I will note, Marlon Johnson will

21 also be available to ask that question on cross.  And if he

22 says yes, then we also have a problem.  But that's something

23 for down the road.

24             **THE COURT:**  But how about we do that with Mr. Ake?

25 Because it's an easy ask.

1           **MR. GARDNER:**  Thank you, Your Honor.  I will.

2           **THE COURT:**  So that would then give you -- if there

3  is anything else, Mr. Goldman, we'll know it and you'll get it.

4  Okay?

5           **MR. GOLDMAN:**  I'm satisfied with that.

6           **THE COURT:**  Okay.  All right.  That's 11.

7       I think that -- let's see.  Does that -- I think that's

8  all the outstanding motions.  Am I right about that?

9           **MR. GARDNER:**  Yes, Your Honor.

10          **MR. GOLDMAN:**  Yes, Your Honor.

11          **THE COURT:**  Okay.  So then that motion, which is 310,

12  is granted in part, denied in part consistent with the ruling,

13  the oral ruling.

14      Anything else along the lines of discovery that we've not

15  discussed that we really should now that we're all together?

16          **MR. GOLDMAN:**  Not from the defense at this time.

17          **MR. GARDNER:**  Nothing in terms of discovery, Your

18  Honor.

19          **THE COURT:**  Okay.  And then we do have a scheduling

20  order where we will -- the next rounds of motions will be due

21  and ripe for a hearing in January.

22      Anything else that we need to discuss today?

23          **MR. GARDNER:**  No, Your Honor.

24          **MR. GOLDMAN:**  Not from the defense, Your Honor.

25          **THE COURT:**  Thank you all.  See you in January.  Have

1    a good holiday, if I don't see you sooner.

2                **MR. GARDNER:**  Thank you, Your Honor.

3                **MR. GOLDMAN:**  Thank you, Your Honor.  You, too.

4                **DEPUTY CLERK:**  All rise.  This Honorable Court now

5    stands adjourned.

6        (Proceedings were concluded at 12:32 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF OFFICIAL REPORTER

2

3

4       I, Paula J. Leeper, Federal Official Court Reporter, in

5  and for the United States District Court for the District of

6  Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7  the foregoing is a true and correct transcript of the

8  stenographically-reported proceedings held in the

9  above-entitled matter and the transcript page format is in

10 conformance with the regulations of the Judicial Conference of

11 the United States.

12                              Dated this 3rd day of November 2024.

13

14

15                              /S/ Paula J. Leeper
                               _____
16
                               Paula J. Leeper, RPR
17                             Federal Official Reporter

18

19

20

21

22

23

24

25