**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. PX-22-91** |
| | * | |
| **AKBAR MASOOD,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S CONSOLIDATED OPPOSITION**
**TO DEFENSE MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    CONSOLIDATED STATEMENT OF FACTS ................................................. 1

   A.   Investigation ................................................................................................. 1

   B.   Indictment, Arrest, and Electronic Device Processing ............................ 3

   C.   Trial Dates and Speedy Trial Act Exclusions .......................................... 6

   D.   Filter Team Progress ................................................................................... 9

   E.   Masood Hires New Counsel ...................................................................... 10

III.   DEFENSE'S MOTION TO DISMISS ON SPEEDY TRIAL GROUNDS (ECF 330)
       SHOULD BE DENIED ...................................................................................... 12

   A.   Argument ..................................................................................................... 13

       1.   All Time In This Case Has Been Properly Excluded, Hence No STA Violation Has
            Occurred ............................................................................................... 14

       2.   The Defendant is Estopped from the Nunc Pro Tunc Arguments He Now Makes ........... 16

       3.   Alternatively, Even Assuming a Violation Occurred, Any Dismissal Should Be Without
            Prejudice ............................................................................................... 22

   B.   Defense's Motion at ECF 330 Should Be Denied ................................... 23

IV.    DEFENSE'S MOTION TO DISMISS BASED ON THE GOVERNMENT'S
       DESTRUCTION OF EVIDENCE (ECF 332) SHOULD BE DENIED ................. 24

V.     DEFENSE'S MOTION TO DISMISS FOR GOVERNMENT'S EFFECTIVE DESTRUCTION
       OF THE INFUSED SERVER (ECF 333) SHOULD BE DENIED ...................... 27

   A.   Marlon Johnson Is a Whistleblower, Not a Suspect ............................. 28

   B.   Infused's Server Did Not Contain Apparently Exculpatory Impeachment Information of
        Marlon Johnson ......................................................................................... 30

   C.   Defense's Theory Fails Even If the Server Contained Only "Potentially Exculpatory"
        Information ................................................................................................. 31

   D.   Defense's Motion at ECF 333 Should Be Denied ................................... 31

VI.    DEFENSE'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (ECF 334)
       SHOULD BE DISMISSED ................................................................................ 32

   A.   The Government's Second Superseding Indictment Renders Defense's Arguments
        Regarding the Adequacy of the Indictment Moot ................................. 32

   B.   DHA and Walter Reed are "Health Care Benefit Programs" and CDI Medical Coding
        Services are a "Health care Benefit, Item or Service" Within the Meaning of 18 U.S.C. 24(b) .... 33

       1.   CDI Medical Coding Services are Medical Benefits, Items, or Services ............... 34

       2.   DHA and Walter Reed are Health Care Benefit Programs ................................. 36

**C.    Defense's Motion at ECF 334 Should Be Denied** ........................................................ 41

**VII.    CONCLUSION** ............................................................................................................... 41

## I.    INTRODUCTION

The defense filed four separate motions to dismiss in this case.  Those motions are:

ECF 330: Akbar Masood's Motion to Dismiss the Indictment with Prejudice for Violations of Speedy Trial Rights;

ECF 332: Akbar Masood's Motion to Dismiss Based on the Government's Destruction of Evidence;

ECF 333: Akbar Masood's Motion to Dismiss for Government's Effective Destruction of the Infused Server; and

ECF 334: Akbar Masood's Motion to Dismiss for Failure to State an Offense or, in the Alternative, because the Government Provided the Grand Jury with Instructions that Seriously Misstated the Law.

The Government now files this consolidated response to these motions to dismiss.  Each of these motions lack merit and should be denied.

## II.    CONSOLIDATED STATEMENT OF FACTS

### A.    Investigation

In July 2018, Marlon Johnson, an owner of Infused Solutions, LLC ("Infused"), went to the Loudoun County Sheriff's Office to report that he suspected his co-owner and business partner, Defendant Akbar Masood, of committing fraud against his company.  Government Exhibit 1.  The reported fraud involved a contract between Infused and Walter Reed National Military Medical Center ("Walter Reed") and another company, HMA Solutions, LLC ("HMA").  Id.  At that time, Johnson's understanding of the fraud was limited, but he reported discovering that Masood had secretly set up this company, HMA, to steal money from Infused related to Infused's Walter Reed contract.  Id.  This information was forwarded by Loudoun County to the U.S. Army Criminal

1

Investigations Division ("Army CID") because the fraud being investigated involved a contract with a military hospital.

Working under the broadly stated theory that certain actors, including HMA, were falsely billing Walter Reed for medical coding which was actually not being conducted, Army CID and other investigative agencies obtained information from various sources as they developed their investigation.

- On February 28, 2019, agents met with Marlon Johnson from Infused Solutions who provided them 35 emails related to his suspicions of the fraud that Defendant Akbar Masood may have committed.

- On March 7, 2019, agents requested and received email datasets from the Defense Information Systems Agency ("DISA"), a military agency that maintains email information for various government email accounts, for the following email addresses:

  - Nancy Stambler nancy.k.stambler.civ@mail.mil (Date range: October 2011 – March 2019) ~40,000 emails
  - Akbar Masood akbar.masood2.ctr@mail.mil (Date Range: Nov 2018 – March 2019) ~500 emails
  - Harriett Jackson harriett.m.jackson2.ctr@mail.mil (Date Range: Nov 2013 – March 2019) ~13,500 emails
  - Tiffany Jackson tiffany.s.mathews.ctr@mail.mil (Date Range: July 2014 – March 2019) ~3,000 emails
  - Michelle Peebles michelle.o.peebles.ctr@mail.mil (Date Range: Aug 2014 – March 2019) ~24,000 emails
  - Judith Russ judith.russ1.civ@mail.mil (Date Range: Feb 2016 – March 2019) ~24,000 emails
  - April Coates april.d.coates2.ctr@mail.mil (Date Range: Nov 2014 – March 2019) ~35,000 emails
  - Deandre Diggs deandre.l.diggs.civ@mail.mil (Date Range: March 2012 – March 2019) ~48,000 emails

- On March 2, 2020, agents requested and received email datasets from Infused for the following email addresses:

2

- ○ Akbar Masood amasood@infusedsolutions.com (Date Range: Aug 2012 – Feb 2020) ~543,000 emails
- ○ Kristine Morgan (Gillespie) kmorgan@infusedsolutions.com (Date Range: Sep 2011 – Feb 2020) ~680,000 emails
- ○ Michelle Peebles mpeebles@infusedsolutions.com (Date Range: June 2013 – Feb 2020) ~190,000 emails

Agents obtained these emails from a server controlled by Infused with assistance from Barbara Rosas, the wife of whistleblower Marlon Johnson, co-owner of Infused and the Infused office manager. Marlon Johnson was also present while these files were being copied by agents.

In addition to these emails, agents conducted interviews and obtained various financial records to include payment records for the Clinical Documentation Implementation ("CDI") medical coding services at issue in the Walter Reed contract as well as bank account records for HMA Solutions, LLC and bank accounts records for various individuals suspected of being involved in defrauding Walter Reed. With this and a variety of other documentary evidence substantiating what appeared to be fraud, a case was authorized by the U.S. Attorney's Office for the District of Maryland for further investigation.

**B.      Indictment, Arrest, and Electronic Device Processing**

On March 17, 2022, a Grand Jury sitting in this District returned a twelve count Indictment charging several individuals, including Defendants Akbar Masood ("Masood"), Michelle Peebles ("Peebles"), and Harriet Jackson ("Jackson") (collectively the "Principal Co-Defendants") with various criminal acts including Conspiracy to Commit Health Care and Wire Fraud in violation of 18 U.S.C. § 1349. Agents executed arrest warrants and court-authorized search warrants of the homes of the Principal Co-Defendants on or about April 6, 2022. During the executions of those warrants 30 electronic devices were seized—13 from Masood, 9 from Jackson, and 8 from Peebles.

Also on April 6, 2022, the Principal Co-Defendants each had their initial appearances. ECF 14, 21, 25. None of the Principal Co-Defendants were detained and all are currently on various conditions of release.

The Government initially furnished defense counsel for each of the Principal Co-Defendants with discovery that focused on their respective client's charged conduct and their respective client's phone downloads.  In a Consent Motion to Exclude Time Pursuant to the Speedy Trial Act filed on May 6, 2022, the Government informed the Court that the three Principal Co-Defendants "have notified the Government that those devices may contain attorney-client privileged material, necessitating the use of a filter team before that electronic material can be examined and provided as discovery."  ECF 90 at 2.  The Court granted the parties' request to toll the Speedy Trial clock for three months to continue sorting out the various issues with these devices.  ECF 91.

