### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
Southern Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 8:22cr91-PX |
| | ) | |
| AKBAR MASOOD | ) | |
| | ) | |
| | ) | |

### AKBAR MASOOD'S REPLY IN SUPPPORT OF HIS MOTION TO DISMISS FOR GOVERNMENT'S EFFECTIVE DESTRUCTION OF INFUSED SOLUTIONS SERVER

The Government's Response highlights its refusal to acknowledge the weaknesses in its case against Mr. Masood but fails to refute the need for dismissal based on its destruction of the Infused Server. These weaknesses include the extent to which its key witnesses—Infused's President Marlon Johnson and Infused's Director of Operations Barbara Rosas—could be impeached if it had fulfilled its duty to obtain all "exculpatory evidence gathered by those acting on [its] behalf." *See United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010).

The issue this Motion raises is not whether Johnson was a suspect or a whistleblower, but rather whether the case against Mr. Masood rests on information from Johnson that would be more obviously unreliable if the government had not destroyed the server. The Government's discovery includes substantial information that both undermines Johnson's statements and points to additional information on the server that would have allowed Mr. Masood to effectively present his defense.

As discussed further below, the Infused Server contained information impeaching Johnson's statements, more fully revealing the reasons for his biases against Mr. Masood, and exculpating Mr. Masood. The destruction of the server has deprived Mr. Masood of his rights to

due process, to access evidence in his favor, and to mount his defense. He has no other means to obtain the information on the server. The case against him should therefore be dismissed.

Should the Government dispute the factual representations below, Mr. Masood seeks an evidentiary hearing on the Motion to resolve three factual disputes. The first is whether the Government constructively possessed the server—a highly fact-specific analysis in which the Court must consider the nature of the Government's interactions with Barbara Rosas. The second is whether the Government knew about or was on notice of the exculpatory evidence on the server. The third is whether such evidence was on the server, a fact easily proven through testimony by witnesses like Johnson. To the extent the Court finds the current record insufficient to resolve these factual disputes, Mr. Masood seeks an evidentiary hearing on the Motion.

## <u>ARGUMENT</u>

### I.      The Infused Server Contained at Least Five Categories of Evidence Favorable to Mr. Masood.

The Infused server was the central repository of all business records and communications of Infused Solutions, the prime contractor on the Walter Reed contract at issue in this case. It contained all Infused email accounts, contracts, human resources materials, payroll and tax documents, business plans, contract proposals, banking information, and company financials.

The HMA coding work alleged to have been fraudulently billed for was conducted as an independent contract through Infused Solutions. There is no allegation or evidence that HMA ever contracted directly with Walter Reed. All records of persons who worked at Walter Reed, including payroll, invoices, background checks, and IT credentialing of contractors, had to pass through Infused employees' email accounts, which were kept on the server along with their attachments. HMA could not have done what the Government alleges it did without working

through Infused Solutions, and information regarding any such work or communication necessarily existed on the Infused Server.

As the Government investigated the case against Masood and his alleged coconspirators, its agents made requests to Johnson and Rosas. Many documents the Government produced in discovery, including invoices, contracts, emails, and numerous other categories of information, came from the Infused Server—provided selectively, indeed specifically cherry-picked per the Government's requests—by Rosas, Johnson, or other Infused personnel.

Significantly, the Government admits that Johnson's vendetta against Mr. Masood is "a theory it has not even considered." (ECF 346 at 31.) Further, it refuses to acknowledge that the Infused server contained evidence favorable to Mr. Masood, yet the Government's productions are replete with examples of selective investigation and reliance on uncorroborated reports by Johnson and Rosas, many of which defy logic or common sense. From Johnson's first report to the Loudoun County Sheriff's Office ("LCSO") onward, his allegations against Mr. Masood were verifiably false and based in unveiled personal bias—of which the Government was aware given the past and ongoing business disputes and litigation between Masood and Johnson. *See* Exhibit 1 – Aug. 29, 2019 ALERTS entry of SA Hartsoe.