On June 21, 2022, AUSA Adam Ake, then the lead prosecutor in the case, notified counsel for each of the Principal Co-Defendants that Army CID's Cyber Team had been unable to create images of most of the seized devices because they were password protected and a password-circumvention software known as "Graykey" had been unsuccessful in breaking into the devices. Government Exhibit 2.  To avoid further delay, AUSA Ake asked the various counsel to provide passwords for each of the devices that were password blocked.  Id.  AUSA Ake advised counsel for the Principal Co-Defendants that without their clients providing the passwords, gaining access to the devices could take *years*.  Id.  Each defendant returned a spreadsheet containing their respective clients' passwords they remembered or had access to.  Id.

The provision of the passwords allowed the Government to access and image most of the devices.  Following that process, on July 31, 2022, AUSA Ake directed that the devices be returned

to their respective owners.  Each of the 30 devices was successfully imaged with the following exceptions[1]:

- Laptop seized from Jackson's residence.  This device had markings indicating that it belonged to Walter Reed and had a Common Access Card, or CAC, inserted into the computer that belonged to another individual unrelated to this case.[2]  Law enforcement personnel assessed that this laptop fell outside of the scope of the search warrant and out of an abundance of caution, the laptop was returned to Jackson.

- iPhone seized from Jackson's residence.  This device could not be accessed because Jackson could not provide the password.

- iPhone seized from Masood's residence: The evaluation of this device determined that it had been wiped clean or factory reset and therefore contained no information to image.

- iPhone 7 seized from Masood's residence: This device too had been wiped clean or factory reset and contained no information to image.

- Chromebook seized from Peebles' residence.  The Army CID Cyber Team recognized that this type of device does not store data on the device itself, but rather in the cloud, and therefore no attempt at imaging was made.

- iPad Pro seized from Peebles' Residence.  This device could not be accessed because Peebles could not provide the password.

- iPad seized from Peebles' Residence.  This device was examined and assessed to have been wiped clean or factory reset and contained no information to image.

---

[1] See Government Exhibit 3 [Table of Devices]
[2] Communications with counsel for Jackson revealed that this Laptop and CAC belonged to a former employee of Case, the company Jackson owned, named Sylvia Koonce.  Koonce had quit working for Case prior to the Covid-19 pandemic and left her laptop at the office.  The device normally would have been wiped and assigned to a new employee, but it was taken home by Jackson due to the onset of the Covid-19 pandemic.  Jackson never had credentials to access the laptop and never accessed the computer.

The three Principal Co-Defendants had these electronic devices seized contemporaneous with their arrest, and notified the Government that those devices may contain attorney-client privileged material and they were not willing to waive that privilege. Counsel for the Principal Co-Defendants also indicated to AUSA Ake that they were unwilling to consent to the device images being provided to their Co-Defendants to allow them all faster access to review the information. As a result, the Government assembled a filter team to conduct a filter review before any of the devices could be reviewed by the prosecution team and produced to defense counsel.

### C.    Trial Dates and Speedy Trial Act Exclusions

On May 4, 2022, counsel for all Principal Co-Defendants and original lead prosecutor AUSA Adam Ake conferred with the Court on the status of the case. After discussing the discovery matters above, all parties requested a three-month period to review discovery and to begin exploring potential case resolution before the Court set firm deadlines in the case, ECF 90, which was granted, excluding the period between April 8, 2022 and August 9, 2022 from Speedy Trial Act calculations.  ECF 91.

Counsel for all Principal Co-Defendants filed a joint letter reserving their clients' rights based on this delay.  ECF 94.  In that letter the Principal Co-Defendants noted that they did not object to continuances (nor did they attempt to invoke their speedy trial rights) because of their desire to review the electronic materials for potentially exculpatory or otherwise helpful information. ECF 92, 94. The Government acknowledged receipt of the Defendants' letter reserving their rights and agreed to provide the Defendants with copies of their own electronic devices and other materials obtained post-indictment before commencing a filter review of various documents for which defendants had claimed contained attorney-client privileged information. ECF 95.

On August 16, 2022, the parties requested an additional 60 days be excluded from Speedy Trial Act calculations to give the Government more time to process the information in its possession and for the Defense to review it for potentially exculpatory or helpful information. ECF 96. The signed order excluded the period between August 10, 2022 and October 26, 2022. ECF 97.

A Speedy Trial Act tolling request was made by the parties on December 2, 2022, to exclude the time between October 27, 2022 and December 22, 2022, ECF 101, which was granted the same day, ECF 102.[3]

On December 8, 2022, the Government made a discovery production to all Defendants that included most of the Rule 16 material the Government anticipated would be used at trial. A filter review of significant amounts of electronic evidence had not been completed due to delays/difficulties in uploading the data to the Relativity database, and the Government informed the Court that it did not intend to seek a delay in scheduling on that basis. ECF 103.

Another joint request was made on December 22, 2022 to exclude the time between December 23, 2022 and February 3, 2023 (the date of the next status/scheduling call), ECF 103, which was granted on February 3, 2023. ECF 106 (telephone conference).

On February 3, 2023, the Court held a status conference with all parties in this matter and scheduled trial for February 12, 2024. ECF 107.

On February 17, 2023, the parties jointly sought to exclude time from February 3, 2023 through November 27, 2023, ECF 108, which was granted by the Court that same day. ECF 110.

On November 21, 2023, Masood filed an unopposed motion to extend the deadline to file pretrial motions to "a date not sooner than January 3, 2024" stating that "Mr. Masood and the

---

[3] This period also appears to have been excluded by the Court in a separate order on February 3, 2023. ECF 105.

Government actively and diligently are negotiating a pretrial resolution to this case." ECF 130. After the Court denied that motion, ECF 131, since it would run into a scheduled motions deadline, Masood's counsel filed a subsequent motion requesting a motions deadline of December 4, 2022 (and excluding time between November 27, 2023, and December 4, 2023). ECF 132. This motion was granted. ECF 133.

Defendant Masood subsequently filed two motions on December 4, 2023: the first, a motion to dismiss the indictment and the second, a motion to suppress the evidence seized in the search warrants that had been executed. ECF 135, 136. The hearing on these motions, originally set for January 5, 2024, was moved to January 12, 2024, ECF 146, and then during a status call the parties collectively agreed to move the trial date in this case to April 29, 2024, ECF 150. The parties again collectively agreed to move the trial to July 15, 2024. ECF 167. Throughout this period counsel for Defendant Masood, Joshua Lowther, Esq., requested that the Government *not* respond to his motions to dismiss against the backdrop of an expected pre-trial resolution.

During this entire period, the parties were actively engaged in plea negotiations. Jackson and Peebles entered guilty pleas in April and May 2024, respectively. ECF 181, 190. Then on May 24, 2024, the Government and Defendant Masood agreed to continue the trial date again so that the parties could continue to discuss pretrial resolution. AUSA Ake left the U.S. Attorney's Office in May of 2024 and AUSA Darren Gardner entered his appearance as counsel of record on May 21, 2024, with AUSA Ranganath Manthripragada entering his appearance on June 4, 2024. ECF 202, 206. On May 24, 2024 the Court set a new trial date of September 3, 2024. ECF 205.

On June 13, 2024, Defendant Masood and the Government sought to exclude the time between May 28, 2024 and September 3, 2024. ECF 211. This motion was granted on June 17, 2024. ECF 217.

On August 8, 2024 the Government obtained a superseding indictment as to Defendant Masood, charging him in a seven-count superseding indictment.  ECF 226.

### D.    Filter Team Progress

Concurrently with the case activity described above, the U.S. Attorney's Office for the District of Maryland was preparing for and conducting a filter review of the contents of the various devices which counsel for the Principal Co-Defendants said contained attorney-client privileged information.  As the Government relayed during various conference calls and in communications to defense counsel, the process was slow and resource-intensive and suffered from delays due to the amount of data that needed to be processed and uploaded to the Relativity platform used to manage the filter review.