Despite the Government—including SA Kimrey— having spent several years working on "the investigation that [it] had done to create evidence" (Exhibit 2, 12/19/24 Tr. of Kimrey's 3d GJ Test. at 5:15-19), it accepted Johnson's story at face value. But the Government cannot plausibly argue it did not know the Infused server contained evidence that was apparently exculpatory for Mr. Masood just because it failed to realize its key witness was less than truthful or that Johnson and Infused were profiting from the arrangement with HMA.

II.    **The Infused server contained apparently exculpatory evidence.**

In its Response, the Government argues Mr. Masood has made no proffer of exculpatory or impeachment evidence on the Infused Server. In reply, Mr. Masood proffers—with support from existing discovery—the following categories of information the Infused Server would show. Many of these categories are crucial to Mr. Masood's defense as impeachment of key prosecution witnesses under *Giglio v. United States*, 405 U.S. 150 (1972). Others are important as showing prosecution witness bias under *Davis v. Alaska*, 415 U.S. 308 (1974). And others are independently favorable to Mr. Masood both at trial and any sentencing under *Brady*. To the extent the Government disputes any of the factual recitations below, Mr. Masood requests an evidentiary hearing to resolve the issues.

1) Johnson's statements that he knew nothing about HMA before December 2017 are contradicted by an email in discovery, and further such information was on the server.

Johnson's statements to law enforcement are impeachable for many reasons, and Mr. Masood is entitled to evidence supporting Johnson's impeachment under *Giglio*. Throughout the investigation, Johnson asserted to the Government that he was unaware of Infused's contract with HMA until December 2017. Information on the Infused server—including emails, business reports, contracts, and organizational documents—directly contradicts these assertions.

Both in his initial interview with the LCSO and in subsequent interviews with Army CID, Johnson reported that he first learned of HMA's subcontract with Infused through a tax document he saw in December of 2017. *See* Exhibit 1 to ECF 346 ("Back in December of 2017, via a tax document, Mr. Johnson discovered a sub-contract with HMA Solutions."); *see also* Interview Recording of Johnson, Exhibit 1 to ECF 315.

But an email in the Government's discovery, from Infused accountant Patrick Clezie to Infused's three shareholders, on August 3, 2017, reveals Johnson was not only aware HMA was

a vendor but was informed that HMA's work was yielding nearly four times its projected profit margin to Infused; and Clezie reported these funds were needed for Infused to meet its operating expenses with the remainder split among general partners, including Johnson. *See* Exhibit 3 – Aug. 3, 2017 Email from Clezie to Johnson, Faustin, Masood.

The Government only provided Exhibit 3 in discovery because it was in Mr. Masood's email account (one of the three it chose to obtain from Infused, out of many, including Johnson's Rosa's, and Jackson's, it destroyed), as he was one of the addressees. Numerous other examples of Johnson's knowledge of HMA exist on the Infused server, impeaching his statements to law enforcement. While Mr. Masood has Exhibit 3, the content is an email to Johnson, not from him, so to the extent he were to deny having read it or known its contents, the Government could argue it is insufficient on its own as impeachment. To effectively impeach Johnson, Mr. Masood would need the additional evidence of Johnson's knowledge contained on the Infused Server. For example, Johnson's response is not in discovery, nor are the numerous other emails between Johnson, Rosas, Clezie, and other Infused employees on which Mr. Masood was not copied but which would certainly be found on the server and would show Johnson's knowledge of HMA prior to December 2017.

Johnson's knowledge of HMA was further available on the Infused server in the form of hundreds of email communications between HMA and Infused personnel, including Rosas and Gillespie. Discovery includes Gillespie's Infused emails, many of which are between her and Peebles for HMA. Some of those emails include Rosas, but her own email account would show numerous other HMA contacts surrounding the payment of invoices, emails on which Mr. Masood was not copied, and which are thus not contained in Government discovery.

By failing to maintain the complete contents of the Infused server and not providing email accounts other than those for Peebles, Mr. Masood, and Kristine Gillespie, the Government has deprived Mr. Masood of evidence needed to confront and impeach witnesses against him. "'When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility'" violates the Constitution. *Long v. Hooks*, 972 F.3d 442, 462 (4th Cir. 2020) (quoting *Giglio*, 405 U.S. at 154). As key prosecution witnesses, Johnson's and Rosas's credibility could not be more central to the Government's case.