As part of an in-camera review into this filter team review process, the Court reviewed various internal U.S. Attorney's Office communications of those involved and provided the following summary of the filter process:

> . . . Shortly after the – I believe it was the initial appearance, AUSA Ake, who was the AUSA on the case at the time, does request the filter team process, and it begins shortly thereafter. Mr. Ake timely requested within, you know, a month or two of that process being initiated, the passwords from defense counsel so that some of the devices could be accessed.
>
> He does discuss shortly thereafter the return of the devices. He also discusses with defense counsel making all devices available to all counsel, but there was not full consent. And I think this is relevant, because this was a choice that counsel made, and I understand that it wasn't you all at the table now, but defense counsel made the decision that that workaround, this very issue, was not appropriate at the time. The filter team review of documents is completed in September.
>
> But in September of 2022, the size of the drive, the sheer volume, presented the problem, and that's when it was culled down -- presented the problem to uploading it to Relatively, and so the hard drive had to be culled out. And I cannot remember whether it was in

> our hearing the last time, during the evidentiary hearing, or in this production that I learned that some of this was just getting the operating programs off of the devices themselves.
>
> Then it seems like from the review, the biggest holdup was waiting on the Litigation Technology Center, the LTSC at the Department of Justice . . . who were responsible for uploading the culled-down version into Relativity. And Mr. Ake follows up with them. He follows up in December more than once. The taint team does conduct a partial review of what they could review of messages that were given to them.
>
> But the database was not yet produced in February, in March, in April. Mr. Ake keeps following up, following up. And then finally, the review -- after discussion of alternative solutions, finally the review is complete in [November 2023]. It took quite some time [but] what I don't see is any evidence of bad faith. I don't see Mr. Ake ignoring this or deciding it's not important or not communicating with the defense or not trying to find a workaround.

Government Exhibit 6. Following the completion of the filter review of the devices, the content of the devices was then reviewed by members of the prosecution team. No Brady or Giglio information relevant to Defendant Masood was identified, nor was any material the Government intends to use at trial extracted from any of the devices.

### E.    Masood Hires New Counsel

Former lead counsel for Defendant Masood, Joshua Lowther, filed a motion to withdraw as counsel on August 16, 2024, ECF 233, and new counsel for Defendant Masood, Eugene Gorokhov and Daniel Goldman, entered appearances on August 15, 2024, ECF 229, 230. Additional counsel Joshua Greenberg then entered his appearance on August 23, 2024. ECF 250. Counsel for the defense filed various motions immediately upon joining the case.

During a telephone conference with the Court on August 22, 2024, new counsel for the Government relayed incorrect information to the Court that the filter review of the devices seized from the Principal Co-Defendants had not been completed. This error was discovered and

corrected via letter to the Court on August 22, 2024.  ECF 247.  Undersigned counsel had learned that the review had in fact been completed in November of 2023 and the contents accessed by various individuals on the prosecution team.  Of note, no <u>Brady</u> or <u>Giglio</u> material had been identified pertaining to Defendant Masood (although such material was identified as to another defendant), and the Government determined the devices contained nothing of evidentiary value to the prosecution's case.

Undersigned Counsel also determined that while Masood had the content of his own devices, the contents of the devices belonging to Masood's fellow Principal Co-Conspirators Jackson and Peebles were never affirmatively provided to counsel for Masood.  The Government had not received follow-on communications from any defense counsel about these devices amidst the various trial postponements and plea offers of early-to-mid-2024.  However, the Government acknowledged that the failure to affirmatively provide the contents of these devices meant that Masood's counsel could not independently determine what could be exculpatory or useful to his case.  ECF 265.

These files were subsequently delivered to successor defense counsel in two forms.  The Army CID Cyber Team had extracted readable files, such as PDFs and Word documents, from the devices for upload and review on Relativity.  These files were first provided to defense counsel electronically in August, 2024.  A large hard drive containing the raw images of the devices without any processing, including files that had previously been filtered out like operating system files, totaling several terabytes of data, was delivered to defense counsel via Fedex in October, 2024.

During a September 19, 2024, scheduling call the trial was rescheduled to March 17, 2025, which defense counsel requested to provide them an opportunity to fully review the contents of

the devices seized from the Principal Co-Defendants in this case.  ECF 287.  The Court excluded

time between September 19, 2024 and March 17, 2025 to allow defense time to review the device

contents.  Id.

### III.    DEFENSE'S MOTION TO DISMISS ON SPEEDY TRIAL GROUNDS (ECF 330) SHOULD BE DENIED

In order to review discovery, engage in plea negotiations, and prepare for trial, the parties

have filed numerous consent motions in good faith to exclude time under the Speedy Trial Act.

The Court has granted these motions after making appropriate and detailed findings of facts as to

the necessity for those exclusions.

Yet despite these jointly filed motions for exclusions of time, the Defendant now

challenges these exclusions granted by the Court.  He asks this Court to reverse itself and revisit

and nullify its prior findings of fact on the speedy trial exclusions, seeking the extraordinary

relief of dismissal of the criminal charges.  In sum, the Defendant argues that if the Court

nullifies its prior speedy trial exclusions, the 70-day speedy trial clock has somehow now

expired.

The Defendant's argument fails on many levels and should be summarily denied.

As a threshold matter, the Defendant is wrong that the speedy trial clock has run; no time

has elapsed on the speedy trial clock.

Next, based on the record in this case, the Defendant should be judicially estopped from

such an about-face.  After consenting to every Speedy Trial Act waiver filed, and rejecting a plea

offer extended by the Government, the Defendant—now with new counsel and without his co-

defendants joining—wants to argue for the first time that the speedy trial clock has run.  Moreover,

the Defendant's arguments violate the law of the case doctrine.

The Defendant also incorrectly characterizes the Government's discovery productions; the Government has produced reams of discovery in a complex multi-agency, white-collar case where information was collected from numerous sources at various times both pre and post indictment. The Government has acknowledged the one shortcoming in its discovery obligations, which was cured by a continuance granted by the Court to allow defense counsel time to review the newly-produced information. The Government has diligently followed up on the dozens of discovery requests, written and oral, and worked with Defense counsel in good faith to resolve any remaining discovery issues.

Finally, and most fundamentally, the Defendant's arguments regarding speedy trial must be rejected because to humor them would unnecessarily reward gamesmanship and undercut the judicial process. Far from being a case and fact specific motion for relief, this appears to be part of defense counsel's standard arsenal; the Government is aware of the near identical motion filed in another recent case in this District which Judge Maddox roundly rejected.[4] This Court should do the same.

### A.    Argument

The Speedy Trial Act of 1974 ("Speedy Trial Act" or "STA") generally provides that a defendant's trial "shall commence within seventy days from the filing date . . . of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). However, the STA provides for exclusions of time from speedy trial clock calculations. 18 U.S.C. § 3161(h). For example, if the Court makes findings that the "ends of justice" outweigh the defendant's and the public's interests in a speedy trial, the time period may be excluded from

---

[4] *See United States v. Osemwenkhae*, MJM-23-411 (D. Md.) at ECF 142, 143.

STA calculations.   18 U.S.C. § 3161(h)(7)(A).  Additionally, time is excluded based on any

"delay resulting from any pretrial motion, from the filing of the motion through the conclusion of

the hearing on, or other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(D).

When multiple defendants are charged in the same indictment, there is a unitary speedy

trial clock that runs as to all defendants in the case.  As such, in "a case involving several

defendants, time excludable for one defendant is excludable for all defendants."  *United States v.*

*Jarrell*, 147 F.3d 315, 316 (4th Cir. 1998); *see also Henderson v. United States*, 476 U.S. 321,

323 n.2 (1986) ("All defendants who are joined for trial generally fall within the speedy trial

computation of the latest codefendant.").

Additionally, the Supreme Court and the Fourth Circuit have recognized that defendants

may be judicially estopped from claiming an STA violation where they consented to exclusions of

time.  *See Zedner v. United States*, 547 U.S. 489, 504-06 (2006) (analyzing estoppel argument

against STA motion, while holding that estoppel did not apply "[i]n this case"); *United States v.*

*Velasquez*, 52 F.4th 133, 140-42 (4th Cir. 2022) (same).

Applying these general standards, it is clear that Defendant Masood's motion to dismiss

fails.

### 1.    All Time In This Case Has Been Properly Excluded, Hence No STA Violation Has Occurred

No time has elapsed on the speedy trial clock for this case.  Here, the speedy trial clock

began on April 8, 2022, the day after the last defendant had her initial appearance.  18 U.S.C. §

3161(c)(1); ECF 54.  After that time, with the consent of all the defendants, including Defendant

Masood, the Court excluded multiple periods of time under 3161(h)(7)(A) based on clear factual

findings that the ends of justice outweighed the parties' and the public's interest in a speedy trial.

Specifically, the speedy trial computations are as follows:

- April 8, 2022 to August 9, 2022: time excluded (ECF 91)

- August 10, 2022 to October 26, 2022:  time excluded (ECF 97)

- October 27, 2022 to December 22, 2022:  time excluded (ECF 101, 105)

- December 23, 2022, to February 3, 2023:  time exclude (ECF 106)

- February 4, 2023 to November 27, 2023:   time excluded (ECF 110)

- November 27, 2023 to December 4, 2023:  time excluded (ECF 133).