   2) <u>Rosas was central to Infused's operations, and evidence on the server would show her involvement in actions attributed to Mr. Masood.</u>

Discovery shows that Rosas controlled and managed Infused's financial operations, including invoicing, payroll, tax documents, and ensuring new hires had proper tax documents completed.[1] Rosas also depended financially on Infused's profitability, as her husband Johnson was a 40% shareholder and she received a significant salary from Infused. Materials on the server would show she managed payroll, prepared and submitted invoices, issued bills to and paid contractors, and managed Infused's cash flow. She and Johnson were the sole signatories on Infused's bank accounts, had sole access to Infused's online banking, and were the contacts for Infused's credit lines. Rosas supervised in-house accountant/bookkeeper Salman Ejaz, who assisted her in payroll processing and invoice preparation, and Infused's outside accountant reported to Rosas directly. Rosas had administrative and primary access to Infused's timesheets, payroll, and the government invoice submission system, Wide Area Workflow ("WAWF"). Johnson and Rosas were the only two persons at Infused with access to WAWF, the portal controlling invoicing on government contracts. See Exhibit 4, at 3 and 8 (WAWF access

---

[1] For reference, Rosas's name appears over 79,000 times in discovery documents, including invoices, time sheets, and emails.

snapshots showing Johnson and Rosas as government contacts). In short, no financial, HR, payroll, or invoice transactions at Infused could have been done without Rosas's input and Johnson's knowledge, and proof of these facts existed on the server as emails, documents, and access protocols.

Access to the Infused Server would further show that Rosas reviewed and authorized all timesheets for each pay period for the Walter Reed contract. She approved payroll for processing payments to all CDIs, W2 employees, the four indicted contractors, and HMA, all of whom were 1099 independent contractors and would have had to provide W-9s to Rosas before their payments could have been made.

Likewise, Rosas reviewed and authorized biweekly payments to all contractors on the Walter Reed contract. Rosas's claims that she did not know about HMA are unbelievable and would be easily refuted by information contained in emails and other documents on the Infused server if the Government had not destroyed it. But the Government elected not to obtain her emails, except those captured in the email accounts of Gillespie, Peebles, and Masood.

   3) <u>Evidence on the server contradicts the Government claims it does not know Johnson and Infused profited from the Walter Reed contract and HMA's support.</u>

The Government concedes that Johnson has never been considered a suspect in the fraud case involving his company's defrauding Walter Reed of roughly $2.9M, by the Government's account. *See* Exhibit 5 – DOJ PowerPoint Presentation, at 9. Johnson's company Infused, not HMA, had the annually awarded $6.7M contract with Walter Reed. *Id.* at 3. All funds earned were paid by the Government to Infused, not to HMA. Infused then paid HMA for work Infused billed to Walter Reed on the subcontract, and earned a profit by the margin by which Infused billed HMA work at a rate lower than Infused's contract with Walter Reed provided. *See, e.g.,*

Exhibit 6[2] – Ghost Coders Analysis (showing the difference between what was billed to Infused and what Infused billed to the Government and revealing substantial profit margins that totaled roughly $1M profit in two years).

The Government asserts that it is unaware Johnson profited from the HMA subcontract, and that the exhibits attached to Mr. Masood's Motion do not say what he presents them as saying. But the Government's own discovery reveals clearly that Infused, of which Johnson was a 40% shareholder, profited greatly from the HMA work on the Walter Reed contract. Not only did HMA complete work to enable Infused to maintain its performance on the contract, but Infused marked up the bills from what HMA charged and made profit on the margin. As supported by Exhibit 3, Infused's margin on HMA's work far exceeded its standard margin.

As to the exhibits in support of Mr. Masood's Motion, the Government inexplicably asserts that ECF 333 Exhibit 4, the ALERTS entry, is "entirely unrelated to the fraud that […] Masood is accused of." The entry shows that Russ had recognized that Infused had been double-billing coding encounters *on the same contract for which Mr. Masood is charged*. As the Government acknowledges, SA Kimrey was made aware that Infused was billing Walter Reed for encounters coded by Infused and government employees who were being paid hourly or by salary to do the same work. By billing their per-encounter work while they were being paid hourly or by salary, Infused was double-billing Walter Reed and turning a substantial profit on it in addition to the margins it was making by billing HMA work at a rate lower than what Walter Reed was paying. *See* Exhibit 6. As shown in Exhibit 6, this double-billing persisted for the

---

[2] Exhibit 6 is a pdf converted for filing from an excel file in discovery. An electronic version of the Excel spreadsheet can be provided to the Court via email or the portal to allow the Court to more easily review it.

entire period of the contract and thus cannot be anomalous as the Government claims Russ told them.