On December 4, 2023, the deadline for Defense motions, Defendant Masood filed a motion to dismiss the indictment and a motion to suppress.  ECF 135, 136.  This resulted in time being excluded under 18 U.S.C. § 3161(h)(1)(D); *see also United States v. Tinklenberg*, 563 U.S. 647, 653 (2011) (the filing of a pretrial motion "stops the speedy trial clock from running automatically"); *United States v. Pair*, 84 F.4th 577, 583 (4th Cir. 2023) (holding that time was properly excluded from defendant's filing of motion to dismiss on October 21, 2020 through January 27, 2021 when the motion was decided).[5]

Three trial postponements followed while various plea negotiations were finalized and charges against each of the Defendants except Masood were effectively resolved.  The parties all understood that (1) the motion would toll the STA clock; and (2) the parties could use the time to resolve the case and the Government need not respond to the motion.  This was not only directly

---

[5] On December 6, 2023, Defendant Jackson filed her own motion to suppress which itself remained on the docket and tolled speedy trial as to all defendants through at least the date of her plea on April 22, 2024.  ECF 142, 182. Defendant Bagnon Titi joined in Jackson's motion and didn't resolve their case until May 20, 2024.  ECF 145, 201. Numerous other motions were filed by different parties or the Government between December 4, 2024 and the date new defense counsel for Masood began filing motions of their own on August 16, 2024, creating a separate and independently sufficient reason to exclude almost all of that period of time.

communicated orally to the Government by prior counsel but was obviously the understanding as prior counsel made no requests for a new hearing date on the motions.

Indeed, the parties never held a hearing on these motions and all motions to dismiss which the defense wishes to continue to litigate are currently being briefed and will be argued before the Court on January 27, 2025.  Moreover, since that time, other motions have been filed which have also not yet been resolved.  ECF 235 (filed August 16, 2024); ECF 241, 242 (filed August 20, 2024); ECF 330 (the instant motion to dismiss filed November 27, 2024).  Additionally, the Court granted a consent motion to exclude the period between May 28 to September 3, 2024.  ECF 217.  The facts above show that no time has elapsed on the speedy trial clock.  As such, the Defendant's motion must be denied.

       **2.**       **The Defendant is Estopped from the Nunc Pro Tunc Arguments He Now Makes**

The Defendant argues that days excluded *nunc pro tunc* cannot be counted as being properly excluded, ECF 330 at 9-13, and, now that it suits him, the Defendant forgets that he **consented** to all of these exclusions through his experienced prior counsel, and hence must be estopped from now trying to reverse course.  As the Fourth Circuit noted in *Velasquez*, a court must consider several factors in applying estoppel:  "(1) the inconsistency between the defendant's position . . .; (2) 'whether the party has succeeded in persuading a court to accept that party's earlier position"; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"  52 F.4th at 141 (quoting *Zedner*, 547 U.S. at 504).  Here, the Defendant knowingly consented to each and every period covered by the parties' consent motions to exclude.  This included both the time properly counted under the ends-of-justice exclusions and the time that might be considered as excluded nunc pro tunc.

Defendant has wholly switched positions. He previously consented to the exclusion, even where it was nunc pro tunc, and now he is singing a different tune and claiming it is non-excludable. The Defendant successfully convinced the Court to accept his prior position of excludability; the Court granted all the above-referenced exclusions, regardless whether the time was nunc pro tunc or not. It is clear that the Defendant is seeking an improper benefit; he is seeking dismissal of the criminal prosecution against him by reneging on his prior statements to Government counsel and this Court. This is a classic bait and switch. His new counsel is engaging in gamesmanship by trying to walk back his prior consents. And he is doing it after he claims the speedy trial clock has run, affording the Government no recourse. Had he raised such objections before, the Government would have sought a speedy trial or sought a continuance on some other basis. Either way, it is clear that the instant facts meet each and every prong of the test for estoppel. As such, the Defendant must be estopped from raising any concerns about time excluded nunc pro tunc to which he previously consented.

Next, while the Defendant asks this Court to revisit its previous ends-of-justice factual findings based on claims of "new evidence," ECF 330 at 13-16, these claims fall flat legally and factually. For starters, the Defendant's argument runs afoul of the law of the case doctrine. The law of the case doctrine prevents a court from revisiting prior rulings made in the case. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478 (3d ed. 2024). Courts have repeatedly explained that such finality-based rules are meant to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy. *See United States v. Aramony*, 166

F.3d 655, 661 (4th Cir. 1999).  The law of the case governs a given outcome for the remainder of the case. There are only a few narrow exceptions to this rule, namely—(1) a subsequent trial or proceeding in the district court produced substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.  *Aramony*, 166 F.3d at 661. Here, this Court made factual findings for the ends-of-justice STA exclusions it ordered based on the representations and with the consent of both parties.  ECF 91, 97, 101, 103, 105, 110, ECF 133.  Those findings are law of the case and cannot be disturbed absent the Defendant showing that some exception applies.  He cannot.

All defendants knew about the ongoing filter team review and the Principal Co-Defendants made the strategic choice to not allow their clients' devices to be produced to all defendants, asserting that the data would contain attorney-client information.  At that time, their preference and their choie was to not proceed with the case without receiving and reviewing materials that woud be produce after a filter review.  This choice by the defendants required a resource-intensive filter review to be conducted that caused significant delay.  Defense consented to tolling for this entire period in numerous tolling motions, at least one of which was filed by counsel for Masood himself.  See ECF 132.

At the point when the files being reviewed were ready to be produced to defense counsel—approximately the beginning of 2024—trial was continued several times as individual defendants resolved their respective cases and nobody—not the Government and not the Defendants—prioritized the filter team information.  Not a single Defendant inquired about this data until August 2024.  Against this backdrop the Government did not affirmatively produce the contents of these devices to Masood as it should have—but clearly not in bad faith.  This

oversight cannot be contorted to fit into the exceptions laid out in *Aramony* to the law of the case doctrine. It simply makes no sense that ends-of-justice findings, largely made during calendar years 2022 and 2023, could be upended when the ends-of-justice findings were made with full knowledge that the labor-intensive filter team process was ongoing. The oversight had not even occurred yet.

As undersigned counsel has state previously, plea negotiations continued up until nearly the day that Defendant Masood replaced prior defense counsel on August 15, 2024. It was only after a final attempt to reach a resolution failed in mid-August that Masood sought new counsel, opting for a more scorched earth approach to his defense. See ECF 283 (Government's Motion for Appropriate Relief Regarding Discovery) and ECF 314, Section V (Governments' Consolidated Response re Motions to Compel; Defense's Unprofessional Conduct).

Tacked onto this main argument are the Defendant's litany of other complaints against the Government, each of which occurred after new counsel joined the case. ECF 303 at 26-34. These allegations do not justify a law of the case doctrine exception nor do they have anything to do with ends-of-justice findings made by the Court throughout this case, which were made in response to consent motions signed long before any current counsel became involved. To the extent the diligence of the Government following Defendant Masood's replacement of his counsel is relevant to any argument, the Court has a full record before it to make that determination. The Court has been sent a substantial portion of the email communications in this case in attachments to Defense's numerous filings and correspondence. The Court has also received hundreds of pages of discovery-related arguments and updates, and has heard the parties discuss discovery ad nauseum in person.

The Defendant's meritless claims, if accepted by this Court, would have dire consequences for judicial economy and the administration of justice in this District.  If every defendant were to be allowed to revisit prior STA rulings based on post-hoc claims of dissatisfaction about the basis on which speedy trial time was previously excluded, cases would remain in a constant state of uncertainty.  The remedy for an STA violation is dismissal, and that remedy carries the potential for a dismissal with prejudice.  Once an STA exclusion is granted, the parties reasonably rely on that ruling, as the law of the case doctrine rightly gives them liberty to do.  If the law of the case were rejected here it would incentivize defendants to weaponize the STA.  As previously noted, Defendant Masood's counsel used this same strategy in another case in this District. Far from being an allegation made because of the specific facts of this case, this appears to a standard and universal argument that counsel is using and will continue to use with the hope that he will find a sympathetic judge.  Such tactics should be denounced, not encouraged.[6]

The Defendant's claims about discovery delays lack also lack credibility because all the other co-defendants consented to the speedy trial exclusions and none of them have raised similar complaints.  The exclusions as to the co-defendants are clearly valid and unchallenged, and hence should remain undisturbed.  And, because proper exclusions as to co-defendants are attributed to Defendant Masood, *see Jarrell*, 147 F.3d at 316, his complaint cannot upset all the parties' collective understanding of the speedy trial act clock.  If Defendant Masood wanted his own speedy trial clock, he needed to successfully move for a severance.  That never happened, and proper exclusions as to his codefendants are attributable to him.