The Government cannot credibly claim this was unrelated to the crimes for which Mr. Masood is charged as it was part and parcel of the seemingly incestuous nature of Infused's contract with Walter Reed. Furthermore, the Government cannot reliably claim it did not know Johnson and Infused were directly profiting from the HMA subcontract with Infused, evidence of which is confirmable from materials on the server and supported by documents in discovery, including Johnson's emails and Infused financial records.

4) <u>Evidence on the server would refute Johnson's representation that Mr. Masood, not Johnson himself, was the project manager for the Walter Reed contract</u>.

Johnson's credibility is also suspect given his misrepresentations regarding his role on the Walter Reed contract. In multiple statements, Johnson attempted to shift authority for the Walter Reed contract to Mr. Masood, saying Mr. Masood was the project manager. *See* Exhibit 7 – Oct. 13, 2018 AIR of SA Hartsoe. But the Government's own discovery, including its proposed trial exhibit 41B, shows Johnson himself was listed as the project manager on the Walter Reed contract. Exhibit 8 – Government Ex. 41B (Infused 9/30/2017 Invoice). While the invoice shows Johnson listed as project manager, it does not have his signature, so its authenticity could be denied. Mr. Masood would have had support for its authenticity from the server.

5) <u>Johnson's statement that he had repeatedly inquired about HMA's ownership and management would be dispelled by its nonexistence on the Infused Server</u>.

Johnson advised law enforcement from his initial interview that he had repeatedly asked Mr. Masood to provide him information about HMA Solutions. *See* Exhibit 1 to Government Response. But without Johnson's emails or the Infused server, Mr. Masood is unable to demonstrate that a search of those emails would reveal no such communications inquiring about HMA. The server would likewise contradict Johnson's assertion to law enforcement that he had

inquired of Peebles about HMA and the fact that her phone number was listed as the company

number as he had claimed in his initial report to LCSO in 2018. A full search of the server would

allow Mr. Masood to directly confront Johnson with the lack of evidence of his inquiries and

would significantly undermine the Government's investigation and theory of the case.

**III.    Insofar as the evidence on the Infused server was potentially rather than apparently exculpatory, the Government acted in bad faith by destroying it.**

The Government violates due process when it fails to preserve apparently exculpatory

evidence, irrespective of good or bad faith, when a defendant is unable to obtain comparable

evidence from another source. *United States v. Johnson*, 996 F.3d 200, 206, 216 (4th Cir. 2021)

(citing *California v. Trombetta*, 467 U.S. 479 (1984)). The Government wrongly asserts that

destroying "apparently exculpatory" evidence "only" violates due process "if the evidence was

destroyed in bad faith." (ECF 346, Gov't Consol. Opp'n at 24). But this assertion is contradicted

by both *Trombetta* and *Johnson*. While the Government cites *Arizona v. Youngblood*, 488 U.S.

51 (1988), its reliance is mistaken in that *Youngblood* addresses evidence that "can only be said

to be 'potentially useful.'" *Johnson*, 996 F.3d at 206 (quoting *Youngblood*, 488 U.S. at 57-58).

Additional cases cited by the Government in its Response are likewise misconstrued.[3]

The Government's Response argues that Mr. Masood has not asserted bad faith so he

cannot prevail unless the evidence on the server is apparently exculpatory. Mr. Masood has

shown the server evidence is apparently exculpatory, but even if the Court were to hold that it is

only potentially exculpatory, he should prevail. The Infused server is so central to the material

issues of this case and to Mr. Masood's ability to present a defense, that its destruction "negate[s]

any negligent or innocent explanation." *See Burgess v. Balt. Police Dep't*, 300 F. Supp. 3d 696,

_____

[3] A more complete analysis of the potentially/apparently exculpatory and good/bad faith case law is included in Mr. Masood's Reply in Support of Akbar Masood's Motion to Dismiss Based on the Government's Destruction of Evidence.