For all the reasons set forth above, the Government maintains that no Speedy Trial Act

---

[6] Mr. Masood's current defense counsel tried this very tactic recently, and it was roundly rejected by Judge Maddox. *See United States v. Osemwenkhae*, MJM-23-411 (D. Md.) at ECF 142, 143.

violation has occurred in this case.  As such, the motion must be denied.

### 3.   Alternatively, Even Assuming a Violation Occurred, Any Dismissal Should Be Without Prejudice

In the alternative, the Government would argue that even if the Court finds that a violation occurred, dismissal without prejudice is the appropriate remedy.

The Speedy Trial Act sets forth various factors that courts should consider when determining whether a dismissal pursuant to the Act should be with or without prejudice. Section 3162 of Title 18 of the United States Code sets forth in relevant part that "court[s] shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." (emphasis added); *see also United States v. Reames*, 40 F. App'x 861, 2002 WL 1611339 (4th Cir. Jul. 23, 2002). Further, "[a]lthough not dispositive, 'the presence or absence of prejudice to the defendant' is also 'relevant for a district court's consideration,' and may be considered in conjunction with the third factor." *United States v. Williams*, 665 F. App'x 290, 292 n.1 (4th Cir. 2016) (quoting *United States v. Taylor*, 487 U.S. 326, 334 (1998)).  The decision to dismiss an indictment with or without prejudice is a matter reserved to the discretion of the Court, and neither remedy is presumptively mandated by the STA.  *See Taylor*, 487 U.S. at 334–35.

Here, all the relevant factors demonstrate that any dismissal, if granted, should be without prejudice.

First, the offenses alleged in the indictment are quite serious:  Defendant Masood is charged with large-scale fraud on a Government institution that provides healthcare to servicemembers and veterans.  Clear eyed and with deliberation, he orchestrated a scheme that stole more than $3 million dollars from the Government using stolen identities of real people.

The seriousness of this offense demonstrates why any dismissal must be without prejudice; any other result under the facts of this case would be an injustice, giving Defendant Masood a get-out-of-jail-free card, with each of the other co-defendants accepting responsibility for their role in this fraud and awaiting a sentence from this Court. The public and the victims deserve for this matter to have its day in court.

Second, the facts and circumstances of any delay in the proceedings are necessarily driven by the complexity of the case. This fraud scheme required intensive Government investigation to uncover. It was complex. With multiple individuals charged, and terabytes of evidence recovered, those individuals accepted a delay to obtain information they believed could help in their defense. Several defendants have now pled guilty. In short, this is a complex case for which the previously excluded periods of time were reasonable and appropriate. Indeed, Defendant Masood's codefendants believe that the exclusions were appropriate; he thought so too until his attempts to receive a plea untenable to the Government were rejected and he changed his strategy in this case.

Third, the Defendant has not established any kind of prejudice that has inured to him based on these delays. Never in custody, he was perfectly happy to agree to multiple exclusions of the 70-day STA period and to have his trial date set in 2024 because it was to his benefit. His new-found claims of prejudice fall flat and should be rejected. He should be made to stand trial in March 2025 as the parties have agreed.

In sum, if any dismissal is ordered, it should be without prejudice.

## B.    Defense's Motion at ECF 330 Should Be Denied

Based on the foregoing, the Court should deny the Defendant's motion (ECF 330).

23

IV.     **DEFENSE'S MOTION TO DISMISS BASED ON THE GOVERNMENT'S DESTRUCTION OF EVIDENCE (ECF 332) SHOULD BE DENIED**

Defense seeks dismissal of this case based on the argument that (1) the Government seized 30 devices from the homes of Principal Co-Defendants Masood, Jackson and Peebles; (2) four of these devices were not imaged but returned to their owners; and (3) those devices that were not imaged contained apparently exculpatory information.  ECF 332 1-13.  Alternatively, defense argues that (1) devices contained only potentially exculpatory information; and (2) the Government's bad faith nevertheless justifies dismissal.[7]

Proof of a due process violation based on a failure to preserve evidence requires two elements. First, the defendant must show that the missing evidence had "an exculpatory value that was apparent before the evidence was destroyed[] and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." United States v. Perry, 92 F.4th 500, 513 (4th Cir. 2024) (quoting California v. Trombetta, 467 U.S. 479, 489 (1984)). Second, the destruction of such exculpatory evidence by the Government only rises to the level of a constitutional violation if the evidence was destroyed in bad faith. Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  Bad faith is only present where the defendant can show that "the officer intentionally withheld the evidence for the purpose of depriving the [defendant] of the use of that evidence during criminal trial." Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000); United States v. Varner, 261 F. App'x 510, 517 (4th Cir. 2008) ("[F]or due process concerns to arise…the destroyed evidence must have some exculpatory value that the

---

[7] Defense counsel, with all the gusto of the Spanish Inquisition, spends pages discussing the Brady "confessions" of undersigned counsel and how they must mean that the Government knowingly destroyed apparently exculpatory information.  ECF 332 at 2-5.  The Government provided its answer to this line of argument in ECF 260.  The Government, the defense, and the Court all used the term "Brady violation" at the August 29, 2024 evidentiary hearing in this case loosely to refer to the inability of defense counsel to review the seized and imaged devices themselves for Brady material—until the Government produced them, which it has.  All parties used "Brady violation" during the hearing in a technically incorrect way, knowing full well what they were referring to.

agents recognized, and yet nevertheless destroyed."). Negligence does not constitute bad faith. Elmore v. Osmint, 661 F.3d 783, 831 (4th Cir. 2011).

The Government explained why each of these devices were not imaged in detail above with the most relevant parts repeated here. The four devices were (1) one laptop seized from Jackson's home that had clear indications that it was a work laptop issued to someone named Sylvia Koonce; (2) an iPhone seized from Jackson's residence for which Jackson could not provide a password (though she did provide various other passwords); (3) an iPad Pro seized from Peebles' residence for which Peebles could not provide a password; and (4) an iPad seized from Peebles residence which had been wiped and contained no information.

The defense does not identify what apparently exculpatory value the devices contained— nor can they. These devices, alongside numerous others, were seized in the hopes that they would contain relevant information, and counsel for the Principal Co-Defendants were willing to delay resolution of this case in the hopes that, when the contents were produced, they may contain exculpatory information.

To find a due process violation based on the destruction of evidence that can only be said to be potentially exculpatory, as in the case of these devices, the Defense must demonstrate that a law enforcement officer, Agent Joshua Kimrey in this case, exhibited bad faith. That means they must show that he sought to deprive the Defendant of exculpatory information at trial. To that the defense offers not a hint of evidence.

Whatever the Defense might say about what Agent Kimrey *should* have done with the four devices, he clearly did not act intending to deprive information on them from the defense. For one, it is clear he had no idea what was on any of these devices – only that devices belonging to the Defendants could be relevant. Second, apart from the Walter Reed laptop, which he

25

deemed to be outside the scope of his warrant and returned almost immediately to the place it

was seized from, he and the Army CID Cyber Team tried to create images of *all* the devices.

The Walter Reed laptop was treated differently because it clearly was not a personal device of

Jackson and was in Jackson's possession because of her role as owner of Case, another

Government contract company that was doing work with Walter Reed.  That work was, by all

appearances, legitimate contract work for the Government and Case employed numerous

individuals to fill its contract with the Government.  Agent Kimrey knew this and believed the

laptop had been seized by mistake.  Federal prosecutors would have advised him to do exactly as

he did.[8]

One of the four devices in dispute was empty.  Two were password protected and may

have taken years to break into, if ever.  That delay was obviously untenable and would not have

been tolerated by the Principal Co-Defendants in this case.

With respect to these two devices without passwords, Agent Kimrey cannot have

effectively destroyed data in its possession by returning the devices because the Government

never possessed the data they contained.  See United States v. Young, No. 23-CR-208

(MJD/ECW), 2024 WL 913308, at *4 (D. Minn. Mar. 4, 2024) ("While the physical cellphone is

the Government's possession by virtue of a warrant, the data it contains is not in the

Government's possession because the cellphone is encrypted.")