705 (D. Md. 2018) (finding an agent's failure to investigate an alternative suspect based on an eyewitness account amounted to intentional deprivation of material exculpatory evidence). As in *Burgess*, the Government's failure to gather and preserve exculpatory evidence from the Infused server shows bad faith. Thus, even if the Court finds the server evidence only potentially exculpatory, the Motion should be granted.

**IV.    The Government's argument that it was not in constructive possession of the Infused Server is without support and belied by the investigative record.**

"[T]o comply with *Brady*, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Horner v. Nines*, 995 F.3d 185, 204 (4th Cir. 2021) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *see also United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010). In determining whether the prosecution has knowledge or possession of exculpatory evidence, courts look to whether the imputation would impose "unacceptable burdens on prosecutors and the police." *Id*. In *Robinson*, the Fourth Circuit found the prosecution was not obliged to learn of every instance of unrelated misconduct of every officer on the investigation team. *Id*. But the *Robinson* court reasoned that it is completely reasonable that prosecutors must "inquire about whether police have turned up exculpatory or impeachment evidence during their investigation." *Id.* But it is another thing entirely to require that prosecutors "conduct disciplinary inquiries into the general conduct of every officer working the case." Mr. Masood asserts his right to due process only insofar as the prosecution was obliged to preserve and disclose apparently exculpatory evidence to which it had open and ongoing access through Johnson and Rosas.

But despite the Government's arguments, whether Johnson and Rosas were whistleblowers, witnesses, or suspects is irrelevant to the Government's contention that it never had constructive possession of the server. Discovery is replete with examples of Infused

employees' compliance with investigator requests for documents from the server. The entries in the ALERTS database show that government agents made at least 22 requests for documents from the server through Rosas alone (*see* Exhibit 8 to ECF 333), and Johnson himself produced many additional documents from the server during his various contacts with law enforcement. Rosas and Johnson complied every single time the Government asked either of them for documents from the server. Johnson and Rosas were thus agents of the Government's investigation, searching for documents on the server upon request and providing them without question, and the prosecution is properly imputed with knowledge and possession of apparently exculpatory evidence contained therein.

## V.    Mr. Masood requests an evidentiary hearing on any factual disputes.

Should the Government persist in disputing that the server contained exculpatory information, Mr. Masood requests an evidentiary hearing. An evidentiary hearing is appropriate to resolve any material dispute of material fact that would entitle Mr. Masood to relief. *See*, *e.g.*, *United States v. Garza*, 435 F.3d 73 (1st Cir. 2006) (reflecting that the court held an evidentiary hearing to develop facts as to defendant's evidence destruction claim); *United States v. Murray*, 484 F. Supp. 3d 334, 343 n.65 (E.D. La. 2020) (relying on evidence from evidentiary hearing to rule on evidence destruction motion); *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (motion to dismiss indictment); *United States v. Borja-Casillas*, No. 5:15-CR-119-BO, 2017 WL 2256625, at *1 n.1(E.D.N.C. May 22, 2017) (denying hearing on motion to dismiss because material facts not in dispute).

Respectfully Submitted,

By: /s/ *Daniel H. Goldman*

Daniel Goldman, Md. Bar No. 2202010033
LAW OFFICE OF DANIEL GOLDMAN, PLLC

421 King Street, Suite 505
Alexandria, Virginia 22314
(202) 677-5709 (phone)
(833) 523-2310 (fax)
dan@dangoldmanlaw.com


Eugene Gorokhov VSB # 73582
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com


Joshua Greenberg BAR #
THE JOSH GREENBERG LAW FIRM
1717 K Street, NW, Suite 900
Washington, D.C. 20006
(202) 422-0809 (phone)
josh@joshgreenberglawfirm.com


I hereby certify that the above Motion was filed electronically via CM/ECF, which will cause a copy to be served on all parties.


By: /s/ *Daniel H. Goldman*
Daniel H. Goldman, Md. Bar # 2202010033
*Counsel for Akbar Masood*