What we have, in sum, is a device that was quickly deemed to be outside the scope of the

warrant and not searchable, two devices that were encrypted and could not be accessed, and one

---

[8] Defense spills significant ink on Agent Kimrey's "defiance" of AUSA Ake's email instructions to return the
devices to their owners after they were successfully imaged, ECF 332 at 11-12, but this email is clearly taken out of
context and dramatizes an otherwise unremarkable exchange that, in context, referred to the devices in the custody
of Army CID's Cyber Team.

device that was found to be empty.  Exactly what exculpatory evidence could Agent Kimrey have thought he was destroying or depriving Masood of?[9]

The <u>Youngblood</u>/<u>Trombetta</u> standard puts the focus on the state of mind of law enforcement in destroying the evidence.  Otherwise, the destruction of any item of potential value would invite defense counsel to craft wish lists of exculpatory information that had certainly been destroyed.  The question is: did Agent Kimrey's return of these devices suggest he was purposely trying to deprive Defendant Masood of exculpatory information at trial?  The answer is plainly no, and it is not a close call.  This motion should be denied.[10]

## V.  DEFENSE'S MOTION TO DISMISS FOR GOVERNMENT'S EFFECTIVE DESTRUCTION OF THE INFUSED SERVER (ECF 333) SHOULD BE DENIED

Similar to the argument above, Defense seeks dismissal of this case based on the argument that (1) the Government was in constructive possession of Infused's server based on its requests for information from that server from Infused Owner Marlon Johnson and Infused Operations Director Barbara Rosas; (2) the Government knew that information was exculpatory based on information it had from interviews with Marlon Johnson, examination of documents, and from Mr. Masood's own representations; and (3) by not seizing the entire server using through a warrant, the Government allowed the evidence to be destroyed.

This argument is governed by the Trombetta/Youngblood analysis detailed above, and collapses under that analysis just as readily.  The defense argues that the Infused server contained

---

[9] It is worth noting that, of the information stored on the 20+ imaged devices, the Government found no evidence it deemed exculpatory for Masood and nothing it intends to use at trial against him.  The Defense has been in possession of this information since August, 2024, and if they themselves had found exculpatory material taken from these devices they certainly would have cited it to bolster their argument that these four devices contained the same.

[10] Other judges in this district have recently dismissed similarly speculative claims with respect to information that can only be said to be potentially exculpatory in the absence of bad faith.  <u>See</u>, <u>e.g.</u>, DKC-22-429 (D. Md.) <u>U.S. v. OJ Rashad Green</u> at ECF 105 (Order Denying Motion to Dismiss Count One of the Superseding Indictment).

information that Mr. Masood would have used, if he had access to it, to impeach Marlon Johnson and Barbara Rosas' accusations against him.  The arguments seem to boil down to: Marlon Johnson (and Barbara Rosas, his wife) had motive to falsely accuse Masood of fraud.  Proof of that motivation was apparently on the Infused server, and the Government knew it but didn't obtain it.  The Defendant's allegations are speculative and baseless.

What does the Defense think would have been on the server that was so apparently exculpatory?  On that the Defense is silent.  The defense indicates it will certainly attempt to somehow impeach Marlon Johnson and Barbara Rosas at trial, but the Defense cannot even make a proffer of what they allege is obviously exculpatory information that was destroyed.  That is because it is not obvious that exculpatory information ever existed on the server—not to Government counsel, not to the agents in this case, and seemingly not to Defense who cannot identify it.

### A.      Marlon Johnson Is a Whistleblower, Not a Suspect

Marlon Johnson initiated this investigation by bring a whistleblower complaint to the attention of law enforcement—a complaint that has resulted in multiple guilty pleas in this case.  The Government treated him as just that: *a whistleblower and a potential witness*.  He has *never* been a suspect, nor has his spouse and officer at Infused, Barbara Rosas.  As whistleblowers, they cooperated with law enforcement to provide information that law enforcement identified as relevant to their investigation, including helping download email content that investigators identified as relevant to fraud against Walter Reed.  They could have declined requests from investigators.  These facts do not, as Defense argues, put the Infused server in the constructive possession of the Government.

When Marlon Johnson initially reported Defendant Masood in July of 2018, the details he gave were vague—it was clear he believed some fraud was afoot against his company and that Defendant Masood was behind it—but was uncertain about details of the fraud. Government Exhibit 1. The Government took that initial report and conducted their own investigation and subsequently pursued charges that fit the evidence uncovered. At no point did the Government identify Marlon Johnson as being anything other than a business owner who was duped by his partner. Defense now apparently seeks dismissal of this case because law enforcement did not, in its investigation, find evidence implicating Marlon Johnson as a suspect.

Defense makes the curious (and obviously incorrect) assertion that the Government knew Marlon Johnson "had personally profited from the alleged fraud scheme that the government was investigating." This assertion appears to be based on two things:

(1) an email produced to the defense in which Agent Kimrey is told by an Infused employee, Patrick Clezie, that Mr. Clezie believes Infused had a liability with HMA that was not passed on to the Government. Agent Kimrey asks what evidence supports this assertion, to which Patrick Clezie responds that he has "not looked further to unravel the remainder liability amount we have on Infused's books." See ECF 333, Defense Exhibit 6; and

(2) an ALERTS entry "Reflecting that the Government Knew and Investigated the Fact that Infused Double Billed the Government." See ECF 333, Defense Exhibit 4. The Defense cut this exhibit off, leaving out much needed context. When properly excerpted, this ALERTS entry shows that Judith Russ, an employee of Walter Reed, told Agent Kimrey that, entirely unrelated to the fraud Defendant Masood is accused of, Walter Reed had not properly removed medical coding "encounters" conducted by hourly/salaried employees before paying Infused based on the

total number of encounters.  The result, Judith Russ relayed, may have been some overpayment to Infused.  <u>See</u> Government Exhibit 4.

Apart from these two instances in which evidence cited by the defense does not say what they purportedly believe it says (and even if it did, would not relate in any way to exculpatory information on the Infused server), their assertions are speculative.

### B.     Infused's Server Did Not Contain Apparently Exculpatory Impeachment Information of Marlon Johnson

To support their argument that the Infused server contained apparently exculpatory information, Defense cites a case where the criminal history of a key Government witness was not disclosed to the defense, <u>United States v. Perdomo</u>, 929 F.2d 967, 970 (3d Cir. 1991), and another case where the Government failed to obtain important impeachment information of a law enforcement until after trial.  <u>United States v. Nhung Nguyen</u>, No. 1:04-CR-232 (BBM), 2007 WL 9735541, at *6 (N.D. Ga. Feb. 7, 2007).  Just like in those cases, the Defense argues, the Government failed to discover and obtain impeachment information of a Government witness, Marlon Johnson.  The analogy, however, crumbles under a light breeze.  The Government did investigate this case thoroughly, and brought numerous indictments based on its findings against numerous individuals.  Whistleblowers Marlon Johnson and Barbara Rosas were never found to have been involved.  The Government investigated this case from every angle over the course of several years.  Unlike in the cases cited by Defense, the Government did its diligence—years of it.  Statements by Johnson and Rosas in the possession of the Government have been disclosed.  If the Defense believes either can be impeached in a way that helps Defendant Masood's case, the Defense is welcome to try to do so at trial.

The Defense appears to be pursuing a theory of the case that somehow a vendetta from Marlon Johnson's against Masood explains Masood (1) creating HMA in secret; (2) billing the

Government for labor that was never completed under names of individuals who never worked for HMA; (3) making sure that the profits of the contract ended up in Masood's personal bank accounts.  Whatever the defense chooses to argue to a jury is their business, but the "Marlon Johnson vendetta theory" has never been theory the Government found evidence for.  How could the Government fail to preserve evidence that supported a theory it has not even considered, for which it found no support, and which it does not understand?

### C.     Defense's Theory Fails Even If the Server Contained Only "Potentially Exculpatory" Information

If whatever is on the Infused server can only be said to be "potentially exculpatory", as is obviously the case, the analysis turns to whether law enforcement possessed the server and exhibited bad faith in destroying it.  See Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  First, the Infused server was never in the possession of the Government, as detailed above.  But even assuming it was, the Defense makes no argument that bad faith exists or explains how not imaging the entire Infused server was done for the purpose of depriving Masood of exculpatory material at trial.

The years-long investigation never supported Masood's current "Marlon Johnson vendetta theory" to somehow explain his fraud.  The Government never had any reason to think the Infused server's contents would contain exculpatory information or that they would be harming Masood by not imaging it.  There is no bad faith in this case—not a hint.  Defense's claims to dismiss the case under this theory fall woefully short.

### D.     Defense's Motion at ECF 333 Should Be Denied

The Defense cannot show that the Government ever possessed the Infused server (and thus cannot have destroyed it).  The server, even if somehow considered destroyed by the Government because the Government did not seize it via search warrant, contained no apparently

exculpatory information and, to the extent it contained potentially exculpatory information, law enforcement did not take or fail to take any actions with the Infused server intending to deprive Masood of helpful evidence at trial.  This Motion should be denied.

## VI.    DEFENSE'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (ECF 334) SHOULD BE DISMISSED

The Defense makes two distinct arguments in its Motion to Dismiss for Failure to State a Claim, both of which should be rejected by this Court.

The defense first argues that the Superseding Indictment against Masood does not adequately allege the requisite elements of a health care fraud conspiracy under 18 U.S.C. § 1347.  Specifically, the defense claims there is not an adequate allegation that either Walter Reed National Military Medical Center ("Walter Reed") or the Defense Health Agency ("DHA") are "health care benefits programs" or that CDI medical coding specialists provide a "medical benefit, item, or service", both elements of a health care fraud conspiracy.  ECF 334 at 3-13.  As part of that argument, the defense includes speculation that the grand jury must not have received accurate instruction on this count because the Government did not include certain definitions related to health care fraud conspiracy from 18 U.S.C. § 24 in a later proposed jury instruction. ECF 334 at 8-9, 18-19.

The defense next argues that, as a legal matter, Walter Reed and DHA can never be health care benefits programs and CDI medical coders do not ever provide a medical benefit, item, or service.  ECF 334, 13-18.

### A.    The Government's Second Superseding Indictment Renders Defense's Arguments Regarding the Adequacy of the Indictment Moot.

As to the first, the defense simply misstates what is required of an indictment to be considered valid on its face.  The indictment alleges all the elements of health care fraud

conspiracy simply by repeating the elements from the statute, word-for-word. "Challenges going only to the instructions given to the grand jury as to the elements of the offenses are not grounds for dismissal of an indictment that is valid on its face." United States v. Buchanan, 787 F.2d 477, 487 (10th Cir. 1986); United States v. Welch, 201 F.R.D. 521, 525 (D. Utah 2001) (denying motion for in camera review because there was "no deficiency in the indictment"). Therefore, as long as the indictment correctly alleges all elements of the crime, a defendant cannot successfully secure the dismissal of the indictment for failure to properly instruct the jury. See also United States v. Wills, 346 F.3d 476, 489 (4th Cir. 2003) ("Because the indictment tracks the language of [the charged statute] and properly alleges each element of the statute, the indictment is valid on its face.")

The defense is also wrong in its chain of inferences about what the Grand Jury was actually told and, as a purely legal matter, on what and how the Grand Jury *must* be instructed in order to return a valid indictment.

However, rather than continue to quibble over this point, on December 19, 2024, the Government obtained a second superseding indictment against the Defendant including language that leaves no room for doubt about what exactly the Government is alleging – that both Walter Reed and DHA, as its parent agency, are health care benefit programs and that CDI medical coding services are a "medical benefit item or service" within the meaning of 18 U.S.C. § 1347 and 18 U.S.C. § 24.  Arguments about the sufficiency of the indictment are moot.

**B.     DHA and Walter Reed are "Health Care Benefit Programs" and CDI Medical Coding Services are a "Health care Benefit, Item or Service" Within the Meaning of 18 U.S.C. 24(b).**

The defense takes an extraordinarily narrow view of what constitutes both a "health care benefit program" and a "health care benefit, item or service" as defined by 18 U.S.C. 24(b).  As

to CDI medical coding services, the Defense argues that "CDI work is an administrative, after-the-fact task that has no bearing on the delivery of or payment for any type of health care", ECF 334 at 13, as if the only health care benefit, item or service covered under the statute is provided by a doctor holding a scalpel. The defense also argues that health care benefit programs are limited to health insurers, or at the very least the Congress intended 18 U.S.C. § 1347 to address health fraud against health insurers and any other claim works uphill against Congressional intent. ECF 344 at 16-17.

Courts roundly reject this view. Court after court points to the breadth and expansive definition of both "health care benefit program" and "health care benefit, item or service" in 18 U.S.C. 24(b). Those definitions bear repeating as both sides argue that the plain meaning of the statute and accompanying definitions support their argument:

> As used in this title, the term "health care benefit program" means any public or private plan or contract, affecting commerce, under which *any* medical benefit, item, or service is provided to *any* individual, and includes *any individual or entity* who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. 18 USCS § 24(b) (emphasis added).

To be clear, the health care benefit programs are DHA and Walter Reed. The medical benefit, item, or service is CDI medical coding. The contract is the contract between Walter Reed and infused to provide Walter Reed CDI medical coding services.

The Government addresses both "health care benefit program" and "medical benefit, item, or service" in turn.

## 1.    CDI Medical Coding Services are Medical Benefits, Items, or Services

The defense goes to great lengths to describe CDI medical coding services as "administrative." CDI work is an integral part of the provision of healthcare and makes up an important part of patient treatment. CDI coders are highly skilled professionals with years of

medical coding experience and additional certifications.  As alleged in the Second Superseding

Indictment:

> Clinical Documentation Information ("CDI") specialists provided
> health care benefits, items, or services by working with doctors,
> nurses, and administrative personnel to ensure patient records were
> accurate, complete, and reflective of care provided to the patient.
> CDI specialist work included reviewing patient records to ensure
> they accurately reflected the diagnosis and treatment provided to
> patients, and coaching doctors and nurses on how to improve their
> documentation of patient encounters to better track patient care and
> improve patient outcomes.

ECF 342.  The Department of Defense publishes a manual entitled "Management Standards for

Medical Coding of DoD Health Records" which states: "CDI programs facilitate the overall

quality and completeness of clinical documentation to accurately represent the severity, acuity,

and risk of mortality profile of the patient being treated."  Government Exhibit 5 at 7.

The jury will be presented with evidence of what CDI medical coding services entails.

They could rightly determine that these coders are providing a medical benefit, item or service

under the exceptionally broad definition.  As examples, a medical benefit, item or service can be

provided by an entity that issues payments for medical care (but does not itself provide them),

United States v. Gallop, No. 2:08CR217, 2009 WL 10702245, at *4 (E.D. Va. Mar. 19, 2009).  A

medical benefit, item or service can include auto insurance that merely covers medical costs.

United States v. Collins, 774 F.3d 256, 260 (5th Cir. 2014).  More similar to this case, it can also

include a social worker who visits needy families to monitor the safety of at-risk children, but

provides no care.  United States v. Manamela, 612 F. App'x 151, 152 (3d Cir. 2015).

In Manamela, the Department of Human Services of the city of Philadelphia contracted

with a third party company, MultiEthnic Behavioral Health, Inc. ("MEBH"), owned by

Manamela, to provide a service whereby representatives of MEBH were to meet with certain

children identified as at risk of neglect, abuse or delinquency and monitor their health condition. Id. at 152-53.  Ultimately, it was discovered that MEBH was not performing the work it was charging for, and Manamela was charged with six counts of health care fraud in violation of 18 U.S.C. § 1347.  The Court had no trouble labeling the visitation and monitoring services MEBH provided as a medical benefit, item or service.  Id. at 151-53.

The facts of Manamela, are remarkably similar to the facts here, where Masood is accused of falsely billing for CDI medical coding services that were not delivered.  The Manamela court's decision upholding the a § 1347 conviction and its recognition of §24(b)'s broad definitions runs counter to many of defense's arguments to apply § 24(b) rigidly to only the most common fact pattern of a massive health insurer like Medicaid being falsely billed.

CDI medical coders need not be traditional health care professionals for their work to qualify as a benefit, item or service.  See United States v. Lucien, 347 F.3d 45, 51 (2d Cir. 2003) ("We cannot adopt [the] view that the statute applies only to health care professionals because such construction is obviously at odds with the language of 18 U.S.C. § 1347."  In fact, CDI medical coders are more directly linked to the health outcomes of patients than any of the examples described above.  They are necessary to ensure continuity of treatment across doctors, clarify diagnosis and capture all relevant clinical information to improve patient outcomes.  In short, they are part of the delivery of medical care.

### 2.    DHA and Walter Reed are Health Care Benefit Programs

The defense goes to great lengths to explain what it supposes Congress intended by 18 U.S.C. § 24(b)'s definition of "health care benefit program" and argue that the clear and unambiguous meaning of the statute limits the definition to, essentially, health insurers.  See ECF 344 at 15-16.

There is admittedly some linguistic oddness in describing Walter Reed, a hospital, as a "health care benefit program", or DHA, the umbrella organization that manages the Department of Defense's provision of health services, including hospitals and TRICARE as a "health care benefit program."  But it is perhaps more linguistically odd to describe a car insurance company as a "health care benefit program."  In United States v. Collins, 774 F.3d 256, 260 (5th Cir. 2014) the Fifth Circuit held that "[t]o the extent automobile insurers pay for medical treatment, they are health care benefit programs under the statute."[11]  An automotive insurance *company* in this case is a health care benefit program to the extent they provide a medical benefit, item or service by simply paying for those services.  It is no different to say that DHA, as the DoD's primary agency providing health care services, or Walter Reed which falls under DHA and actually entered into the CDI medical coding services contract, is a health care benefit program *to the extent they provide a medical benefit, item or service* by paying for those services (in this case, coding completed by CDI medical coding specialists).

The definition expressly applies to *individuals or entities* which, by the clear language of 18 U.S.C. § 24(b), can be health care benefit programs.  The definition is so broad that an *individual*—John Doe—can be a health care benefit program if he meets the statute's criteria.

As to just how broad the definition of health care benefit program is, and which way the plain language of the statute cuts, the Government agrees with the Third Circuit in *United States v. Manamela*:

> Section 24(b) begins its definition of "health care benefit program" with the phrase "*any* public or private plan or contract." 18 U.S.C. § 24(b).  That the word "any" precedes the phrase "public or private plan or contract" is of great import. The American Heritage Dictionary of the English Language defines the adjective "any" as "[o]ne, some, every, or all without specification," and "[e]xceeding

---

[11] The law is full of such oddities, such as an automobile oil filter that has been modified to suppress sound from a firearm being itself accurately defined as a "firearm" under the National Firearms Act, 18 U.S.C. 921.

> normal limits, as in size or duration." The American Heritage
> Dictionary of the English Language 81 (5th ed.2011). Webster's
> Third New International Dictionary defines "any" as, *inter alia,*
> "one indifferently out of more than two: one or some
> *indiscriminately of whatever kind,*" "all—used as a function word to
> indicate the maximum or whole of a number or quantity," and "a or
> some no matter how great or small—used as a function word to
> indicate what is considered despite its quantity or extent." Webster's
> Third New International Dictionary 97 (1966)

612 F. App'x 151, 155–56 (3d Cir. 2015) (emphasis in original).  Note that this definition

expressly applies to ***any individual or entity*** who is providing a medical benefit, item, or service

for which payment may be made under the plan or contract.  Any, as the <u>Manamela</u> court notes,

is quite an inclusive word.

      The <u>Manamela</u> court also provides a direct response to the argument that 18 U.S.C. §

24(b) requires that a public or private plan or contract be an insurance provider or entity funded

by an insurer: "If Congress had intended to limit § 24(b) to insurers, it certainly could have done

so." <u>Id.</u> at 155.  <u>See</u> <u>also</u> <u>United States v. Gelin</u>, 712 F.3d 612, 618 (1st Cir.2013) (reasoning that

the "statutory definition at issue is simple and broad"); <u>United States v. Lucien</u>, 347 F.3d 45, 50,

52 (2d Cir.2003) (relying on the word "any" in rejecting the defendant-appellant's argument that

§ 24(b) applied "only to health care professionals, and that the New York State no-fault

automobile insurance program [was] not a 'health care benefit program' within the meaning of

the statute").  The definition is so broad that the health care benefits program at issue could be

entirely fraudulent and still meet the definition.  <u>See</u> <u>United States v. Graf</u>, 610 F.3d 1148, 1167

(9th Cir. 2010) "[The fraudulent insurance company] meets the unambiguous statutory definition

of a health care benefit program, even though it was primarily a vehicle for major health care

fraud."

Defense argues the Court's ruling that DHA or Walter Reed are health care benefit programs under § 24(b) "would turn transform § 1347 into a statute that could be used to obtain a conviction for health care fraud based on any misrepresentation that causes a health care facility to pay for something less valuable than it believed it was receiving." ECF 334 at 17. This would only be true when those facilities are defrauded as it pertains to the provision of health care benefits, items, or services—which sounds exactly like what a health care fraud statute should prohibit. "The broad language of § 1347 shows that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct." United States v. Lucien, 347 F.3d 45, 51 (2d Cir. 2003).

Finally, the Defense cautions this Court from wading into uncharted waters by designating a health care facility as a health care benefit program. ECF 344 at 17-18. "Mr. Masood's counsel have not found a single opinion by any court in the nation that suggests, let alone decides, that a military health care facility such as Walter Reed is a "health care benefit program." Id. at 16.

The Government has found such a case – many of them. This is not a novel issue, and the Court would be on firm ground in agreeing with one decision after another stressing how broad the definitions in § 24(b) are. As one example, the Ninth Circuit in United States v. Morsette, 653 F. App'x 499, 502 (9th Cir. 2016) dealt with a charge under 18 U.S.C. § 669, which criminalizes knowingly and willfully embezzling, stealing, or otherwise without authority converting . . . the moneys, funds, securities, premiums, credits, property, or other assets of a *health care benefit program*" (emphasis added). That statute specifically uses the same § 24(b) definition as does § 1347.

In <u>Morsette</u>, the defendant was convicted after stealing from her employer, a healthcare facility called the Rocky Boy Health Board Clinic ["RBHB"].  The <u>Morsette</u> court began with the recitation that "the term health care benefit program ... includes any ... entity who is providing a medical benefit, item, or service for which payment may be made under a health plan or contract."  653 F. App'x 499, 502 (9th Cir. 2016) (internal quotations removed).  In rejecting appellant's arguments that RBHB was not a "health care benefit program" under § 24(b), the court stated: "[t]he parties do not contest that RBHB is a health clinic that provides medical treatment and receives insurance reimbursements and health plan payments. Under the statute's plain text, Section 669 applies to health clinics; thus, [the Appellant's] arguments are without merit. <u>Id.</u>

In any case where an individual was convicted of theft from a facility in violation of 18 U.S.C. § 669, there was a determination that the facility was a health care benefit program under § 24(b).  <u>See</u>, <u>e.g.</u>, <u>United States v. Tadios</u>, 822 F.3d 501, 503 (9th Cir. 2016) (affirming conviction under § 669 for misappropriating funds from a health care clinic); <u>United States v. Whited</u>, 311 F.3d 259, 263 (3d Cir. 2002) (chiropractic center in Pennsylvania is a health care benefit program or contract).

These cases and many more stressing the incredibly broad definition of § 24(b), cannot be read in harmony with defense's arguments.

Clearly when fraud under § 1347 is federally indicted it most often occurs when a large insurance program such as Medicaid is falsely billed for significant services not rendered.  This explains the comparative number of cases dealing with insurance plans as the health care benefit program rather than a hospital.  Based on the experience of Government counsel, theft from a hospital, clinic, or other facility would rarely be for enough money to justify federal prosecution.

However, as the <u>Manamela</u> court aptly noted: "If Congress had intended to limit § 24(b) to insurers, it certainly could have done so."  612 F. App'x 151, 155 (3d Cir. 2015).  It did not, and the Defendant bears the comparatively rare status of somebody who stole enough from a hospital to warrant a §1347 charge.

> **C.    Defense's Motion at ECF 334 Should Be Denied**

Walter Reed and its parent agency, DHA, are each an "entity who is providing a medical benefit, item, or service for which payment may be made under a health plan or contract", namely CDI medical coding services.  <u>Morsette</u> at 502.  All other issues raised by the defense about the adequacy of the indictment are meritless and have nevertheless been rendered moot by the Second Superseding Indictment.  The Defendant's motion should be denied.

## VII.    CONCLUSION

For all the foregoing reasons, the defense's motions to dismiss lack merit and the motions in ECF 330, 332, 333, and 334 should each be denied.

Respectfully submitted,

Erek L. Barron
United States Attorney

<u>/s/ Darren S. Gardner</u>
Darren S. Gardner
Ranganath Manthripragada
Assistant United States Attorneys
United States Attorney's Office
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770

41

**<u>CERTIFICATE OF SERVICE</u>**

I, Darren S. Gardner, certify that a copy of the foregoing was filed with the Clerk of the

Court using the CM/ECF system, which will send notice of such filing to all counsel of record, on

December 20, 2024.

<div style="margin-left:40%">

<u>/s/ *Darren S. Gardner*</u>
Darren S. Gardner
Assistant United States Attorney

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. PX-22-091** |
| | * | |
| **AKBAR MASOOD,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

## <u>ORDER</u>

For the reasons set forth in the Government's Consolidated Opposition to Defense Motions to Dismiss, the defense's motions to dismiss in ECF numbers 330, 332, 333 and 334 are denied.

Dated:

_____
Honorable Paula Xinis
United States District Court Judge

43